UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case |
| | : | |
| MOTORS LIQUIDATION COMPANY, f/k/a GENERAL | : | Case No. 09-50026 (REG) |
| MOTORS CORPORATION, *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF MOTORS LIQUIDATION COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adversary Proceeding |
| against | : | |
| | : | Case No. 09-00504 (REG) |
| JPMORGAN CHASE BANK, N.A., *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

DECISION ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT

APPEARANCES:

DICKSTEIN SHAPIRO LLP
*Counsel for the Official Committee of*
*Unsecured Creditors of Motors Liquidation Company*
1633 Broadway
New York, New York 10019-6708
By:     Barry N. Seidel, Esq.
        Eric B. Fisher, Esq. (argued)
        Katie L. Cooperman, Esq.

KELLEY DRYE & WARREN LLP
*Counsel for Defendant JPMorgan Chase Bank, N.A.*
101 Park Avenue
New York, New York 10178
By:     John M. Callagy, Esq. (argued)
        Nicholas J. Panarella, Esq.
        Martin A. Krolewski, Esq.

Table of Contents

Introduction ........................................................................................................................... 1
Facts ...................................................................................................................................... 6
   A. Synthetic Lease Origination ........................................................................................ 6
   B. Term Loan Origination .............................................................................................. 7
   C. Synthetic Lease Termination ...................................................................................... 8
      1. The Synthetic Lease Termination Agreement ........................................................ 9
      2. The Synthetic Lease Closing Checklist ................................................................ 12
      3. The Unrelated UCC-3 ........................................................................................ 14
      4. The Synthetic Lease Escrow Agreement ............................................................. 16
      5. The Synthetic Lease Transaction Payoff ............................................................. 20
      6. GM's Understanding .......................................................................................... 20
   D. Subsequent Events ................................................................................................... 21
Discussion ........................................................................................................................... 22
I.  Summary Judgment Standards ...................................................................................... 22
II.  Choice of Law ............................................................................................................. 23
III.  Effectiveness of the Unrelated UCC-3 ....................................................................... 24
   A.  The Requirement for Authorization ......................................................................... 26
   B.  Was Authorization Granted? .................................................................................... 30
      1.  Actual Authority ............................................................................................... 31
      2. Apparent Authority ........................................................................................... 53
      3. Ratification ....................................................................................................... 55
   C.  The Committee's Other Arguments .......................................................................... 57
      1.    Implied Authority ............................................................................................ 57
      2.    "UCC Filings that Mistakenly Terminate a Security Interest Are Legally Effective." 59
IV.  Certification to Circuit ................................................................................................ 72
Conclusion .......................................................................................................................... 74

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 11 case of Motors

Liquidation Company, formerly known as General Motors Corporation ("**GM**"), plaintiff

Official Committee of Unsecured Creditors (the "**Committee**")[1] seeks a determination that the

principal lien securing a syndicated $1.5 billion term loan (the "**Term Loan**") that had been

made to GM in November 2006 was terminated in October 2008, before the filing of GM's

chapter 11 case—thereby making most of the $1.5 billion in indebtedness under the Term Loan

unsecured.  The defendants are the syndicate members who together made the Term Loan (the

"**Lenders**") and JPMorgan Chase Bank, N.A. ("**JPMorgan**"), the agent under the facility.[2]

The action presents issues as to Uniform Commercial Code ("**UCC**") filings that are

commonly used in secured financings:  a UCC-1 initial financing statement ("**UCC-1**"), with

which a security interest can be perfected, and a UCC-3 financing statement amendment

("**UCC-3**"), with which, among other things,[3] the effectiveness of an earlier UCC-1 may be

---

[1]    When GM's Plan of Reorganization (the "**Plan**") was confirmed, after this adversary proceeding was
commenced, the Committee's right to pursue this litigation devolved to one of several trusts created under
the Plan—the "Avoidance Action Trust."  For simplicity, the Court continues to refer to the plaintiff here as
the Committee.

While the Committee continues as plaintiff, there is a controversy, not yet resolved, as to the rights to any
proceeds of this litigation.  Although the United States Treasury ("**Treasury**") disclaimed a lien on the
litigation proceeds when it extended its DIP financing, Treasury later contended that it could nevertheless
reach those proceeds ahead of GM's unsecured creditors by reason of Treasury's rights to a "superpriority"
claim.  This Court's determination in favor of the Committee as to that contention, on cross-motions for
summary judgment in a separate adversary proceeding (brought by the Committee to address unsecured
creditors' tax needs at the time, and to avoid prosecuting an action that if successful but benefitting
someone else would be contrary to unsecured creditor interests), was later vacated on ripeness grounds by a
judge of the district court.  *See Official Comm. of Unsecured Creditors v. U.S. Dept. of the Treasury (In re
Motors Liquidation Co.*), 460 B.R. 603 (Bankr. S.D.N.Y. 2011), *vacated on ripeness grounds*, 475 B.R.
347 (S.D.N.Y. 2012).  But unless this Court's determinations with respect to the present controversy,
discussed below, are later reversed, neither Treasury nor GM's unsecured creditors will have litigation
proceeds to claim, and that controversy will now turn out to be moot.

[2]    Appearances by the Lenders in this adversary proceeding were deferred while threshold issues, addressed
in this decision, were addressed.

[3]    Other things can include the continuation of an earlier initial financing statement, the assignment of a
security interest, or the deletion of identified collateral.  But one of the boxes that can be checked on a

-1-

brought to an end.  Here, in connection with the payoff of a GM "synthetic lease" (the

"**Synthetic Lease**"), which was one-tenth of the size of the Term Loan and wholly unrelated to

it,[4] the batch of several UCC-3s to be filed to terminate liens on Synthetic Lease collateral (and

which thereafter were filed) mistakenly included one UCC-3 (the "**Unrelated UCC-3**") which

would terminate a UCC-1—referenced only by its 8-digit filing number—that did not have any

connection to the Synthetic Lease.[5]  The UCC-1 was instead the principal UCC-1 securing the

Term Loan (the "**Main Term Loan UCC-1**").[6]

Without dispute, all of GM and its counsel (who drafted and caused to be filed the

Unrelated UCC-3) and JPMorgan and its counsel (who were provided draft documents before the

Unrelated UCC-3 was filed) were aware of the UCC-1 *filing numbers* shown on the various draft

UCC-3s in connection with the Synthetic Lease payoff (including the Unrelated UCC-3).  But

none were aware of their potential significance.  None of the counsel on the Synthetic Lease

---

UCC-3 (Box 2, "Termination") can provide for the effectiveness of an initial financing statement to be wholly brought to an end.  When UCC-3 filings so provide, they are normally referred to as "termination statements."  *See* n.72 below.

[4]  Neither the terms of the Synthetic Lease, nor the nature of synthetic leases generally, is relevant to the controversy here—except insofar as it is important to recognize, and agreed by the parties, that the Synthetic Lease financing was wholly unrelated to the Term Loan, and that the only thing they had in common was that UCC-1s were filed with respect to each.

By way of background only, a synthetic lease is a financing transaction under which an asset (most commonly real property) is acquired not by its user but a by a separate entity (often a special purpose vehicle) which then leases the asset to the ultimate user.  A synthetic lease has been described as:

> A lease which is arranged so that it is not shown as a liability on a company's balance sheet but as an expense on the income statement.  The item or asset being leased is owned by a special purpose vehicle (SPV) which then leases it to the company.  The SPV is usually owned by the company.

Reuters Financial Glossary, available at http://glossary.reuters.com/index.php?title=Synthetic_Lease (last viewed 2/28/2013).

[5]  An image of the Unrelated UCC-3 is attached to this decision as Appendix A.

[6]  The Main Term Loan UCC-1 was not the only initial financing statement that had been filed when the Term Loan was put in place.  The Term Loan documentation also included UCC-1 filings relating to fixtures, and one relating to assets of one-time GM subsidiary, Saturn.  But the Main Term Loan UCC-1, which covered, among other things, all of the equipment and fixtures at 42 GM facilities, was by far the most important of them.

financing, or the counsel on the Term Loan (which at least for JPMorgan was different), or their respective clients, knew that the UCC-1 filing number shown on the Unrelated UCC-3 was actually that of a UCC-1 for the Term Loan.  And without dispute, neither the borrower nor the lenders on the Synthetic Lease financing, nor the borrower nor the Lenders on the Term Loan, intended to affect the Term Loan in any way.

But because the UCC-1 whose filing number was referenced in the Unrelated UCC-3 related to the Term Loan, and not the Synthetic Lease, the Court must decide, notwithstanding the absence of anyone's intention to affect the Term Loan, whether the perfection of the principal lien securing the Term Loan nevertheless came to an end.

Both sides move for summary judgment, in whole or in part.[7]  Arguing that UCC filings are effective even when mistaken (and that a secured party's acquiescence in the filing of a UCC-3 making reference to a specified initial financing statement by file number alone, irrespective of intent, is sufficient to constitute any necessary authority), the Committee moves for summary judgment in part,[8] seeking a ruling that the Unrelated UCC-3, notwithstanding the parties' intentions, brought the Main Term Loan UCC-1 to an end.  JPMorgan moves for summary judgment in full, seeking a ruling to the opposite effect—that JPMorgan's authorization to terminate the *Main Term Loan* UCC-1 was required under the UCC; that JPMorgan did not provide the required authorization; and thus that the Main Term Loan UCC-1, and JPMorgan's resulting lien, remained in place.

---

[7]     References to the briefs on the Committee's motion appear here as Comm. Partial SJ Br.__; JPMorgan Partial SJ Opp.__; and Comm. Partial SJ Reply __ (ECF ## 26, 48, and 55, respectively).  References to the briefs on JPMorgan's motion appear here as JPMorgan SJ Br.__; Comm. SJ Opp.__; and JPMorgan SJ Reply __ (ECF ## 29, 45, and 56, respectively).

[8]     The Committee moves for partial summary judgment only, recognizing that other UCC-1s with respect to the Term Loan remained in place, covering some other collateral as to which JPMorgan and the Lenders would remain secured.  But while the value of the other collateral would need to be determined at a later time, the consequences of invalidation of the Main Term Loan UCC-1 are enormous, and the Committee's desire to secure even partial summary judgment under the present circumstances is understandable.

\* \* \*

It is initially tempting to regard the consequences of all UCC filings the same and as absolute (or, as one court put it, though under an earlier statutory regime, "dramatic and final"),[9] or to speak, in general terms, of parties living with their mistakes—with the result that JPMorgan and the Lenders would suffer the consequences of this extraordinary set of events.  But having focused on the changes in UCC Article 9 that were put in place in 2001, and the more thoughtful caselaw and commentary, the Court believes that it cannot view the matter in such simplistic terms.  The issues instead turn on the UCC's express requirement for authorization to terminate an initial financing statement, and on what is required to constitute the requisite authorization. Under the present Article 9, a UCC termination statement is not necessarily "dramatic and final." And all mistakes are not the same.  That a termination statement filing was made is only the start—and not the end—of the judicial inquiry.

Under Article 9 of the UCC as it was amended in 2001, the termination of a UCC-1 is ineffective unless it has been authorized.  The issue here presented—which the UCC then leaves to caselaw—is what is required to constitute "authorization" for the filing of a termination statement when someone other than the secured party files the termination statement on the secured party's behalf.[10]

---

[9]     *Crestar Bank v. Neal (In re Kitchin Equip. Co. of Virginia, Inc.),* 960 F.2d 1242, 1247 (4th Cir. 1992) ("**Kitchin Equipment**").  While the holding in *Kitchin Equipment* (a 2-1 decision) was not necessarily incorrect (since *Kitchin Equipment* involved action by the secured creditor itself, and did not involve a secured creditor's authorization of acts by another), *Kitchin Equipment*'s very general statements can no longer be regarded as applicable to situations requiring secured creditor authorization after the 2001 amendments to UCC Article 9.  Similarly, statements in later caselaw that quoted *Kitchin Equipment* without considering the effect of the 2001 amendments are of questionable reliability.  *See* discussion beginning at page 60 below.

[10]    In much of its argument, the Committee states the issue differently—speaking in terms of the effects of mistakes and contending that UCC filings that mistakenly terminate security interests are legally effective. *See* Comm. Partial SJ Br. 11-14; Comm. SJ Opp. 4; Comm. Partial SJ Reply 15-16.  For reasons addressed below, the Court believes that under the UCC as amended in 2001, that misstates the issue.

-4-

As principles underlying the determination of the motions here, the Court concludes, for reasons set forth below:

> (1) When an agent acts on behalf of a secured lender principal to terminate an initial financing statement with respect to a financing, to be effective the termination must be *authorized* by the secured lender principal; and

> (2) to determine whether authorization has been granted, the court must consider indicia identified in non-UCC agency law—including (importantly here) that to be so authorized, the agent must believe (and though the distinction does not matter under the facts here, *reasonably* believe) that the principal intended for the agent to terminate the initial financing statement for that particular financing.

A matching of file numbers by itself is not enough when other indicia lead to a contrary conclusion. And when the agent *knows* that the secured creditor principal does not intend to bring an initial financing statement to an end (by reason of one or more of the documents that embody the authorization, or by other means), and the agent itself believes that it was not so authorized, the requisite authorization cannot be found.

Applying those principles to the undisputed facts here, the lack of the requisite belief on the part of GM that it was authorized to terminate the Main Term Loan UCC-1 is ultimately conclusive—though the remaining indicia lead to the same conclusion. The undisputed facts here (including, most significantly, the statements in the document the parties used to embody the nature and scope of JPMorgan's authorization, and the consistent testimony of all of the personnel acting for JPMorgan and GM) conclusively establish that JPMorgan intended to grant, and granted, authority to GM to terminate UCC-1s only with respect to the Synthetic Lease. As importantly or more so, this was GM's belief as well. While it is undisputed that JPMorgan

-5-

knew in advance of GM's counsel's intent to file a UCC-3 which showed the "Initial Financing

Statement File #" of a UCC-1 that in fact was the initial financing statement on the Term Loan

(and JPMorgan at least arguably consented to the filing), in the absence of belief by GM that

actions to terminate the Main Term Loan UCC-1 were authorized, the Court cannot find that

JPMorgan authorized the termination of the initial financing statement for that unrelated facility.

Accordingly, JPMorgan's motion for summary judgment must be granted, and the

Committee's motion for partial summary judgment must be denied.  The bases for the Court's

decision follow.

Facts[11]

Though the parties advance diametrically opposed legal conclusions, the material facts

are not in dispute.[12]

*A. Synthetic Lease Origination*

In October 2001, GM entered into the Synthetic Lease, by which GM obtained up to

approximately $300 million in financing from a syndicate of financial institutions.  The proceeds

were used for the acquisition of (and construction on) several pieces of real estate.  The Synthetic

Lease was documented by, among other things, a Participation Agreement dated as of October

31, 2001 (the "**Participation Agreement**").[13]

---

[11]    To avoid further lengthening this decision, record citations are limited to quotations and the most
significant matters.  The parties' very detailed and often very technical presentations of the facts in their
affidavits and Rule 7056-1 Statements have been compressed and restated to more clearly tell the story.

[12]    Being mindful of the Second Circuit's admonitions that summary judgment should be awarded sparingly
when matters involving state of mind are involved, *see, e.g.*, *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.
1984), the Court considered whether it should deny summary judgment in favor of each side for that
reason.  Neither side contended that such was necessary or even appropriate here, and ultimately the Court
agrees.  Here, there is no issue as to the principal's and agent's states of mind.  The beliefs of all of the
participants involved on behalf of both sides to the transaction at the time—each of JPMorgan and GM—
were confirmed by affidavit, deposition testimony, or both.  There was nothing in the record to support a
contrary conclusion.

[13]    Parties to the Participation Agreement were GM, as Lessee (and Construction Agent); Auto Facilities Real
Estate Trust 2001-1 (the "**Trust**"), as Lessor; Wilmington Trust Company ("**Wilmington Trust**"), as

GM's obligations under the Synthetic Lease were secured by liens on an original 12 pieces of real estate (the "**Properties**") identified in the Synthetic Lease documentation. To perfect security interests in the Properties, UCC-1s were filed in the counties in which such Properties were located. UCC-1s were also filed with the Delaware Secretary of State.

JPMorgan was one of the backup facility banks, and, as noted (and more importantly for the purposes of this controversy), the administrative agent for the Synthetic Lease. JPMorgan's Richard W. Duker ("**Duker**") acted on behalf of JPMorgan with respect to it.

In connection with the Synthetic Lease, GM was represented by the law firm of Mayer Brown LLP ("**Mayer Brown**"), and JPMorgan was represented by the law firm of Simpson Thacher & Bartlett LLP ("**Simpson Thacher**").

*B. Term Loan Origination*

About five years later, in November 2006, GM and its then-subsidiary Saturn Corporation ("**Saturn**") entered into a 7-year senior secured term loan facility—the Term Loan—from a different syndicate of financial institutions. Once more, JPMorgan was administrative agent.

The Term Loan provided GM with approximately $1.5 billion in financing. It was a transaction wholly unrelated to the Synthetic Lease.

In connection with the Term Loan, JPMorgan was represented by law firms different from that which had acted for JPMorgan in connection with the Synthetic Lease. This time, JPMorgan was represented by Cravath Swaine & Moore and, later, Morgan, Lewis & Bockius ("**Morgan Lewis**").

---

Trustee; certain named entities, as "Investors"; other named entities, as "Backup Facility Banks"; an entity called "Relationship Funding Company, LLC"; and Chase Manhattan Bank (to which JPMorgan was successor), as Administrative Agent.

Documents executed in connection with the Term Loan included a "**Term Loan Agreement**" and a "**Collateral Agreement**."  Duker, who was also involved in the Synthetic Lease transaction, was a signatory to the Term Loan Agreement on behalf of JPMorgan as administrative agent.

Under the Collateral Agreement, the Lenders took security interests in a massive amount of collateral ("**Term Loan Collateral**")—including, among other things, all of GM's equipment and fixtures at 42 facilities throughout the United States.  Upon the closing of the Term Loan, JPMorgan caused the filing of a total of 28 UCC-1 initial financing statements to perfect the Lenders' security interests in the Term Loan Collateral—two of which (one for GM and one for Saturn)[14] were filed with the Delaware Secretary of State.  The one filed in Delaware for GM—*i.e.*, the Main Term Loan UCC-1—bore filing number "6416808 4."

*C. Synthetic Lease Termination*

The Synthetic Lease would mature on October 31, 2008, approximately seven years after it was put in place.

In an email dated September 30, 2008, a GM representative informed Robert Gordon ("**Gordon**"), a real estate partner at Mayer Brown, GM's counsel, who was then responsible for the Synthetic Lease, that GM planned to repay the amount due under the Synthetic Lease.  GM requested that Mayer Brown "prepare the documents necessary for [JPMorgan and the Lenders] to be paid off for the obligations on that synthetic lease and to release their interest in those properties."[15]  Gordon assigned this work to Ryan Green ("**Green**"), a Mayer Brown real estate associate.  Green was to draft the documents necessary for "the termination and payoff of the

---

[14]    The other 26 were localized fixture filings, in the various counties in the United States where fixture collateral was located.

[15]    Gordon Dep. 6 (Callagy Decl. Exh. 4); 9/30/08 Sundaram Email (Callagy Decl. Exh. 12).

synthetic lease."[16]  Gordon also asked Green to "put together [a] checklist draft"—referring to a

checklist of the required documents for the release and transfer of the Synthetic Lease Properties,

including "an initial draft of a brief checklist of required documents for the release and

transfer."[17]

 The documents prepared by Green included three documents and one batch of UCC-3s:

  (1) an agreement with respect to the termination of Synthetic Lease

  obligations and related documentation (the "**Synthetic Lease Termination**

  **Agreement**");

  (2) a closing checklist (the "**Synthetic Lease Closing Checklist**");

  (3) UCC-3s, and

  (4) a letter agreement embodying instructions to an escrow agent with

  respect to the Synthetic Lease termination (the "**Synthetic Lease Escrow**

  **Agreement**").

 The next day, October 1, GM likewise informed JPMorgan's Duker of GM's intent to

pay off the amounts due under the Synthetic Lease.  As of that time, the balance to be repaid on

the Synthetic Lease was about $150 million.

 *1. The Synthetic Lease Termination Agreement*

 Two weeks later, on October 15, 2008, Green circulated the Synthetic Lease Termination

Agreement to Simpson Thacher, among others, in draft form.

 The Synthetic Lease Termination Agreement stated, among other things (as circulated on

October 15, and also in its final form), that the Administrative Agent (JPMorgan) and Lessor (the

Trust) were thereby releasing all of their liens against the "Properties" that had been created by

---

[16]  Gordon Dep. 12.

[17]  10/1/08 Gordon Email (Callagy Decl. Exh. 12).

-9-

the operative agreements which were coming to an end, and that they acknowledged that such

liens were released. The Synthetic Lease Termination Agreement then went on to provide, as

relevant here:

> (ii) [T]he Administrative Agent and the Lessor do hereby
> …
>
>> (x) [*sic.*; seemingly should be z] authorize
>> Lessee to file a termination of any existing
>> Financing Statement relating to the Properties.[18]

Importantly, the words "Financing Statement" and "Properties" as used in the quoted

language were capitalized defined terms.  The next paragraph of the Synthetic Lease Termination

Agreement told the reader where to look for definitions of capitalized terms that did not

otherwise appear.  It referred the reader to an earlier document, defined as the "Participation

Agreement," that had been entered into back in October 2001 when the Synthetic Lease was put

into place.

The Participation Agreement, in turn, listed the 12 particular pieces of real property that

originally were collateral under the Synthetic Lease.[19]  Annex A to the Participation Agreement

---

[18]    Synthetic Lease Termination Agreement (Duker Aff. Exh. L) (reformatted for readability).  The second
paragraph of the Synthetic Lease Termination Agreement, which was paraphrased in the preceding
paragraph, and from which the quoted  language was taken, stated in full:

> In consideration of ONE DOLLAR ($1.00) and other good and
> valuable consideration, the receipt and sufficiency of which is hereby
> confessed and acknowledged, the undersigned, each of which is a party
> to one or more of the agreements identified as the Operative
> Agreements, hereby agree that (i) each of such Operative Agreements
> and any Commitment thereunder is hereby terminated and is discharged
> and of no further force or effect as of the date hereof, and (ii) the
> Administrative Agent and the Lessor do hereby (x) release all of their
> Liens and Lessor Liens against the Properties created by the Operative
> Agreements, (y) acknowledge that such Liens and Lessor Liens are
> forever released, satisfied and discharged and (x) [*sic.*; seemingly
> should be z] *authorize Lessee to file a termination of any existing*
> *Financing Statements relating to the Properties.*

*Id.* (emphasis added).

[19]    *See* 1/6/2003 Participation Agreement First Amendment (Duker Aff. Exh. E) at JPMCB-STB-00000918-
920 exh. A (six warehouses in Bolingbrook, IL; Reno, NV; Denver, CO; Ontario, CA; Brandon, MS; and

(captioned "Rules of Usage and Definitions") provided definitions for the key words "Financing

Statements"[20] and "Properties"[21]—later referred to as the "Financing Statements" and

"Properties" in the Synthetic Lease Termination Agreement's second subparagraph (x).

---

[20] Charlotte, NC, respectively; a transmission parts distribution center in Indianapolis, IN; two parking decks in Detroit, MI; an engine plant in Flint, MI; an office building in Grand Blanc, MI; and a vacant parcel of land in Detroit, MI).

[20]    Annex A provided:

> "Financing Statements" means, collectively, the *Lessor Financing Statements* and the *Lessee Financing Statements.*

Participation Agreement Annex A (Duker Aff. Exh. B) at 17 (emphasis by italics added; underlining, to signify defined terms that would thereafter be used, in original).  It additionally provided definitions for the two terms used there:

> "Lessor Financing Statements" means UCC financing statements made by Lessor, as debtor, and Administrative Agent, as secured party, appropriately completed and executed for filing in the appropriate state and county offices in the State where the applicable Property is located and the State of Delaware.

*Id.* at 26 (underlining, to signify defined  terms that would thereafter be used, in original).

> "Lessee Financing Statements" means UCC financing statements made by Lessee, as debtor, and Lessor, as secured party, appropriately completed and executed for filing in the appropriate state and county offices in the State in which each Property is located and the State of Delaware, as the same shall be assigned to the Administrative Agent on behalf of the Secured Parties pursuant to such Lessee Financing Statements.

*Id.* (underlining, to signify defined  terms that would thereafter be used, in original).  It should be recalled that as used in the Participation Agreement, the "Lessor" was Auto Facilities Real Estate Trust 2001-1; the "Lessee" was GM, and the Administrative Agent was Chase, the predecessor to JPMorgan.  *Id.* at 3, 26.

[21]    Annex A provided:

> "Property" or "Properties" means either individually or collectively, as the case may be, *each parcel of Land* (including all Appurtenant Rights attached thereto) *or*, in the case of Land subject to a Ground Lease, the *ground leasehold estate to be acquired by the Lessor pursuant to the provisions of the Participation Agreement*, as more particularly described in the Requisition and the Memorandum of Lease and Supplement with respect to such Land, together with all of the Improvements at any time located on or under such Land, or multiple parcels of Land with Improvements, as the context may require.

*Id.* at 35 (emphasis by italics added; underlining, to signify defined  terms that would thereafter be used, in original).

-11-

The Synthetic Lease Termination Agreement was later executed by GM, JPMorgan and the other parties to the Synthetic Lease termination on or about October 30, 2008, the effective date of the closing of the payoff.

*2. The Synthetic Lease Closing Checklist*

With assistance from his colleagues at Mayer Brown, Green drafted a closing checklist. It was entitled:

CLOSING CHECKLIST
General Motors: Release of Properties from JPMorgan
Chase Synthetic Lease
CLOSING DATE: October 31, 2008.[22]

The word "Properties" as used in the Closing Checklist title was capitalized, but because it was part of a title, it is unclear whether "Properties" as used there was intended to be as defined in the Participation Agreement, which was the underlying source for definitions in the Synthetic Lease Termination Agreement. But whether or not it was so intended, it still specified what "Properties" were covered: properties from "JPMorgan Chase Synthetic Lease," as contrasted to any others.

In order to determine what types of documents should be included on the Synthetic Lease Closing Checklist, Green "looked through a copy of the participation agreement. That's the main document for the [Synthetic Lease] and it contained a description of how to unwind and the relevant documents."[23] The record indicates, without dispute, that Green's intent—and only intent—was to list the documents that would release Synthetic Lease facility collateral.

---

[22]   Synthetic Lease Closing Checklist, 10/15/08 Green Email Attachment (Callagy Decl. Exh. 15).

[23]   Green Dep. 8 (Callagy Decl. Exh. 2).

The Synthetic Lease Closing Checklist listed several dozen closing documents relating to the Properties, including various UCC-1s that needed to be terminated for each property.[24] Under Section 5 of the Synthetic Lease Closing Checklist, entitled "General Documentation," three UCC-1s that had been filed in Delaware were listed for termination:

> Termination of UCCs (central, DE filings) Blanket-type financing statements as to real Property and related collateral located in Marion County, Indiana (file number 2092532 5, file date 4/12/02 and file number 2092526 7, file date 4/12/02)) financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06).[25]

The three UCC-1 filing numbers listed on the Synthetic Lease Closing Checklist were derived from a UCC search Green had requested that a Mayer Brown paralegal, Michael Perlowski, perform.  Working from a prior search for UCC-1 financing statements recorded against GM (and without knowledge of the underlying transactions that had involved those filings, or, for that matter, the purpose of his undertaking),[26] Perlowski identified several UCC-1 financing statements in response to Green's request.  Perlowski was not aware of the specific transaction on which Green was working.[27]  Two of the UCC-1 financing statements Green listed on the Synthetic Lease Closing Checklist had been filed in connection with the Synthetic Lease.  But the third UCC-1 financing statement he listed, with filing number 6416808 4, did not relate to the Synthetic Lease transaction.  Instead, this third UCC-1 financing statement, bearing file number 6416808 4, was the Main Term Loan UCC-1.

---

[24]   Synthetic Lease Closing Checklist.

[25]   *Id.* at 4.

[26]   Perlowski Dep. 10-11, 40-41 (Callagy Decl. Exh. 1).

[27]   *Id.*

Green circulated a draft of the Synthetic Lease Closing Checklist to GM as well as Simpson Thacher, counsel for JPMorgan, on October 15, 2008.  That same day, Duker of JPMorgan received drafts of the Synthetic Lease Closing Checklist from GM and Simpson Thacher.  Green circulated updated, but largely similar, drafts of the Synthetic Lease Closing Checklist to Simpson Thacher, among others, later on October 15, and again on October 21, 2008.  The subject lines for each of Green's e-mails attaching the drafts of the Synthetic Lease Closing Checklist stated that they related to the "GM/JPMorgan Chase - Synthetic Lease."[28]

The drafts of the Synthetic Lease Closing Checklist identified the Main Term Loan UCC-1 as a "financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06)."  They made no mention of the words "Term Loan."  The "file date 11/30/06" appearing adjacent to "file number 6416808 4" on the Synthetic Lease Closing Checklist substantially corresponds to the November 29, 2006 date of the Term Loan Agreement, though no one involved recognized that at the time, because everyone believed they were working on the Synthetic Lease transaction. No one at Mayer Brown involved in drafting the Synthetic Lease Closing Checklist and no one at Simpson Thacher or JPMorgan who reviewed and/or received the Synthetic Lease Closing Checklist recognized that "file number 6416808 4, file date 11/30/06" was unrelated to the Synthetic Lease.

*3. The Unrelated UCC-3*

Another Mayer Brown paralegal, Stewart Gonshorek ("**Gonshorek**"), was tasked with drafting the UCC-3 termination statements for the unwinding of the Synthetic Lease.  One of the UCC-3s that he drafted was the Unrelated UCC-3.

---

[28]   10/15/2008 Sundaram Email (Callagy Decl. Exh. 13); 10/15/2008 Merjian Email (Callagy Decl. Exh. 15); 10/15/2008 Merjian Ledyard Email (Callagy Decl. Exh. 16); 10/21/2008 Merjian Ledyard Email (Callagy Decl. Exh. 17).

Under section 10 of a draft of the Unrelated UCC-3, a section entitled "OPTIONAL FILER REFERENCE DATA", Gonshorek typed in "Matter No. 00652500."[29]  "Matter No. 00652500" was an internal Mayer Brown client-matter number, relating exclusively to Mayer Brown's representation of GM in connection with the Synthetic Lease and its repayment.

Gonshorek prepared the Unrelated UCC-3 to "terminate the UCC in connection with the synthetic lease becoming unwound."[30]  But the Unrelated UCC-3 showed, on its Line 1a, under "INITIAL FINANCING STATEMENT FILE #," "6416808 4 on 11.30.06."[31]  The "Initial Financing Statement File #" was that of the Main Term Loan UCC-1.

But the Unrelated UCC-3 never used the words "Term Loan," or any synonym for such.

Further down on the Unrelated UCC-3, it had a Line 9, "NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT,"[32] on which "JPMORGAN CHASE BANK, AS ADMINISTRATIVE AGENT," was typed in.  But the Unrelated UCC-3 did not have a granting clause—*i.e.*, a clause by which authorization was granted—nor did it have a place for signature by JPMorgan, the party said to have authorized the amendment.

While the UCC-3 Gonshorek prepared referenced the Main Term Loan UCC-1 by its filing number and date (6416808 4 on 11.30.06), Gonshorek intended to terminate only a UCC financing statement related to the Synthetic Lease.[33]  The Committee does not contend (nor did it introduce evidence) to the contrary.

---

[29]   Draft Unrelated UCC-3 Email Attachment (Callagy Decl. Exh. 16) at JPMCB-STB-00000206.

[30]   Gonshorek Dep.  20.

[31]   Unrelated UCC-3 (Fisher Decl. Exh. X).

[32]   *Id.*  The remainder of Line 9 continued:  "(name of assignor, if this is an Assignment).  If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment."

[33]   Gonshorek Dep. 20.

On Wednesday, October 15, 2008, Green circulated by email to Simpson Thacher's Merjian and counsel for Wilmington Trust, among others (and along with an updated checklist and drafts of most of the other closing documents), the draft UCC-3 termination statements that had been prepared by Gonshorek—including the draft Unrelated UCC-3.

The subject line of Green's e-mail enclosing the draft documents was "GM/JPMorgan Chase - Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)";[34] the documents attached to Green's email included nearly a hundred pages of draft documents, including ten draft UCC-3 termination statements.  But Green did not attach copies of any of the UCC-1 initial financing statements whose file numbers corresponded to the file numbers referenced on the ten draft UCC-3s that were circulated.  Nor, once again, did anything in Green's email or enclosures mention the words "Term Loan."

Green had concluded his October 15 email with a line "Please contact me with any questions or comments you may have."  On Friday, October 17, 2008, Simpson Thacher's Merjian responded, also by email, stating "Nice job on the documents" before continuing with "[m]y only comment," and going on to state what that comment (which did not relate to the UCC-3s) was.[35]

### 4. The Synthetic Lease Escrow Agreement

Incident to the Synthetic Lease repayment, the parties utilized LandAmerica (the "**Title Company**") to serve as an escrow agent, recording agent and title insurance issuer.  As a general matter, the Title Company would receive payment from GM and documents executed by the various parties, after which the Title Company would act in accordance with written instructions

---

[34]    10/15/2008 Merjian Ledyard Email.

[35]    10/17/2008 Merjian Email (Fisher Decl. Exh. T).

-16-

(executed by counsel for GM, JPMorgan, and the Trust)[36] calling for the Title Company to close the transaction, cause the documents it had received to be recorded and delivered, and disburse the funds in accordance with the instructions it had received.

The instructions were embodied in the Synthetic Lease Escrow Agreement, which in each of its draft and final form[37] was an 8-page letter agreement addressed to LandAmerica, which was likewise referred to as "the Title Company," as a defined term, in the Synthetic Lease Escrow Agreement.

On October 24, 2008, by email addressed to the Title Company's William Wineman; Simpson Thacher's Mardi Merjian, and counsel for Wilmington Trust (the trustee for the Trust), Green circulated a draft of the Synthetic Lease Escrow Agreement, seeking review and any comments.[38] The subject line of that email stated: "RE: GM/JPMorgan Chase - Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)."[39] As Mayer Brown's Gordon testified, the purpose of the Synthetic Lease Escrow Agreement was to arrange for the payoff of the Synthetic Lease.[40]

Again as a general matter, the Synthetic Lease Escrow Agreement listed 47 different documents that would be delivered to the Title Company (defined in that letter as "**Escrow Documents**"), which, after conditions precedent to closing were satisfied, would be delivered,

---

[36]    Signatures by counsel for GM, JPMorgan and the Trust were followed by a signature block for the Title Company, in a different form.  It said:

>    The undersigned acknowledges receipt of these recording instructions
>    and agrees to proceed in strict accordance therewith.

(block caps in original converted to ordinary text for readability).

[37]    So far as the Court can tell, there were no material differences in the Synthetic Lease Escrow Agreement as between its draft as initially circulated by GM counsel Mayer Brown and its execution version.  If there were any changes at all, in fact, neither the Committee nor JPMorgan has called the Court's attention to them.

[38]    Synthetic Lease Escrow Agreement, 10/24/2008 Wineman Email Attachment (Callagy Decl. Exh. 18).

[39]    *Id.*

[40]    Gordon Dep. 20.

recorded or otherwise handled by the Title Company in accordance with the instructions set forth

in the Synthetic Lease Escrow Agreement.

The "Re" line of the Synthetic Lease Escrow Agreement was very lengthy, running on

for 15 lines.  It described the Synthetic Lease Escrow Agreement's subject as:

> Termination of that certain Participation Agreement dated as of October 31, 2001, among General Motors Corporation ("**GM**"), as Lessee and Construction Agent, Auto Facilities Real Estate Trust 2001-1 ("**Trust**"), as Lessor, Wilmington Trust Company ("**Trustee**"), as Trustee, the Persons named therein as Investors, the Persons named therein as Backup Facility Banks, Relationship Funding Company, LLC, and JPMorgan Chase Bank ("**Agent**"), as Administrative Agent, as amended (the "**Participation Agreement**") and *release of all liens related thereto including liens relating to the following properties*: (i) the SPO Headquarters Building located in Grand Blanc, Michigan (the "**Grand Blanc Property**"); (ii) the GM Powertrain L6 Engine Plant in Flint, Michigan (the "**Flint Property**"); (iii) the Franklin Deck in Detroit, Michigan (the "**Franklin Deck**"); (iv) the River East Parking Deck in Detroit, Michigan (the "**River East Deck**"); and (v) Parcel 6/C in Detroit, Michigan ("**Parcel 6/C**") (the Grand Blanc Property, the Flint Property, the Franklin Deck, the River East Deck and Parcel 6/C herein are each a "Property" *and, collectively, the "Properties"*).[41]

Specifically, it provided that its undersigned attorneys represented GM, the Agent,

JPMorgan, and the Trustee in connection with that transaction, and that the Title Company had

agreed to issue title insurance policies with respect to the Properties.  It further stated that "[t]his

letter constitutes escrow and recording instructions in connection with the Transaction."[42]

It then listed the 47 documents or categories of documents that were being delivered to

the Title Company, of which the second was "Termination of UCC Financing Statements (File

---

[41]    Synthetic Lease Escrow Agreement at 1 (bold face, for defined terms, in original; emphasis by italics added).

[42]    *Id.*

Numbers 2092532 5, 2092526 7, and 6416808 4) (the "**General UCC Terminations**")."[43]  The

Synthetic Lease Escrow Agreement then continued:

> When all of the conditions precedent to closing set forth in
> Section A below have been met, you are instructed to close
> this transaction and disburse the Funds (as defined below)
> as directed in Section B below and to release from escrow
> and deliver, record or to otherwise handle the Escrow
> Documents in accordance with Section C below.[44]

The third of the General UCC Terminations (relating to UCC financing statement

6416808 4) was the Unrelated UCC-3, which referenced the Main Term Loan UCC-1.  But while

the Unrelated UCC-3 was listed as one of the documents to be *delivered* to the Title Company, it

was not listed as one of the documents to be *recorded*.[45]  Rather, the Title Company was

instructed to deliver it (along with others) to GM's counsel, Mayer Brown. [46]

When asked if he had any comments to the draft Synthetic Lease Escrow Agreement

circulated on October 24, 2008, Simpson Thacher's Merjian replied "it was fine."[47]

---

[43]    *Id.* (bold face, for defined term, in original).

[44]    *Id.* at 4.

[45]    *See id.* at 5-6.  Section C began:

> As soon as possible after the release of the Funds pursuant to Section B
> above, you are instructed to record (or file, as applicable) the
> documents below (the "**Recording Documents**") with the appropriate
> recording office in the applicable state in the following order as to each
> Property:

*Id.* at 5 (bold face, for defined term, in original).  It then listed the Recording Documents, which were 23 of
the 47 documents that were to be delivered to the Title Company.  Neither the Unrelated UCC-3, nor any of
the other General UCC Terminations, was one of those Recording Documents.

[46]    *Id.* at 6 (as set forth at the beginning of Section D, "Immediately following closing, any extra original
documents and copies of all Escrow Documents shall be forward to the counsel for GM, except for those
documents which have been forwarded to the recorder's office (in which case certified copies of the
foregoing shall be forwarded to the counsel for GM).").

[47]    10/27/2008 Merjian Email (Fisher Decl. Exh. V).

*5. The Synthetic Lease Transaction Payoff*

GM repaid the amount due on the Synthetic Lease transaction on October 30, 2008. Thereafter, but on the same day, Mayer Brown transmitted the Unrelated UCC-3 to a third-party vendor to cause the filing of the Unrelated UCC-3 with the Delaware Secretary of State.  The Unrelated UCC-3 had no place for a signature by JPMorgan, and it was not signed by JPMorgan.[48]

*6. GM's Understanding*

Each of the participants on the GM side understood that he was acting only with respect to the Synthetic Lease.  None had the understanding that he or she was acting with respect to the Term Loan, or was authorized to do so.  Gordon stated, in a declaration, that "GM was not authorized by the Termination Agreement to terminate any financing statement related to the Term Loan Agreement,"[49] and testified to the same effect at his deposition.[50]  Gordon's more junior colleague at Mayer Brown, Green, had the same belief.[51]

Similarly, GM's Debra Homic Hoge (the GM business person with responsibility for the Synthetic Lease), stated that GM was not authorized by the Synthetic Lease Termination Agreement, nor did GM believe it had any authority, to terminate any UCC-1 related to the Term Loan.  She further stated that GM had not granted Mayer Brown authority to do so.[52]

Every deponent in this adversary proceeding (on the JPMorgan side or the GM side) first learned that the Unrelated UCC-3 actually related to the Term Loan only in June 2009, after GM

---

[48]     *See* Appendix A.

[49]     Gordon Aff., 6/19/09 Email Attachment (Callagy Decl. Exh. 11).

[50]     *See* Gordon Dep. 66.

[51]     *See* Green Dep. 99.

[52]     Hoge Aff. ¶ 11.

had filed its chapter 11 petition. Before that time, none of them even realized that they had a filed a UCC-3 relating to the Term Loan.[53]

*D. Subsequent Events*

GM filed its chapter 11 case on June 1, 2009. Approximately two weeks later, Morgan Lewis (which by this time was acting for JPMorgan in connection with the Term Loan and the GM bankruptcy) discovered that Mayer Brown had caused a UCC-3 termination statement to be filed in October 2008 related to the Term Loan.

About three weeks after GM's chapter 11 case was filed, this Court gave final approval to GM's preliminarily approved postpetition financing, commonly referred to in the bankruptcy community as "**DIP Financing**." The approval was documented in a lengthy order, dated June 25, 2009 (the "**DIP Financing Order**"). Among many other things, the DIP Financing Order authorized the repayment of the Term Loan.

On June 30, 2009, as authorized under the DIP Financing Order, the amount then outstanding under the Term Loan (just under $1.5 billion, *viz.*, $1,481,656,507.70) was repaid out of the proceeds of the $33 billion in DIP financing.[54] After the repayment, JPMorgan authorized the filing of UCC-3s with respect to the Term Loan, including one with respect to the Main Term Loan UCC-1.

One month later, the Committee filed its complaint in this adversary proceeding.

---

[53]     *See* Green Dep. 88-89; Perlowski Dep. 40-41; Gonshorek Dep. 47-48; Hoge Aff. ¶ 12.

[54]     To the extent that the Committee might be successful in this adversary proceeding, the amount paid to JPMorgan and the Lenders would be subject to recapture, as provided in the final DIP Financing Order when the payoff of the Term Loan was authorized. In that event, after the return of the amount previously paid on what was thought to be a duly secured claim, the Lenders would still have a claim for the Term Loan debt, but would have only an unsecured claim, sharing *pari passu* with the many billions of dollars of other unsecured claims in GM's chapter 11 case.

Discussion

I.

Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[55]  The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.[56]  Then, if the movant carries this initial burden, the non-moving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[57]

In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[58]  A fact is material if it "might affect the outcome of the suit under the governing law."[59]  An issue of fact is genuine if "the evidence

---

[55]    FED. R. CIV. P. 56(a), made applicable to this adversary proceeding by FED. R. BANKR. P. 7056; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The Court notes that Rule 56 was amended in December 2010.  By order of the Supreme Court, the amendment governs "insofar as just and practicable, [in] all proceedings . . . pending."  Supreme Court Order of April 28, 2010.  The amended Rule applies to this motion, but the Court also notes that the substantive standard for summary judgment has not been altered.  Advisory Committee Notes to December 2010 Amendment to Rule 56 ("The standard for granting summary judgment remains unchanged.").

[56]    *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995); *Ferrostaal, Inc. v. Union Pacific R.R. Co.*, 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact . . . .").

[57]    *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 529 (Bankr. S.D.N.Y. 2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.").

[58]    *See Matsushita*, 475 U.S. at 587 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) ("We . . . constru[e] the evidence in the light most favorable to the non-moving party.").

[59]    *See Anderson*, 477 U.S. at 248, 1 S.Ct. 2505.

-22-

is such that a reasonable jury could return a verdict for the nonmoving party."[60]  The standards

for determining a summary judgment motion apply equally to cases, like the instant one, in

which each side moves for summary judgment.[61]

## II.

## Choice of Law

Choice of law is not a material concern here.

The issues here are governed, at least in the first instance, by the Uniform Commercial

Code, which does not differ in its content as between Delaware and New York—the two states

whose law JPMorgan and the Committee have principally addressed.[62]  Under UCC

§ 1-102(2)(c) (as enacted in each state), one of the "[u]nderlying purposes" of the UCC is to

"make uniform the law among the various jurisdictions."  Thus both sides agree, as does the

Court, that while strictly speaking, it is the Delaware version[63] of the UCC that applies here, the

Court can (and should) look to decisions from any state or federal courts considering comparable

provisions, without regard to the jurisdictions in which those courts sit.

---

[60]     *Id.*

[61]     *Bronx Household of Faith v. Board of Educ. Of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *In re Magnesium Corp. of America*, 460 B.R. 360, 364-66 (Bankr. S.D.N.Y. 2011) (also considering cross-motions for summary judgment).

[62]     The Main Term Loan UCC-1 and the Unrelated UCC-3 were each filed in Delaware, as was required because GM was a Delaware corporation, which thus was deemed to be "located" in Delaware by reason of its organization there under UCC §§ 9-301 and 9-307.  Thus, strictly speaking, Delaware law governs the perfection of JPMorgan' security interest, the effect of perfection or nonperfection, and the priority of JPMorgan's security interest in collateral.  *See* UCC § 9-301(1).

The Term Loan documentation had a New York choice of law provision.  But while it would govern matters of enforcement or interpretation of that agreement as between JPMorgan and GM, it would not govern the matters just described.

[63]     6 Del. C. § 9-101 et seq.  It became effective in Delaware on July 1, 2001, the day that had been recommended as the effective date by the National Conference of Commissioners on Uniform State Laws, which was also the day (presumably for that reason) that the revised Article 9 became effective in New York.

Similarly, as intended by the UCC's drafters,[64] law other than UCC Article 9—here, principles of agency—must be applied interstitially to fill gaps in the statute. Once again, the Court believes that strictly speaking, the law of Delaware is the most appropriate to use to fill gaps in the Delaware UCC—particularly since the purpose of that use is to determine the effectiveness of termination statements, and continuing validity of initial financing statements, filed in Delaware. But the two sides here have relied principally on cases decided under New York law and on discussion of generally accepted legal principles, such as those in various versions of the *Restatement of Agency*. More importantly, they have not identified any respects in which the Delaware law of agency differs from that of any other jurisdiction in which a court considered similar issues. Thus the Court considers whatever caselaw is available—from a variety of jurisdictions around the country—from any courts that have addressed similar issues, or are asserted to have done so.

## III.

## Effectiveness of the Unrelated UCC-3

It is undisputed that JPMorgan, on behalf of its lending syndicate, at least initially had a duly perfected security interest with respect to its collateral—including, as relevant here, all of the equipment and fixtures at the 42 GM properties covered under the Main Term Loan UCC-1. Thus, if that duly perfected security interest did not come to an end, JPMorgan and the Lenders continued to have a security interest in all of those assets as of the time GM filed its chapter 11 case—the time at which the Lenders' continued rights to their secured status is measured.[65] The

---

[64]     *See* n.83 below.

[65]     The Committee properly notes (Comm. Partial SJ Br. 10) that if a security interest is unperfected as of the time of the petition, it will be trumped by the statutory lien of a trustee or debtor in possession under section 544 of the Bankruptcy Code. But that is not debated by JPMorgan. The issue here is rather whether or not the Lenders' previously perfected lien remained so.

Court here must decide whether the perfection of JPMorgan's Term Loan security interest came to an end before that time.

In that connection, JPMorgan does not dispute that a termination statement that referred to the Main Term Loan UCC-1 by number was filed. JPMorgan also recognizes that each of GM and JPMorgan knew or was on notice of the initial financing statement *filing number* to which the Unrelated UCC-3 referred, though neither was aware that it actually related to the Main Term Loan UCC-1.

But conversely, the Committee does not dispute that neither of the counsel for GM or JPMorgan, nor either of their respective clients, intended to terminate the Main Term Loan UCC-1, or would have filed (or permitted to be filed) the Unrelated UCC-3 if they had known that the filing of that document would have any effect on the Main Term Loan UCC-1.[66] The Committee effectively bases its argument on the contention (one of law) that JPMorgan's and GM's undisputed intent does not matter.

Determination of the issues here starts with interpretation of the Uniform Commercial Code, whose Article 9 governs security interests. Article 9 was amended in 2001, in respects highly relevant here. Since its 2001 amendment, Article 9 no longer requires the execution of a UCC-3 termination statement by the secured party. Instead, such a filing may be made without any signature, and by anyone, provided that the filing has been authorized by the secured party. Importantly, there now is no automatic consequence by reason of the filing of a termination statement. The fact that a termination statement has been filed does not by itself mean that the initial statement came to an end. It all depends on whether the termination of the underlying

---

[66] *See* Comm. SJ Opp. 12 ("Of course, if JPMorgan had analyzed and appreciated the consequences of the UCC filing, it never would have permitted Old GM's counsel to cause the Term Loan Termination Statement to be filed.").

initial financing statement was authorized.  If the requisite authorization was lacking, the termination was ineffective.

Since the termination statement here was filed not by JPMorgan, but by GM on JPMorgan's behalf, the resolution of this controversy turns on whether GM was authorized, as part of the payoff of the Synthetic Lease, to terminate JPMorgan's security interest on the unrelated Term Loan.  On the undisputed facts, the Court concludes that GM's authority to terminate initial financing statements was limited to the measures that related to the paid off Synthetic Lease, and that JPMorgan did not authorize the release of its security interest on the wholly unrelated Term Loan.

### A.  The Requirement for Authorization

After the 2001 amendments to the Uniform Commercial Code, three sections of UCC Article 9, which came into being in 2001,[67] are particularly relevant.  The first, UCC § 9-509(d),[68] provides, in relevant part:

> (d) Person entitled to file certain amendments. — A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if:
>
> > (1) the secured party of record authorizes the filing; or
>
> > (2) [inapplicable under the facts here].

The second, UCC § 9-510(a),[69] provides:

---

[67]   See Harry C. Sigman, *The Filing System Under Revised Article 9*, 73 Am. Bankr. L.J. 61, 70-71 (1999) ("***Sigman***").

[68]   6 Del. C. § 9-509(d).

[69]   6 Del. C. § 9-510(a).

(a) Filed record effective if authorized. — A filed record is effective only to the extent that it was filed by a person that may file it under Section 9-509.

The third, UCC § 9-513(d),[70] provides in relevant part:

(d) Effect of filing termination statement. — *Except as otherwise provided in Section 9-510*, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective.[71]

Thus, under UCC § 9-513(d), the filing of a termination statement *generally* causes the initial financing statement to which the termination statement relates to no longer be effective. But because UCC § 9-513's effect is "except as otherwise provided in [UCC §] 9-510," one must then look to UCC § 9-510, which requires one to look to § 9-509 to ascertain whether there has been authorization.

A termination statement (filed by means of a UCC-3) is one kind of financing statement—one that is an amendment to an initial financing statement (filed by UCC-1).[72]

---

[70]   6 Del. C. § 9-513(d).

[71]   (emphasis added).

[72]   UCC § 9-102(39) (6 Del. C. § 9-102(39)), one of UCC Article 9's many definitions, defines a "financing statement." That section provides:

"Financing statement" means a record or records composed of an initial financing statement *and any filed record relating to the initial financing statement*.

(emphasis added). Similarly, UCC § 9-102(79) (6 Del. C. § 9-102(79)), another of UCC Article 9's definitions, defines a "termination statement." That section provides:

"Termination statement" means an amendment of a financing statement which:

(A) identifies, by its file number, the initial financing statement to which it relates; and

(B) indicates either that it is a termination statement or that the identified financing statement is no longer effective.

Failures to focus on the distinction between an "initial financing statement" and a "financing statement," and on the fact that a "termination statement" is one kind of a "financing statement," have introduced error into the caselaw, most significantly in one of the cases relied upon by the Committee, *Roswell Capital Partners LLC v. Alternative Construction Technologies*, 2010 U.S. Dist. LEXIS 90695, 2010 WL 3452378

-27-

UCC §§ 9-509(d), 9-510(a) and 9-513(d) thus collectively provide that a termination statement is

effective only to the extent that the secured party of record *authorizes* it—and that if the

termination statement has not been duly authorized, it is ineffective.[73]   And that is so irrespective

of the extent to which the public records tell the world that the initial financing statement is no

longer in effect.[74]

As Harry Sigman, one of the members of the drafting committee for Revised Article 9,

explained:

> Revised Article 9 makes explicit another concept that is
> implicit under current law—the fact that a filing is on the
> public record doesn't guarantee that it is effective.  For
> example, … a termination statement that bears a forged

---

(S.D.N.Y. Sep. 1, 2010), *aff'd by summary order on other grounds*, 436 Fed. Appx. 34 (2d Cir. 2011)
("**Roswell**").  *See* discussion at page 69 below.

[73]     *See*, in addition to UCC §§ 9-509 and 9-510, Official Comment 3 to UCC § 9-502, as enacted in Delaware
and elsewhere.  It provides, in relevant part:

> The fact that this Article does not require that an authenticating symbol
> be contained in the public record *does not mean that all filings are
> authorized.*  Rather, Section 9-509(a) entitles a person to file an initial
> financing statement, an amendment that adds collateral, or an
> amendment that adds a debtor only if the debtor authorizes the filing,
> and Section 9-509(d) entitles a person other than the debtor [*sic.;* query
> whether it should say "secured party of record"] to file a termination
> statement *only if the secured party of record authorizes the filing.  Of
> course, a filing has legal effect only to the extent it is authorized*.  See
> Section 9-510.

6 Del. C. § 9-502 cmt 3 (emphasis added).

[74]     In its opening brief on its motion for partial summary judgment, the Committee argues that "the filing of a
termination statement renders ineffective the financing statement to which the termination relates and
causes the subject lien to become unperfected."  Comm. Partial SJ Br. 9.  For its failure to address the
critical requirement of authorization, and the exception expressly articulated in UCC § 9-513(d), that
statement is an overly general, and consequentially inaccurate, statement of the present law.  *See* discussion
at page 60 below.

Pre-2001 caselaw that the Committee argues supports such a generalization, *see, e.g.*, *In re Silvernail
Mirror & Glass, Inc.*, 142 B.R. 987 (Bankr. M.D. Fla. 1992) ("**Silvernail**"), analyzed the issues under a
different statutory scheme, and cannot be relied on in instances where the changes in the UCC matter.
Language in other post-2001 decisions upon which the Committee relies, *Peoples Bank of Kentucky, Inc. v.
U.S. Bank, N.A. (In re S.J.. Cox Enterprises, Inc.)*, 2009 Bankr. LEXIS 4573, 2009 WL 939573 (Bankr.
E.D. Ky. Mar. 4, 2009) ("**S.J. Cox**"), and *Roswell*, each of which quoted or cited the pre-2001 decisions
while failing to consider their continuing vitality in light of the 2001 changes in the UCC, suffer from the
same deficiency.  For further discussion of the Court's belief that it should not rely on these cases, see page
60 et seq. below.

secured party signature is not effective simply because it gets onto the public record. Revised Article 9 states that a filed record is "effective" only to the extent that its filing is authorized.[75]

Similarly, as stated in a treatise on the UCC:

A filed record, whether it is an initial financing statement or an amendment, *is effective only if it is filed by a person who may file it under the rules of revised Section 9-509* [Rev]. Except in the case of agricultural liens, only a filer who is authorized by the right party may file a record. In the case of an initial financing statement or an amendment adding collateral or adding a debtor, the authorization (actual or deemed) must come from the debtor. *In the case of other amendments, authorization must come from the secured party of record.*

*The fate of a record filed by someone other than a person given the power to do so under revised Section 9-509 [Rev] is quite clear. Such a filing is ineffective.* Thus, if a secured party files an initial financing statement without actual or deemed authorization of the debtor, that financing statement is ineffective. *The same is true for a termination statement not authorized by the secured party of record.*[76]

After the Uniform Law Commissioners and the American Law Institute ("**ALI**") promulgated the revised Article 9 of the UCC that was enacted in 2001, they formed a review committee in 2008 to consider whether further changes or clarifications should be made.[77] In connection with proposed further amendments to UCC Article 9 (one of which, by means of amendment to UCC § 9-518, would allow secured parties to file an optional, and non-binding, "information statement" providing notice that one who filed a termination statement or other financing statement lacked authority to do so), the Uniform Law Commissioners and ALI noted,

---

[75]   *Sigman,* n.67 above, 73 Am. Bankr. L.J. at 71.

[76]   *Hawkland's Uniform Commercial Code Series* ("***Hawkland***") § 9-510:2 [Rev] (2012) (emphasis added).

*Roswell* has language, arguably dictum, to the contrary. For a discussion of this Court's inability to agree with *Roswell* in this and other respects, see the discussion beginning at page 64 below.

[77]   *See* their report, *reprinted in Hawkland* Art. 9 [Rev.] App. C.

in a proposed addition to the Official Comment to UCC § 9-518, that it would have "no legal

effect."  "Its sole purpose [was] to provide some limited public notice that the efficacy of a filed

record is disputed."[78]  They observed that because it would have "no legal effect, a secured party

of record—even one who is aware of the unauthorized filing of a record—[had] no duty to file

one."  They went on to say:

> If the person that filed the record was not entitled to do so,
> the filed record is ineffective, regardless of whether the
> secured party of record files an information statement.
> Likewise, if the person that filed the record was entitled to
> do so, the filed record is effective, even if the secured party
> of record files an information statement.[79]

And they concluded:

> Just as searchers bear the burden of determining whether
> the filing of [an] initial financing statement was authorized,
> searchers bear the burden of determining whether the filing
> of every subsequent record was authorized.[80]

## B.  Was Authorization Granted?

It is clear, then, that a filed record is effective only to the extent its filing is authorized.

But the critical term "authorizes" is not defined in the UCC—in the "Definitions and Index of

Definitions" section of Article 9 (UCC § 9-102),[81] the "General Definitions" at the beginning of

the UCC (UCC § 1-201)[82] which generally apply to all of the UCC's Articles, or anywhere else.

That was not inadvertent.  The drafters were aware that the Revised Article 9 would be silent

with respect to what constitutes the required authorization (and any standards for determining

---

[78]     *Id.*

[79]     *Id.*  (italics in original, used to indicate an addition, deleted).

[80]     *Id.*  (italics in original, used to indicate an addition, deleted; apparent omitted text added in brackets).

[81]     6 Del. C. § 9-102.

[82]     6 Del. C. § 1-201.

that issue), and contemplated that law outside UCC Article 9 would decide it.[83]  Thus textual

analysis, with which the Court normally begins any matter of statutory construction, is of limited

utility here.

With "authorizes" not having been statutorily defined, the Court turns, as the drafters of

the UCC contemplated, to the principal area of the law addressing situations where one is

authorized to act on behalf of another—the law of agency.[84]  Analysis of authority to act in

agency law has traditionally involved consideration of "actual" authority; "apparent" authority;[85]

and "ratification" of the agent's acts.  Though under the facts here, the latter two of those

doctrines are inapplicable, the Court considers them in turn.

### 1.  Actual Authority

As articulated in caselaw, "[a]ctual authority exists when an agent has the power 'to do

an act or to conduct a transaction on account of the principal which, with respect to the principal,

---

[83]     *See* Official Comment 3 to UCC § 9-509 (6 Del. C. § 9-509 cmt 3) ("Law other than this Article, including
the law with respect to ratification of past acts, generally determines whether a person has the requisite
authority to file a record under this section."); *accord* UCC § 9-502 cmt 3 (6 Del. C. § 9-502 cmt 3) (same).

In that connection, a third provision of the UCC—one of its "General Provisions," which did not come into
place in 2001, but rather has been in place since its inception—is consistent with the consideration of
agency law to decide when appropriate authority has been granted.  That provision, UCC § 1-103(b) (6 Del.
C. § 1-103(b)) provides, in relevant part:

> Unless displaced by the particular provisions of the Uniform
> Commercial Code, the principles of law and equity, including the law
> merchant and the law relative to capacity to contract, *principal and
> agent*, estoppel, fraud, misrepresentation, duress, coercion, mistake,
> bankruptcy, or other validating or invalidating cause supplement its
> provisions.

(emphasis added).

[84]     Neither the Committee nor JPMorgan suggests that there is any relevant statutory law in this regard.  The
principles emerge from caselaw, and caselaw-driven authorities such as the *Restatement of Agency*.

[85]     Another type, "implied" authority, which is a species of actual authority, is discussed at page 58 below.

he is privileged to do because of the principal's manifestation to him.'"[86]  Likewise, as set forth

in the current *Restatement*:

> An agent acts with actual authority when, at the time of
> taking action that has legal consequences for the principal,
> the agent reasonably believes, in accordance with the
> principal's manifestations to the agent, that the principal
> wishes the agent so to act.[87]

Actual authority is created by "direct manifestations" of that grant of authority which

come from the principal to the agent.[88]  "[T]he extent of the agent's actual authority is interpreted

in the light of all the circumstances attending these manifestations, including the customs of

business, the subject matter, any formal agreement between the parties, and the facts of which

both parties are aware."[89]

---

[86]  *Hidden Brook Air, Inc. v. Thabet Aviation Intern., Inc.,* 241 F. Supp. 2d. 246, 260 (S.D.N.Y. 2002) ("**Hidden Brook Air**") (under New York law) (quoting *Minskoff v. American Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (making reference to the 1958 Restatement (Second) of Agency (the "**Restatement Second**"), and thus general principles of law)).

[87]  Restatement (Third) of Agency ("**Restatement**") § 2.01 (2006); *see also id.* § 3.01 ("Actual authority, as defined in § 2.01, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf.").

[88]  *Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir. 1968) ("**Demarco**"); *Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1088 (2d Cir. 1997) ("**Peltz**") (quoting *Demarco*); *Highland Capital Management LP v. Schneider,* 607 F.3d 322, 327 (2d Cir. 2010) ("**Highland Capital Management**") (quoting *Peltz*).  Though *Demarco* and the approximately ten other decisions with identical language all appear to have been decided under New York law, the Court has no reason to believe that Delaware law would be any different in this respect.

See also Restatement Second § 7 (cited by *Demarco* court) ("Authority is the power of the agent to affect the legal relations of the principal by acts done *in accordance with the principal's manifestations of consent to him.*") (emphasis added); *Restatement* § 1.03 ("A person manifests assent or intention through written or spoken words or other conduct."); *id.* cmt a ("Actual authority as defined in § 2.01 requires a manifestation from the principal to the agent.  The scope of actual authority, addressed in § 2.02, is based upon, although not wholly defined by, the principal's manifestation to the agent.  A manifestation of assent by the principal is requisite to creating actual authority under § 3.01.").

[89]  *Demarco*, 390 F.2d at 844; *Peltz*, 115 F.3d at 1088 (quoting *Demarco*); *Highland Capital Management*, 607 F.3d at 327 (quoting *Peltz*).

Importantly for reasons that follow, "[t]he focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action."[90]  As stated in the current *Restatement*:

> An agent does not have actual authority to do an act if the agent does not reasonably believe that the principal has consented to its commission.  …  Lack of actual authority is established by showing either that the agent did not believe, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question.  This standard requires that the agent's belief be reasonable, an objective standard, and that the agent actually hold the belief, a subjective standard.[91]

Thus (presumably because of the requirement that the agent actually hold the belief, a subjective standard),[92] testimony of the alleged agent concerning the agent's belief as to his or her authority is a common means to prove or disprove the existence and scope of authority. Cases in this district and elsewhere have repeatedly considered the agent's testimony as to his understanding of his authority in determining whether actual authority existed.[93]

---

[90]     *Restatement*, § 2.01 cmt c.

[91]     *Restatement*, § 2.02 cmt e.

[92]     *Id.*

[93]     *See Merex A.G. v. Fairchild Weston Systems, Inc.,* 810 F.Supp. 1356, 1369 (S.D.N.Y. 1993), *aff'd by summary order,* 54 F.3d 765 (2d Cir.), *cert. denied,* 516 U.S. 915 (1995) (court relied on testimony of alleged agent, a market manager, when he stated that he informed the plaintiff Merex that he had no authority to bind the defendant Fairchild); *Playboy Enterprises, Inc. v. Dumas,* 960 F.Supp. 710, 721 (S.D.N.Y. 1997) ("There is no evidence suggesting that any of the [accountant agents  alleged to have been authorized in the transaction in question] believed that it had the authority to bind Nagel to a work for hire agreement.  In fact, what evidence there is shows that the agents believed that such action was outside of the limited scope of their agency."); *Yolton v. El Paso Tennessee Pipeline Co*., 668 F.Supp.2d 1023, 1041 (E.D. Mich. 2009) (relying on testimony by union representative that he knew that the union lacked the authority to modify employees' vested retirement benefits); *Big Bear Import Brokers, Inc. v. LAI Games Sales, Inc.,* 2010 U.S. Dist. LEXIS 18604, at *12, 2010 WL 729208, at *4 (D. Ariz. Mar. 2, 2010) (defendant LAI introduced undisputed evidence that agent Hughes did not have authority to enter into purchase agreement, and that at the time he signed it, he knew he did not have such authority, based on Hughes' admission that "he had a feeling that he was not allowed to enter the purchase agreement"); *Lone Star Heat Treating Co. v. Liberty Mutual Fire Insurance Co.,* 233 S.W.3d 524, 531 (Tex. Civ. App. 14th Dist. 2007) (on summary judgment motion, relying on uncontroverted affidavit of employee when he swore that nobody had told him that he was authorized to take actions in question).

In another case, *Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060 (7th Cir. 2000), where there was an issue as to whether one Richard Opp had authority to act as an agent, the Seventh Circuit found significant the

-33-

Here the Committee argues that JPMorgan (through its counsel, Simpson Thacher) granted actual authority to GM (through GM's counsel, Mayer Brown) to terminate the Main Term Loan UCC-1, as a consequence of JPMorgan's alleged authorization to file the Unrelated UCC-3.  The Committee bases its actual authority arguments, in substance, on the communications between JPMorgan and its counsel, on the one hand, and GM and its counsel, on the other, that took place before the Unrelated UCC-3 was filed.  Upon consideration of those communications, however—with a focus on the manifestations of the authority JPMorgan granted to GM (and, in particular, "the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware"),[94] and, to a lesser extent, on the caselaw—the Court concludes that JPMorgan did not grant actual authority to terminate the Main Term Loan UCC-1.

### (a) The Authority Indicia

The underlying facts—as contrasted to conclusions that flow from them—are not in dispute.  The parties agree, as does the Court, that the documents that are most significant in analyzing JPMorgan's manifestations of the authority it gave to GM are four particular documents:

---

*absence* of any testimony from Mr. Opp.  *See id.* at 1064-65 ("And the record contains no testimony from Mr. Opp.  Because the record provides no counter-affidavits that establish an explicit agency relationship between Ms. and Mr. Opp, we must accept Ms. Opp's affidavit as true and conclude that she never explicitly granted Mr. Opp the authority to limit the carriers' liability.").

Thus the Court must overrule the Committee's objection to the statements in affidavits and deposition testimony of Mayer Brown and GM personnel that they were not authorized to terminate the Main Term Loan UCC-1.  The Committee's objection, premised on the contention that each was expressing an impermissible legal conclusion, mischaracterizes the statements' substance.  Though the Mayer Brown and GM personnel sometimes spoke in conclusory terms, each was in substance expressing his or her *understanding or belief* that Mayer Brown and GM personnel had not been so authorized.  That is exactly what the *Restatement* says should be the factual predicate for the "subjective standard" prong of the legal conclusion.  *See* page 33 & n.91 above ("Lack of actual authority is established by showing … that the agent did not believe … that the principal's grant of actual authority encompassed the act in question.  This standard requires that … the agent actually hold the belief, a subjective standard.").  With the witnesses providing their understandings and beliefs, the Court can draw its own legal conclusions.

[94]     *See* page 32 & nn. 88-89 above.

(1) the Synthetic Lease Termination Agreement;

(2) the Synthetic Lease Closing Checklist;

(3) the Unrelated UCC-3; and

(4) the Synthetic Lease Escrow Agreement.

With respect to each of these documents, the Court considers it appropriate to ask two questions: was it an authorization, and, if so, an authorization of what? With respect to the first and fourth of those documents (the Synthetic Lease Termination Agreement and the Synthetic Lease Escrow Agreement), the Court finds a grant of authorization to do *something*.[95] But with respect to each of the four documents (including the first and the fourth), the Court finds no grant of authority to terminate the Main Term Loan UCC-1 (nor does it find a failure to object to any such document to be an authorization), and the Court finds the lack of the requisite authority to be particularly clear when the totality of the surrounding circumstances is considered.

*(1) The Synthetic Lease Termination Agreement*

Of the four key documents, the Synthetic Lease Termination Agreement was by far the most specific in defining the nature of GM's authority to file termination statements. That agreement, which is quoted in full above,[96] stated, in its most significant part:

> the Administrative Agent and the Lessor do hereby . . .
> authorize Lessee to file a termination of any existing
> Financing Statements relating to the Properties.

That plainly is an authorization. It also tells the reader exactly what has been authorized.

The key words "Financing Statements" and "Properties" in the preceding quoted language were capitalized and defined terms. They took their meaning from the Participation

---

[95]     With respect to the other two documents (the Synthetic Lease Closing Checklist and the Unrelated UCC-3), the Court cannot even find that.

[96]     *See* n.18 above.

Agreement, entered into back in October 2001, which had listed the particular pieces of real property that originally were collateral under the Synthetic Lease.

"Properties" as there used thus meant the Properties (as defined in the Participation Agreement) that were still collateral under the Synthetic Lease.[97]  "Properties" as there used did not include the very different collateral for the Term Loan.  Similarly, "Financing Statements," by reason of the defined terms in the Participation Agreement, referred to the "Lessor Financing Statements" and "Lessee Financing Statements" that had been filed in connection with the Synthetic Lease, which had been executed by the "Lessor" (the Auto Facilities Real Estate Trust 2001-1); the "Lessee" (GM); and the "Administrative Agent" (JPMorgan).[98]  Once again, they did not include unrelated initial financing statements (most significantly, the Main Term Loan UCC-1) with respect to the Term Loan, nor any that had been filed with respect to any other financing.

The Synthetic Lease Termination Agreement can be read in only one way:  that Administrative Agent JPMorgan authorized Lessee GM to file terminations of existing financing statements only with respect to the specific properties that were the subject of the Synthetic Lease.  The Synthetic Lease Termination Agreement plainly was an authorization to terminate initial financing statements—but only those that it specified.  It was not an authorization to bring the Main Term Loan UCC-1 to an end.

### (2) The Synthetic Lease Closing Checklist

The second of the four potentially relevant documents is the Synthetic Lease Closing Checklist—a six-page listing of several dozen documents, prepared by GM's counsel Mayer Brown, that would be executed in connection with the payoff of the Synthetic Lease, some of

---

[97]        *See* n.21 above.

[98]        *See* n.20 above, quoting the original definitions.

which would also be filed.  The Court is satisfied that personnel from Simpson Thacher and

JPMorgan received and reviewed the Synthetic Lease Closing Checklist, and voiced no objection

to it.  But the Court cannot find an authorization on the part of JPMorgan, by reason of that

receipt, review, or failure to protest, to file or terminate anything, and especially cannot find an

authorization to terminate the Main Term Loan UCC-1.

Preliminarily, the Synthetic Lease Closing Checklist did not say that it was, nor was it, an

authorization to do anything.  It did not by its terms invite or call for (or even mention) an

authorization from JPMorgan with respect to the documents that were listed upon it, and

JPMorgan did not execute it.  In each of these respects, it was quite different than the Synthetic

Lease Termination Agreement discussed above.  Plainly, the Synthetic Lease Closing Checklist

was sent to Simpson Thacher and JPMorgan for comment.  And one can infer that if Simpson

Thacher or JPMorgan had any objection or protest (or even comments), Mayer Brown would

refrain from action, at least pending further discussion.  But the Synthetic Lease Closing

Checklist did not purport to be, nor was it, an authorization of any kind.

Because the Court cannot find the Synthetic Lease Closing Checklist to be an

authorization at all, the Court need not address the second question that must be asked:  "an

authorization of what?"  If the Court were required to answer that question, however, it would

answer it in the same way that it answered that question for the Synthetic Lease Termination

Agreement, as discussed above.

The Synthetic Lease Closing Checklist identified itself as relating to the "Release of

Properties from JPMorgan Chase Synthetic Lease."  It made no mention of the Term Loan, nor

of any financing other than the Synthetic Lease.  Assuming, *arguendo*, that failure to protest to

-37-

the filing of the listed documents could be deemed to be an authorization, it could only be read as an authorization for what it described—the properties remaining under the Synthetic Lease.

For those same reasons, the Court is unpersuaded that Simpson Thacher's Merjian's statement, "Nice job on the documents," preceding the one comment he had relating to Synthetic Lease matters, should be deemed to be an authorization of any kind, or, if one reaches the issue, an authorization to terminate the Main Term Loan UCC-1.

It is true, of course, that embodied in the Synthetic Lease Closing Checklist was the number of a UCC-1 which those involved with this case now know to be the Main Term Loan UCC-1. But nobody knew that at the time. Nobody knew that the Main Term Loan UCC-1 would be affected in any way—or more importantly, intended by the Synthetic Lease Closing Checklist to achieve such an end.

It also is true, of course, that by reference to each UCC-1 filing number that was mentioned in the Synthetic Lease Closing Checklist, one could find the original UCC-1 to which the checklist referred; then discern to what the UCC-1 related; and then decide whether or not to authorize the termination of that UCC-1, even if it related to a wholly unrelated transaction. But the failure to have engaged in such an exercise cannot be found to be an authorization.

### (3) The Unrelated UCC-3 Itself

The third of the four documents potentially relevant to this inquiry is the draft of the UCC-3 itself. Based on the content of the draft Unrelated UCC-3; its delivery to Simpson Thacher and JPMorgan before its filing; and Simpson Thacher's asserted approval of it (or at least Simpson Thacher's failure to object to its filing), the Committee contends that the

Unrelated UCC-3 itself constitutes authorization for the termination of the Main Term Loan UCC-1.[99]

Once again, however, the Court cannot find an authorization here, or conclude, assuming *arguendo* that the draft UCC-3 was an authorization, that it was an authorization to terminate the Main Term Loan UCC-1. With respect to the first of those issues, the UCC-3 did not call for the signature of the secured party principal. Nor did it have a granting clause or use granting language—such as the "hereby … authorize" which appears in the Synthetic Lease Termination Agreement. GM's filling in of a box listing JPMorgan as "Secured Party of Record Authorizing this Amendment" could not reasonably be regarded as a substitute for this. Nor could the UCC-3, executed solely by GM, reasonably be deemed to be a grant of authority by JPMorgan.

Then, assuming *arguendo* that the draft UCC-3 could be deemed to be an authorization of something, it cannot be found to be an authorization to terminate the Main Term Loan UCC-1. The Unrelated UCC-3 did not, as the Committee argues, "indicate[]that the effectiveness of the Term Loan Financing Statement is terminated…."[100] It made no reference to the Term Loan other than as might be ascertained by looking at the number listed under "Initial Financing Statement File #" and then following through on an inquiry to discern the file number's significance.[101]

---

[99]      *See* Comm. Partial SJ Br. 14 ("The draft of the Term Loan Termination Statement [*i.e.*, the Unrelated UCC-3] indicated that the effectiveness of the Term Loan Financing Statement is terminated and identified JPMorgan as the secured party of record authorizing the termination.").

[100]     *See* n.99 above.

[101]     Addressing one of the important premises for its arguments here, the Committee argues that:

> In this case, the Term Loan Termination Statement [*i.e.*, the Unrelated UCC-3] stated unambiguously that the Term Loan Financing Statement was terminated with respect to the security interest of JPMorgan, the secured party of record authorizing its filing.

*See* Comm. Partial SJ Br. 13. But that is not quite correct. The words "Term Loan Financing Statement" or "Term Loan" never appeared on the Unrelated UCC-3. The Committee's argument rests on what might

-39-

Since a draft of the Unrelated UCC-3 was included amongst the documents that were sent to Simpson Thacher, the Court is inclined to agree with the Committee that when Simpson Thacher's Merjian stated, "Nice job on the documents," just preceding the one comment he had relating to Synthetic Lease matters, the Unrelated UCC-3 was covered under that remark to no lesser degree than the other documents in the pile. But for the reasons above, that generalized remark still cannot be deemed to be an authorization of any kind, or, if one reaches the issue, an authorization to terminate the Main Term Loan UCC-1. In the absence of an indication that Merjian knew that there was a document that could affect the Main Term Loan UCC-1 in the batch he received, or that Merjian intended that a UCC-3 in that batch terminate the Main Term Loan UCC-1—and, of course, when neither JPMorgan nor GM had the belief that the Main Term Loan UCC-1 would be affected in any way—the Court cannot find Merjian's comment to constitute an authorization to terminate that wholly unrelated document.

### (4) The Synthetic Lease Escrow Agreement

The fourth and last of the documents that are asserted to have potential relevance is the Synthetic Lease Escrow Agreement. As with the Synthetic Lease Termination Agreement, the Synthetic Lease Closing Checklist, and the Unrelated UCC-3, the Court considers this document at two levels: again, whether was it an authorization at all, and, if so, an authorization of what.

At the first level, the Court concludes that the Synthetic Lease Escrow Agreement was indeed an authorization—to authorize the Title Company to act to implement the letter's joint directions. But the Synthetic Lease Escrow Agreement was not a grant of an authorization to file UCC-3s. The Court so concludes because (1) the UCC-3s were not amongst the documents that were to be recorded or filed under that agreement, and (2) it was the intention of JPMorgan, GM,

---

have been learned in the multi-step inquiry process if any of Simpson Thacher, JPMorgan, Mayer Brown or GM had engaged in one.

and the other parties to the Synthetic Lease Termination Agreement to embody any authorization JPMorgan might grant within that document instead.

At the second level, the Court concludes, once again, that assuming, *arguendo*, that the Synthetic Lease Escrow Agreement was intended to constitute a second (and seemingly redundant) basis for authority to terminate UCC-1s, the Synthetic Lease Escrow Agreement was an authorization to terminate UCC-1s only with respect to the Synthetic Lease. It still could not be regarded as an authorization to terminate the Main Term Loan UCC-1.

Here, with respect to whether the Synthetic Lease Escrow Agreement was an authorization at all, the Court concludes that it was—though to the Title Company, not to GM or Mayer Brown. In fact, Mayer Brown, on behalf of GM, was one of the three entities granting the authorization—not the entity being authorized.

With respect to *what* the Synthetic Lease Escrow Agreement authorized, it authorized the Title Company to record or file specified documents (*i.e.*, the 23 Recording Documents),[102] but not all of the 47 Escrow Documents.[103] The remainder (which included the Unrelated UCC-3) were simply to be returned to Mayer Brown.[104]

Significantly, the Synthetic Lease Escrow Agreement, which by its terms gave instructions to the Title Company, did not give Mayer Brown instructions or authority to do anything. Nor, especially, did it give Mayer Brown any instructions concerning what Mayer Brown should do with the Escrow Documents that the Title Company would not file, but instead would only forward to Mayer Brown—including, as relevant here, the Unrelated UCC-3.[105]

---

[102]     *See* n.45 above.

[103]     *See* page 19 above.

[104]     *See* n.46 above.

[105]     In its briefing and at oral argument on these motions, *see* Comm. SJ Opp. 6 n.6, Comm. Partial SJ Reply 11, and Arg. Tr. at 31-32 (ECF #63), the Committee asked rhetorically, in substance, if the remainder of the

Finally, the Synthetic Lease Escrow Agreement described itself as relating to the Participation Agreement, *i.e.*, to the Synthetic Lease.[106]  It made no mention of the Term Loan.

For all of these reasons, the Court cannot find the Synthetic Lease Escrow Agreement to be a source of authority for GM or Mayer Brown to have filed anything, including, especially, anything affecting the Term Loan.

### (5) *"All Circumstances Attending [Principal's] Manifestations" to Agent*

As noted above,[107] actual authority is created by "direct manifestations" coming from the principal to the agent.  "[T]he extent of the agent's actual authority is interpreted in the light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware."[108]  The direct manifestations, and all of the circumstances attending them, likewise cause this Court to conclude that termination of the Main Term Loan UCC-1 was not authorized.

When the Unrelated UCC-3 was filed, there was one, and only one, "direct manifestation[]" of the authority granted to GM by JPMorgan here.  That was the Synthetic Lease Termination Agreement, the only document embodying a grant of authority to GM.  The "direct manifestation[]" of GM's authority to terminate initial financing statements (which granted authority with respect to the "Financing Statements" relating to the "Properties," each of which was a defined term in the Synthetic Lease Termination Agreement), came from the

---

Escrow Documents were not being returned for filing, what were they returned for?  Certainly the filing of at least some of them was foreseeable—though many more documents were to be returned than were, or could be, filed.  But the fact remains that the Synthetic Lease Escrow Agreement embodied no authority for GM to do anything with respect to documents so returned, whether the filing of any of them was foreseeable or not.

[106]   *See* nn. 38 and 39 above.

[107]   *See* page 32, above.

[108]   *Demarco*, 390 F.2d at 844; *accord Peltz*, 115 F.3d at 1088; *Highland Capital Management*, 607 F.3d at 327.

Synthetic Lease Termination Agreement, and nowhere else.  Having provided the necessary

grant of authority in one place (in very express terms), there was no need to express it again, and

the Court can find no evidence of an intent to say it again, either in the same terms or different

ones.  The other asserted manifestations of authority to GM, as argued by the Committee, were

not at all "direct," if they could be regarded as manifestations at all.

The Court then considers "the customs of business, the subject matter, any formal

agreement between the parties, and the facts of which both parties were aware."  No expert

testimony, or other evidence, was offered as to the "customs of business," so the Court lacks

evidence of that character upon which to rely.  But there is a fair amount of evidence in the

record as to the remaining factors, as to which there are no disputed issues of fact, and it all

points the same way.

The "subject matter" of the transaction was, as nearly every relevant document expressly

stated, the termination of the Synthetic Lease.  In all of the emails and underlying documents,

there was no mention, before the filing of the Unrelated UCC-3, of the Term Loan or of any

intent to affect the Term Loan in any way.  The affidavits and deposition testimony were wholly

consistent.  Nobody at GM, JPMorgan, Mayer Brown or Simpson Thacher ever regarded the

subject matter of the transaction as anything other than the Synthetic Lease.  The Committee

effectively asks the Court to conclude that JPMorgan granted authorization to GM to take action

with respect to a wholly different subject matter—a wholly unrelated $1.5 billion loan—without

any of the participants in the Synthetic Lease payoff ever mentioning that along the way.

Looking at any "formal agreement between the parties," the Court comes to the same

conclusion.  The only formal agreement between the parties with respect to authority to file the

Unrelated UCC-3, as discussed above in the Court's discussion of direct manifestations from

principal to agent, was the Synthetic Lease Termination Agreement—with respect to which the

grant of authority was explicit, and equally explicit with respect to what it covered.  Other

documents relied upon by the Committee as sources of authorization here were not agreements.

They provide no basis for the Court to conclude that JPMorgan and GM agreed to trump or

supplement the one formal agreement between the parties that expressly addressed the matter of

authority.[109]

Other, earlier, formal agreements between the parties reinforce that conclusion.  When

the Term Loan was put into place in 2006, its documentation had provisions to protect the liens

securing the Term Loan.  Under one such provision, the Term Loan Collateral could not be

eliminated unless the Term Loan was fully paid off.[110]  Under another, GM covenanted to

maintain the perfection of the security interests in the Term Loan Collateral.[111]  And under

another, the Term Loan Lenders' perfected security interests could not be released "without the

written consent of each Lender."[112]  These too were elements of formal agreements between the

parties that must be considered when determining whether JPMorgan authorized the termination

---

[109]    The Committee asserts that the Synthetic Lease Termination Agreement does not say that it is the sole
source of authority to GM, and that it lacked an integration clause—and thus that the Committee is not
foreclosed from relying on other documents as sources of authority.  Comm. SJ Opp. 9 n.9; Comm. Partial
SJ Reply 14-15.  The Court agrees with the Committee that it is not so foreclosed, and has assumed,
consistent with *Demarco, Peltz* and similar cases, that if there were any other formal agreements likewise
speaking to a grant of authority, the Court should consider them as well.  For these reasons, the Court has
reviewed, with some care, what the Synthetic Lease Closing Checklist, the Unrelated UCC-3, and the
Synthetic Lease Escrow Agreement said (even though not all of them were agreements between JPMorgan
and GM), along with earlier formal agreements between JPMorgan and GM.  Ultimately, however, the
documents that the Committee wishes the Court to consider fall considerably short of granting additional or
different authority, especially when two of the three of them are not agreements at all.  Also, when
considering the circumstances in the aggregate, it is appropriate to give the most specific document the
greatest weight.

[110]    Collateral Agreement § 7.13 (Duker Aff. Exh. H).

[111]    Collateral Agreement § 4.03.

[112]    Term Loan Agreement § 10.01 (Duker Aff. Exh. G).

of the Lenders' Term Loan liens as a consequence of the inferences the Committee asks the Court to draw here.

Consideration of "the facts of which both parties are aware" likewise supports JPMorgan's contention that it did not grant authority to terminate the Main Term Loan UCC-1. Here neither principal (JPMorgan) nor agent (GM) believed or understood that JPMorgan authorized GM to terminate the Main Term Loan UCC-1. Their understandings were to the contrary. Nor were they even aware that a UCC-3 referencing an initial financing statement for the Term Loan had been filed until long after the Unrelated UCC-3's filing, or of any extrinsic facts that would cause either to believe that GM should be terminating the Main Term Loan UCC-1. As an additional one of the factors to be considered under *Demarco*, *Peltz*, and similar cases, "the facts of which both parties were aware" require the Court to conclude that no authorization was given.

Finally consideration of all of the circumstances in the aggregate compels a finding that authority to terminate the Main Term Loan UCC-1 was not granted. Stepping back from the more detailed analysis above, the Court sees the transaction as the payoff of a real estate financing under which the parties intended to bring the real estate financing liens to an end, without any intention to affect anything else. Neither GM nor JPMorgan intended, or believed, that their documents would affect anything else—and, more to the point, thought JPMorgan had authorized GM to affect anything else. A document now known to have related to the unrelated Term Loan was mistakenly filed by Mayer Brown. Even with delivery of a draft of that document to Simpson Thacher in advance, and Simpson Thacher's failure to protest, the mistaken filing by Mayer Brown of that document—in the absence of recognition by either Mayer Brown or Simpson Thacher that the initial financing statement filing number appearing

-45-

on it would, upon further investigation, lead to a reference to the Term Loan—does not equate to
an authorization by JPMorgan or Simpson Thacher for the termination of JPMorgan's Term
Loan liens.  This too compels a ruling by this Court that when authorizing termination of
UCC-1s with respect to the Synthetic Lease, JPMorgan did not give actual authority to GM to
terminate the Main Term Loan UCC-1.

### (6) Understanding of the Agent

There is, in addition, one more reason why the Court cannot find termination of the Main
Term Loan UCC-1 to have been authorized.  That is the understanding of the agent.

As discussed above,[113] an agent does not have actual authority to do an act if the agent
does not reasonably believe that the principal has consented to its commission.  Here no one on
the GM side had any belief, reasonable or otherwise, that GM had been authorized to terminate
JPMorgan's security interests with respect to the Term Loan.

If Mayer Brown or GM had actually believed that either had been authorized by
JPMorgan to terminate a wholly unrelated $1.5 billion financing, this would be a different case,
requiring the Court to then consider whether such a belief was reasonable.[114]  But that is not an
issue here, because every individual on the GM side unequivocally expressed his or her belief
that GM had not been so authorized.  And because, as the *Restatement* makes clear, a belief (and
indeed, a reasonable belief) by the agent that he or she has been authorized is essential to a
finding of actual authority—and that is lacking here—the Court cannot find that GM or Mayer

---

[113]    *See* page 33 & n.91 above.

[114]    *See Restatement* § 2.02 cmt e.  Though under the facts here, any such belief, if it existed, would be absurd,
the Court is uncertain whether the absurdity of the agent's belief can be decided on a summary judgment
motion when reasonableness is at issue.  That issue need not be decided here, of course, because those on
the GM side did not have a belief that JPMorgan had authorized the termination of its security interest on
the unrelated Term Loan, reasonable or otherwise.

Brown had actual authorization.  Quite apart from the conclusion that flows from the multi-indicia analysis dictated by *Demarco*, *Peltz* and similar cases, that is ultimately conclusive.[115]

\* \* \*

For all of these reasons, the Court concludes that GM and Mayer Brown lacked actual authority to cause JPMorgan's Main Term Loan UCC-1 to come to an end.[116]

### (b) Helpful Caselaw

Because the consideration of indicia of a grant of authority is fact-driven, caselaw dealing with grants of authority in connection with the filing of other UCC-3s is not as helpful as it otherwise might be.  But there are a few cases worthy of consideration.

In the *Negus-Sons* bankruptcy case,[117] the bankruptcy court held that secured party authorization was required to file a UCC-3, and that this authorization had been provided.  The Eight Circuit Bankruptcy Appellate Panel, and then the Eighth Circuit, affirmed—finding that the bankruptcy court's decision was "supported by the record," though "the strongest basis for affirming" was an alternate one, that the secured party was paid off with respect to the remainder of its collateral.

---

[115]   Here the "actual authority" that the Committee asks the Court to find is ultimately based on the results of an investigative process that never happened.  It is not based on anything JPMorgan said or signed, or that GM believed.  It rather is the result of a logical syllogism resulting from Simpson Thacher's failure to protest when it saw GM's draft UCC-3 listing a particular initial financing statement filing number, when if Simpson Thacher, Mayer Brown, or either of their clients had investigated and tracked down the referenced UCC-1, and then investigated further to ascertain the financing to which that UCC-1 related, they would have discovered that the UCC-1 in question related not to the Synthetic Lease but rather to the Term Loan.  That is not a proxy for actual authority, which requires the reasonable belief by the agent that it has been authorized to act in the respect at issue.

[116]   The Committee also relies on "implied authority," which is a species of actual authority.  Because the Committee asserts this as a separate contention, the Court considers it as such, and deals with it below.  *See* page 58 below.

[117]   *See Lange v. Mutual of Omaha Bank (In re Negus-Sons, Inc.),* 2011 Bankr. LEXIS 2378, 2011 WL 2470478 (Bankr. D. Neb. June 20, 2011) ("***Negus-Sons-Bankruptcy***"), *aff'd,* 460 B.R. 754 (B.A.P. 8th Cir. 2011) ("***Negus-Sons-BAP***"), *aff'd on opinion of BAP,* 701 F.3d 534 (8th Cir. 2012) (*per curiam*).

-47-

There a secured party, Mutual of Omaha Bank (the "**Bank**"), had liens on a variety of

collateral, some of which the Bank intended to keep and some of which it intended to release.

But a Bank employee carelessly placed language in a loan payoff letter provided to a new lender,

Wells Fargo Equipment Finance, stating that "[u]pon receipt of payoff *all* liens will be

released."[118]   Based on this language, and its earlier request for authorization for a release of the

security interest "in all the collateral," Wells Fargo Equipment Finance filed a termination

statement on the Bank's behalf.   While the Bank claimed that it intended only to release its

security interest in the collateral for which payment was received, the bankruptcy court ruled that

the broad language in the Bank's responding letter authorized the filing of the termination

statement.[119]

The bankruptcy court's decision in *Negus-Sons-Bankruptcy*, which the BAP implicitly

found not to be clearly erroneous,[120] is in any event easily distinguishable.   The bankruptcy court

---

[118]     *Negus-Sons-Bankruptcy,* 2011 Bankr. LEXIS 2378, at *12, 2011 WL 2470478, at *5 (emphasis added).

[119]     The Bank contended that its authorization was more limited, referring only to its equipment collateral and
not its entire security interest.  *See* 2011 Bankr. LEXIS 2378, at *9-10, 2011 WL 2470478, at *4.  The
*Negus-Sons-Bankruptcy* court found that contention inconsistent with the request from Wells Fargo
Finance to which the Bank was responding.  The request provided, in relevant part:

> This letter is to confirm that upon receipt of funds from Wells Fargo
> Equipment Finance, Inc. for the entire payoff of all accounts that you
> *agree to terminate your security interest in all the collateral with all
> the companies listed above* and forward all titles to the following
> address:
>
> ...
>
> We have prepared an amendment to your UCC filing(s) to effectuate
> these terminations.  Please indicate your consent to the filing of these
> amendments, and your authorization for us to file them on your behalf,
> by signing in the space provided below....

*Id.* (emphasis added).

[120]     The BAP stated that "[t]he record supports the bankruptcy court's determination that Wells Fargo had the
authority to terminate [the] financing statements."  *Negus-Sons-BAP,* 460 B.R. at 757.  But it went on to
say that it could affirm on the basis that the termination of the financing statements was unnecessary,
because of payment in full of the remaining indebtedness before the bankruptcy, taking pains to say "we
can affirm on any ground supported by the record."  *Id.* at 757 n.9.  And it later found that the alternative
ground was "the strongest basis for affirming the bankruptcy court's determination that Mutual of Omaha
no longer has a security interest in the Property."  *Id.* at 758.  It is fair to infer that the B.A.P. found the

found that authorization to terminate the liens with respect "to all of the collateral with all the companies listed above" was sought, and that authorization for the release of "all liens" was expressly granted by the Bank.  The Bank did not limit its release of liens to those on particular assets.[121]

But while not fully on point as a factual matter (and while they engage in a factual analysis somewhat less structured than the one this Court has undertaken, pursuant to *Demarco*, *Peltz* and similar cases) the decisions by the bankruptcy and district courts in the *A.F. Evans* bankruptcy[122] are nevertheless instructive.  The bankruptcy court in *A.F. Evans-Bankruptcy* understandably started with the statutory scheme of UCC §§ 9-509(d), 9-510 and 9-513.  It then engaged in a fact-driven analysis to ascertain whether the requisite authority had been granted— ultimately concluding that *authority to terminate the liens on two items of collateral did not extend to a third*, even though a termination statement that covered the third as well had been filed.  The *A.F. Evans-District* court affirmed.

The *A.F. Evans* cases involved a situation, like this one, in which a creditors' committee, on behalf of the debtor's unsecured creditor community, was jousting with a secured lender over the validity of the secured lender's lien.  As here, the secured creditor City National Bank ("**City**

---

bankruptcy court's factual finding of authority not to be clearly erroneous, but not to have been strongly supported.

The BAP also stated that in light of its rulings, it did "not need to address the more general question of whether unauthorized termination statements are effective," *id.* at 757, though it went on to say that it was hesitant to endorse the holding in *Roswell*, which "appears to be contrary to the plain language of the Uniform Commercial Code."  *Id.* at 757 n.10; *see also* this Court's discussion of *Roswell*, beginning at page 64 below.

[121]   Other cases involving termination of UCC-1s by entities acting (albeit without authority) on behalf of secured lenders, *S.J. Cox* and *Roswell*, are in this Court's view erroneously decided, and thus are inappropriate for discussion in this context.  The Court addresses them below, in the context in which the Committee relies upon them, beginning at pages 61 and 64, respectively.

[122]   *See Official Committee of Unsecured Creditors v. City National Bank, N.A. (In re A.F. Evans Co.),* 2009 Bankr. LEXIS 2473, 2009 WL 2821510 (Bankr. N.D. Cal. July 14, 2009) ("***A.F. Evans-Bankruptcy***"), *aff'd* 2011 U.S. Dist. LEXIS 51628, 2011 WL 1832963 (N.D. Cal. May 13, 2011) ("***A.F. Evans-District***").

**Bank**") originally had a lien on the debtor's interests in three partnerships.  When interests in

two of the partnerships were sold, the debtor had asked City Bank to release its liens on those

two partnership interests (in exchange for a cash payment to City Bank), leaving only the third

under City Bank's original lien.  City Bank agreed.  To facilitate the closing of the sale of those

two partnerships, the debtor there (analogous to GM here) sent City Bank (analogous to

JPMorgan here) proposed escrow instructions directed to the debtor and to a title company, First

American Title Insurance Co. ("**First American**"), along with two proposed UCC-3s checking

the box for deletion of collateral (the two partnerships being sold) but not the box for

termination.  The proposed instructions (analogous in many respects to the Synthetic Lease

Termination Agreement here) included an exhibit containing a description of the collateral to be

released upon payment to City Bank.  The descriptions were limited to the two partnerships

being sold, and did not include any reference to the third.[123]

City Bank then caused the instructions to be sent to First American, accompanied by

those two UCC-3s, which, again, would release collateral from the scope of the original UCC-1

but not terminate it.  But thereafter, someone (presumably at First American, though no finding

was made as to who the "someone" was) mistakenly checked an additional box on the UCC-3s,

this time the box providing for termination,[124] and caused the UCC-3s to be filed.  The *A.F.*

*Evans* creditors' committee then argued, as here, that the filing of the UCC-3s with their

"termination" box checked caused City Bank to lose its priority as a secured lender.

---

[123]    *See* 2009 Bankr. LEXIS 2473, at *2-3, 2009 WL 2821510, at *1.

[124]    *See* 2009 Bankr. LEXIS 2473, at *5, 2009 WL 2821510, at *2.

The *A.F. Evans-Bankruptcy* court rejected that contention.  After going through California's versions of UCC §§ 9-509(d), 9-510(a) and 9-513(d),[125] it recognized that the termination of City Bank's security interest would be effective only to the extent such had been authorized.  It then recognized, as this Court has, that in "determining what a secured party did or did not authorize" within the meaning of UCC 9-509(d), "law other than the Commercial Code may determine the issue."[126] And it did not quarrel with the general agency principle that principals are bound by the acts of their agents acting within the scope of their authority, and that First American had the authority to act with respect to the two partnerships with respect to which City Bank had agreed to release its liens.  But the *A.F. Evans-Bankruptcy* court found that terminating City Bank's lien on the third partnership was beyond the scope of the authority City Bank had granted.  It followed from this that City Bank "was not bound by First American's unauthorized modification to the UCC-3, if indeed the modification was by First American."[127]

As the Committee here correctly observes, *A.F. Evans-Bankruptcy* is not the same as this case in the respect that the documents City Bank reviewed and approved in that case showed nothing wrong, and were changed thereafter.  But in a key respect, it is highly relevant to what we have here.  The *A.F. Evans-Bankruptcy* court did not equate the authority City Bank had granted to file UCC-3s with respect to identified collateral (two of the three partnerships) to authority to make filings generally.  Rather, it measured the agent First American's authority by looking at the exact authority that City Bank had granted, and found authority to that extent and

---

[125]   *See* 2009 Bankr. LEXIS 2473, at *6, 2009 WL 2821510, at *3.  The California versions of those provisions, Cal. Comm. Code §§ 9509(d), 9510(a), and 9513(d), were the standard uniform provisions, identical except in numbering to those in Delaware.

[126]   2009 Bankr. LEXIS 2473, at *8, 2009 WL 2821510, at *3, citing the Official Comment to UCC § 9-509, quoted above at n.83.

[127]   2009 Bankr. LEXIS 2473, at *10, 2009 WL 2821510, at *4.

nothing more.  As the *A.F. Evans-Bankruptcy* court explained (referring to City Bank by the

acronym "CNB"):

> Therefore, First American was not CNB's agent, except for
> the limited purpose of handling the closing of the escrow
> for the debtor's sale to the buyer *of the Westgate and
> Greenery partnership interests*.  And First American was
> not acting within the scope of its very limited authority
> from CNB when it recorded a UCC–3 Amendment
> statement in a form other than that which CNB had
> authorized.[128]

The decision in *A.F. Evans-District*, which expressly dealt with this contention on appeal,

and affirmed the bankruptcy court with respect to it, was to the same effect.  On appeal, the *A.F.*

*Evans* creditors' committee argued that City Bank gave First American broad authorization to

file any 'appropriate amendments' to City Bank's UCC-1, and that First American was acting as

City Bank's agent in all matters relating to City Bank's security interest in the debtor's

property.[129]  But the *A.F. Evans-District* court looked at the context in which the grant of

authority had been given, and in particular, City Bank's release with respect to those two

particular partnerships.[130]  It concluded that "[t]he bankruptcy court reasonably construed such

instruction to mean that the only "appropriate amendments" authorized by CNB were

amendments that relinquished CNB's interest *in the two properties identified therein*."[131]

---

[128]   *Id.* (emphasis added).

[129]   *A.F. Evans-District*, 2011 U.S. Dist. LEXIS 51628, at *13-14, 2011 WL 1832963, at *5.

[130]   *Id.* ("City National Bank hereby releases all of its right, title and interest in [Westgate and Greenery] and authorizes the filing of appropriate amendments to [the] UCC Financing Statement….").

[131]   *Id.* (emphasis added).

As applied to this case, each of *A.F. Evans-Bankruptcy* and *A.F. Evans-District* support finding authority for GM to terminate UCC-1s with respect to the "Properties"—*i.e.* the "Properties" that were the subject of the Synthetic Lease—but not for anything else.[132]

### 2. Apparent Authority

Apparent authority is different from actual authority.  Apparent authority arises from the written or spoken words or other conduct which, reasonably interpreted, cause a *third party* to believe that the principal consents to have an act done on the principal's behalf by the person purporting to act for him.[133]  As stated in the *Restatement*:

> Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.[134]

Apparent authority does not in itself carry the consequences of actual authority with respect to the rights and duties that apply to the relationship between agent and principal.[135]

Unlike actual authority, which considers manifestations from the principal to the agent from the perspective of the agent, apparent authority considers the conduct of the *principal,* and

---

[132]    *A.F. Evans-Bankruptcy* is also noteworthy for its view that it should not rely on two decisions upon which the Committee relies here, by the Ninth Circuit BAP and Ninth Circuit, respectively, in *Koehring Co. v. Nolden (In re Pacific Trencher & Equipment, Inc.)*, 27 B.R. 167 (B.A.P. 9th Cir. 1983) ("***Pacific Trencher***"), *aff'd* 735 F.2d 362 (9th Cir. 1984).  While the *A.F. Evans-Bankruptcy* court found the *Pacific Trencher* decisions distinguishable because in *A.F. Evans,* boxes that had been checked on the UCC-3s sent mixed signals, the *A.F. Evans-Bankruptcy* court also found the *Pacific Trencher* decisions distinguishable (consistent with this Court's views as to those cases, see page 61 below) that the mistake in *Pacific Trencher* was made by the secured party itself (and did not involve an unauthorized act by an agent), and that the *Pacific Trencher* cases were decided prior to the 2001 UCC amendments' enactment of UCC §§ 9-509 and 9-510, which specifically address the effect of an unauthorized filing.  *See A.F. Evans-Bankruptcy*, 2009 Bankr. LEXIS 2473, at *11-13, 2009 WL 2821510, at *5.

[133]    *Hidden Brook Air,* 241 F. Supp. 2d. at 261.

[134]    *Restatement* § 2.03.

[135]    *Id.* cmt a.

as the principal's conduct is interpreted by a *third party*.[136]  "Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction."[137]  The agent cannot by his own acts imbue himself with apparent authority.[138]

As with manifestations of actual authority made to agents,[139] a principal's manifestations of apparent authority made to third parties must be understood in context.[140]  Apparent authority may result under any set of circumstances under which it is reasonable for a third party to believe that an agent has authority, so long as the belief is traceable to manifestations of the principal.[141]

Importantly, the inquiry requires the belief of an actual *third party,* who has acted in reasonable *reliance* on the principal's representations as to the agent's authority.[142]

Here the Court finds the doctrine of apparent authority simply to be inapplicable.  There here were no statements to third parties with respect to the Term Loan upon which a finding of apparent authority could be made.

---

[136]  *Minskoff v. American Exp. Travel Related Services Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996) ("Apparent authority, then, is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent.").

[137]  *Hallock v. State of New York*, 64 N.Y.2d 224, 231, 474 N.E.2d 1178 (1984) ("***Hallock***"); *FDIC v. Providence College*, 115 F.3d 136, 140 (2d Cir. 1997) ("***Providence College***") (quoting *Hallock*).

[138]  *Hallock,* 64 N.Y.2d at 231.

[139]  *See* page 32 & n.89 above.

[140]  *Restatement* § 2.03 cmt c ("A principal's conduct does not occur in a vacuum.  A third party's reasonable understanding of the principal's conduct will reflect general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties.").

[141]  *Restatement* § 2.03 cmt c.

[142]  *See Providence College*, 115 F.3d at 140 ("The inquiry therefore centers on the 'words or conduct of the principal … communicated to a third party … that give rise to the appearance and belief that the agent … possesses authority to enter into a transaction ….'") (quoting *Hallock*); *In re Kollel Mateh Efraim, LLC*, 334 B.R. 554, 560 (Bankr. S.D.N.Y. 2005) ("Apparent authority consists of two elements: (1) a manifestation by the principal that the agent has authority and (2) reasonable reliance on that manifestation by the person dealing with the agent.").

Though the distinction ultimately does not matter here, it also is the case that the third party must rely on manifestations as to the existence of authority from the principal—not the agent.  *See Hallock*, 64 N.Y.2d at 230 ("The agent cannot by his own acts imbue himself with apparent authority.").

*3. Ratification*

The Committee further contends that the filing of the Unrelated UCC-3 was ratified by

JPMorgan,[143] and hence that the termination of the Main Term Loan UCC-1 should be held to

have been valid under the agency doctrine of ratification.  Once more, however, the Court is

unable to agree.

As set forth in the *Restatement*, "ratification is the affirmance of a prior act done by

another, whereby the act is given effect as if done by an agent acting with actual authority."[144]  A

person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations,

or (b) conduct that justifies a reasonable assumption that the person so consents.[145]  While

silence may, in some circumstances, act as the ratification of a prior act, "[t]he intent required for

ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts

or language.'"[146]

Additionally, an important prerequisite to a finding of ratification is full knowledge by

the principal of the facts relevant to whether the transaction should be ratified.  As stated in the

*Restatement*, "[a] person is not bound by a ratification made without knowledge of material facts

involved in the original act when the person was unaware of such lack of knowledge."[147]

Ratification requires that the principal have actual knowledge of material facts.[148]  As stated by

---

[143]     Comm. SJ Opp. 18-19; Comm. Partial SJ Reply 13.

[144]     *Restatement* § 4.01(1); *see also Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 232, 455 N.Y.S.2d 429, 432 (4th Dept. 1982) ("***Holm***") ("Ratification is the express or implied adoption of the acts of another by one for whom the other assumes to be acting, but without authority.").

[145]     *Restatement* § 4.01(2).

[146]     *Adelphia Recovery Trust v. HSBC Bank USA*, 634 F.3d 678, 693-94 (2d Cir. 2011) (under New York law) (citing *Chemical Bank*, 169 F.3d at 128) (under New York law).

[147]     *Restatement* § 4.06

[148]     *Id.* cmt b.  This actual knowledge is in contrast to "notice" as used in the *Restatement*, which includes not just knowledge of a fact, but also reason to know the fact, having received an effective notification of the

New York's Appellate Division, Fourth Department, "[t]he act of ratification, whether express or implied, must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."[149]  Many federal court decisions in this circuit and district, some applying New York law and others applying general principles of common law, similarly note the knowledge requirement, with some affirmatively emphasizing it.[150]

Then, the Second Circuit has required the acceptance of the benefits of a transaction as an additional element beyond the requisite knowledge.[151]

Here three elements necessary to establish a ratification by JPMorgan are missing.  First, since ratification requires affirmance of a "prior act,"[152] no facts here establish that JPMorgan did anything to affirm any of the key prior acts (most significantly, the filing of the Unrelated UCC-3, and any termination of the Main Term Loan UCC-1) after such acts took place.

---

fact, or there existing circumstances under which a person "should know" the fact to fulfill a duty owed to another person.  *See Restatement* § 1.04(4).

[149]     *Holm,* 89 A.D.2d at 233, 455 N.Y.S.2d at 432.

[150]     *See*, *e.g.*, *Rodonich v. House Wreckers Union Local 95,* 817 F.2d 967, 973 (2d Cir. 1987) ("Under general principles of common law, "ratification can only occur when the principal, *having knowledge of the material facts involved in a transaction*, evidences an intention to ratify it.") (emphasis added); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank,* 850 F.Supp. 1199, 1213 (S.D.N.Y. 1994) ("To ratify the unauthorized act of an agent, a principal *must have full and complete knowledge of all the material facts of the transaction.*") (emphasis added); *Prisco v. State of New York,* 804 F.Supp. 518, 523 (S.D.N.Y. 1992) ("Ratification of the acts of an agent *only occurs where the principal has full knowledge of all material facts* and takes some action to affirm the agent's actions.") (emphasis added); *Cooperative Agricole Groupement De Producteurs Bovins De L'ouest v. Banesto Banking Corp.*, 1989 U.S. Dist. LEXIS 8368, at *50, 1989 WL 82454, at *16 (S.D.N.Y. July 19, 1989) ("*Cooperative Agricole*") ("Ratification requires knowledge by the principal of the material facts of a transaction, coupled with the retention of benefits. … In other words, ratification requires acceptance by the principal of the benefits of an agent's acts, with *full knowledge of the facts*, in circumstances indicating an intention to adopt the unauthorized arrangement.") (emphasis added), *aff'd without opinion,* 904 F.2d 35 (2d Cir. 1990); *Orix Credit Alliance v. Phillips-Mahnen, Inc.,* 1993 U.S. Dist. LEXIS 7071, at *73, 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993) ("*Orix*") ("[R]atification occurs when a principal, *having knowledge of the material facts in a transaction*, evidences an intention to affirm or adopt the transaction of his agent through his acts or words.") (emphasis added).

[151]     *See Monarch Insurance Co. of Ohio v. Insurance Corp. of Ireland Ltd*., 835 F.2d 32, 36 (2d Cir. 1987); *see also Cooperative Agricole*, 1989 U.S. Dist. LEXIS, at * 50, 1989 WL 82454, at *16.

[152]     *Restatement* § 4.01(1).

Secondly, the knowledge requirement here has not been satisfied.  Assuming, *arguendo*, that JPMorgan engaged in the necessary affirmance, it did so without knowledge of what it had done, and even without knowledge that it "was unaware of such lack of knowledge."[153]  As of the time of the filing of GM's chapter 11 case, nobody at Simpson Thacher or JPMorgan (or though it does not matter with respect to this requirement, Mayer Brown or GM) knew that a termination statement with respect to the Term Loan had been filed.  In fact, lacking such knowledge, JPMorgan and GM acted thereafter (including, most significantly, by effecting the paydown of the Term Loan, which was appropriate if, but only if, the Term Loan was then secured) believing that the Term Loan was fully secured.

Third, the acceptance of benefits requirement also has not been satisfied here.  While JPMorgan benefitted from GM's fulfillment of its duties under the Synthetic Lease, there was no comparable benefit at the time with respect to the Term Loan.

Thus the Court is unable to find a ratification here.

## C.  The Committee's Other Arguments

The Court then considers other arguments put forward by the Committee to the extent they have not been addressed above.

### 1.    Implied Authority

In one of its briefs,[154] the Committee further argues that GM "implicitly" authorized the filing of the Unrelated UCC-3, and thus that GM had "implied" authority to terminate the Main Term Loan UCC-1.  The Court is unable to agree.

Implied authority is a species of actual authority, the latter of which can be express or implied.[155]  Express authority is "[a]uthority delegated to [an] agent by words which expressly

---

[153]     *Restatement* § 4.06.

[154]     *See* Comm. SJ Opp. 11.

authorize him to do a delegable act."[156]  It is "authority distinctly, plainly expressed, orally or in

writing."[157]  Implied authority, by contrast, is not expressly granted.  Rather, it exists when

necessary or appropriate to accomplish the agent's express responsibilities, or when the agent

reasonably believes that the action in question is required to accomplish the principal's

objectives.  As explained in the *Restatement*:

> "Implied authority" is often used to mean actual authority
> either (1) to do what is necessary, usual, and proper to
> accomplish or perform an agent's express responsibilities
> or (2) to act in a manner in which an agent believes the
> principal wishes the agent to act based on the agent's
> reasonable interpretation of the principal's manifestation in
> light of the principal's objectives and other facts known to
> the agent.[158]

Here, by way of example, after JPMorgan had authorized GM to file UCC-3s with

respect to the Synthetic Lease Properties, GM or its counsel had implied authority to retain and

direct a UCC filing service to file the Synthetic Lease Properties' UCC-3s.  But GM did not have

implied authority to do tasks other than those that were appropriate to accomplish the tasks, with

---

[155]   *See Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entertainment Services,* 1996 U.S. Dist. LEXIS 6729, at *22, 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996) ("***Nationwide***"); *Hidden Brook Air*, 241 F.Supp.2d at 260.

[156]   *Nationwide*, 1996 U.S. Dist. LEXIS 6729, at *22, 1996 WL 263008, at *8.

[157]   *Id.* (quoting 1979 version of *Black's Law Dictionary*); *Hidden Brook Air,* 241 F.Supp.2d at 261 (same, quoting *Nationwide*).

[158]   *Restatement* § 2.01 cmt b.  The two circumstances are not mutually exclusive.  *Id.*; *see also Vig v. Deka Realty Corp.*, 143 A.D.2d 185, 187, 531 N.Y.S.2d 633, 634 (2d Dept. 1988), *leave to appeal denied*, 73 N.Y.2d 708, 540 N.Y.S.2d 1003 (1989) ("While the president of a corporation may have implied authority *to do necessary acts within the scope of his usual and ordinary duties*, he does not possess such authority as to unusual or extraordinary events.") (emphasis added).

A few decisions, sometimes relying on the 1958 *Restatement Second*, which preceded the present *Restatement*, describe implied authority as existing "where the acts or representations of a principal lend the appearance of authority to the agent."  *See Nationwide,* 1996 U.S. Dist. LEXIS 6729, at *22-23, 1996 WL 263008, at *8.  That definition, in the Court's view, is imprecise and overly broad, inappropriately blending separate concepts that (coupled with other factors, most significantly instilling a belief in a third party) define implied authority, on the one hand, and apparent authority, on the other.  Particularly since the issuance of the present *Restatement*, "implied authority," as the quotations from the present *Restatement* make clear, is better thought of as the additional authority necessary to implement actual authority otherwise granted, or that the agent reasonably believes to exist.

respect to the Synthetic Lease Properties, for which GM had been expressly authorized—*i.e.*, to implement the authority GM had otherwise been granted.  GM was not authorized to act except with respect to the Synthetic Lease Properties, and filing the Unrelated UCC-3 was not "necessary," "usual" or "proper" to bring the UCC-1s with respect to the Synthetic Lease Properties to an end.[159]

Similarly, if GM had *reasonably believed* that it was expressly authorized to bring the Main Term Loan UCC-1 to an end, GM likely, if not plainly, would have had implied authority to take measures to accomplish that end.  But again, GM did not have such a belief.  There was no actual authority—even authority that GM perceived to exist—to terminate the Main Term Loan UCC-1.  For these reasons, the Court cannot find the implied authority doctrine to be applicable here.

2.    *"UCC Filings that Mistakenly Terminate a Security Interest Are Legally Effective."*

Recurring themes in the Committee's briefs are very broad statements (in one instance, as a topic heading)[160] that "the filing of a termination statement renders ineffective the financing statement to which the termination relates and causes the subject lien to become unperfected,"[161] and, especially, that "UCC filings that mistakenly terminate a security interest are legally

---

[159]    At the end of its implied authority argument, the Committee states that "this case concerns an uncontested agency relationship between JPMorgan and Old GM, pursuant to which Old GM was authorized to make UCC filings on behalf of JPMorgan."  Comm. SJ Opp. 15 n.12.  That statement, while technically true, suffers from its excessive breadth, and a failure to state other uncontested, and critical, facts.  GM was authorized "to make UCC filings" only with respect to the "Financing Statements" relating to the "Properties"—which, as discussed above, were those with respect to the Synthetic Lease alone.  *See* the Synthetic Lease Termination Agreement and its definitional cross-references, quoted at nn.18-21 above.

[160]    *See* Comm. Partial SJ Br. 11-14 ("Even If Mistaken, The Term Loan Termination Statement is Legally Effective"); *see also* Comm. SJ Opp. 4 ("JPMorgan acknowledges, as it must, the consistent authority holding that UCC filings that mistakenly terminate a security interest are legally effective."); Comm. Partial SJ Reply 15-16 ("[A] termination statement that is filed by mistake, like the Term Loan Termination Statement at issue in this case, is legally effective.").

[161]    Comm. Partial SJ Br. at 9.

effective."[162]  Broad statements of that character are unhelpful, and by their excessive breadth unsatisfactorily describe the applicable law.

Because the Committee's contentions rest on (1) cases involving entities that made the UCC filings themselves; (2) cases that predated the 2001 amendments to UCC Article 9; and (3) cases that while decided after the 2001 amendments to the UCC, relied on the earlier authority without focusing on the fact that the UCC had changed (or some combination of those deficiencies), the Court is not in a position to accept the Committee's broad statements as properly descriptive of the law, or to consider the underlying cases as relevant to the controversy here.

In the first category are the cases relied upon by the Committee involving erroneous filings by *the secured party itself*—the Fourth Circuit's decision in *Kitchin Equipment*;[163] the Ninth Circuit BAP's and Ninth Circuit's decisions in *Pacific Trencher*;[164] the bankruptcy court decisions in *Silvernail*,[165] *York Chemical*,[166] and *Hampton*;[167] and the decision of the Kansas Court of Appeals in *J.I. Case*.[168]  In each of these, under the UCC's pre-2001 statutory scheme, the secured party had itself signed the termination statement and caused it to be filed.[169]

---

[162]    *See* n.160 above.

[163]    *See* n.9 above.

[164]    *See* n.132 above.

[165]    *See* n.74 above.

[166]    *Rock Hill National Bank v. York Chemical Industries, Inc. (In re York Chemical Industries, Inc.),* 30 B.R. 583 (Bankr. D. S.C. 1983) ("*York Chemical*").

[167]    *In re Hampton*, 2001 Bankr. LEXIS 2060, 2001 WL 1860362 (Bankr. M.D. Ga. Jan. 2, 2001) ("***Hampton***").

[168]    *J.I. Case Credit Corp. v. Foos,* 11 Kan. App. 2d 185, 717 P.2d 1064 (1986) ("***J.I. Case***").

[169]    *See Kitchin Equipment,* 960 F.2d at 1244-46; *Pacific Trencher*, 27 B.R. at 168; *Silvernail*, 142 B.R. at 988-90; *York Chemical*, 30 B.R. at 585; *Hampton*, 2001 Bankr. LEXIS 2060, at *2 & n.1, 2001 WL 1860362, at *1 & n.1; *J.I. Case,* 11 Kan. App. 2d at 186, 717 P.2d at 1065-66.

In the second category—cases that predated the 2001 amendments—are each of the above as well.  Because they were decided under the pre-2001 statutory scheme (and also because the termination statements were filed by the secured parties themselves), none had occasion to consider the authorization requirement.

In the third category are *Roswell* and *S.J. Cox*.[170]  The events they addressed took place after the 2001 amendments to the UCC, but they quoted language from the earlier cases in the first two categories without addressing the changes in the UCC.  Though they involved the filing of termination statements by agents, they decided those cases as if they were governed by the former statutory scheme, and this Court respectfully must decline to follow them.

*S.J. Cox,* a 2009 bankruptcy court decision, involved an adversary proceeding for wrongful termination of an initial financing statement, under the post-2001 statutory scheme. Here, unlike the earlier cases discussed above (where the termination statement had been filed by the secured party), a termination statement potentially ending an entity's security interest in the debtor's farm equipment was filed by someone else—by an employee of "Kentucky Bank" (previously known as "Peoples Bank of Sandy Hook, Kentucky") with respect to the plaintiff Peoples Bank of Kentucky, Inc., a different entity.[171]  The plaintiff Peoples Bank of Kentucky sued Kentucky Bank for wrongfully terminating the former's initial financing statement, and the *S.J. Cox* court ruled in the plaintiff's favor[172]—seemingly accepting defendant Kentucky Bank's first argument that "priority among the Movants must be determined before its liability can be

---

[170]    *See* n.74 above.

[171]    2009 Bankr. LEXIS 4573, at *1-2, 2009 WL 939573, at *1.

[172]    2009 Bankr. LEXIS 4573, at *15, 2009 WL 939573, at *6.

-61-

established," but then rejecting Kentucky Bank's second argument that Peoples Bank's first

priority status was unaffected by the supposed "'release' of the [initial] Financing Statement."[173]

This Court agrees with the *S.J. Cox* court that the filing of a termination statement there

was unauthorized.  And this Court also agrees that priority among the respective secured

creditors had to be determined before deciding whether one of them was civilly liable for

wrongful termination of another's security interest—and thus that it was necessary to determine

whether the plaintiff Peoples Bank's first priority interest was affected at all.  But this Court

cannot agree with the remainder of the *S.J. Cox* conclusions, and especially its analysis.

Puzzlingly, the *S.J. Cox* court, when first considering the "Effect of termination of the

Financing Statement,"[174] quoted and considered the Kentucky equivalents of UCC §§ 9-

509(a)[175] (a provision that addresses who may file an *initial* financing statement, an amendment

that *adds collateral*, and an amendment that *adds a debtor*, but which does not involve

terminations of initial financing statements at all); 9-511 (addressing who is a secured party of

record); and 9-513 (addressing a secured party's duty to cause a termination statement to be filed

after no obligations from the debtor to the secured party remain)—and those alone.  Oddly, the

*S.J. Cox* court never mentioned the Kentucky equivalents of UCC §§ 9-509(d) and 9-510(a),[176]

quoted and addressed at length starting at page 26 above, two of the three provisions that address

the requirement for authorization for financing statement amendments[177]—and that provide,

expressly, that amendments may be filed only when the secured party of record authorizes them,

---

[173]   2009 Bankr. LEXIS 4573, at *13-14, 2009 WL 939573, at *5 (quotation marks surrounding "release" in original).

[174]   2009 Bankr. LEXIS 4573, at *8, 2009 WL 939573 at *3.

[175]   Ky. Rev. Stat. § 355.9-509(1).

[176]   Ky. Rev. Stat. §§ 355.9-509(4) and 355.9-510, respectively.

[177]   It did quote UCC § 9-513, Ky. Rev. Stat. § 355.9-513, in part, including quotation of UCC § 9-513(d), Ky. Rev. Stat. § 355.9-513(4), but failed to take note of the clause at the beginning of that subsection, "[e]xcept as otherwise provided in KRS 355.9-510 [UCC§ 9-510]."

and that amendments are effective only to the extent that they have been filed by a person who has been so authorized.

Additionally (perhaps by reason of its failure to consider UCC §§ 9-509(d) and 9-510), the *S.J. Cox* court incorrectly stated that "these provisions" (presumably the provisions of the UCC that it had quoted) "make it clear that the only party authorized to file a termination statement is the secured party of record."[178]   And the *S.J. Cox* court went on with a broad statement, in reliance on *Silvernail* and *Kitchin*, that "[t]he termination of a financing statement, even if mistaken, releases the secured creditor's lien against the debtor's property"[179]—without noting that each of *Silvernail* and *Kitchin* involved a termination by the *secured creditor itself* (and not a third party); that the UCC had been amended in 2001 after *Silvernail* and *Kitchin*; and that UCC §§ 9-509(d) and 9-510 made authorization a *sine qua non* to a valid termination.   The *S.J. Cox* court proceeded to reach the conclusions it did by reliance on the very different *Silvernail* and *Kitchin*, including *Kitchin*'s broad (and now overly broad) statement that a termination statement's "effect on a security interest is dramatic and final."

The *S.J. Cox* court concluded that a cause of action had been established for unauthorized termination of a UCC-1 when, because the termination was unauthorized, it should have held that there was no termination at all.[180]

Puzzlingly, the Committee here contends that *S.J. Cox* is "on point" and relies on it.[181] But for the reasons stated above, the Court does not believe that it should do so.

---

[178]   *S.J. Cox,* 2009 Bankr. LEXIS 4573, at *10-11, 2009 WL 939573, at *4.

[179]   2009 Bankr. LEXIS 4573, at *11, 2009 WL 939573 at *4.

[180]   Likewise, a UCC treatise has observed that *S.J. Cox* was incorrectly decided.  *See Hawkland* § 9-509:4 [Rev] n0.50 ("court seems to hold, incorrectly, that the filing actually terminated the financing statement").

[181]   *See* Comm. Partial SJ Reply 17-18.

*Roswell*, in contrast, plainly reached the right bottom line, and indeed was affirmed (on the first of its two rationales) by the Second Circuit.[182]  But in articulating a second rationale for its decision, the *Roswell* court expressed thoughts with which this Court, once again, cannot agree.

*Roswell* involved an action by several secured lenders, for whom Roswell Capital Partners was collateral agent (the "**Roswell Lenders**"), to foreclose on the assets of their borrower Alternative Construction Technology, Inc. (referred to in the decision by the acronym "**ACT**").  The Roswell Lenders' effort to foreclose was opposed not by their borrower ACT, but rather by assertedly secured competing lenders—an individual, James Beshara, and his sole proprietorship, JMB Associates (referred to in the decision by the acronym "JMB," but here, for greater clarity, as the "**JMB Lenders**").[183]

The JMB Lenders extended secured credit to ACT, with respect to which they had duly filed UCC-1s, but thereafter (in June 2006) they exercised a contractual right to convert their debt into equity, and took equity in their borrower ACT instead.[184]  After the value of the equity had gone down, in July 2008, the JMB Lenders exercised another contractual right they had, to return their shares and reinstate the debt obligation.  But in the meantime (in July 2007), one or more UCC-3s were filed by ACT[185] to terminate the JMB Lenders' earlier security interest, and the Roswell Lenders extended their secured credit and filed UCC-1s after the filing of those UCC-3s.

---

[182]     Though the second rationale was addressed by each side in its briefing to the Second Circuit, the Circuit did not speak to the second rationale, upon which the Committee here relies.

[183]     *Roswell*, 2010 U.S. Dist. LEXIS 90695, at *1, 2010 WL 3452378, at *1.

[184]     2010 U.S. Dist. LEXIS 90695, at *5-8, 2010 WL 3452378, at *2-3.

[185]     2010 U.S. Dist. LEXIS 90695, at *21, 2010 WL 3452378, at *7.

The *Roswell* court ruled that the equity conversion extinguished the JMB Lenders'
security interest, and with it, the JMB Lenders' lien.[186] When the JMB Lenders' debt was
extinguished after the conversion to equity, there was no longer an obligation to secure. And a
"security interest [could not] exist without a debt."[187] That conclusion was affirmed by a
summary order of the Second Circuit, which stated, in its succinct decision, that "because the
equity conversion extinguished the debt obligation, and a security interest cannot survive the
debt's extinguishment, when JMB converted its debt to equity shares in ACT, any security
interest it had in the collateral was also extinguished."[188]

But in a portion of its decision that was not endorsed by the Circuit on appeal, the
*Roswell* court went on to set forth a second rationale for its conclusion, which was unnecessary
to support *Roswell*'s plainly correct result.[189] The Committee relies on that second rationale.
But that rationale included several elements with which this Court cannot agree.

In the second part of its legal analysis, captioned "JMB's UCC-1 Financing Statement is
Ineffective," the *Roswell* court considered an additional contention by the Roswell Lenders: that
ACT's filing of a UCC-3 termination statement had canceled the JMB Lenders' previously filed
UCC-1s. Deciding the matter with reference to the Florida UCC (which conformed to the UCC

---

[186]   2010 U.S. Dist. LEXIS 90695, at *18-19, 2010 WL 3452378, at *6.

[187]   2010 U.S. Dist. LEXIS 90695, at *18, 2010 WL 3452378, at *6.

[188]   *Roswell Capital Partners LLC. v. Beshara*, 436 Fed. Appx. 34, 35-36 (2d Cir. 2011).

[189]   The discussion of the second rationale began "[w]hile JMB's failure to show that it had any enforceable
security interest in the Collateral at the time the Plaintiffs filed their UCC-1 financing statements in July
2007 permits summary judgment to be awarded to the Plaintiffs, the parties dispute as well the validity and
effect of ACT's filing … of the UCC-3." *Roswell*, 2010 U.S. Dist. LEXIS 90695, at *21, 2010 WL
3452378, at *7. That would at least arguably suggest that the second rationale was dictum. *See Willis
Management (Vermont), Ltd. v. United States*, 652 F.3d 236, 243 (2d Cir. 2011) (a statement in a footnote
in an earlier Second Circuit opinion "was not essential to the Court's holding because it was offered in the
alternative and therefore it is dictum that is not binding on us").

Roswell's second rationale has been described in a UCC treatise as "troubling *dictum*." *Hawkland*
§ 9-510:2 [Rev] at n.1.50. But the Court does not need to decide whether or not it was dictum, because
district court decisions are not binding on bankruptcy courts, except with respect to any district court
mandate pursuant to an appeal.

generally), the *Roswell* court rejected the JMB Lenders' contention "that the termination

statement was ineffective because [the JMB Lenders] did not authorize ACT to file it."[190]  The

*Roswell* court stated, in that connection:

> Even if the termination statement was not authorized by
> JMB, it nonetheless extinguished any perfected security
> interest JMB had in the Collateral.[191]

And it declined to consider a factual argument with respect to whether authorization was lacking,

stating that:

> This argument need not be considered given that even if the
> UCC-3 termination statement was unauthorized, it
> nonetheless extinguished any perfected security interest
> JMB held in the Collateral after the conversion.[192]

Unlike the court in *S.J. Cox*, the *Roswell* court made reference to the proper statutory

provisions, including the Florida equivalents of UCC §§ 9-509 and 9-510,[193] discussed at length

above.  But it then proceeded with a caselaw-driven analysis without reference to what textual

analysis of those two provisions (along with UCC § 9-513, which the *Roswell* court did not

address) would require.  In that connection, it relied on *S.J. Cox* (which had been issued in

reliance on the wrong provisions of the UCC, and which had ignored UCC §§ 9-509(d) and

9-510), and on *Kitchin Equipment*, *Silvernail* and *Pacific Trencher* (each of which, as noted

above, involved filings by the secured party itself, and was decided under the pre-2001 statutory

scheme).

More specifically, the *Roswell* court repeated *S.J. Cox*'s statements (each based on pre-

2001 law) that "[t]he termination of a financing statement, *even if mistaken*, releases the secured

---

[190]     *Roswell*, 2010 U.S. Dist. LEXIS 90695, at *21, 2010 WL 3452378, at *7.

[191]     2010 U.S. Dist. LEXIS 90695, at *25, 2010 WL 3452378, at *8.

[192]     2010 U.S. Dist. LEXIS 90695, at *25 n.15, 2010 WL 3452378, at *8 n.15.

[193]     Fla. Stat. §§ 679.509 and 679.510, respectively.

creditor's lien against the debtor's property,"[194] and that a "termination statement's effect on a security interest is dramatic and final."  And it went on to say that:

> This clear rule accords with the policy of the UCC. Potential creditors must be able to rely on termination statements filed in the public record, *even if they were filed* in error or *without authorization*.[195]

It thereafter continued with the statements quoted above to the effect that even if the UCC-3 termination statement was unauthorized, it nonetheless extinguished any perfected security interest the JMB Lenders had in their collateral.

Like others,[196] this Court is unable to agree.  These conclusions cannot be squared with the provisions of UCC §§ 9-509(d), 9-510 and 9-513(d), and UCC § 9-502's Official Comment 3, which provides that a "filing has legal effect only to the extent it is authorized."

The *Roswell* court further stated that "[t]he UCC therefore places the burden of monitoring for potentially erroneous UCC–3 filings on existing creditors, who are aware of the true state of affairs as to their security interests, rather than potential creditors who will not be in a position know whether a termination statement was authorized or not."[197]  And it rejected, in a footnote, the JMB Lenders' argument that because the UCC adopted "notice filing"—a system contemplating further inquiry to determine the scope of a security agreement—subsequent

---

[194]    2010 U.S. Dist. LEXIS 90695, at *22-23, 2010 WL 3452378, at *7 (emphasis in original).

[195]    *Id.* (emphasis added).

[196]    *See Negus-Sons-BAP,* 460 B.R. 754, 757 n.10 ("We are also hesitant to endorse the holding in [*Roswell*], relied on by the Trustee, that a termination statement filed by a third party is effective regardless of whether it was authorized. … *Roswell*'s holding appears to be contrary to the plain language of the Uniform Commercial Code."); *AEG Liquidation Trust v. Toobro N.Y. LLC,* 32 Misc. 3d 1202(A), 2011 N.Y. Misc. LEXIS 3041, at *27 n.1, 2011 WL 2535035, at *9 n.1 (Sup. Ct. N.Y. Co. Commer. Div. Jun. 24, 2011) ("***Toobro***") ("For these reasons [which are discussed beginning at page 70 below], the court declines to follow the SDNY Court's analysis in *Roswell Capital*.");  *Hawkland* § 9-510:2 [Rev] at n.1.50 (describing *Roswell* conclusions as "troubling," though regarding them as dictum).

[197]    2010 U.S. Dist. LEXIS 90695, at *23-24, 2010 WL 3452378, at *7.

lenders like the Roswell Lenders would have to further investigate the filing of the UCC-3

termination statement to determine the true status of the JMB Lenders' security interests.

      However in this respect also, the Court cannot agree.  "Notice filing" is indeed the regime

under the UCC, as recognized in the UCC's Official Comments,[198] and less directly by the

Second Circuit in its *Credit Bancorp* decision.[199]  As Official Comment 2 makes clear,

documents of record may be insufficient to ascertain "the complete state of affairs," but UCC

Article 9 only requires information sufficient to engage in further inquiry.  When the

authorization underlying a previously filed termination statement matters to a subsequent lender

(as it usually will), the lender can simply include any necessary further inquiry as part of its due

diligence.[200]

---

[198]    As stated in Official Comment 2 to UCC § 9-502, which addresses the sufficiency of a financing statement:

        This section adopts the system of "notice filing." …

        The notice itself indicates merely that a person may have a security
        interest in the collateral indicated. Further inquiry from the parties
        concerned will be necessary to disclose the complete state of affairs.

[199]    *SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 454 (2d Cir. 2004) ("**Credit Bancorp**").

[200]    *Roswell* was cited approvingly with respect to "notice filing" in a recent North Carolina case, *Ward v. Bank of Granite* (*In re Hickory Printing Group, Inc.*, 479 B.R. 388 (Bankr. W.D. N.C. 2012) ("**Hickory Printing**").  This Court would not differ with the *Hickory Printing* result that is most relevant here (*i.e.*, that the filing of a UCC-3 by the secured lender's employee was authorized, and thus that it terminated the bank's security interest in debtor collateral) since the *Hickory Printing* court considered UCC §§ 9-509(d), 9-510(a), and 9-513(d) as part of its analysis; the UCC-3 was filed by an employee *of the secured creditor itself*; and the secured creditor *admitted* that the UCC-3 filing was authorized.  *See* 479 B.R. at 396-97 (bank's employee "filed hundreds of termination statements, followed her normal (and apparently approved) procedures when filing the Termination Statement, and intended to terminate the Original Financing Statement"; "by the summary judgment hearing, the Bank was willing to concede that, while it was a mistake, the Termination Statement was authorized").  However, the Court cannot concur with *Hickory Printing*'s endorsement of *Roswell*'s "notice filing" analysis, *see id.* at 398, and its endorsement of *Roswell*'s statements as to burdens on the part of secured creditors to maintain their perfected liens, *see id.* at 404, for the reasons stated above.  Nor can the Court agree with the overly broad language in *Hickory Printing* based on *Kitchin Equipment*, *Pacific Trencher, York Chemical,* and *Silvernail.*

In cases like *Hickory Printing* (but unlike the one here) where the UCC-3 is filed by the *secured party itself*, and not by a debtor or other third party (and thus where authorization is not at issue), pre-2001 cases may still have vitality.  But they do not support the "notice filing" conclusions the *Roswell* court reached, and the *Hickory Printing* court endorsed.

Then, the *Roswell* court believed, erroneously in this Court's view, that notice filing applies only to UCC-1s.  Rejecting the JMB Lenders' contentions (based on the UCC's Official Comments and *Credit Bancorp*)*,* that because the UCC had adopted notice filing, the Roswell Lenders were required to further investigate the filing of the UCC-3, the *Roswell* court stated:

> The problem with JMB's argument is that *Credit Bancorp* and the Official Comments refer only to "financing statements," and not to termination statements.[201]

But the Court believes the *Roswell* conclusion that flowed from that to be incorrect.  As noted above,[202] a "termination statement " is one kind of a "financing statement."  The term "financing statement," as defined in UCC § 9-102(39), includes not just an "*initial* financing statement"[203] (which may be what the *Roswell* court had in mind), but also "any filed record relating to the initial financing statement."

Finally, if there were a duty on the part of secured lenders to monitor their UCC filings to protect them from improper termination, one must ask what would a secured lender do if it discovered anything?  By then, under the *Roswell* rationale, termination of the secured lender's security interest—which by *Roswell*'s reasoning would have taken place even if unauthorized— would already have transpired.[204]

---

[201]    2010 U.S. Dist. LEXIS 90695, at *24 n.14, 2010 WL 3452378, at *7 n.14.

[202]    *See* page 28 & n.72 above.

[203]    Emphasis added.

[204]    The *Roswell* court seemed to believe that a provision of the UCC imposing civil liability for unauthorized filings, *see* UCC § 9-625, Fla. Stat. § 679.625, would provide a satisfactory remedy for unauthorized termination.  *See* 2010 U.S. Dist. LEXIS 90695, at *22, 2010 WL 3452378, at *7.  This is in substance a policy view rather than an element of statutory interpretation or application, but to the extent it is relevant, the Court is reluctant to agree with it.  More than a few of the disputes in federal district courts and the commercial divisions of state courts, and a huge number of the disputes in bankruptcy courts, are disputes between creditors jousting for priority.  Each of *Roswell*, *Toobro*, *Negus-Sons* and this case is a good example.  In many cases, the debtor or other unauthorized filer would be unable to make the secured lender whole for the resulting damages if an unauthorized filing were deemed to be effective, leaving the secured lender without an effective remedy.  Each of *Roswell, Negus-Sons* and this case is a good example of that as well.

-69-

The concerns this Court voiced with respect to *Roswell*'s second rationale were shared in *Toobro*. In relevant part, in the context of a New York CPLR 3211 motion to dismiss, *Toobro* too involved a need to determine the relative priority of two competing secured lenders, there American Equities Group Inc. (referred to in the decision as "AEG," but referred to here, for greater clarity, as "**American Equities**") and Signature Bank—each of which had extended credit to Ahava Diary Products Corp. ("**Ahava Dairy**"), initially in 1996 (under a secured factoring agreement) in the case of American Equities,[205] and in 2005 in the case of Signature Bank.[206] Each lender had duly filed UCC-1s. But in between those two dates, in 2002, an "unknown party,"[207] allegedly without authorization and knowledge of American Equities, had filed UCC-3s purporting to terminate the first lender American Equities' liens. The *Toobro* court was required to determine the lenders' respective priorities.

The *Toobro* court did so by reference to UCC §§ 9-509(d) and 9-510.[208] It ruled, based on the allegation that "AEG as the secured party did not authorize the filing of the termination statements,"[209] that "the termination statements … were ineffective under Section 9-510."[210] Thus the financing statements to which they related remained in effect.[211]

The *Toobro* court then addressed *Roswell*, in a lengthy footnote, disagreeing with *Roswell* for much the same reasons this Court has done so.[212] The *Toobro* court noted that the cases

---

[205]    2011 N.Y. Misc. LEXIS 3041, at *3-4, 2011 WL 2535035, at *1.

[206]    2011 N.Y. Misc. LEXIS 3041, at *4, 2011 WL 2535035, at *3.

[207]    2011 N.Y. Misc. LEXIS 3041, at *5, 2011 WL 2535035, at *2.

[208]    2011 N.Y. Misc. LEXIS 3041, at *19-27, 2011 WL 2535035, at *8-9.

[209]    2011 N.Y. Misc. LEXIS 3041, at *19-27, 2011 WL 2535035, at *9.

[210]    2011 N.Y. Misc. LEXIS 3041, at *24, 2011 WL 2535035, at *9.

[211]    2011 N.Y. Misc. LEXIS 3041, at *24, 2011 WL 2535035, at *9.

[212]    2011 N.Y. Misc. LEXIS 3041, at *25 n.1, 2011 WL 2535035, at *9 n.1.

*Roswell* cited in support of its analysis were interpreting earlier versions of Article 9.[213]  It also

differed with *Roswell*'s "notice filing" analysis, for the same reasons this Court does.[214]  It then

closed this element of its discussion by saying that for these reasons, it "declines to follow" the

*Roswell* analysis.[215]

* * *

For these reasons, the Court is unable to agree that there is a general principle of law that

"UCC Filings that Mistakenly Terminate a Security Interest Are Legally Effective."  The

question is rather whether they have been authorized.  That issue must be addressed in the

manner this Court addressed it above.  For the reasons there set forth, the requisite authority was

lacking.[216]

---

[213]   *Id.*

[214]   The *Toobro* court stated, in this connection:

> In *Roswell Capital,* the SDNY court considered but distinguished the "notice filing" comment of UCC § 9–502 stating that it "refer[s] only to financing statements,' and not to termination statements."  *See* 2010 LEXIS 90695 *24, n. 14.  This distinction is inconsistent with the definitions of "financing statement" and "termination statement" under Article 9.  *See* UCC §§ 9–102(39), (79). … Since a termination statement is a record "relating to the initial financing statement," it is part of a "financing statement" as this term is defined by the UCC.  *See* UCC § 9–102(39).  Consequently, the "notice filing" comment of UCC § 9–502 applies to termination statements.

> *Id.*

[215]   *Id. Toobro's* holding was approved in a UCC treatise.  *See Hawkland* § 9-510:2 at n.1.50 ("court correctly held that termination statement filed by a person not authorized to do so by secured party was ineffective to terminate financing statement even though it might mislead searchers; court declined to follow troubling *dictum* to the contrary in [*Roswell*]").

[216]   The Court need not lengthen this decision further by specifically addressing any of the other contentions raised by the Committee on these motions.  The Court has canvassed them and satisfied itself that no material points other than those it has specifically addressed were raised and require discussion.  To the extent those points were not expressly addressed in this decision, they must be rejected.

Similarly, in light of its conclusions, the Court does not need to address JPMorgan's constructive trust argument, or any of the other bases upon which JPMorgan asserted that it should prevail.

IV.

Certification to Circuit

On rare occasions, a direct appeal from a bankruptcy court to the court of appeals makes

sense.  In the Court's view, this is one of those occasions where the Circuit might want to

consider that as an option.

In that connection, 28 U.S.C. § 158 grants a court of appeals jurisdiction to hear appeals

from final judgments of the bankruptcy court under certain circumstances.  First the bankruptcy

court (acting on its own motion or on the request of a party to the judgment), or all the appellants

and appellees acting jointly, must certify that—

> (i) the judgment, order, or decree involves a
> question of law as to which there is no controlling
> decision of the court of appeals for the circuit or of
> the Supreme Court of the United States, or involves
> a matter of public importance;
>
> (ii) the judgment, order, or decree involves a
> question of law requiring resolution of conflicting
> decisions; or
>
> (iii) an immediate appeal from the judgment,
> order, or decree may materially advance the
> progress of the case or proceeding in which the
> appeal is taken….[217]

Then the court of appeals decides whether it wishes to hear the direct appeal.[218]

In this case, the Court considers each of the three bases for a certification to be present.

With respect to the first prong, the decision here is one of law based on undisputed facts,

presented to the Court on cross motions for summary judgment, as to which there is no

---

[217]    28 U.S.C. § 158(d).

[218]    *Id.; see also In re General Motors Corp.*, 409 B.R. 24, 27 (Bankr. S.D.N.Y. 2009) (the "***Sale Appeal
Certification Decision***") ("The Circuit does not have to take the appeal, however, and can decide whether
or not to do so in the exercise of its discretion.").

controlling decision by the Second Circuit (or any Circuit), the Delaware Supreme Court, the New York Court of Appeals, or the highest court of any other state.  Though the size of the amount in controversy here, and its effect upon thousands of GM creditors, may be regarded as personal to them, the underlying legal issues are important, as are their potential effect, going forward, on secured lending.

With respect to the second prong, available authorities, while helpful to a point, came nowhere close to addressing a factual situation of this nature.  The issues were complicated by broad language in the caselaw, much of which, in this Court's view, should no longer be regarded as having validity in cases involving UCC filings by an entity other than the secured party.  Though the Court believes that the authorities may be harmonized, in part, and many may be distinguished on their facts, broad language in many of those cases required resolution of conflicting decisions.  The Court has declined to follow the reasoning of the second rationale of *Roswell*, which, if it were regarded as anything other than dictum, would result in a conflict between lower courts in the Second Circuit.

With respect to the third prong, the Court believes that an immediate appeal from the judgment in this adversary proceeding is likely to advance the progress of the GM case.  The outcome of this controversy may have a material impact on unsecured creditor distributions, and will obviously have a material effect on secured creditor distributions.  A second level of appeal (which would otherwise be likely, given the stakes of the controversy) would have a foreseeable adverse effect on the timing and finality of creditor distributions.[219]

---

[219]    In one of its earlier decisions in the *GM* case, *see* the *Sale Appeal Certification Decision*, 409 B.R. at 27-29, this Court denied certification to the Circuit of its order approving GM's section 363 sale after this Court's decision in *In re General Motors Corp.,* 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "***363 Sale Decision***"), *stay pending appeal denied,* 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed,* No. 10–4882–bk (2d Cir. July 28, 2011)—even though, as the subsequent history of the *363 Sale Decision* indicates, it ultimately did go up to the Circuit.

<u>Conclusion</u>

The Court concludes, based on the undisputed facts and under the applicable law, that JPMorgan did not authorize the termination of the UCC-1 with respect to the Term Loan, and that anything JPMorgan said or did in connection with the payoff of the Synthetic Lease was not effective in bringing the UCC-1 securing the Term Loan to come to an end.

JPMorgan's motion for summary judgment is granted. The Committee's motion for partial summary judgment is denied. Pursuant to Fed. R. Civ. P. 58 (made applicable to this adversary proceeding by Fed. R. Bankr. P. 7058), the Court is today entering a separate standalone judgment consistent with its first ruling, denying the relief sought by the Committee in its complaint. The Court is also today entering an order with respect to the underlying cross-motions, which includes a decretal paragraph, consistent with the Court's second ruling, denying the Committee's motion for partial summary judgment.

The Court is certifying its judgment for direct appeal to the Second Circuit.

Dated: New York, New York          *s/Robert E. Gerber*
        March 1, 2013                   United States Bankruptcy Judge

---

This Court did so because while GM's well-being and that of its suppliers, as a business matter, had substantial public importance, the legal issues were not particularly debatable. The *363 Sale Decision* was a straightforward application of controlling authority in the Second Circuit (if not also elsewhere)—including five published decisions of the Second Circuit on the 363 Sale issue, and the Circuit's oral affirmance of *Chrysler* (on a direct appeal) on the successor liability issue. *See Sale Appeal Certification Decision*, 409 B.R. at 28-29; *363 Sale Decision*, 407 B.R. at 489 & n.39.

Here, by contrast, the Court had much less in the way of available caselaw—and none from the Circuit—with which to work. Also, though the Court is mindful of its earlier statement in the *Sale Appeal Certification Decision* that appellate courts "review judgments, not statements in opinions," 409 B.R. at 28, and its view that this should be taken into account when deciding whether the necessary conflict exists to warrant certification, here both sides, and the Court, were required to work with statements in the conflicting authority for lack of any better alternative.

-74-

Appendix A

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Bryan Kluever
CT
208 South LaSalle Street
Suite 814
Chicago, IL 60604

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 07:22 PM 10/30/2008
INITIAL FILING # 6416808 4
AMENDMENT # 2008 3661491
SRV: 081081602

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
6416808 4 on 11.30.06

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. [x] TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. [ ] CONTINUATION

4. [ ] ASSIGNMENT

5. AMENDMENT (PARTY INFORMATION)

6. CURRENT RECORD INFORMATION:
6a. ORGANIZATION'S NAME
GENERAL MOTORS CORPORATION

7. CHANGED (NEW) or ADDED INFORMATION:

8. AMENDMENT (COLLATERAL CHANGE)

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT
9a. ORGANIZATION'S NAME
JPMORGAN CHASE BANK, AS ADMINISTRATIVE AGENT

10. OPTIONAL FILER REFERENCE DATA
File with DE SOS [Matter No. 00652500] [General-13] [Doc. No. 1457978]   BK-74018450-5   log

FILING OFFICE COPY -- UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

EXHIBIT NO. 5
Perlousti

Kelly A. Siska

CONFIDENTIAL MB006384