**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | FOR PUBLICATION |
|  |  |
| MOTORS LIQUIDATION COMPANY, | Chapter 11 |
| f/k/a GENERAL MOTORS |  |
| CORPORATION, *et al.*, | Case No. 09-50026 (MG) |
|  | (Jointly Administered) |
| Debtors. |  |
|  |  |
| MOTORS LIQUIDATION COMPANY |  |
| AVOIDANCE ACTION TRUST, by and |  |
| through the Wilmington Trust Company, |  |
| solely in its capacity as Trust |  |
| Administrator and Trustee, |  |
|  |  |
| Plaintiff, | Adversary Proceeding |
|  |  |
| against | Case No. 09-00504 (MG) |
|  |  |
| JPMORGAN CHASE BANK, N.A., *et al.*, |  |
|  |  |
| Defendants. |  |

**MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO DISMISS,**
**FOR JUDGMENT ON THE PLEADINGS, AND TO VACATE PRIOR COURT ORDERS**

*A P P E A R A N C E S:*

HAHN & HESSEN LLP
*Attorneys for Certain Term Loan Investor Defendants*
488 Madison Avenue
New York, NY 10022
By:    Mark T. Power, Esq.
       Sarah M. Gryll, Esq.

BLANK ROME LLP
*Attorneys for PNC Bank, National Association*
405 Lexington Avenue
New York, NY 10174
By:    Stanley B. Tarr, Esq.
       John E. Lucian, Esq.

PULLMAN & COMLEY, LLC
*Attorneys for the State of Connecticut Retirement Funds and Trust*
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601
By:     Elizabeth J. Austin, Esq.

WARNER NORCROSS & JUDD LLP
*Attorneys for Defendant Alticor Inc.*
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, MI 49503
By:     Gordon J. Toering, Esq.
        and
STARK & STARK, P.C.
P.O. Box 5315
Princeton, NJ 08543
By:     Joseph H. Lemkin, Esq.

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
*Attorneys for SEI Institutional Investments Trust-High Yield Bond Fund,*
*SEI Institutional Managed Trust-High Yield Bond Fund,*
*SEI Institutional Managed Trust-Core Fixed Income Fund,*
*DE-SEI Instl Inv TR-Hi Yld BD, DE-SEI Instl Mgd TR-Hi Yld BD,*
*SEI Inst Mgd TR Core Fxd Inc., DE-SEI Institutional Investment Trust - High Yield*
*Bond Fund, DE-SEI Institutional Managed Trust - High Yield Bond Fund*
Wall Street Plaza
88 Pine Street, 21st Floor
New York, NY 10005
By:     R. David Lane, Jr, Esq.

ICE MILLER LLP
*Attorneys for Defendant Ohio Police & Fire Pension Fund*
250 West Street, Suite 700
Columbus, OH 43215
By:     Daniel R. Swetnam, Esq.

ELENIUS FROST & WALSH
*Attorneys for Continental Casualty Company*
125 Broad Street, 7th Floor
New York, NY 10004
By:     William P. Lalor, Esq.
        and
DAVID CHRISTIAN ATTORNEYS LLC
2515 W. 75th Street, Suite 208
Prairie Village, KS 66208
By:     David Christian, Esq.

BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP
*Attorneys for Wells Cap Mgmt – 13923601*
299 Park Avenue, 16th Floor
New York, NY 10171
Phone: (212) 888-3033
By:    Jordan E. Stern, Esq.

K&L GATES LLP
*Attorneys for Sanford C. Bernstein Fund Inc. - Intermediate Duration Portfolio, Sanford C.*
*Bernstein Fund Inc. II - Intermediate Duration Institutional Portfolio, and Ivy Funds, on behalf*
*of its series, Ivy High Income Fund*
599 Lexington Avenue
New York, NY 10022
By:    Robert T. Honeywell, Esq.

ENTWISTLE & CAPPUCCI LLP
*Attorneys for Teachers' Retirement System of the State of Illinois*
*and TCW Illinois State Board of Investments*
299 Park Avenue, 20th Floor
New York, NY 10171
By:    Andrew J. Entwistle, Esq.

SHAPIRO HABER & URMY LLP
*Attorney for the Employees' Retirement System of the City of Montgomery*
Seaport East
Two Seaport Lane
Boston, MA 02210
By:    Edward F. Haber, Esq.

SCHUBERT JONCKHEER & KOLBE LLP
*Attorney for City of Oakland Police & Fire Retirement System*
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111
By:    Noah M. Schubert, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Defendant and Cross-Claim Defendant JPMorgan Chase Bank, N.A.*
51 West 52nd Street
New York, NY 10019
By:    Harold S. Novikoff, Esq.
       Marc Wolinsky, Esq.
       Emil A. Kleinhaus, Esq.

       and

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
By:    John M. Callagy, Esq.
       Nicholas J. Panarella, Esq.
       Martin A. Krolewski, Esq.

MUNGER, TOLLES & OLSON LLP
*Attorney for Term Loan Lenders*
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
By:    John W. Spiegel, Esq.
       George M. Garvey, Esq.
       Bradley R. Schneider, Esq.
       Craig A. Lavoie, Esq.

       and

560 Mission Street, 27th Floor
San Francisco, CA 94105
By:    Kristin Linsley Myles, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorney for Ad Hoc Group of Term Lenders*
1633 Broadway
New York, NY 10019
By:    Mark E. Kasowitz, Esq.
       Andrew K. Glenn, Esq.
       Paul M. O'Connor, Esq.
       Michele L. Angell, Esq.
       Michelle G. Bernstein, Esq.

BINDER & SCHWARTZ LLP
*Attorneys for Plaintiff*
28 W. 44th Street, Suite 700
New York, NY 10036
By:    Eric B. Fisher, Esq.
       Neil S. Binder, Esq.
       Lindsay A. Bush, Esq.
       Lauren K. Handelsman, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       Pending before the Court are the following motions to dismiss (collectively, the "Motions

to Dismiss") and motions for judgment on the pleadings (collectively, the "Judgment on the

Pleadings Motions," and together with the Motions to Dismiss, the "Motions") in this adversary proceeding (the "Avoidance Action"):

1. The joint motion of certain Term Loan Investor Defendants[1] to dismiss the Plaintiff's Amended Complaint[2] (the "Term Loan Investors' Motion," ECF Doc. # 226);[3]

2. The motion of Ad Hoc Group of Term Lenders[4] to (1) vacate certain prior orders of the Court; and (2) dismiss the adversary proceeding (the "Ad Hoc Motion," ECF Doc. # 262);

3. The motion of Defendant Continental Casualty Company ("Continental") to dismiss the Plaintiff's Amended Complaint (the "Continental Motion," ECF Doc. # 310, 311)[5];

4. The motion of Term Loan Lenders[6] for judgment on the pleadings (the "TLL Motion," ECF Doc. # 377); and

5. The Moving Term Loan Lenders' Motion for judgment on the pleadings (the "Moving TLL Motion," ECF Doc. # 390).

The Motors Liquidation Company Avoidance Action Trust (the "Trust" or "Plaintiff") filed an omnibus opposition to the Motions (the "Opposition," ECF Doc. # 427). Thereafter, the moving defendants submitted voluminous briefs in further support of the Motions. Other defendants filed joinders to the Motions.

The Avoidance Action was filed on July 31, 2009, in the General Motors Corporation's ("GM" or "General Motors") chapter 11 cases pending before my then-colleague, Judge Robert E. Gerber. The Avoidance Action, naming approximately 500 defendants, seeks to avoid and

---

[1]     The term "Term Loan Investor Defendants" shall have the meaning prescribed in the Term Loan Investors' Motion.

[2]     The "Amended Complaint" shall mean the *First Amended Adversary Complaint for (1) Avoidance of Unperfected Lien, (2) Avoidance and Recovery of Postpetition Transfers, (3) Avoidance and Recovery of Preferential Payments, and (4) Disallowance of Claims by Defendants* (ECF Doc. # 91).

[3]     All docket references herein shall refer to the adversary proceeding's docket at 09-00504. The "Main Proceeding" shall refer to the main proceeding's docket at 09-50026.

[4]     The term "Ad Hoc Group of Term Lenders" shall have the meaning prescribed in Ad Hoc Motion.

[5]     The term "Continental Motion" shall refer to the *Memorandum of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint* (ECF Doc. # 311).

[6]     The term "Term Loan Lenders" shall have the meaning prescribed in TLL Motion.

recover transfers of $1.5 billion to the holders (or their transferees) of interests in a $1.5 billion

term loan to General Motors.  The term loan was originally fully secured, but it later turned out

that—after the loan was repaid in full shortly after the General Motors bankruptcy cases were

filed—the liens on much of the collateral had mistakenly been released.  The Trust now seeks to

recover the payments as avoidable preferences or constructively fraudulent transfers.

The Avoidance Action was actively litigated for many years in this Court, on direct

appeal from this Court to the Second Circuit, on certification of a question of law from the

Second Circuit to the Delaware Supreme Court, and then back to the Second Circuit, which

based on the Delaware Supreme Court decision, reversed Judge Gerber's decision dismissing the

case.  The case was then remanded to this Court for further proceedings.

On January 5, 2016, in anticipation of Judge Gerber's retirement at the end of January

2016, the General Motors (now called "Motors Liquidation Company") chapter 11 cases and the

Avoidance Action were transferred to me.  The Motions are now fully briefed and ready for

decision.  The Court heard argument on the Motions on April 18, 2016.

For the reasons explained below, all of the Motions are **DENIED.**

## I.    GENERAL BACKGROUND

### A.    Term Loan Agreement and Collateral Agreement

In 2006, GM obtained the $1.5 billion seven-year term loan (the "Term Loan"),

evidenced by a note pursuant to the Term Loan Agreement.[7]  (Term Loan Investors' Mot. at 3

(citing Am. Compl. ¶¶ 571–72).)  JPMC was the administrative agent under the Term Loan

Agreement.  (Opp'n at 4 (citing Fisher Decl. Ex. B (Term Loan Agreement)).)  In addition to

---

[7]    The "Term Loan Agreement" refers to the term loan agreement dated as of November 29, 2006, amended by that certain first amendment dated as of March 4, 2009, between GM, as borrower, JPMorgan Chase Bank, N.A. ("JPMC"), as agent, the Bank Lenders (as defined therein), various institutions as agents and Saturn Corporation ("Saturn") as guarantor, pursuant to which GM obtained the Term Loan.

acting as the administrative agent, JPMC was also a Term Lender.  (*Id.*)  To secure their

obligations under the Term Loan, GM and Saturn granted to JPMC, pursuant to a November 29,

2006 collateral agreement, among GM, Saturn and JPMC, a first priority security interest in

certain equipment, fixtures, documents, general intangibles, all books and records and their

proceeds.  (Term Loan Investors' Mot. at 3 (citing Am. Compl. ¶ 572).)  On November 30, 2006,

a UCC-1 financing statement (the "Financing Statement") was filed with the Secretary of State

of Delaware listing GM as "debtor" and JPMC as "administrative agent and secured party."

(Am. Compl. ¶ 581.)  The collateral covered by the Financing Statement was comprised of the

assets described on Annex 1 to the Financing Statement (the "Collateral").  (*Id.*, Ex. 1.)

The Term Loan was a complex syndicated commercial financing, pursuant to which

JPMC, Credit Suisse, Cayman Islands Branch, ABN AMRO Bank N.V., Barclays Bank PLC,

The Bank of New York, and National City Bank (collectively, the "Bank Lenders") committed

upfront to fund the Term Loan.  (Term Loan Investors' Mot. at 3 (citing Term Loan Agreement ¶

2.01, Ex. 1).)  The Bank Lenders then had the right to sell, typically through assignments,

interests in the Term Loan and the accompanying note in the secondary market to a variety of

investors.  (*Id.* (citing Term Loan Agreement ¶ 10.06).)  To facilitate trading in the secondary

market, the Term Loan and accompanying note were registered and assigned CUSIP No.

37046GAF9.  (*Id.* at 4.)  The Bank Lenders ultimately assigned some or all of their interests in

the Term Loan, and over 500 sophisticated entities became lenders under the Term Loan

Agreement (the "Term Lenders").  (*Id.* at 4 (citing Am. Compl. ¶¶ 15–568).)

Prior to entering into the Term Loan Agreement, GM entered into a synthetic lease (the

"Synthetic Lease") on October 31, 2001, by which GM obtained up to approximately $300

million in financing from a syndicate of financial institutions.  (*Id.* at 5.)  The Synthetic Lease

was documented by a Participation Agreement dated as of October 31, 2001, with JPMC acting as administrative agent. (*Id.*) GM's obligation to repay the financing under the Synthetic Lease was secured by liens on certain real properties. (*Id.* at 5–6.)

Outstanding amounts under the Synthetic Lease were paid off and the Synthetic Lease was terminated on October 30, 2008, and the liens on real estate and related assets were released. (*Id.* at 6.) On October 30, 2008, GM's counsel, with respect to the Synthetic Lease, caused the filing of UCC-3 termination statements with the Delaware Secretary of State. (*Id.*) As part of that filing, JPMC and its counsel erroneously authorized the filing of a UCC-3 termination statement (the "Termination Statement") terminating the UCC-1 financing statement securing the Term Loan. (*Id.*) Specifically, the Termination Statement provided that the "[e]ffectiveness of the Financing Statement . . . is terminated with respect to security interest(s) of the Secured Party authorizing [the] Termination Statement."[8] (Am. Compl. ¶ 582, Ex. 2.)

### B.    GM's Bankruptcy Filing and the DIP Financing Order

On June 1, 2009 (the "Petition Date"), GM and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. As of the Petition Date, the outstanding principal balance under the Term Loan Agreement was in excess of $1.4 billion. (Am. Compl. ¶ 573.)

On June 3, 2009, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors of Motors Liquidation f/k/a General Motors Corporation (the "Committee") pursuant to section 1102 of the Bankruptcy Code. (*Id.* ¶ 7.)

---

[8]    The Termination Statement did not release the liens securing the Term Loan arising from 26 "fixture filings" that were intended to perfect security interests in "fixtures" located in GM's plants in different states, including Michigan, Ohio and Louisiana. The extent, validity, perfection, and value of liens arising from the fixture filings remain subject to dispute in the Avoidance Action. Nothing in this Opinion addresses those issues.

8

On the Petition Date, the Debtors also filed the motion for debtor-in-possession financing (the "DIP Motion") seeking authority to obtain interim postpetition financing on a secured and superpriority basis up to a maximum aggregate interim amount of $15 billion and final postpetition financing on a secured and superpriority basis up to a maximum aggregate final amount of $33.3 billion under a DIP facility from the United States Department of Treasury and Export Development Canada to pay, among other things, certain prepetition claims and fund the Debtors' operations and administration costs.  (Term Loan Investors' Mot. at 6 (citing Am. Compl. ¶ 574).)  The Court approved the DIP facility, first on an interim and then on a final basis.  (Interim DIP Order (Main Proceeding ECF Doc. # 292) and the DIP Order (Main Proceeding ECF Doc. # 2529).)  Among other things, the DIP Order authorized repayment in full of the Term Loan.  (Term Loan Investors' Mot. at 6 (citing Am. Compl. ¶ 578).)

Paragraph 19(d) of the DIP Order provides for full general releases of any and all claims against, among others, the holders of the Term Loan, *except*:

> that such release shall not apply to the Committee with respect only to the perfection of first priority liens of the Prepetition Senior Facilities Secured Parties (it being agreed that if the Prepetition Senior Facilities Secured Parties, after Payment, assert or seek to enforce any right or interest in respect of any junior liens, the Committee shall have the right to contest such right or interest in such junior lien on any grounds, including (without limitation) validity, enforceability, priority, perfection or value) (the 'Reserved Claims').

(Term Loan Investors' Mot. at 7 (citing DIP Order ¶ 19(d)).)

Following entry of the DIP Order, the Debtors paid $1,481,656,507.70 to the Term Lenders in full satisfaction of all claims arising under the Term Loan Agreement.  (Am. Compl. ¶ 578.)

JPMC contends that following GM's bankruptcy filing, JPMC provided status updates to the Term Lenders in a variety of ways.  Some of these facts are disputed by defendants, but it is unnecessary to resolve these issues to rule on the pending Motions.  In June 2009, JPMC set up an *Intralinks* site to communicate with the Term Lenders regarding the loan and the GM bankruptcy proceedings.  (Opp'n at 9.)  JPMC also asserts that it wrote the Term Lenders on June 25, 2009, explaining that the Committee had reserved the right to investigate the liens.  (*Id.*)

### C.    The Initial Complaint

On July 31, 2009, the Committee filed the *Adversary Complaint for (1) Avoidance of Unperfected Lien, (2) Avoidance and Recovery of Postpetition Transfers, (3) Avoidance and Recovery of Preferential Payments, and (4) Disallowance of Claims by Defendants* (the "Initial Complaint," ECF Doc. # 1).  The Initial Complaint challenged the liens securing the Term Loan on the ground that the Termination Statement caused the liens on the Collateral to be unperfected.  (Initial Compl. ¶¶ 433, 440, 449.)  The Initial Complaint named JPMC, as Administrative Agent and as Term Lender, as well as all other Term Lenders that the Committee was able to identify.  However, the Initial Complaint was only served on JPMC.

On July 23, 2009, approximately a week before the Committee filed the Avoidance Action, JPMC contends that it hosted a conference call with over twenty entities, including Term Lenders and the investment managers and affiliates of Term Lenders.  (Opp'n at 11 (citing Fisher Decl. Ex. J (JPMCB-3-0001290-1292)).)  On August 3, 2009, approximately a week after the Committee commenced the Avoidance Action, JPMC again hosted a conference call, this time with over fifty entities, including Term Lenders and the investment managers and affiliates of Term Lenders.  (*Id.*)

Then, on September 18, 2009, JPMC asserts that it wrote to the Term Lenders regarding

the Avoidance Action stating that the Committee had filed an adversary complaint on July 31,

2009, naming JPMC:

> individually and as administrative agent, along with dozens of
> lenders who participated in the Term Loan Agreement as
> defendants. The Action seeks, in part, to avoid and recover
> approximately $1.4 billion in post-petition payments made to
> lenders in connection with the Term Loan Agreement as well as
> approximately $28 million in pre-petition interest payments made
> within 90 days of General Motors Corporation's bankruptcy filing
> of June 1, 2009 (the 'Petition Date') on the grounds that the
> lenders did not have a perfected security interest in GM's assets
> that were securing indebtedness under the Term Loan Agreement
> as of the Petition Date.

(Opp'n at 12 (citing Fisher Decl. Ex. L (JPMCB-3-00000444)).)   Moreover, JPMC contends that

the letter addressed JPMC's assessment of the merits of the Committee's action and discussed

service of process, including JPMC's proposal to the Committee that service be delayed as to the

Term Lenders:

> [JPMC] considers the Committee's Action to be meritless.
> Accordingly, in an effort to efficiently litigate the substance of the
> Action, [JPMC] has proposed to the Committee that it serve
> [JPMC] with the complaint but withhold service for a substantial
> period of time upon the Term Loan Agreement lenders until after it
> takes discovery regarding the Committee's contention that the
> security interest related to the Term Loan Agreement was
> unperfected as of the Petition Date, and after that dispositive
> motions are heard. On September 17, 2009, the Committee
> accepted [JPMC]'s proposal.

(*Id.*; *see also* ECF Doc. # 393 ¶ 61 (JPMC averring that it "informed the Term Lenders via

*Intralinks* of this agreement, that the Court entered a stipulation in the public record allowing the

Committee to withhold service of the complaint on the Term Lenders"), 394 ¶ 62 (same), 391 ¶

60 (same).)

On July 1, 2010, the Committee filed a motion for partial summary judgment, and JPMC filed a motion for summary judgment.

On March 29, 2011, the Court entered an order (the "Confirmation Order," ECF Doc. # 9941) confirming the *Debtors' Second Amended Joint Chapter 11 Plan* (the "Plan," ECF Doc. # 9836). The Plan provided, among other things, for the creation of the Trust to hold and administer certain assets, including the Avoidance Action. (Am. Compl. ¶ 12.) On or about December 15, 2011, the Debtors transferred the Avoidance Action to the Trust. (*Id.* ¶ 13.)

On March 1, 2013, this Court entered its *Decision on Cross-Motions for Summary Judgment* (ECF Doc. # 71), *Judgment* against the Committee (ECF Doc. # 73), and *Order on Cross Motion for Summary Judgment* (ECF Doc. # 72) (collectively, the "March 1, 2013 Summary Judgment Orders and Judgment"). The March 1, 2013 Summary Judgment Orders and Judgment denied the Committee's prayers for relief set forth in the Initial Complaint, granted summary judgment in favor of JPMC, denied the Committee's motion for partial summary judgment, and concluded that the Termination Statement did not terminate the perfection of the liens in favor of the Term Lenders. (*See* ECF Doc. # 71 at 5–6; 72 at 1; 73 ¶ 2; Am. Compl. ¶ 584.) The Court certified its ruling for a direct appeal to the Second Circuit (ECF Doc. # 74), the Committee appealed to the Second Circuit (ECF Doc. # 76), and the motion for leave to appeal to the Second Circuit was granted (ECF Doc. # 83).

The Second Circuit then considered the appeal and focused on whether a secured lender must review and knowingly approve the filing of a UCC-3 termination statement for it to extinguish a perfected security interest, or whether the secured lender must instead intend to terminate the particular security interest that is listed on a UCC-3 termination statement. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank,*

*N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d. Cir. 2014), *certified question answered sub nom.*, *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1011 (Del. 2014).  On June 17, 2014, the Second Circuit certified the question to the Delaware Supreme Court, noting that "[t]he important and urgent reason for an immediate determination by the Delaware Supreme Court . . . is that the question is one of first instance in the State of Delaware."  *Id.*  Subsequently, the Delaware Supreme Court answered the certified question, holding that a secured party reviewing and authorizing a UCC-3 filing was enough to extinguish a perfected security interest.  *Official Comm.*, 103 A.3d at 1010.

On January 21, 2015, after receiving the decision of the Delaware Supreme Court, the Second Circuit issued a decision ruling that the Term Loan security interest had been terminated upon the filing of the erroneous Termination Statement and remanded the litigation back to this Court for further proceedings.  *See generally Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100 (2d Cir. 2015).

On May 20, 2015, the Trust filed the Amended Complaint.  The Trust asserts four claims for relief against the Defendant Term Lenders:

> (1)     avoidance of the Term Loan's lien as unperfected pursuant to section 544(a) of the Bankruptcy Code;
>
> (2)     avoidance and disgorgement of the postpetition Transfers the Defendant Term Lenders allegedly received improperly because the lien was not perfected, pursuant to sections 549 and 550 of the Bankruptcy Code;
>
> (3)     avoidance and disgorgement of the Payments the Defendant Term Lenders allegedly received as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code; and
>
> (4)     disallowance of any claims the Defendant Term Lenders may have against the Debtors pursuant to section 502(d) unless and until they disgorge the avoidable transfers alleged in the second and third claims for relief.

Several groups of Term Loan Defendants (the "Cross Claimants"[9]) filed cross claims against JPMC alleging, among other things, that JPMC recklessly and with gross negligence filed the Termination Statement.  (Opp'n at 19.)

### D.    The Extension Orders

From the time the Avoidance Action was initially filed, the Court faced the question of how the action could most efficiently be litigated in the bankruptcy court.  It was clear from the outset that the gating issue was whether the erroneously-filed Termination Statement was effective.  If it was ineffective, the loan collateral remained in place and the repayment of the loan was permissible.  If the lien release was effective, the avoidance action would proceed against all defendants, with many other issues having to be litigated.

The Court entered the following orders extending the time to serve the summons and complaint:

- On October 6, 2009, the Court entered an order granting the Committee 240 days to complete service on Defendant Term Lenders[10] other than JPMC (the "First Service Extension Order," ECF Doc. # 10).

- On January 20, 2010, the Court so-ordered a stipulation between the Committee and JPMC (the "Second Service Extension Order," ECF Doc. # 17), giving the Committee "until thirty (30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."   (Second Service Extension Order ¶ 4.)

- On April 10, 2013, the Court entered an order (the "Third Service Extension Order," ECF Doc. # 82), extending the Committee's time to serve the summons and complaint on Defendant Term Lenders other than JPMC to thirty (30) days after the date of entry of a final order on the Committee's and JPMC's cross-motions for summary judgment (Third Service Extension Order, at 2).

- On May 19, 2015, the Court entered a stipulation and order (the "Fourth Service Extension Order," ECF Doc. # 90) between the Plaintiff Motors Liquidation

---

[9]     Over 150 Term Lender Defendants have filed cross claims to date.  (*See* Opp'n at 19.)

[10]    The "Defendant Term Lenders" shall mean the defendants named in the Amended Complaint.

Company Avoidance Action Trust, as successor to the Committee, (the "Plaintiff" or the "Trust") and JPMC, extending the Trust's time to serve a summons and Amended Complaint on Defendant Term Lenders other than JPMC to sixty (60) days following the filing of the Amended Complaint. (Fourth Service Extension Order ¶ 2.)

- On August 13, 2015, on the motion of the Trust, the Court further extended the Trust's time to serve the Amended Complaint on Defendant Term Lenders other than JPMC to September 30, 2015 (the "Fifth Service Extension Order," ECF Doc. # 152 at 2).

The series of extensions of time to serve the summons and complaint on defendants other than JPMC effectively divided the litigation into phases, with the first phase, Phase I, between the Plaintiff and JPMC challenging the effectiveness of the lien release. If, as Judge Gerber initially ruled, the lien release was not effective, the case was at an end, and it was unnecessary for the remaining defendants to be served. While many of the other defendants appear to dispute the knowledge they had about the pending Avoidance Action before they were served with the summons and complaint, many of those defendants certainly knew of the Avoidance Action, and until the Second Circuit reversed Judge Gerber's grant of summary judgment in favor of JPMC, those defendants were no doubt happy to sit by on the sidelines without having to defend the action. The Court concludes it is unnecessary to resolve the issues about what each defendant knew. As explained below, the extensions of time to serve the summons and complaint that were granted by Judge Gerber were all proper.

## II.     PARTIES' POSITIONS

### A.     Term Loan Investor Defendants' Position

The Term Loan Investor Defendants move to dismiss the Amended Complaint for insufficient service of process under Fed. R. Civ. P. 12(b)(5) and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), both made applicable under Fed. R.

Bankr. P. 7012(b).[11] (Term Loan Investors' Mot. at 1.) With respect to alleged insufficient

service of process, the Term Loan Investor Defendants argue that the insufficient service of

process resulted in the Term Loan Investor Defendants' due process rights being violated. (*Id.* at

2.) With respect to alleged failure to state a claim upon which relief can be granted, the Term

Loan Investor Defendants argue that the Amended Complaint's third claim for relief—avoidance

and recovery of an alleged prepetition preferential payment of $28,241,781 to JPMC for the

benefit of the Defendants—fails because the Trust lacks standing to pursue the claim and the

alleged transfer is protected by the safe harbor under section 546(e) of the Bankruptcy Code.

(*Id.*) Finally, the Term Loan Investor Defendants argue that the Amended Complaint's second

claim for relief—avoidance and recovery of the alleged postpetition transfer which constituted

payment in full of all amounts due and outstanding under the Term Loan Agreement to JPMC for

the benefit of the Defendants—fails because certain Term Loan Investor Defendants were not

term lenders at the time the transfers were made or were otherwise acting as a conduit. (*Id.* at 2–

3.)

    *1. Amended Complaint Should be Dismissed for Insufficient Service of Process*

First, the Term Loan Investor Defendants argue that the six year delay in service of

summons and the Initial Complaint upon them violated their due process rights since they did not

receive constitutionally adequate notice of the proceedings and have been prejudiced as a result.

(*Id.* at 2.) Additionally, the Term Loan Investor Defendants argue that not only were they not

served with the adversary proceeding in a timely manner, they were not even provided notice or

the opportunity to be heard on the "*ex parte*" service extension orders, further depriving them of

their entitled notice. (*Id.*) The Term Loan Investor Defendants contend that they suffered

---

[11]    Additionally, the Term Loan Investor Defendants assert that they move to dismiss the Amended Complaint pursuant to Rule 12(b)(2), but their briefing contains no mention of personal jurisdiction.

prejudice because (1) in effect, the two-year limitations period has been "unilaterally" extended, and (2) the lack of notice affected their ability to (a) participate in and shape the outcome of the litigation, (b) assert potential cross-claims against parties, (c) obtain documents and information necessary to defend their interests, and (d) establish appropriate reserves or take other steps for protection. (*Id.* at 1–2.) In so arguing, the Term Loan Investor Defendants first argue that the Court has discretion to reconsider and vacate the service extension orders. (*Id.* at 11–13.)

Second, the Term Loan Investor Defendants argue that the service extension orders should be set aside as improper because they were not sound exercises of discretion. (*Id.* at 13.) The Term Loan Investor Defendants argue that inconvenience and expense to a plaintiff who initiates an action does not constitute good cause to extend a service deadline and that the entry of the service extension orders on those grounds was an unsound exercise of discretion. (*Id.* at 15.) The Term Loan Investor Defendants argue the extensions of time for "convenience" under Rule 4(m) render their rights meaningless under Rule 19 and also subvert Rule 23. (*Id.* at 16.) The Term Loan Investor Defendants contend that the Court should reconsider and vacate the service extension orders because they involved unsound exercises of discretion. (*Id.* at 18.)

Third, the Term Loan Investor Defendants argue that the service extension orders violated their due process rights. (*Id.*) The Term Loan Investor Defendants argue that they have been potentially prejudiced by the "*ex parte*" service extension orders. (*Id.* at 20.) They contend that their right to assert cross-claims against third parties is being challenged, that many defendants have destroyed or no longer have access to documents and other information needed to support their defenses, and finally that they were unable to establish back in 2009 the appropriate reserves to protect their investors and beneficiaries from the potential liability. (*Id.*) As an example of this potential prejudice, the Term Loan Investor Defendants point to JPMC's

17

position that the applicable statutes of limitations under New York law for their claims with

respect to the termination of the term loan's security interest may have expired since the

Termination Statement was filed in October 2008. (*Id.* (citing *Stipulation and Order Regarding*

*Extension of the Deadline for the Undersigned Defendants to File Cross-Claims Between and*

*Among Themselves*, ECF Doc. # 188 ¶ 3 (stating that "[f]or the avoidance of doubt, each

Stipulating Defendant, including [JPMC], reserves any and all rights and arguments it had as of

November 16, 2015 to assert that any cross-claim does or does not "relate back" to the filing of

the complaint in the above-captioned action and is or is not barred by the statute of limitations or

any other legal, equitable, or other defense relating to the passage of time.")).) But resolving the

current motion does not require the Court to address the issue of the applicable statutes of

limitations for the lenders' claims against JPMC.

> ### 2. Amended Complaint's Third Claim for Relief Should be Dismissed Because the Trust Lacks the Necessary Standing

The Term Loan Investor Defendants contend that although the DIP Order gave the

Committee (and the Trust, as successor-in-interest) the right to challenge the "perfection of first

priority liens" of the Term Loan, it did not give the Committee the right to bring claims seeking

disgorgement of prepetition preferential transfer payments under section 547 of the Bankruptcy

Code. (*Id.* at 24.) The Term Loan Investor Defendants argue that claims to avoid a lien as

unperfected under section 544 of the Bankruptcy Code are wholly distinct from preferential

transfer claims brought under section 547 of the Bankruptcy Code. (*Id.*) The Term Loan

Investor Defendants contend that the DIP Order is clear that the Committee has standing to bring

claims related to the "perfection of first priority liens" of the Term Loan, which textually only

encompasses claims under section 544(a), and, by extension, claims under 549 of the Bankruptcy

Code, if it is determined that the lien is unperfected. (*Id.* at 26 (citing DIP order ¶ 19(d)).) The

Term Loan Investor Defendants argue that the release provision of the DIP Order is general, but that the exception for Reserved Claims (as defined in the DIP Order) is narrow and limited.  (*Id.*) The Term Loan Investor Defendants conclude that the Court should dismiss the Amended Complaint's third claim for relief because (i) the Trust lacks standing, (ii) the claim was released under the express terms of the DIP Order, and (iii) such claim is time-barred.  (*Id.* at 27.)

### 3. Amended Complaint's Third Claim for Relief Should be Dismissed Due to the Safe Harbor under Section 546(e) of the Bankruptcy Code

The Term Loan Investor Defendants argue that the prepetition payments to JPMC for the benefit of the defendants qualify as both a "settlement payment" and as a "transfer made by or to (or for the benefit of)" a financial institution "in connection with a securities contract," and, as such, are exempt from avoidance under either prong of section 546(e) of the Bankruptcy Code. (*Id.* at 28.)  The Term Loan Investor Defendants concede that courts in the Second Circuit have yet to formally address the safe harbor protection to "tradeable bank debt."  (*Id.*)  The Term Loan Investor Defendants argue that the circumstances concerning the interests in the Term Loan and the accompanying note, which were identified in the marketplace by a CUSIP number, were widely held and traded by non-traditional bank investors.  (*Id.*)  The Term Loan Investor Defendants contend that this wide trading mandates a finding that the interests in the Term Loan acquired by the Term Lenders in the marketplace and the prepetition payments made in connection thereto should qualify for safe harbor treatment.  (*Id.*)

### 4. Amended Complaint's Second Claim for Relief Should be Dismissed Because Certain Term Loan Investor Defendants Were Not Term Lenders at the Time the Transfers Were Made or Were Conduits

The Term Loan Investor Defendants contend that several of the Term Loan Investor Defendants sold their interests in the Term Loan to other Term Loan Lenders prior to the Record Holder Date, but the settlement dates on the sales occurred after the Record Holder Date.  (*Id.* at

19

34.)  The Term Loan Investor Defendants contend that since these Term Loan Investor

Defendants were still listed as the holder of record as of the Record Holder Date, they are being

sued for the full amount of the postpetition transfer even though they did not hold an equitable

interest in the Term Loan at the time the postpetition transfers were made.  (*Id.*)  The Term Loan

Investor Defendants contend that in every case, to the extent that they received postpetition

transfers, each Seller Conduit Defendant (as defined in the motion) either (i) remitted to its buyer

in its entirety or (ii) netted out the postpetition transfers against the amount it was owed from the

sale, which satisfied the buyer's obligation, and remitted the balance to its buyer.  (*Id.* at 34–45.)

In all events, the Term Loan Investor Defendants maintain that the buyer held the equitable

interests in the Term Loan and was the ultimate beneficiary of the postpetition transfers.  (*Id.* at

35.)

     The Seller Conduit Defendants concede that the conduit defense is fact specific and does

not lend itself to a motion to dismiss.  (*Id.* at 36.)  They argue that they should not have to endure

discovery.  (*Id.*)  They request the Court to establish a streamlined procedure for granting

dismissal of the Amended Complaint's second claim for relief against any Seller Conduit

Defendant that can demonstrate to the Trust or the Court that it sold its interest in the Term Loan

prior to the postpetition transfers being made.  (*Id.*)

     **B.**    **Ad Hoc Group of Term Lenders' Position**

     The Ad Hoc Group of Term Lenders advances the same arguments that the Term Loan

Investors make in favor of dismissal of the Amended Complaint, contending that the entire

Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(5), made applicable

to the adversary proceeding through Fed. R. Bankr. P. 7012(b), due to insufficient service of

process.  (Ad Hoc Mot. at 1.)  Additionally, the Ad Hoc Group of Term Lenders contends, just as

the Term Loan Investor Defendants do, that the preference claim—the Amended Complaint's

third claim for relief—should be dismissed.  (*Id.* at 27.)

C.    **Continental Casualty Company's Position**

Continental moves to dismiss the Amended Complaint and contends that it should be

dismissed for the reasons stated in the Term Loan Investors' Motion and the Ad Hoc Motion.

(Continental Mot. at 1–2.)

Unique from the other moving parties, Continental moves to dismiss the Amended

Complaint's second claim for relief (avoidance and recovery of postpetition transfers) for failure

to state a claim.  In short, Continental contends that an essential element of avoidance under

section 549(a), avoidance of a transfer that is "not authorized," is lacking in the Amended

Complaint.[12]  Continental argues that the Court expressly authorized the postpetition transfer to

Continental, and thus, the Trust cannot establish that there was an unauthorized transfer.

Accordingly, Continental argues that the Amended Complaint must be dismissed pursuant to

Fed. R. Civ. P. 12(b)(6).  (Continental Mot. at 2.)

Continental argues that the Trust seeks to circumvent this basic infirmity (that avoidance

is only permitted if the transfers were unauthorized) by alleging that the postpetition transfers at

issue were only "provisionally" authorized.  (*Id.* at 4.)  Continental concedes the DIP Order

authorized the Committee to investigate the liens of any of the Prepetition Senior Facilities

Secured Parties (as defined in the DIP Order), and provides the Committee with authority to

bring actions based on its investigation no later than July 31, 2009.  (*Id.*)  However, Continental

contends that these provisions do not qualify the authority to make postpetition transfers to

Continental and other prepetition Term Lenders; the only reference in the DIP Order to section

---

[12]    Continental also disputes the allegation that the postpetition transfers to the defendants were ever property
of the estate.  (Continental Mot. at 2.)

549 of the Bankruptcy Code relates to the new DIP lenders' liens, not the Debtors' prepetition

lenders.  (*Id.* (citing DIP Order ¶ 6).)

Continental argues that the DIP Order does not bind Continental because it was not a

party to the DIP Order and because Continental's interests are adverse to the interests of JPMC,

the agent for the prepetition term lenders who participated in negotiating the DIP Order. (*Id.* at

5.)  Continental also contends that it had no notice of the DIP Order or its terms.  (*Id.*)

### D.      Term Loan Lenders' Position

The Term Loan Lenders move for judgment on the pleadings under Fed R. Civ. P. 12(c)

based on untimely service and release.  (TLL Mot. at 1.)  In doing so, they advance largely the

same arguments as the Term Loan Investors that (i) the Amended Complaint should be dismissed

for insufficient service of process and (ii) the Trust fails to state a preference claim because the

release in the DIP Order does not authorize such a claim.  (*See generally id.*)  As these claims are

already summarized above, they are not summarized here.

### E.      Moving Term Loan Lenders' Position

The moving term loan lenders (the "Moving Term Loan Lenders") join the TLL Motion

for judgment on the pleadings under Fed. R. Civ. P. 12(c) and Fed. R. Bankr. P. 7012(c).

(Moving TLL Mot. at 1.)  The Moving Term Loan Lenders advance the same arguments as the

Term Loan Lenders and, largely, the Term Loan Investor Defendants.  (*See generally id.*)  As

these claims are already summarized above, they are not summarized here.

### F.      Trust's Opposition

In the Opposition to the Motions, the Trust argues that (i) the extension orders were

proper and should not be vacated, (ii) the Trust has proper standing to pursue the action, (iii) the

preferential payments are not protected by the safe harbor provision of section 546(e) of the

Bankruptcy Code, and (iv) the conduit defense is not properly considered on a motion to dismiss or a motion for judgment on the pleadings. (*See generally* Opp'n.)

### 1. The Extension Orders Were Proper and Should Not be Vacated

The Trust contends that JPMC, as administrative agent for the moving defendants under the Term Loan Agreement, sought to litigate this action in two phases and to have service of the complaint on the defendants delayed during the pendency of Phase I, which it litigated on the Term Lenders' behalf pursuant to a grant of authority under the Term Loan Agreement and Collateral Agreement. (Opp'n at 21.) The Trust maintains that the defendants were repeatedly notified about the status of the litigation, including the extension orders, and none of the moving defendants sought to intervene, instead opting to permit their administrative agent to act for them. (*Id.*)

The Trust contends that it timely served process in accordance with the extension orders and that the movants' motions challenging service of process should be dismissed on this ground. (*Id.* at 23.) Further, the Trust contends that the extension orders were proper, as JPMC, the moving defendants' agent, proposed and agreed to the entry of the extension orders. (*Id.* at 24–25.) The Trust argues that JPMC had no conflict of interest and that JPMC vigorously defended the defendants' rights with respect to the collateral during Phase I of the litigation, taking advantage of virtually every procedural avenue and appeal. (*Id.* at 28.) The Trust argues that JPMC acted with apparent authority at all times. When the moving defendants entered into the Term Loan, the Trust was required to accept JPMC's assertion that it was acting as agent for the Term Loan Lenders, evidenced by the Collateral Agreement. (*Id.* at 28–29.) The Collateral Agreement provided that the Trust may in all events rely on JPMC's apparent authority to act on the Term Lenders' behalf. (*Id.* at 29 (citing Fisher Decl. Ex. C (Collateral Agreement § 6.04)

("[JPMC is] conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting," and Old GM and Saturn shall not "be under any obligation, or entitlement, to make any inquiry respecting such authority")).)

Additionally, the Trust argues that the defendants were on notice of the litigation as JPMC established and maintained an *Intralinks* site that it used to communicate with the defendants.  (*Id.* at 33.)  Further, the Trust argues that the Federal Rules authorized the extension orders, the Court properly extended the Trust's time to serve the defendants, the defendants' due process rights have not been violated, Federal Rules of Civil Procedure 19 and 23 are inapplicable, and the law of the case doctrine dictates that the extension orders should stand.

### 2.  *The Trust has Proper Standing*

The Trust argues that the DIP Order expressly gives the Committee "automatic standing and authority" to "investigate" and "bring actions based upon" the Term Lenders' "perfection of first priority liens."  (Opp'n at 41 (citing Fisher Decl. Ex. G (DIP Order ¶ 19(d))).)  The DIP Order further dictates that the Committee's "grant of automatic standing" was "without . . . any requirement that the Committee file a motion seeking standing or authority . . . before prosecuting any such challenge."  (*Id.*)  The Trust argues that the claims seeking recovery of transfers pursuant to sections 549 and 547 of the Bankruptcy Code are "based upon" the Committee's successful challenge to the "perfection of the first priority lien[]" and, thus, fall squarely within the grant of authority set forth in the DIP Order.  (*Id.* at 42.)  The Trust argues that the claim to avoid the preference payment under section 547 of the Bankruptcy Code falls squarely within the carve-out of the DIP Order because the claim is *based upon* "the perfection of first priority liens" of the Term Lenders.  (*Id.* at 43.)  The Trust argues that the Plan provided

for, among other things, the creation of the Trust, to prosecute the Avoidance Action[13] following

the dissolution of the Committee.  (*Id.* at 45.)  Further, the Trust cites to a previous decision of

this Court which confirmed the Committee's (and the Trust's) standing.  (*Id.* at 46.)

       With respect to Continental's argument that the Trust does not have the authority to avoid

the postpetition transfers pursuant to section 549(a) of the Bankruptcy Code, the Trust argues

that such an argument ignores the plain language of the DIP Order, which authorized the

postpetition transfers. The DIP Order stated the Committee had "automatic standing" to

investigate and challenge the perfection of the Main Lien (as defined in the DIP Order) and bring

actions upon any such challenges to perfection.  (*Id.* at 48 (citing Fisher Decl. Ex. G (DIP Order

¶¶ 19(d), 24)).)

          3.   *The Preferential Payments Are Not Subject to the Safe Harbor Provision of*
             *Section 546(e) of the Bankruptcy Code*

       The Trust argues that the safe harbor defense is not a valid basis for dismissal at this

stage, as the defendants bear the burden of proving that section 546(e) is applicable to bar the

Trust from avoiding a transfer, and there is an issue of fact whether the interest payment of

$28,241,781 made on May 27, 2009 was a routine or "mandatory" payment under the Term Loan

Agreement.  (*Id.* at 50–51.)  Next, the Trust argues that the alleged preferential transfers are not

protected by the safe harbor under section 546(e) because the transfers do not qualify as

"settlement payments" or as transfers made in connection with a "securities contract."  (*Id.* at

51–57.)

---

[13]    Defined in the Plan as "any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 50 or 551 of the Bankruptcy Code, except to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement."  (Plan § 1.8.)

    4.   *The Mere Conduit Defense Is Not Properly Considered on a Motion to Dismiss or on a Motion for Judgment on the Pleadings*

The Trust argues that the Term Lender Defendants' argument is replete with factual allegations that are not found in the Amended Complaint and that such statements emphasize that a mere conduit defense requires an evidentiary record sufficient to prove that a defendant did not have dominion and control over the transferred funds. (*Id.* at 58–59.) The Trust also takes issue with the Term Lender Defendants' efforts to seek the establishment of a streamlined procedure for granting dismissal and contends that the Term Lender Defendants cite no case law in support and fail to articulate why such a procedure is, among other things, proper. (*Id.* at 59–60.)

## G.    Term Loan Investor Defendants' Reply

In their reply, the Term Loan Investor Defendants reiterate their arguments and contend that (i) the Trust did not provide actual notice to many of the defendants and that *Intralinks* was not designed to inform them of the litigation, (ii) the prepetition payments are protected by the safe harbor of section 546(e) of the Bankruptcy Code, and (iii) the Trust lacks standing to sue the Seller Conduit Defendants and streamlined procedures should be established for their identification and dismissal.

First, the Term Loan Investor Defendants contend that the Court should vacate the "*ex parte*" service extension orders and the Amended Complaint should be dismissed for the reasons outlined in their original motion (the "Term Loan Investor Reply," ECF Doc. # 450 at 1.) The Term Loan Investor Defendants contend that the Trust fails to demonstrate how any of the 500 defendants actually accessed information on *Intralinks*. (*Id.* at 2.) Additionally, the Term Loan Investor Defendants argue that there is a large category of defendants that could not have received notice via *Intralinks*: defendants who sold their interest in the Term Loan prior to repayment under the DIP Order (the "Preference Only Defendants"). (*Id.*) The Term Loan

Investor Defendants argue that the Preference Only Defendants were denied access to *Intralinks* because the *Intralinks* workspace terms and conditions expressly prohibit access to the site by a party who ceased being a term lender.  (*Id.* at 3 (citing Opp'n Fisher Decl. Ex. I).)

Second, the Term Loan Investor Defendants reiterate their previous argument that the prepetition payments are protected by the safe harbor of section 546(e) of the Bankruptcy Code. (*Id.* at 6.)  The Term Loan Investor Defendants contend that while the Term Loan itself may not be a security, the *interests* in the Term Loan debt sold to hundreds of investors and traded extensively on the secondary market are "securities" within the scope of section 546(e) of the Bankruptcy Code.  (*Id.* 8–11.)  Next, the Term Loan Investor Defendants reiterate their previous arguments that the prepetition payments were within the scope of the Bankruptcy Code's definition of a "settlement payment" and made in connection with a securities contract.  (*Id.* at 11–14.)

Third, the Term Loan Investor Defendants reiterate their previous argument that the Trust lacks standing to sue the Seller Conduit Defendants and urge that streamlined procedures be established for their identification and dismissal.  (*Id.* at 15.)

## H.    Omnibus Reply

In the omnibus reply (the "Omnibus Reply," ECF Doc. # 467), which the Ad Hoc Group of Term Lenders and the Term Loan Lenders filed together (the "Certain Term Lenders"), the Certain Term Lenders counter the two primary arguments that the Trust makes that (i) JPMC agreed to the service extensions and litigated this case as the Term Lenders' agent, and (ii) knowledge of this litigation is sufficient to bind the Term Lenders to the non-appealable partial judgment that was entered at the end of Phase I.  (Omnibus Reply at 1.)

The Certain Term Lenders argue that the agency argument is easily disposed of because JPMC consistently has made clear that it was not acting as a representative agent of the other defendants for purposes of this litigation, as evidenced by JPMC stating in its answer that it was not responding "on behalf of any other defendant named in the Complaint or lender under the Term Loan Agreement." (*Id.* at 1–2.) The Certain Term Lenders maintain that JPMC confirmed this position most recently in its March 30th statement to this Court where it stated it was acting "only as a named defendant, and *not* on behalf of any of the other Term Lenders." (*Id.* at 2 (citing JPMC Statement, ECF Doc. # 448, at 2 (emphasis in original)).)

The Certain Term Lenders argue that the Trust's second statement, that the Term Lenders are bound by the Phase I judgment, contradicts Supreme Court authority holding that, under fundamental principles of due process, only service of process can bind a named party to a judgment, regardless of whether the party knew of the litigation. (*Id.* at 2.) The Certain Term Lenders contend that the extension orders here are inconsistent with this authority. (*Id.*)

The Certain Term Lenders argue that vacatur of the extension of the dismissal of the claims against the Term Lenders is the only appropriate remedy. (*Id.*)

## I.    Continental Reply

In its reply, Continental clarifies its position in its original motion. ("Continental Reply," ECF Doc. # 446 at 2.) Continental maintains that it does not argue that the Court has not granted the Trust standing; rather, the Amended Complaint fails to establish a cause for the avoidance of the postpetition transfers to Continental, whether brought by the Trust or anyone else acting on behalf of the estate. (*Id.*)

Specifically, Continental stresses that to avoid a postpetition transfer under section 549(a), the Trust must prove that the transfer was "not authorized." (*Id.* at 3.) While the Trust

argues that the postpetition transfer to Continental was provisionally authorized, Continental

contends that that word appears nowhere in the DIP Order, which expressly authorized the

postpetition transfers to Continental.  (*Id.* at 3.)  Continental recognizes that at least some of the

parties to the DIP Order intended to provide a vehicle for clawing back repayment of the Term

Loan Lenders and that if the DIP Order had been worded differently, the case might be different.

(*Id.* at 3–4.)  But Continental, a stranger to the bankruptcy proceedings, was entitled to accept

repayment and then move on, in reliance on the DIP Order, which contained express

authorization for such repayment.  (*Id.* at 4.)

### J.    Moving Term Loan Lenders' Reply

In their reply, the Moving Term Loan Lenders reiterate the arguments that they

articulated in their motion for judgment on the pleadings.  (*See generally* the "Moving Term

Loan Lenders' Reply," ECF Doc. # 456.)  Moreover, the Moving Term Loan Lenders add that

JPMC did not act as their agent during Phase I and point to JPMC's express disclaimer of any

such representative role in its answer—"[JPMC] does not Answer this Complaint on behalf of

any other defendant named in the Complaint or lender under the Term Loan Agreement."  (*Id.* at

5 (citing ECF Doc. # 12 at 2 n.1).)  The Moving Term Loan Lenders argue that JPMC maintains

this view today.  (*Id.* (citing JPMC Statement).)

### III.    <u>DISCUSSION</u>

### A.    The Applicable Standard

Rule 12(c) of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by Bankruptcy Rule 7012, states that: "[a]fter the pleadings are closed—but early

enough not to delay trial—a party may move for judgment on the pleadings."  FED. R. CIV. P.

12(c).  In deciding a Rule 12(c) motion for judgment on the pleadings, courts apply the same

standard applicable to a motion under Rule 12(b)(6).  *See Hayden v. Paterson*, 594 F.3d 150, 160

(2d Cir. 2010); *Lewis v. GMAC, Mortgage Co., LLC (In re Residential Capital, LLC),* Adv. Pro.

No. 12-01731 (MG), 2012 WL 5386151, *3 (Bankr. S.D.N.Y. Nov. 1, 2012); *see also* FED. R.

CIV. P. 12(h)(2) (stating that "[f]ailure to state a claim upon which relief can be granted . . . may

be raised . . . by a motion under Rule 12(c)").

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a

complaint need only allege "enough facts to state a claim for relief that is plausible on its face."

*Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (emphasis removed)). "Where a complaint pleads facts that are merely

consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation

marks omitted). Plausibility "is not akin to a probability requirement," but rather requires "more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation and internal

quotation marks omitted).

Courts use a two-prong approach when considering a motion to dismiss. *Pension Benefit*

*Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that

motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo working

principles'") (quoting *Iqbal*, 556 U.S. at 678–79); *McHale v. Citibank, N.A. (In re the 1031 Tax*

*Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009). First, the court must accept all

factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb.

*See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124

(2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual

allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). Second, the court must

determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556

U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted).  A claim is plausible when the factual allegations permit "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation

omitted).  A complaint that pleads only facts that are "merely consistent with" a defendant's

liability does not meet the plausibility requirement.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555)

(internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).  "The pleadings

must create the possibility of a right to relief that is more than speculative." *Spool v. World

Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

On a motion to dismiss, in addition to the complaint, a court may consider written

instruments, such as a contract, that are either attached to the complaint or incorporated by

reference.  *See, e.g.*, FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a

pleading is a part of the pleading for all purposes."); *The Official Comm. of Unsecured Creditors

v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 89 (Bankr. S.D.N.Y. 2001)

("In addition to the complaint itself, a court may consider, on a motion to dismiss, the contents of

any documents attached to the complaint or incorporated by reference . . . .").  Courts may also

take judicial notice of settlement agreements in order to determine whether claims are barred by

a previous settlement.  *See, e.g.*, *Rolon v. Henneman*, 389 F. Supp. 2d 517, 519 (S.D.N.Y. 2005);

*see also Johns v. Town of E. Hampton*, 942 F. Supp. 99, 104 (E.D.N.Y. 1996) ("[W]hen a [party]

fails to introduce a pertinent document as part of his pleading, [the other party] may introduce

the exhibit as part of his motion attacking the pleading." (citing CHARLES A. WRIGHT & ARTHUR

R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D §1327, at 762–63 (2d ed. 1990)))

(internal quotation marks omitted).

### B.     The Court's Extension Orders Were Proper and No Cause Exists to Vacate the Extension Orders

Two months after the General Motors chapter 11 cases were filed, the Avoidance Action

was filed.  Judge Gerber was faced with the challenge of how to best handle the massive

Avoidance Action while also dealing with the enormous challenges raised by the chapter 11

cases.  It was clear from the outset of the Avoidance Action that the effectiveness of the

erroneously-filed Termination Statement was a gating issue.  Judge Gerber agreed with the

counsel for the Plaintiff and for JPMC that the most efficient way to handle the Avoidance

Action was to divide it into phases, with Phase I focusing on the effectiveness of the UCC-3 lien

release.  When viewed in this context, the series of orders extending Plaintiff's time to serve the

summons and complaint on all defendants other than JPMC was a sensible and rational case

management decision.  What is crystal clear is that these orders did not permit litigation of the

Avoidance Action to languish to the detriment of any of the defendants.  The moving defendants

ask me to second guess the case administration decisions made earlier in the case.  Defendants

make no persuasive arguments why the Court should do so.

Courts have discretion to reconsider or modify their interlocutory orders.  *United States v.*

*Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).  An "interlocutory order," as opposed to a final order,

does not completely resolve all of the issues pertaining to a discrete claim.  *See, e.g.*, *In re*

*Fugazy Exp., Inc.*, 982 F.2d 769, 776 (2d Cir. 1992).  The discretion to reconsider or modify an

interlocutory order is informed by the law-of-the-case doctrine, which provides that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case. *Uccio*, 940 F.2d at 758. The decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine. *Id.*; *see also Zdonok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964) (Friendly, J.) (stating that the doctrine of the law of the case is addressed to the court's "good sense").

Indeed, courts have held that "[m]otions for reconsideration are disfavored, because '[c]omplete disposition of discrete issues and claims is often essential to effective case management. If a court is forced to revisit earlier interlocutory rulings, much of the advantage in making the early rulings would be lost.'" *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 324 B.R. 492, 494 (Bankr. S.D.N.Y. 2005) (quoting *In re Best Payphones, Inc.*, No. 01-15472 (SMB), 2003 WL 1089525, at *1 (Bankr. S.D.N.Y. Mar. 10, 2003)). In considering whether to reconsider a prior order, "courts have generally applied criteria that respect the need to grant some measure of finality even to interlocutory orders and which discourage the filing of endless motions for reconsideration." *In re Homesteads Cmty. at Newtown, LLC*, No. 04-30417 (LMW), 2013 WL 932214, at *3 (Bankr. D. Conn. Mar. 11, 2013) (internal quotation marks omitted), *aff'd*, 526 B.R. 1 (D. Conn. 2014), *aff'd sub nom. Nuevo Pueblo, LLC v. Napolitano*, 608 F. App'x 40 (2d Cir. 2015).

Although Rule 60(b) (and, for that matter, Rule 59(e)) does not supply the power or the standard for deciding whether to reconsider an interlocutory order, courts have generally applied criteria that respect the need to grant some measure of finality even to interlocutory orders and

which discourage the filing of endless motions for reconsideration. *In re Homesteads*, 2013 WL 932214, at *3. Specifically, courts may find justification for reconsidering interlocutory orders when there is (1) an intervening change in controlling law; (2) newly discovered evidence; or (3) the need to correct a clear error of law or to prevent a manifest injustice. *Id.*

In this case, no justification exists for reconsidering the extension orders. There has not been an intervening change in the controlling law nor have defendants pointed to newly discovered evidence that warrants reconsideration. For the reasons detailed below, there was no clear error of law, and vacating the extension orders would not prevent a manifest injustice.

### 1. There Is No Clear of Error of Law

The Federal Rules of Civil Procedure provide a legal basis for the granting of the extension orders. The time for service in an adversary proceeding may be extended under two different rules:

- <u>Fed. R. Civ. P. 4(m)</u>: Rule 4(m), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7004, governs the enlargements of time for a plaintiff to serve the summons and complaint. "If a defendant is not served within 90 days after the complaint is filed, the court . . . shall . . . dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." FED. R. CIV. P. 4(m). Additionally, Fed. R. Civ. P. 6(b)(1)(A) provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires."

- <u>Fed. R. Bankr. P. 9006(b)(1)</u>: Rule 9006(b)(1) provides that a court "for cause shown may at any time in its discretion . . . with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order."

Importantly, courts are permitted to extend the time to serve the summons and complaint, *even in the absence of good cause*, and even after the deadline for service has already expired. *See Zapata v. City of New York*, 502 F.3d 192, 196–97 (2d Cir. 2007); *Mejia v. Castle Hotel,*

*Inc.*, 164 F.R.D. 343, 345 (S.D.N.Y. 1996).  Here, of course, because Judge Gerber granted

multiple applications to extend the time to serve the summons and complaint, there was no

failure to serve any defendants within the time expressly authorized by the Court, so there is no

issue whether a plaintiff should be permitted to serve a summons and complaint after the time to

do so expired.  That fact, above all others, distinguishes this case from the cases cited by the

moving defendants where the time to serve had already expired when an extension of time was

sought.  That is why the relief sought by the defendants here would require the Court to vacate

orders that the Rules specifically authorized Judge Gerber to grant; here, there is no defect in

service to correct.  *See, e.g.*, *Savage & Assocs., P.C. v. 1201 Owner Corp. (In re Teligent Inc.)*,

485 B.R. 62, 70–71 (Bankr. S.D.N.Y. 2013).[14]  Applications to extend the time to serve a

summons and complaint on defendants are, necessarily, *ex parte*, since the other named but

unserved defendants are not required by any rule to be served with the application.

The moving defendants contend that they have suffered prejudice because they were not

served with the summons and complaint years ago.  Their allegations of prejudice are entirely

speculative.  First, the Plaintiff did not delay prosecuting the Avoidance Action to the detriment

of the moving defendants.  Rather, Judge Gerber concluded that the most efficient way of

handling this enormous litigation was to divide the case into phases, with Phase I focused on the

legal and limited factual issues concerning the erroneous UCC-3 filing.  Phase I was not resolved

until remand from the Second Circuit following the Delaware Supreme Court decision.  Whether

or not some or all of the unserved defendants were advised of developments in the Phase I

litigation is beside the point—JPMC certainly contends that the unserved defendants were kept

apprised of developments, a contention some of the defendants contest.  The case was being

---

[14]    The Court notes that the moving parties cited no case in which an appellate court concluded that an order extending time to serve, granted before time to serve expire, should be vacated.  Further, the Court's research has yielded no such case.

actively prosecuted and defended on issues primarily concerning the Plaintiff and JPMC. The unserved defendants are no worse off than they would be if the Phase I litigation and decisions had been reached in totally unrelated litigation. The law of the Circuit binds this Court to the extent that the previously unserved defendants raise the same legal issues that have already been decided in completely unrelated litigation between different parties. But as explained below, the Court agrees with the moving defendants that the prior judgment against JPMC does not have preclusive effect on the defendants that were not brought into the case until after those court rulings.

Contrary to the Plaintiff's argument, though, the Plaintiff has failed to establish that the previously unserved defendants consented to JPMC defending the Avoidance Action on their behalf. JPMC's pleadings in this case disclaim any intention to defend the case on the other defendants' behalf. The Plaintiff's counsel does not point to any language in the loan or collateral documents expressly authorizing the administrative agent to appear and defend lawsuits on behalf of the lenders. The lenders may be bound by actions of the administrative agent with respect to the collateral, but that does not make the administrative agent the "authorized agent" of the defendants in a lawsuit seeking over $1.5 billion in damages against named but unserved defendants. While those defendants may be bound under the terms of the loan and collateral agreements by actions of JPMC with respect to the collateral, nothing in those agreements authorized JPMC to act for (and bind) the unserved defendants while JPMC defended the litigation to which other defendants had not yet been made parties by service of the summons and complaint. JPMC's pleadings make clear that it was acting only on its own behalf. Whether the unserved defendants have meritorious legal or factual defenses to liability or damages on so far untested theories remains to be seen. Due process protects the ability of those

defendants to assert their defenses in the action after they were made parties by service of the

summons and complaint.  *See, e.g.*, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306,

314 (1950) (noting that "[a]n elementary and fundamental requirement of due process in any

proceeding . . . is notice reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their objections");

*Vazquez-Robles v. CommoLoCo, Inc.*, 757 F.3d 1, 2 (1st Cir. 2014).

### 2.  *Vacating the Extension Orders Would Not Prevent a Manifest Injustice*

In this case, vacating the extension orders would not prevent a manifest injustice.  Even if

the Term Loan Defendants had been served with the Initial Complaint at the outset of the case

and participated in the Phase I litigation, the Court concludes, based on the Second Circuit and

Delaware Supreme Court decisions, that the outcome would have been the same, at least on the

issues addressed in Phase I.  The Term Loan Defendants, at this stage at least, have not identified

any legal or factual issues that could have and may still lead to a different result, at least as to

them.

On the other hand, if the Court were to vacate the extension orders, the Plaintiff would be

unable to refile the Avoidance Action because it would be time barred due to the statute of

limitations having run.  The deadline specified for filing the action under the DIP Order has also

expired.  This represents an injustice to the Trust, as the Trust relied on the Court's various

extension orders in waiting to effectuate service of process on the other Term Loan Defendants.

### 3.  *Rules 19 and 23 are Not Applicable in This Case*

Rule 19 is not applicable to parties who are named as original defendants in an action.

*See, e.g.*, *Moore v S. N.H. Med. Ctr.*, CIV A 08-11751-NMG, 2009 WL 5214879, at *9 (D.

Mass. Aug. 18, 2009) ("Rule 4(k)(1)(B) applies to parties joined under either Rule 14 or 19.

[Defendant] does not meet this criteria as he was named as an original defendant." (emphasis

removed)); *Roscoe-Ajax Const. Co. v Columbia Acoustics & Fireproofing Co.*, 39 F.R.D. 608,

610 (S.D.N.Y. 1966) (same).  Similarly, "class actions are permissive, not mandatory," and, as

such, courts do not second-guess a plaintiff's strategic decision not to proceed under Rule 23.

*Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 306 (D.C. Cir. 2013) (quoting *Sprint

Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 291 (2008)).  Whether class

certification in this case would have been possible is not relevant.

### C.    The Trust Has Standing to Pursue the Preference Action

The DIP Order expressly provides the Committee with "automatic standing and

authority" to "investigate" and "bring actions based upon" the Term Lenders' "perfection of first

priority liens."  (DIP Order ¶ 19(d).)  Further, "the grant of automatic standing shall be without

any further order of [the] Court or any requirement that the Committee file a motion seeking

standing or authority to file a motion seeking standing or authority before prosecuting any such

challenge."  (*Id.*)  The claims seeking recovery of transfers pursuant to sections 549 and 547 of

the Bankruptcy Code fall squarely within the carve-out of the DIP Order because those claims

are "based upon" the Committee's successful challenge to the "perfection of the first priority

lien[]" of the Term Lenders.  (*See id.*)  Here, the Trust, the successor-in-interest to the

Committee, is bringing a preference claim based on *the perfection (or lack thereof)* of the Term

Lenders' first priority lien.  Through avoidance of the first priority lien of the Term Lenders, the

Trust seeks to recover the alleged preference payments.

### D.    The Trust Has Authority to Avoid Postpetition Transfers

Continental argues that the Trust does not have authority to avoid the postpetition

transfers pursuant to section 549(a) of the Bankruptcy Code because such transfers were

authorized by the DIP Order.  Section 549(a) mandates—among other things—that a postpetition transfer be "not authorized" for it to be subject to avoidance.  In this case, the postpetition transfers were indeed authorized subject to the Committee's (and now the Trust's) right to challenge the perfection of the first lien priority.  In this way, the Trust's right to challenge the perfection of the first lien priority effected a provisional authorization of the postpetition transfers.  If the Trust is successful in challenging the postpetition transfers, the subject transfers would have been unwarranted and, thus, unauthorized because the transferees would have been unsecured creditors.

### E.    The Court Cannot Decide on the Motions to Dismiss Whether the Safe Harbor May Apply

The Third Cause of Action of the Amended Complaint seeks to recover interest payments totaling $28,241,781 made to noteholders on May 29, 2009 (within 90 days of the bankruptcy filing) as an avoidable preference under section 547.  Defendants' motion to dismiss does not argue that the complaint fails to state a claim; rather, defendants argue that the section 546(e) safe harbor requires dismissal of the claim as a matter of law.  The interest payments unquestionably enabled the noteholders, assuming that they were unsecured or under-secured, to receive more than they would have received in a chapter 7 liquidation.  Whether the defendants would have a defense to recovery of the interest payments, for example, under section 547(c) as ordinary course payments, is not an issue at this stage of the litigation.

Defendants' counsel acknowledged during argument that no existing case law supports their argument that the section 546(e) safe harbor applies to interest payments on promissory notes.  Counsel also acknowledged that their argument rests on facts that are not pleaded in the complaint.  These concessions are sufficient at this stage of the case to deny the motion to

dismiss the Third Cause of Action—which the Court so rules.  It is useful, however, to discuss

the statute and case law that will control further litigation of this claim.

Section 546(e) provides, in relevant part, that a trustee may not avoid a transfer that is

either (i) a "settlement payment" made by or to (or for the benefit of) a financial institution or

financial participant, or (ii) made by or to (or for the benefit of) a financial institution or financial

participant in connection with a "securities contract."  11 U.S.C. § 546(e).  Defendants' counsel

press both the "settlement payment" and "securities contract" prongs as bases to dismiss the

preference claim.  Because the defense is based on the statute, analysis must begin with the

statutory language.  Three sections of the Bankruptcy Code—sections 101, 546 and 741—must

be read together in analyzing the issues.  Three decisions from the Second Circuit analyze the

statutory language and explicate the potential scope of the section 546(e) defense.  *See In re

Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011); *Official

Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re

Quebecor World (USA) Inc.)*, 719 F.3d 94 (2d Cir. 2013); and *Picard v. Ida Fishman Rev. Trust

(In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d Cir. 2014).  Each case will be

discussed in turn.

### 1.  The Statutory Language

Section 546(e) provides, in pertinent part, as follows:

> Notwithstanding sections [547 and 548(a)(1)(B)], the trustee may
> not avoid a transfer that is a . . . settlement payment, as defined in
> section 101 or 741 of this title, made by or to (or for the benefit of)
> a . . . financial institution [or] financial participant, . . . , or that is a
> transfer made by or to (or for the benefit of) a . . . financial
> institution [or] financial participant . . . in connection with a
> securities contract, as defined in section 741(7), . . . , that is made
> before the commencement of the case, except under section
> 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

The references in this subsection to sections 101 and 741 are important. Section 101 and 741 contain applicable definitions. For our purposes, the definitions of "security," "settlement payment," and "securities contract" are relevant. Section 101(49)(A)(i) defines a "security" to include a "note." This is obviously important because the Term Loan is evidenced by a note, which is considered a "security" for purposes of the other relevant sections of the Code. *See Enron*, 651 F.3d at 340 ("A 'security' is, in turn, broadly defined under the Bankruptcy Code to include various types of debt such as a note, bond, or debenture. 11 U.S.C. § 101(49)(A).")

"Settlement payment" is defined, in circular terms, in two places—section 101(51A) and section 741(8). Section 101(51A) defines "settlement payment" for purposes of the forward contract provisions of the title as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

11 U.S.C. § 101(51A). Section 741(8) uses similar language and states that "settlement payment" means:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade . . . .

11 U.S.C. § 741(8).

"Securities contract" is defined in section 741(7), in pertinent part, to mean:

> (i) a contract for the purchase, sale, or loan of a security, . . . , or option on any of the foregoing, including an option to purchase or sell any such security . . . , and including any repurchase or reverse repurchase transaction on any such security . . .;
> . . . .
>
> (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

41

(viii) any combination of the agreements or transactions referred to in this subparagraph;

(ix) any option to enter into any agreement or transaction referred to in this subparagraph;

(x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or . . . .

11 U.S.C. § 741(7).

Making sense of these definitions in the context of this case in not easy.  The first question is whether the challenged interest payment is a "settlement payment," protected from avoidance by section 546(e).  Even if the interest payment is not a "settlement payment," the interest payment may nevertheless be protected from avoidance as a transfer to a financial participant "in connection with a securities contract."  As explained below, under Second Circuit case law, the Court concludes that the interest payment is *not* protected from avoidance as a "settlement payment."  Whether the interest payment was a transfer to a financial participant "in connection with a securities contract" is less clear—a decision on this question needs to await a full development of the record.

### 2.    *The Prepetition Interest Payment Does Not Qualify as a Settlement Payment*

The Second Circuit has defined a settlement payment as a "transfer of cash made to complete a securities transaction."  *Quebecor*, 719 F.3d at 98 (internal quotation marks omitted) (quoting *Enron*, 651 F.3d at 339); *see also* 11 U.S.C. §§ 101(51A), 741(8) (defining "settlement payment").  While such a transfer must be made by, to, or on behalf of a financial intermediary,

42

"a transfer may qualify for the section 546(e) safe harbor even if the financial intermediary is merely a conduit." *Id.* at 99 (citations omitted).

The Second Circuit in *Enron* addressed "whether 11 U.S.C. § 546(e), which shields 'settlement payments' from avoidance actions in bankruptcy, extends to an issuer's payments to redeem its commercial paper prior to maturity." 651 F.3d at 330. The bankruptcy court had held that redemption payments were not protected from avoidance by section 546(e). *In re Enron Creditors Recovery Corp.*, 407 B.R. 17, 45 (S.D.N.Y. 2009). The district court reversed, concluding that redemption payments were protected from avoidance by the section 546(e) safe harbor. *In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 439–40 (S.D.N.Y. 2009). The Second Circuit affirmed the district court.

The Second Circuit succinctly stated the operative facts:

> Between October 25, 2001 and November 6, 2001, Enron drew down on its $3 billion revolving lines of credit and paid out more than $1.1 billion to retire certain of its unsecured and uncertificated commercial paper prior to the paper's maturity. Enron redeemed the commercial paper at the accrued par value, calculated as the price originally paid plus accrued interest. This price was considerably higher than the paper's market value.

*Enron*, 651 F.3d at 331.

The bankruptcy court had concluded that "the transfer of 'ownership' of a security is an integral element in the securities settlement process"; therefore, "settlement payments" include only payments made to buy or sell securities and not payments made to retire debt. *Id.* at 332–33. The circuit court rejected this conclusion:

> Congress enacted § 546(e)'s safe harbor in 1982 as a means of 'minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.' If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at

risk.

*Id.* at 334 (internal citations omitted).

But the touchstone for application of the "settlement payment" safe harbor is the transfer of cash or securities to *complete* a securities transaction:

> Section 741(8), which § 546(e) incorporates, defines 'settlement payment' rather circularly as 'a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.' The parties, following our sister circuits, agree that courts should interpret the definition, 'in the context of the securities industry,' as 'the transfer of cash or securities made to complete [a] securities transaction.'

*Enron*, 651 F.3d at 334 (internal citations omitted); *see also Madoff*, 773 F.3d at 422 ("But we have held that the statutory definition [of 'settlement payments'] should be broadly construed to apply to 'the transfer of cash or securities made to complete [a] securities transaction.'").

In *Enron*, the redemption payment completed a securities transaction—Enron's commercial paper was paid off in full.[15] That is not so here, where the prepetition periodic interest payment on the Term Loan left the notes in place. Protecting from avoidance prepetition interest payments to some unsecured creditors in the ninety days before bankruptcy would violate the fundamental bankruptcy policy of equality of distribution. The Court concludes that prepetition interest payments—that were not part of the purchase, sale, or redemption of an interest in the note—are not protected from avoidance by the "settlement payments" prong of the section 546(e) safe harbor.

---

[15]    The redemption payment was calculated based on accrued par value, "calculated as the price originally paid plus accrued interest." *Enron*, 651 F.3d at 331. The circuit opinion does not suggest that the interest component was separately protected as a settlement payment.

### 3. The Prepetition Payment May Qualify as a Transfer to a Financial Institution in Connection with a Securities Contract

The Second Circuit's decisions in *Quebecor*, 719 F.3d 94, and *Madoff*, 773 F.3d 411, address the "securities contract" prong of the section 546(e) safe harbor. In *Quebecor*, 719 F.3d at 96, the Second Circuit reviewed a decision of the district court affirming a decision by the bankruptcy court that granted the defendants' motion for summary judgment. The bankruptcy court concluded that payments to noteholders in exchange for private placement notes were protected from avoidance because they were both "settlement payments" and "transfers made . . . in connection with a securities contract," protected by the section 546(e) safe harbor. *Id.* The district court affirmed the bankruptcy court on the basis that the challenged payments were "settlement payments"; the district court did not agree that the transfers were "in connection with a securities contract." *Id.* at 97. The circuit affirmed the decision of the courts below, but concluded that it "need not decide whether the payments fall within the 'settlement payments' safe harbor because they clearly fall within the safe harbor for 'transfers made . . . in connection with a securities contract.'" *Id.* at 96. Although not deciding whether the payments were protected as settlement payments, the circuit decision nevertheless reiterated its holding in *Enron* that "payments made to redeem commercial paper before its maturity date were 'settlement payments,' within the meaning of section 546(e), because they were 'transfer[s] of cash made to complete a securities transaction.'" *Id.* at 97 (quoting *Enron*, 651 F.3d at 339).

The court in *Quebecor* noted "that the Court in *Enron* had no occasion to consider the 'securities contract' safe harbor, which was added after Enron filed for bankruptcy and after the adversary proceeding commenced." *Id.* at 98 n.2. The court's analysis of the "securities contract" issue first examined the statutory definition of a securities contact.

> Section 741(7) of the Code defines a 'securities contract' as 'a contract for the purchase, sale, or loan of a security . . . including

any repurchase or reverse repurchase transaction on any such security.' 11 U.S.C. § 741(7)(A)(i).

*Id.* at 98.

Based on the undisputed facts in the case, the *Quebecor* court concluded that the payments fit "squarely within the plain wording of the securities contract exemption, as it was a 'transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract.'" *Id.* The funds were transferred "in the amount [outstanding principal, accrued interest, and make-whole amount] and manner prescribed by the [note purchase agreements] for purchasing the Notes." *Id.* The note purchase agreements "were clearly 'securities contracts' because they provided for both the original purchase and the 'repurchase' of the Notes. Accordingly, this was a transfer made to a financial institution in connection with a securities contract that is exempt from avoidance." *Id.* at 98–99 (citation omitted).

The Term Lenders argue here that the prepetition interest payments were part of a mandatory quarterly interest payment that was a necessary part of the completion of a securities contract. The underlying documents concerning the terms of the note, or the purchase or sale of interests in the note, are not part of the record on the pending motions. But the *Quebecor* court, in discussing the "securities contract," appears to focus on the contract terms for the purchase or sale of the notes, not on the periodic interest payments. The Court is unable to conclude on the record here that *Quebecor* requires that periodic interest payments are protected from avoidance by section 546(e).

In *Madoff*, 773 F.3d 411, the Second Circuit decision turned on "whether the transfers [by BLIMIS] either were 'made in connection with a securities contract' or were 'settlement payment[s].'" *Id.* at 417. Even though BLIMIS never conducted actual trades, the court concluded that the transfers were protected from avoidance because they were made in

connection with a securities contract and were settlement payments. *Id.* The defendants

contended and the court agreed that the account opening documents were securities contracts.

*Id.* at 418. The court's analysis focused on the statutory definition of a securities contract:

> Thus, the term "securities contract" expansively includes contracts
> for the purchase or sale of securities, as well as any agreements
> that are *similar* or *related* to contracts for the purchase or sale of
> securities. This concept is broadened even farther because §
> 546(e) also protects a transfer that is "in connection" with a
> securities contract.

*Id.* at 418 (emphasis in original) (citation omitted).

The account opening documents were agreements to acquire or dispose of securities on

behalf of customers, specifying the terms for BLIMIS to acquire and dispose of securities for

customers. *Id.* Because the account opening documents also obligate BLIMIS "to reimburse its

customers upon a request for withdrawal, they also fit the definition of 'securities contract' in §

741(7)(A)(xi), which includes, again quite expansively, 'any security agreement or arrangement

related to any agreement or transaction referred to in this subparagraph, including any guarantee

or reimbursement obligation by or to a stockbroker,'" *id.* at 419, the court concluded that the

agreements satisfied the definition of a securities contract. Nothing in the *Madoff* decision

addresses whether periodic interest payments pursuant to a note would also be protected from

avoidance based on the "securities contract" prong of the section 546(e) safe harbor.

The Term Loan Investor Defendants contend that the tradeable interest in the Term Loan

is akin to a publicly traded note or bond issued by a public company. (Term Loan Investors'

Mot. at 33.) The Term Loan Investor Defendants argue that the Term Loan and accompanying

note were registered and assigned a CUSIP number. (*Id.* at 28.) Further, they argue that the

interest in the Term Loan and accompanying note were widely traded and held by hundreds of

different investors (*i.e.*, part of a market). (*Id.*) However, while *Madoff* applies an expansive

scope for a protected "securities contract," the current record provides no factual basis to support the defendants' argument.  It is premature for the Court to make a determination on this issue at this time.

  For the reasons discussed above, the Court concludes that the Motion to Dismiss based on the section 546(e) safe harbor must be denied.

## IV.  **CONCLUSION**

  For the reasons set forth above, the Motions are **DENIED.**

  **IT IS SO ORDERED.**

Dated:  June 30, 2016
    New York, New York


        *Martin Glenn*
        MARTIN GLENN
       United States Bankruptcy Judge