**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

In re:

Chapter 11

MOTORS LIQUIDATION COMPANY,
f/k/a GENERAL MOTORS
CORPORATION, *et al.*,

Case No. 09-50026 (MG)
(Jointly Administered)

Debtors.

MOTORS LIQUIDATION COMPANY
AVOIDANCE ACTION TRUST, by and
through the Wilmington Trust Company,
solely in its capacity as Trust
Administrator and Trustee,

Plaintiff,

Adversary Proceeding

against

Case No. 09-00504 (MG)

JPMORGAN CHASE BANK, N.A., *et al.*,

Defendants.

## MEMORANDUM OPINION AND ORDER DENYING IMMIGON'S MOTION TO DISMISS

*A P P E A R A N C E S :*

LEWIS BAACH PLLC
*Attorneys for Defendant immigon portfoliobbaug ag*
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, DC 20006
BY:    Bruce R. Grace, Esq.

BINDER & SCHWARTZ LLP
*Attorneys for Plaintiff*
366 Madison Avenue, 6th Floor
New York, NY 10017
By:    Eric B. Fisher, Esq.
        Neil S. Binder, Esq.
        Lindsay A. Bush, Esq.
        Lauren K. Handelsmann, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Defendant immigon portfolioabbau ag (formerly known as Österreichische Volksbanken Aktiengesellschaft ("OEVAG") (together, "Immigon"), has moved to dismiss this adversary proceeding pursuant to Rules 12(b)(2), 12(b)(4), and 12(b)(5) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rules of Bankruptcy Procedure 7012(b).  In support of its motion, Immigon submitted a memorandum of law (ECF Doc. # 823-1), together with the Declaration of Dr. Stefan Süssenbach, dated December 22, 2016 (the "Süssenbach Declaration," ECF Doc. # 823-2).  The Motors Liquidation Company Avoidance Action Trust[1] (the "Plaintiff" or "AAT"), submitted a memorandum of law in opposition to the motion (ECF Doc. # 831), together with the Declaration of Eric B. Fisher in Support of Plaintiff's Opposition to Immigon's Motion to Dismiss the Amended Complaint (the "Fisher Declaration," ECF Doc. # 832).  The Fischer Declaration, in turn, attaches the Declaration of Karina Shreefer in Support of Plaintiff's Opposition to Immigon's Motion to Dismiss the Amended Complaint (the "Shreefer Declaration," ECF Doc. # 832, Ex. O).  Immigon filed a reply memorandum of law ("Reply," ECF Doc. # 840).

Immigon is domiciled in Vienna, Austria.  In September 2007, OEVAG purchased from JPMorgan Chase Bank, N.A. ("JPMorgan" or "JPMC") , on the secondary market, a $10 million interest in General Motor's ("GM") syndicated $1.5 billion Term Loan, secured by a Collateral Agreement, in which GM and Saturn granted to JPMC a first priority security interest in certain equipment and fixtures in its U.S. manufacturing facilities.  After GM filed its chapter

---

[1]      The AAT has succeeded to the rights of GM's official committee of unsecured creditors to bring this action on behalf of the GM bankruptcy estate, seeking the return of avoidable payments made under the Term Loan Agreement.  ECF No. 428-7 (DIP Order) ¶ 19(d).

2

11 cases in June 2009, the Term Loan was repaid under the terms of the DIP Order entered by the Court.  OEVAG received $9,893,347.29, paid by JPMC into OEVAG's New York account at the Bank of New York Mellon.  OEVAG made no objection and accepted the payment.

After it was determined that the lien securing most of the collateral for the $1.5 billion Term Loan was released by mistake before the petition date, the AAT succeeded to the rights of the official committee of unsecured creditors and brought this adversary proceeding to clawback the funds repaid to the holders of interests in the Term Loan.

Immigon contends that this Court lacks personal jurisdiction over it,[2] requiring dismissal under Rule 12(b)(2).  Immigon further argues that the AAT did not timely serve Immigon with the summons and complaint, requiring dismissal under Rules 12(b)(4) and 12(b)(5).  The AAT disputes both contentions.  Therefore, the issue is whether the Court would have had personal jurisdiction over OEVAG.  The AAT argues that specific personal jurisdiction exists on several different theories: (i) consent to jurisdiction based on a provision in the Loan Agreement; (ii) consent to jurisdiction included in the DIP Order by receipt of the repayment; and (iii) recognized principles of specific jurisdiction.  Each theory will be separately addressed below. The AAT also argues that, despite a lengthy delay in service (primarily attributed to the United States Department of State (the "State Department"), timely service by means of letter rogatory was made on September 23, 2016.

The Court heard argument of the motion on February 14, 2017.  For the reasons explained below, the motion to dismiss is **DENIED.**

---

[2]    Immigon conceded during argument that if the Court would have had personal jurisdiction over OEVAG, it has personal jurisdiction over Immigon, which stepped into the shoes of OEVAG for purposes of claims in this case.

# I.    BACKGROUND

## A.    Immigon Is the Successor to OEVAG

Immigon is a wind-down company formed pursuant to section 162 of the Austrian

Federal Act on the Restructuring and Resolution of Banks (Bundesgesetz über die Sanierung

und Abwicklung von Banken   ("BaSAG")).  *See* Süssenbach Decl. ¶ 5.  Until July 4,  2015,

the corporate name of the company was Österreichische Volksbanken-Aktiengesellschaft, *id.*

*¶ 6,* abbreviated as OEVAG.  *Id. ¶* 7.  The motion to dismiss uses the names Immigon and

OEVAG interchangeably.

OEVAG was the central institute of the Austrian co-operative banks named

Volksbanken. *Id.* ¶ 8.  OEVAG had its seat in Vienna, Austria.  *Id.*  OEVAG, a licensed bank,

operated under the authority of the Austrian banking authorities.  *Id.*  OEVAG did not have

offices, employees, or property in the United States.  *Id. ¶* 11.  It did not hold itself out as

doing business in New York (or anywhere else in the United States).  *Id. ¶* 12.  OEVAG

did not have a postal address or a telephone number in the United States.  *Id. ¶* 13.  It was

not registered to and, it contends, it did not conduct business in the United States.  *Id. ¶* 14.

OEVAG did not offer any financial or other services in the United States.  *Id. ¶* 15.  Nor did

it advertise in the United States.  *Id. ¶* 16.  These statements are equally true for Immigon.  *Id.* ¶

17.

As of July 4, 2015, OEVAG's function as a central organization and central institution

of the association of Austrian Volksbanken (Volksbanken-Verbund) was transferred by way

of a de-merger to Volksbank Wien AG (formerly, Volksbank Wien-Baden AG). *Id. ¶* 18.

The de-merger, with regulatory approval, was the result of a reorganization plan implemented

by OEVAG. The de-merger was undertaken largely as a result of a 2014 comprehensive

4

assessment showing a large capital shortfall for future years.  This led to a belief that the conditions to ensure OEVAG's continued existence as a bank were no longer in place.  *Id.* The de-merger became effective on July 4, 2015, and involved the transformation of OEVAG from a credit institution into a pure wind-down company pursuant to the BaSAG without a banking license.  *Id.* ¶ 19.  The company's plan is to wind down its assets (including the repayment of liabilities) by the end of 2017, with the ultimate goal of liquidation.  *Id.* ¶ 20.

## B.    The Term Loan

On November 29, 2006, GM obtained a $1.5 billion seven-year term loan (the "Term Loan") evidenced by a note pursuant to the Term Loan Agreement (ECF Doc. # 428).  The Term Loan was secured by a collateral agreement, in which GM and Saturn granted to JPMC a first priority security interest in certain equipment and fixtures in its U.S. manufacturing facilities. The Term Loan was a syndicated loan, through which several large financial institutions (the "Bank Lenders"), including JPMC, committed up front to provide funding.  The Bank Lenders had the right to sell interests on the secondary market, typically by assignment of interests to qualified investors.  ECF Term Loan Agreement at § 10.06.  OEVAG is a qualified investor in the Term Loan.

### 1.   *OEVAG Is a Lender of Record Under the Term Loan Agreement*

In September 2007, OEVAG purchased interests in the Term Loan in two separate trades of $5 million each on the secondary market.  Def. Br. at 4.  OEVAG's records show that the two transactions were arranged by an employee of OEVAG in Vienna, Austria with JPMC as counterparty.  *Id.* Immigon disputes whether OEVAG purchased its interest through "assignments" or "participations."  However, documents submitted to the Court show that these purchases were formal assignments, executed under the standard LSTA Par/Near Par trade

confirmations between OEVAG and JPMC employees in New York through Bloomberg, email

and fax.  *See* Fisher Decl., Ex. A (IMMIGON 000001).  JPMC's Secondary Loan Trading desk

in New York verified that OEVAG was on JPMC's "approved assignee list."  *Id.* Ex. B

(JPMCB-5-000019693); Ex. C (JPMCB-5-00019329).

Assignments are governed by §10.06 of the Term Loan Agreement, which required the

parties to "execute and deliver to [JPMC] an Assignment and Acceptance" agreement in the

form annexed as Exhibit A to the Term Loan Agreement.  ECF No. 428-2 (Term Loan

Agreement) at § 10.06(b)(ii)(B) & Ex. A. Form of Assignment and Acceptance ("**Assignment**

**Agreement**").  Upon the execution and recording of the Assignment Agreement, the assignee

(here, OEVAG), became a party to the Term Loan Agreement and "to the extent of the interest

assigned by such Assignment . . . [had] the rights and obligations of a Lender under this

Agreement."  *Id.* at § 10.06(b)(iii) & Ex. A Assignment Agreement §§ 3(v); 6(i).  The Trade

Confirmations include checked boxes showing that these trades to OEVAG were accomplished

by assignments; separate Assignment and Acceptance forms signed by OEVAG have not been

located.  Nevertheless, as explained below, for purposes of considering the motion to dismiss

for lack of personal jurisdiction, the Court concludes that the Trade Confirmations are

sufficient evidence to show that the OEVAG transactions were assignments.

JPMC, as administrative agent, recorded each assignment and updated a register of

lenders and outstanding principal amounts owing to each lender.  The entries in the register are

prima facie evidence of the existence and amounts of the obligations of the borrower, and the

borrower, the agent and the lenders may treat each person whose name is recorded in the register

as a lender.  *Id.* § 10.06(b)(iv).  JPMC confirmed that on June 30, 2009, OEVAG was a lender of

record under the Term Loan Agreement, ECF No. 12 ¶ 270 (the "JPMC Answer"), and that it

received the specified payoff amount.  ECF No. 761-9, at AAT00056667 (letter from JPMC to

AAT dated Feb. 20, 2015, providing a register of lender addresses and payoff amounts, including

OEVAG).

### 2.  *OEVAG Consented to Jurisdiction in New York in the Term Loan Agreement*

Each Loan Party under the Term Loan Agreement, including assignees:

> irrevocably and unconditionally submits . . . to the nonexclusive
> jurisdiction of any New York State court or Federal court of the
> United States of America sitting in New York City . . . in any
> action or proceeding arising out of or relating to this Agreement.
> . . ."  [Each Loan Party also] "agrees that all claims in respect of
> any such action or proceeding may be heard and determined in
> such New York State court or, to the extent permitted by law, in
> such Federal court.

*Id.* § 10.11(a).  And each Loan Party:

> irrevocably and unconditionally waives . . . any objection which
> it may now or hereafter have to the laying of venue of any suit,
> action or proceeding arising out of or relating to this Agreement
> in any New York State or Federal Court" [and otherwise waives]
> "to the fullest extent permitted by law, the defense of an
> inconvenient forum to the maintenance of such action or
> proceeding in any such court.

*Id.* § 10.11(b).  The Court concludes based on the evidence in the record at this stage of the

case, that by purchasing a $10 million interest under the Term Loan Agreement, OEVAG

consented to personal jurisdiction in New York concerning any dispute relating to its interest

in the Term Loan, including the current dispute with the AAT.

### 3.  *OEVAG Entered into a Transaction in New York Governed by New York Law*

OEVAG purchased its interests in the Term Loan Agreement from JPMC, a New York-

based lender.  OEVAG also maintained a correspondent bank account in New York City at

Bank of New York Mellon, and OEVAG received the repayment under the Term Loan

Agreement in that account.   *See* ECF No. 823-2 (Süssenbach Decl.) ¶ 29; Def. Br. at 4-5.  It is

undisputed that the transaction is governed by New York law.  Fisher Decl. Ex. D at § 22

(LSTA Standard Terms as of Dec. 1, 2006); ECF No. 428-2 (Term Loan Agreement) § 10.10;

Assignment Agreement at § 7.

      Additionally, OEVAG had other contacts with the United States and New York in

connection with the Term Loan.  As one example, OEVAG periodically accessed IntraLinks

(JPMC's platform for distributing formal notifications to the Lenders).  Document Access

Reports tracked each lender's use of IntraLinks and its access to specific postings on the

system.  For example, on February 19, 2009, IntraLinks sent an alert to OEVAG employee

Silvia Hauser, who subsequently logged in to the private side area and viewed various collateral

valuation certificates.  Fisher Decl. Ex. E (JPMCB-3-00000013); Ex. F (JPMCB-3-00000015).

On February 24, 2009, René Eibensteiner, an OEVAG credit analyst, emailed JPMC's attorney

in New York, attaching OEVAG's consent to an amendment of the Term Loan.  Fisher Decl.

Ex. G (JPMCB-MLB-0004199).

### 4.  *OEVAG Reviewed the DIP Order Before Receiving Payment*

      The record also reflects that OEVAG employees made inquiries to JPMC after GM filed

its bankruptcy petitions.  Ms. Hauser viewed the Q1 2009 collateral certificate on June 2, 2009.

*See* Fisher Decl. Ex. H (JPMCB-3-00001190).  Mr. Eibensteiner emailed Andrew Laughlin, a

JPMorgan associate in New York, on June 2, 2009, requesting "a brief update" and a "short

phone call with us."  Mr. Laughlin responded by referencing a June 1, 2009 IntraLinks posting to

all of the Term Lenders—including OEVAG—that referenced the petition and highlighted key

filings uploaded to IntraLinks which were otherwise "filed publicly with the bankruptcy court."

These included: a list of first-day motions; the motion to approve adequate protection for the

Term Lenders; and the interim DIP loan motion.  Mr. Laughlin stressed the DIP loan was "of

critical importance to the Term Loan Lenders," as "one business day after the entry of the Final

Order approving the DIP loan . . . the proceeds will be used to, among other things, pay in full in

cash all obligations under the Term Loan Facility."  Fisher Decl. Ex. I (JPMCB-2-00039617).

   On June 25, 2009, JPMorgan posted a lender update memo to IntraLinks, notifying

Term Lenders that the Court had approved the DIP Order, resulting in repayment to each of the

Term Lenders—including OEVAG—on June 30, 2009.  The memo also stated that the

Creditors Committee "received the right, until July 31, 2009, to investigate and challenge the

perfection of the liens securing the Term Loan" and that "***subject to the rights reserved by the

Committee regarding the investigation of liens***, upon payment of the secured facilities, the

Lenders receive a release of all claims that the bankruptcy estates have or might have against the

Lenders."  ECF No. 428-8 (JPMC Memo dated June 25, 2009) (emphasis added).

   JPMC also posted to IntraLinks the most recent versions of the DIP and Adequate

Protection Orders.  *Id.*  JPMC stated it would post the final versions upon entry by the court.

*Id.*  The Document Access Report for this post indicates Ms. Hauser received an alert on June

25, 2009.  Fisher Decl. Ex. J (JPMCB-3-00000478).  She viewed this memo on June 26, 2009

at 4:19 a.m. (11:19 a.m. Austria time).  *Id.*  The Document Access Report for the final DIP

Order likewise shows Ms. Hauser viewed that Order at the same time.  Fisher Decl. Ex. K

(JPMCB-3-00000476).  Therefore, OEVAG was on notice as of June 26, 2009 that, pursuant to

¶ 19(d) of the Final DIP Order, "[a]ny Prepetition Senior Facilities Secured Party accepting

Payment shall submit to the jurisdiction of the Bankruptcy Court[.]"

   Following entry of the DIP Order, on or around June 30, 2009, OEVAG received

$9,893,347.29, paid by JPMC into OEVAG's "account in New York maintained at the

Bank of New York Mellon."  Def. Br. at 5; ECF No. 823-2 (Süssenbach Decl.) ¶ 29.

OEVAG made no objection and accepted the payment.

> ### 5. *OEVAG Monitored the Term Loan in New York After Payoff and Was Aware of the Complaint in this Action*

OEVAG continued to have contacts with U.S., centered in New York, by monitoring

these proceedings following the conditional payoff of its Term Loan interest.  For example,

between July 1 and 6, 2009, OEVAG sent several emails to a U.S-based JPMC employee

regarding the calculation of break funding in connection with the payoff of the Term Loan.

Fisher Decl. Ex. L (JPMCB-5-00060178).  Another IntraLinks list shows Ms. Hauser accessed

the system on July 23, 2009 at 4:20 a.m. (11:20 a.m. Austria time).  (Fisher Decl. Ex. M

(JPMCB-5-00049258); ECF No. 428-10.  This is on the same day JPMC held a conference call

with term lenders.  *Id.*

The IntraLinks logs also show OEVAG received notice of the initial complaint.  On

September 17, 2009, JPMC posted a memo to the Term Lenders about the commencement of this

adversary proceeding.  ECF No. 428-12 (JPMCB-3-00000444).  OEVAG knew that the AAT

"s[ought], in part, to avoid and recover approximately $1.4 billion in post-petition payments made

to lenders in connection with the Term Loan Agreement[.]"  The Document Access Report shows

Ms. Hauser received an alert on September 17, 2009.  Fisher Decl. Ex. N (JPMCB-3-00000445).

She viewed the memo on September 21, 2009 at 2:26 a.m. (8:26 a.m. Austria time).

### C.    Service on OEVAG

As explained in an earlier opinion of this Court, denying the motions to dismiss filed by

other defendants, until 2015, JPMC was the only entity that was served with the summons for the

Original Complaint.  *See In re Motors Liquidation Co*., 552 B.R. 253, 258–63 (Bankr. S.D.N.Y.

2016) (the "Dismissal Opinion").  Judge Gerber, to whom this case was assigned until his

retirement in January 2016, had approved a series of service extension orders (the "Extension

Orders"), which "effectively divided the litigation into phases, with the first phase, Phase I,

between the Plaintiff and JPMC challenging the effectiveness of the lien release." *Id.* at 263.

"If, as Judge Gerber initially ruled, the lien release was not effective, the case was at an end, and

it was unnecessary for the remaining defendants to be served." *Id.* On June 30, 2016, this Court

entered the Dismissal Opinion, holding, among other things, that the Extension Orders were a

sound exercise of the Court's discretion and would not be reconsidered. 552 B.R. at 274.

### 1.  The First Letter Rogatory Request

Following the close of Phase I litigation, the AAT worked to identify all parties to the

Term Loan Agreement to prepare for service of an amended complaint.  The AAT filed the

Amended Complaint on May 20, 2015.  ECF No. 91.  To effect service of the summons and

amended complaint on OEVAG in Vienna, those documents had to be translated into German.

Shreefer Decl. ¶ 4.  The AAT promptly sent the Amended Complaint to a translation service for

expedited translation.  Shreefer Decl. ¶ 5.  On May 26, 2015, the Clerk of this Court issued a

Summons and Notice of Pretrial Conference directed to all defendants.  ECF No. 92.  The

Summons provided that defendants were "required to submit a motion or answer to the complaint

which is attached . . . on a date to be determined by the U.S. Bankruptcy Court as set forth in

paragraph 3 of the Stipulation and Order, entered on May 19, 2015, and provided herewith." *Id.*

The filing separately notified all parties that a pretrial conference would be held on August 13,

2015. *Id.* With the pretrial conference scheduled three months away, the Court concludes that

the AAT reasonably believed that letters rogatory could be served on OEVAG sufficiently in

advance of the scheduled conference.  Shreefer Decl. ¶ 6.

On June 15, 2015, after the necessary translation and internal review, the AAT filed

with this Court its first request for issuance of a letter rogatory (the **"First Request"**).  ECF No.

97.  Objections to the First Request were due by June 25, 2015.  On June 29, 2015, Judge Gerber granted the application.  ECF No. 107.  On July 24, 2015, the AAT submitted the First Request to the U.S. State Department.  ECF No. 599 (Fisher Decl. at ¶ 3); Shreefer Decl. ¶ 10. The status of the request was monitored, but as of July 24, 2015, service through this formal channel had not been made.   Shreefer Decl. ¶ 10.  Due to a significant backlog of approximately six months at the U.S. State Department, the letter rogatory was not transmitted to the Austrian Ministry of Foreign Affairs until November 18, 2015.  *Id.* ¶ 11.  The Court concludes that this delay in transmitting the letter rogatory is not attributable to a lack of diligence on the part of the AAT.  The Austrian Ministry rejected the application on December 11, 2015, because the summons referenced a stale pretrial conference date.  *Id.*   The AAT explains that it did not learn about the rejection until January 15, 2016.  To attempt service again, the AAT had to submit a new filing fee to the State Department, and ask the Court to issue a new summons and letter rogatory.

### 2.  *The Second Letter Rogatory Request*

The AAT notified this Court on March 15, 2016 that the Austrian Ministry rejected service, and that the AAT needed to obtain and serve a new summons with a revised hearing date. ECF No. 434 at 3.  On March 25, 2016, the AAT requested that this Court issue a custom summons, providing that an answer was due within 30 days of service, with a Court conference to be held at a date and time to be determined.  *See* ECF No. 471 at 16.  On April 1, 2016, the Clerk issued the Fourth Summons.  On May 11, 2016, the AAT filed its formal request for issuance of a second letter rogatory (the "Second Request"), ECF Nos. 597; 599.  The Court granted the request on May 26, 2016.  ECF No. 620-1.  On May 31, 2016, the AAT submitted the second letter to the Court for its signature and seal. Fisher Decl., Ex. P.  Counsel for the AAT received the stamped original back from the Court on June 8, 2016.

The AAT explains that the translation of the Second Request could not proceed until this Court issued a stamped letter, at which time the AAT requested translated copies of the request, a stamped letter, the Fourth Summons, the Amended Complaint and unsealed Exhibits 3 and 4. Shreefer Decl. ¶ 13. The AAT transmitted its final application to the U.S. State Department on July 6, 2016, Shreefer Decl. ¶ 14; service of the letter rogatory, summons and amended complaint were once again placed beyond the control of the AAT.

On September 23, 2016, the Second Request was served on Immigon in Vienna, Austria. Def. Br. at 6; ECF No 825. On October 3, 2016, the Republic of Austria, Josefstadt District Court issued a stamped certificate of service to the Austrian Foreign Ministry of Justice, ECF No. 825, which the U.S. Embassy in Austria received on November 9, 2016. *Id.* The certificate was transmitted to the U.S. State Department on or about November 9, 2016 and was received back on or about December 20, 2016. Shreefer Decl. ¶ 16. The translation service provided the AAT the original proof of service (in German) along with a certified translation on December 23, 2016, which the AAT filed on January 9, 2017. ECF No. 825.

Immigon acknowledges that the form of the second letter rogatory and methods of service were proper, although it contends such service was untimely.

## II.    DISCUSSION

### A.    Dismissal for Lack of Personal Jurisdiction Under Rule 12(b)(2)

#### 1. *Minimum Contacts*

In evaluating a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, "plaintiffs need only make a prima facie showing of personal jurisdiction over the defendant[.]" *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d

158, 163 (2d Cir. 2010). The Court is not confined to the complaint's allegations and may

consider affidavits and documentary evidence. *Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67,

70 (E.D.N.Y. 2006); *see also Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458,

463 (S.D.N.Y. 2008) ([A] motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is inherently a

matter requiring the resolution of factual issues outside of the pleadings and all pertinent

documentation submitted by the parties may be considered in deciding the motion") (internal

citations omitted). When the issue is addressed on affidavits, "all allegations are construed in the

light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor,

notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra*

*Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993). Even if the plaintiff establishes minimum contacts, the

Due Process clause may limit a State's assertion of jurisdiction even "when exercised pursuant to

a corporation's purported consent." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir.

2016) (internal citations omitted).

      This Court recently described what is necessary to support a Court's exercise of specific

jurisdiction over an international defendant:

> For a court to exercise personal jurisdiction, a person or entity
> must have sufficient minimum contacts with the forum such that
> the maintenance of the suit does not offend traditional notions of
> fair play and substantial justice. A court can exercise two
> categories of personal jurisdiction: general jurisdiction or specific
> jurisdiction. General, or all-purpose jurisdiction, over a foreign
> defendant allows a court to hear any and all claims against such
> defendant. If insufficient contacts exist for a court to exercise
> general personal jurisdiction, it may still exercise specific
> jurisdiction. Specific jurisdiction over a foreign defendant allows a
> court to hear claims that arise out of or relate to the defendant's
> contacts with the forum. The inquiry whether a forum State may
> assert specific jurisdiction over a nonresident defendant focuses on
> the relationship among the defendant, the forum, and the litigation.
> The plaintiff must also show that the defendant purposefully
> availed himself of the privilege of doing business in the forum

> state and that the defendant could foresee being haled into court
> there.

*In re MF Glob. Holdings Ltd.*, 561 B.R. 608, 620–21 (Bankr. S.D.N.Y. 2016).  In a Bankruptcy

proceeding, the sovereign is the United States, so the Court first "determine[s] whether the

defendant has the requisite minimum contacts with the United States at large."  *Official Comm.*

*of Unsecured Creditors of Arcapita Bank B.S.C. (c) et al. v. Bahrain Islamic Bank*, 549 B.R. 56,

63 (Bankr. S.D.N.Y. 2016).  However, New York law is relevant on the use of New York banks

to establish specific jurisdiction.

> In the banking context, the requisite inquiry under CPLR 302(a)(l)'
> s first prong may be complicated by the nature of interbank
> activity, especially given the widespread use of correspondent
> accounts nominally in New York to facilitate the flow of money
> worldwide, often for transactions that otherwise have no other
> connection to New York, or indeed the United States.  As a result,
> determining in an individual case whether a foreign bank's
> maintenance and use of a correspondent account is purposeful or
> coincidental may often prove more difficult than was the case in
> *Amigo Foods*, once the facts there were established.  Nonetheless,
> complaints alleging a foreign bank's repeated use of a
> correspondent account in New York on behalf of a client—in
> effect, a course of dealing—show purposeful availment of New
> York's dependable and transparent banking system, the dollar as a
> stable and fungible currency, and the predictable jurisdictional and
> commercial law of New York and the United States.

*Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 338–39 (2012).  Post-*Licci*, New York courts

have consistently held that the use of a New York bank can subject a foreign entity to

jurisdiction in New York.

> Our cases do not require that the foreign bank itself direct the
> deposits, only that the bank affirmatively act on them.  Contrary to
> the dissent's assertion, in *Licci*, it was Hizballah that directed the
> wire transfers through LCB's correspondent bank and not
> defendant, LCB.  A foreign bank with a correspondent account,
> therefore, that repeatedly approves deposits and the movement of
> funds through that account for the benefit of its customer is no less
> "transacting business in New York" because the customer, or a

> third party at the customer's direction, actually deposits or
> transfers the funds to New York.

*Al Rushaid*, 28 N.Y.3d at 328 (2016).

In determining whether a Bankruptcy Court may exercise personal jurisdiction over a foreign defendant, the Court must first "determine whether the defendant has the requisite minimum contacts with the United States at large." *Arcapita Bank B.S.C.*, 549 B.R. at 63. Where, as here, specific personal jurisdiction is sought, the inquiry then "focuses on the affiliation between the forum and the underlying controversy." *Arcapita*, 549 B.R. at 63 (citing *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915 (2011)). The defendant "must have contact with the forum, and the underlying cause of action must arise out of or relate to that contact." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Sufficient contacts are found "where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* at 69.

For specific jurisdiction under CPLR § 302(a)(1), one prong of New York's long arm statute, the Court may exercise jurisdiction over a foreign defendant who "transacts any business within the state" provided that the cause of action arises therefrom. *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 57 (S.D.N.Y. 1999). New York's long arm is a "single act" statute, and defendant need not be physically present in the state, "as long as he engages in purposeful activities or volitional acts through which he avails himself of the privilege of conducting activities within the State, thus invoking the benefits and protections of its laws." *Chloe*, 616 F.3d at 169. Courts look to the totality of the circumstances in determining whether a defendant has "transacted business" under 302(a)(1) and consider, *inter alia*, whether a defendant has an ongoing contractual relationship with a New York corporation, whether the contract contains New York choice of law, forum selection, consent to jurisdiction clauses, and the place of

payment. *See ESI Inc.*, 61 F. Supp. 2d at 57-59. As the New York long arm statute does not

reach as far as the Constitution permits, if the New York statute is met, due process is generally

considered to be satisfied. *Picard v. Chais et al., (In re Madoff Inv. Secs., LLC)*, 440 B.R. 274,

280 (Bankr. S.D.N.Y. 2010).

### 2.  *Due Process*

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to

bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 134 S. Ct. 1115,

1121 (2014) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)).

Where a long-arm statute is not co-extensive with the Due Process clause of the Constitution:

> courts must evaluate the following factors as part of this
> "reasonableness" analysis: (1) the burden that the exercise of
> jurisdiction will impose on the defendant; (2) the interests of the
> forum state in adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate judicial
> system's interest in obtaining the most efficient resolution of the
> controversy; and (5) the shared interest of the states in furthering
> substantive social policies.

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). Because this is a

case involving other countries, not American states, courts look to the interests of the foreign

nation and principles of comity. *See In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d

1036, 1048 (2d Cir. 1996) (discussing comity in the context of international insolvency

proceedings.)

### 3.  *Successor Entities*

In New York, "[t]he general rule in such cases is that the successor-in-interest may be

subject to jurisdiction based on the activities of its predecessor . . . ." *Colson Servs. Corp. v.

Bank of Baltimore*, 712 F. Supp. 28, 31 (S.D.N.Y. 1989); *Transfield ER Cape Ltd. v. Indus.

Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) ("[F]ederal courts have consistently

acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.") (internal citations omitted).[3]  Although Immigon does not rely on the argument that it is a successor corporation and therefore not subject to jurisdiction, case law plainly supports the conclusion that Immigon steps into the jurisdictional shoes of OEVAG.

### B.    OEVAG Consented to Jurisdiction Under the Term Loan Agreement

OEVAG received a transfer of funds in its New York bank account under the Term Loan Agreement.  ECF No. 91, (Am. Compl.) at ¶ 367; *see also* ECF No. 12 ¶ 270 (JPMC Answer) (confirming OEVAG was a Lender of Record under the Term Loan Agreement).  The Term Loan Agreement provided the basis for payment to OEVAG under the DIP Order.  The DIP Order provisionally authorized the postpetition transfers while authorizing the AAT to challenge the lenders' interests under the Term Loan and the transfers.

The Lenders, including OEVAG, expressly consented to the application of New York law *and* to a New York forum "in any action or proceeding arising out of or relating to this Agreement."  ECF No. 428-2 (Term Loan Agreement) at §§ 10.10, 10.11.  A party resisting a forum selection clause "must make a strong showing in order to overcome the presumption of enforceability."  *New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG*, 121 F.3d 24, 29 (2d Cir.

---

[3]    New York recognizes a common-law doctrine whereby a purchaser of assets does not incur liability for the seller's debts, unless one of four situations apply.  *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) ("New York recognizes four common-law exceptions to the rule that an asset purchaser is not liable for the seller's debts, applying to: (1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who de facto merged with a seller; and (4) a buyer that is a mere continuation of a seller.") Here, it appears that under Austrian law, exception 4 would apply, as Immigon is the mere continuation of OEVAG. Still, this doctrine is probably inapplicable, because Immigon did not purchase OEVAG.

1997).  OEVAG enjoyed the benefits and protection of New York law in connection with that

Agreement and should be held to the consent to jurisdiction and New York forum choice.

*Sunward Elec. Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004); *ESI Inc.*, 61 F. Supp. 2d at 62.

Immigon cannot avoid the application of this consent to New York jurisdiction.  The AAT's rights

against Immigon flow from the payment by JPMC to OEVAG under the Term Loan Agreement,

Am. Compl. ¶ 367, and the Term Loan Agreement includes OEVAG's consent to personal

jurisdiction.

### C.    OEVAG Consented to Jurisdiction Under the DIP Order

The Amended Complaint also grounds its standing and authority to sue Immigon based on

the DIP Order.  That order granted the AAT—as successor to the creditors' committee—the

right to prosecute this action seeking recovery against the Prepetition Senior Facilities Secured

Parties.  Am. Compl. ¶ 577 (citing DIP Order ¶ 19(d)).  The AAT specifically alleges that each

Term Lender, *i.e.*, each Prepetition Senior Facilities Secured Party—including OEVAG—that

accepted payment after the Petition Date consented to the jurisdiction of this Court.  Am. Compl.

¶ 579 (citing DIP Order ¶ 19(d)).  The AAT's rights against Immigon flow from the payment to

OEVAG under the Term Loan Agreement, Am. Compl. ¶ 367, and the Term Loan Agreement

includes OEVAG's consent to personal jurisdiction.

Contrary to OEVAG's arguments, the record supports the fact that OEVAG received

notice that the DIP Order included a consent to this Court's jurisdiction.  The AAT made a prima

facie showing that OEVAG monitored the bankruptcy, showing it actually received and viewed

the final DIP Order before receiving payment.  The payment was expressly made subject to

potential clawback.  The Court concludes that OEVAG knowingly consented to the jurisdiction

provision in the DIP Order by accepting the transfer of funds.  *E.g.,* ECF No. 428-8 (JPMC

Memo dated June 25, 2009); Fisher Decl. Ex. J (JPMCB-3-00000478); Ex. K (JPMCB-3-00000476).

D.     **Minimum Contacts Supports Personal Jurisdiction Over OEVAG**

Even if OEVAG did not consent to jurisdiction, the AAT established sufficient minimum contacts to support specific personal jurisdiction over OEVAG.  Under the Term Loan Agreement, any payments were to be made by JPMC in New York.  *See* ECF No. 428-2 (Term Loan Ex. B Form of Note).  OEVAG purchased interests in the Term Loan from JPMC in New York, agreed New York law governed the transaction, and also consented to jurisdiction in a state or federal court in New York.  Such provisions are typical for loan agreements of this type—it promotes certainty and predictability that disputes will be resolved applying New York law in state or federal courts in New York.  OEVAG also selected Bank of New York Mellon for its correspondent bank account for use not only in connection with this loan transaction but also in other dollar denominated transactions.[4]  JPMC made the disputed payment in New York to OEVAG's New York bank account.  *See* ECF No. 823-2 (Süssenbach Decl.) ¶ 29.  These contacts satisfy the requirements for "purposeful availment."  *See Deutsche Bank Secs., Inc. v. Mont. Bd. of Inv.*, 7 N.Y.3d 65, 72 (2006) (concluding that due process is satisfied where institutional investor bought $15 million in bonds from New York investment bank using Bloomberg system).  The use of this account in connection with this transaction establishes specific personal jurisdiction "so long as the use was purposeful and not coincidental."  *Arcapita,* 549 B.R. at 67-68.  Where "the receipt of the funds in New York is precisely the conduct targeted by the Committee, and the activity that the cause of action seeks to have voided," specific jurisdiction is established.  *Id.* at 69.  *See also Picard,* 440 B.R. 274 (denying Israeli defendant's

---

[4]     Immigon's counsel acknowledged during argument that this account was used by OEVAG for other dollar-denominated transactions.

motion to dismiss SIPA trustee's adversary proceeding, where defendant maintained U.S.

accounts, including one in New York and appointed father in law as her agent in New York).

The lending relationship under the Term Loan Agreement was centered in New York,

governed by New York law, and allowed all of the parties—including OEVAG—to enjoy the

benefits of the U.S. banking system and New York's status as a financial capital.  As the AAT

correctly argues, case law supports finding personal jurisdiction in similar circumstances.  *See,*

*e.g., Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607 (1992) (concluding that Argentina's

issuance of negotiable debt instruments denominated in USD payable in New York and

appointing financial agent in New York sufficient purposeful availment); *A.I. Trade Fin., Inc. v.*

*Petra Bank*, 989 F.2d 76 (2d Cir. 1993) (concluding that a Jordanian bank making a guaranty on

a promissory note executed in Jordan by Greek importer to Swiss exporter subject to specific

New York jurisdiction where New York was designated as place of payment and the existence of

a secondary market for the notes further supported jurisdiction); *King Cnt'y Wash. v. IKB*

*Deutsche Industriebank AG*, 712 F. Supp. 2d 104, 113 (S.D.N.Y. 2010) (finding that specific

jurisdiction is proper where German bank benefited from New York being situs of structured

investment vehicle, as New York was "widely regarded as the capital of U.S. capital markets").

Immigon's reliance on *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016),

for the proposition that due process constraints should apply absent a finding of OEVAG's

"actual consent" to receiving funds under the jurisdictional provisions of the DIP Order is

misplaced.  Def. Br. at 9.  *Brown* involved general jurisdiction—which neither party asserts

this Court holds over Immigon—and the holding of *Brown* was that registering to do business

in Connecticut under Conn. Gen. Stat. § 33-920 could not support treating that corporate

defendant as "essentially at home."  *Id.* at 628 (citing *Daimler AG v. Bauman*, 134 S. Ct. 746

(2014). The AAT does not argue that OEVAG is "at home" in New York. Rather, the AAT

argues that OEVAG consented to specific jurisdiction in New York as a Lender under the Term

Loan Agreement and confirmed the jurisdiction of this Court over it by accepting funds

pursuant to the DIP Order. *Brown* does not upset the well-recognized principle that parties to a

transaction my contractually consent to jurisdiction in New York courts, provisions that will

unquestionably be enforced where there is a statutory basis for jurisdiction within the federal

courts.[5]

### E.    Subjecting Immigon to Personal Jurisdiction Satisfies Due Process

The Court must also determine whether the exercise of personal jurisdiction comports with

traditional notions of fair play and substantial justice. *Chloe*, 616 F.3d at 164-65 (citing *Int'l

Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Second Circuit has identified several

factors to determine reasonableness for these purposes, including (1) the burden that exercise of

jurisdiction will impose on the defendant; (2) the interest of the forum state in adjudicating the

case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate

judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the

shared interest of the states in furthering substantive social policies. *Id*. To avoid personal

jurisdiction on this ground, defendant must present a "compelling case that the presence of some

---

[5]    The other cases on which Immigon relies are inapposite. In *Sledziejowski v. MyPlace Dev. SP ZO.O. (In re Sledziejowski)*, Adv. No. 15-08207 (SHL), 2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016), the court held that a Polish company's obligation to repay loans to a U.S. entity was insufficient to support jurisdiction where the loans were secured by property in **Poland** and were governed by **Polish** law. In *Colson Servs. Corp. v. Bank of Baltimore*, 712 F. Supp. 28 (S.D.N.Y. 1989), defendant's wiring of the purchase price for a certificate of deposit from a California bank to the bank's paying agent in New York was not considered purposeful availment of the New York banking system; the defendant had no choice where the wire would be sent and otherwise had no New York contacts. Neither case involved New York loans with New York parties where the proceeds were paid into a New York account purposefully chosen by the defendant. Immigon relies on *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., LTD.*, No. 06 Civ. 3972 (LTS)(JCF), 2009 WL 666780 (S.D.N.Y. Mar. 6, 2009), to support its argument that absent a showing that Immigon was given notice of the DIP Order, "there is no basis to find personal jurisdiction by consent." The court in *Cedar* held that a party sued for breach of a contract containing a forum selection clause did not consent to jurisdiction where it was not a party to that agreement, but here, OEVAG is a party to the Term Loan Agreement.

other considerations would render jurisdiction unreasonable." *Licci v. Lebanese Canadian Bank, SAL (Licci IV)*, 732 F.3d 161, 173 (2d Cir. 2013) (quoting *Burger King*, 471 U.S. at 477). *Canadian Bank, SAL (Licci IV)*, 732 F.3d 161, 173 (2d Cir. 2013) (quoting *Burger King*, 471 U.S. at 477).

This Court has a strong interest in adjudicating claims arising under the Bankruptcy Code. *Arcapita*, 549 B.R. at 72 ("It does not seem prudential to allow foreign creditors to potentially obtain priority over domestic creditors based simply on their foreign status."); *cf. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 130 (2d Cir. 2002) (New York had interest in adjudicating claim where New York was center of loan transaction at issue). The AAT likewise has a strong interest in obtaining convenient and effective relief in this forum. *See Arcapita*, 549 B.R. at 72. Immigon's burden in having to litigate in Bankruptcy Court in New York "is substantially mitigated by the conveniences of modern communication and transportation." *Id.* at 71. The fact that Immigon will have to defend itself in a foreign legal system and foreign language is not dispositive "otherwise a United States court could never constitutionally exercise jurisdiction over a non-US entity." *Id.* at 72; *see also Picard v. Cohmad Secs. Corp. (In re Madoff Inv. Secs. LLC)*, 418 B.R. 75 (Bankr. S.D.N.Y. 2009) (concluding that interests of plaintiff and forum justified even serious burden placed on Swiss defendant). Finally, as the AAT argues, Immigon is not under any equivalent foreign bankruptcy proceeding and its knowledge of these proceedings pre-dates its decision to engage in an orderly wind-down.

### F.    Service of Process was Proper

Service on a foreign corporation in bankruptcy court is governed by Fed. R. Civ. P. 4(h)(2) and 4(f), made applicable by Fed. R. Bankr. P. 7004:

> if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>
> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>
> (C) unless prohibited by the foreign country's law, by:
>
> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>
> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt

FED. R. CIV. P. 4(h)(2).

Because Austria is not a signatory to the Hague Convention, service of process in Austria must be accomplished through a formal request by letter rogatory.[6] Austria requires that all translations be done by an Austrian court-certified translator. Shreefer Decl. ¶¶ 2-3. Alternative service on Austrian defendants is discouraged. *See, e.g., In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, No. MDL 1428 SAS, 2003 WL 21659368, at *3 (S.D.N.Y. July 15, 2003) (concluding that alternative service attempt under Rule 4(f)(3) was invalid as "the direct service of foreign legal documents by foreign authorities or by private individuals without the assistance or consent of Austrian authorities is regarded as an infringement of Austria's sovereignty").

Service of process on foreign defendants can be difficult. Therefore, the Federal Rules do not impose the 90-day time limit that is imposed for domestic service. *See* FED. RULE. CIV. P. 4(m); Adv. Comm. Note 2016. A flexible due diligence standard applies in determining whether service of process was timely. *Burda Media, Inc. v. Blumenberg*, No. 97-cv-7167, 2004 WL 1110419, at *6 (S.D.N.Y. May 18, 2004); *Picard*, 418 B.R. at 84 (stating that

---

[6]    *See* https://travel.state.gov/content/travel/en/legal-considerations/judicial/country/austria.html.

"reasonable time" under foreign service "should be liberally construed."). Here, the Federal Rules do not impose a specific time within which service must be accomplished, but even if they did so, as this Court previously stated, "courts are permitted to extend the time to serve the summons and complaint, *even in the absence of good cause,* and even after the deadline for service has already expired." *Motors Liquidation*, 552 B.R. 253 at 274 (emphasis in original) (citing *Zapata v. City of New York*, 502 F.3d 192 (2d Cir. 2007)).[7] Dismissal under Federal Rule 12(b)(5) is discretionary. *Stone v. Ranbaxy Pharm., Inc.*, No. JFM-10-cv-08816, 2011 WL 2462654, at *7 (S.D.N.Y. June 16, 2011).

    1.   *Service Within Four Months of the Granting of the Second Request Was Reasonable*

The Austrian Ministry rejected the AAT's first attempt to serve by letter rogatory because of the State Department's delay in transmitting the request. The AAT cannot be faulted for this delay and the Austrian Ministry's resulting rejection. The AAT submitted the letter rogatory to the State Department within a reasonable time after completing the service procedures. This Court issued an Order granting the Second Request on May 26, 2016, giving the AAT a second opportunity to effectuate service. ECF No. 620-1. The AAT served Immigon pursuant to this Order on or about September 23, 2016. Immigon asks this Court to second-guess its decision to authorize the Second Request. The Court rejected a similar argument by other Term Lenders (including foreign ones) in denying an earlier motion to dismiss the Amended Complaint. *See* ECF No. 643 at 32-37.

The four month time period to request and serve the second letter rogatory was reasonable under the circumstances. International service "may be a time-consuming

---

[7]    *See also* FED. R. BANKR. P. *9006(b)(1)* (providing that "the court for cause shown may at any time in its discretion . . . with or without motion or notice order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order").

process even in an English-speaking jurisdiction." *Itel Container Int'l Corp. v. Alanttrafik Express Serv., Ltd.*, 686 F. Supp. 438, 444 n.9 (S.D.N.Y. 1988). The need to obtain foreign-language translations further adds to the time required to accomplish service on foreign parties. Plaintiffs must be diligent in taking steps to effect service on foreign parties. The record here establishes that the AAT acted reasonably in its effort to serve Immigon.

### III.    CONCLUSION

For the reasons explained above, the motion to dismiss is **DENIED.**

**IT IS SO ORDERED.**

Dated:    February 16, 2017
        New York, New York

                    *Martin Glenn*
                    MARTIN GLENN
            United States Bankruptcy Judge