# WACHTELL, LIPTON, ROSEN & KATZ

| | | | | |
|---|---|---|---|---|
| MARTIN LIPTON | TREVOR S. NORWITZ | 51 WEST 52ND STREET | ERIC M. ROSOF | DONGJU SONG |
| HERBERT M. WACHTELL | BEN M. GERMANA | NEW YORK, N.Y. 10019-6150 | GREGORY E. OSTLING | BRADLEY R. WILSON |
| PAUL VIZCARRONDO, JR. | ANDREW J. NUSSBAUM | TELEPHONE: (212) 403-1000 | DAVID B. ANDERS | GRAHAM W. MELI |
| THEODORE N. MIRVIS | RACHELLE SILVERBERG | FACSIMILE: (212) 403-2000 | ANDREA K. WAHLQUIST | GREGORY E. PESSIN |
| EDWARD D. HERLIHY | STEVEN A. COHEN | | ADAM J. SHAPIRO | CARRIE M. REILLY |
| DANIEL A. NEFF | DEBORAH L. PAUL | | NELSON O. FITTS | MARK F. VEBLEN |
| ANDREW R. BROWNSTEIN | DAVID C. KARP | | JOSHUA M. HOLMES | VICTOR GOLDFELD |
| MARC WOLINSKY | RICHARD K. KIM | GEORGE A. KATZ (1965-1989) | DAVID E. SHAPIRO | EDWARD J. LEE |
| STEVEN A. ROSENBLUM | JOSHUA R. CAMMAKER | JAMES H. FOGELSON (1967-1991) | DAMIAN G. DIDDEN | BRANDON C. PRICE |
| JOHN F. SAVARESE | MARK GORDON | LEONARD M. ROSEN (1965-2014) | IAN BOCZKO | KEVIN S. SCHWARTZ |
| SCOTT K. CHARLES | JOSEPH D. LARSON | | MATTHEW M. GUEST | MICHAEL S. BENN |
| JODI J. SCHWARTZ | JEANNEMARIE O'BRIEN | OF COUNSEL | DAVID E. KAHAN | SABASTIAN V. NILES |
| ADAM O. EMMERICH | WAYNE M. CARLIN | WILLIAM T. ALLEN    DAVID S. NEILL | DAVID K. LAM | ALISON ZIESKE PREISS |
| RALPH M. LEVENE | STEPHEN R. DiPRIMA | MARTIN J.E. ARMS    HAROLD S. NOVIKOFF | BENJAMIN M. ROTH | TIJANA J. DVORNIC |
| RICHARD G. MASON | NICHOLAS G. DEMMO | MICHAEL H. BYOWITZ  LAWRENCE B. PEDOWITZ | JOSHUA A. FELTMAN | JENNA E. LEVINE |
| DAVID M. SILK | IGOR KIRMAN | GEORGE T. CONWAY III  ERIC S. ROBINSON | ELAINE P. GOLIN | RYAN A. McLEOD |
| ROBIN PANOVKA | JONATHAN M. MOSES | KENNETH B. FORREST   PATRICIA A. ROBINSON* | EMIL A. KLEINHAUS | ANITHA REDDY |
| DAVID A. KATZ | T. EIKO STANGE | SELWYN B. GOLDBERG   ERIC M. ROTH | KARESSA L. CAIN | JOHN L. ROBINSON |
| ILENE KNABLE GOTTS | JOHN F. LYNCH | PETER C. HEIN        PAUL K. ROWE | RONALD C. CHEN | JOHN R. SOBOLEWSKI |
| JEFFREY M. WINTNER | WILLIAM SAVITT | MEYER G. KOPLOW      DAVID A. SCHWARTZ | GORDON S. MOODIE | STEVEN WINTER |
| | | LAWRENCE S. MAKOW    MICHAEL J. SEGAL | | |
| | | DOUGLAS K. MAYER     ELLIOTT V. STEIN | | |
| | | MARSHALL L. MILLER   WARREN R. STERN | | |
| | | PHILIP MINDLIN       PATRICIA A. VLAHAKIS | | |
| | | ROBERT M. MORGENTHAU AMY R. WOLF | | |

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

| | |
|---|---|
| DAVID M. ADLERSTEIN | NANCY B. GREENBAUM |
| AMANDA K. ALLEXON | MARK A. KOENIG |
| LOUIS J. BARASH | LAUREN M. KOFKE |
| FRANCO CASTELLI | J. AUSTIN LYONS |
| DIANNA CHEN | ALICIA C. McCARTHY |
| ANDREW J.H. CHEUNG | PAULA N. RAMOS |
| PAMELA EHRENKRANZ | S. CHRISTOPHER SZCZERBAN |
| KATHRYN GETTLES-ATWA | JEFFREY A. WATIKER |
| ADAM M. GOGOLAK | |

Direct Dial: (212) 403-1226
Direct Fax: (212) 403-2226
E-Mail: MWolinsky@wlrk.com

July 31, 2018

**By Hand, ECF, and Email**

The Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

      Re:    *Motors Liquidation Company Avoidance Action Trust* v. *JPMorgan Chase Bank, N.A.*, Case No. 09-00504 (MG)

Dear Judge Glenn:

      I write on behalf of JPMorgan Chase Bank, N.A., with the concurrence of the Defendants' Steering Committee. Pursuant to Rule 7056-1(a) of the Local Bankruptcy Rules for the Southern District of New York, and as contemplated by the Joint Scheduling Stipulation filed

The Honorable Martin Glenn
July 31, 2018
Page 2

earlier today (Dkt No. 1059, the "Joint Scheduling Stipulation"), defendants seek a pre-motion conference in advance of filing motions addressing seven issues that we believe were settled by the Court's decision following the 40 representative assets trial, but that nonetheless remain in dispute. Defendants believe that five of the issues, covered in Section A below, can be decided by motion based on the Court's decision and the record already before the Court. Two additional issues, covered in Section B below, can be resolved by summary judgment in short order following limited discovery.

With the Court's indulgence, in lieu of filing a separate, two-page pre-motion letter for each of the contemplated motions, we are filing a single, double-spaced letter and limiting our discussion of each motion.

    **A.**    **Issues defendants believe should be resolved by motion now**

The purpose of the 40 representative assets trial was to give the parties guiding principles that could then be applied to the balance of the assets and resolve the case in its entirety. Nonetheless, with respect to each of the five issues identified in this section, we believe that plaintiff is not accepting the Court's decision. 576 B.R. 325 (Bankr. S.D.N.Y. 2017) (the "Decision"). The five issues can and should be resolved by motion.

    **Motion 1 — Clarification that the Decision holds that GM's Mansfield, Ohio Stamping Facility is a specialized facility:** At trial, defendants presented expert and fact evidence that the two Ohio GM facilities at which representative assets were installed — Defiance Foundry and Mansfield Stamping — were specialized facilities. *See, e.g.*, Max Miller Direct Testimony ¶¶ 19, 53, Ex. A at 54-55; Trial Tr. 1148-49; DX 89. The AAT presented evidence to the contrary. *E.g.*, Plaintiff's Post-Trial Brief (Dkt. No. 994) at 385-87

The Honorable Martin Glenn
July 31, 2018
Page 3

(summarizing evidence). Based on the evidence presented at trial, the Court held that for specialized facilities, the Ohio fixture test effectively "blend[s] together" with the Michigan fixture test. Decision at 386-87. The Court then held that Representative Asset No. 30, the TP-14 Transfer Press located at GM's Mansfield, Ohio stamping facility, was a fixture. *Id.* at 401.

The AAT now takes the position, contrary to the Court's ruling, that over 2,000 fixtures worth almost $50 million at Mansfield — including stamping presses identical to Representative Asset No. 30 and many other assets identical to other representative assets ruled fixtures — are not fixtures. Accordingly, defendants' motion will ask the Court to clarify that it found that Mansfield Stamping was a specialized facility as part of its holding that the TP-14 Transfer Press at Mansfield Stamping is a fixture.

**Motion 2 — Partial summary judgment and clarification that the building system assets located at the Lansing Delta Township Central Utilities Complex (the "LDT CUC") (Rep. Asset No. 11) are fixtures:** At trial, the AAT conceded that a number of the "building system" components of the LDT CUC that service the LDT complex generally, as opposed to the manufacturing processes, are fixtures. For example, the AAT conceded that the air handling units that are installed on the roofs of the LDT complex and temper the air throughout the LDT facility are fixtures. Decision at 419. The AAT's concession also included (a) utility piping, (b) hard electrical conduit, (c) a chilled water holding tank, and (d) portions of the waste-water treatment system. *Id*. The Court then ruled that all "disputed components" of the LDT CUC are fixtures — adopting plaintiff's concessions and rejecting plaintiff's position that systems that provide utilities to manufacturing processes are not fixtures. Decision at 419-20; *see also* Decision at Table A, n. 3 ("The parties agree that the portions of the CUC consisting of ordinary

The Honorable Martin Glenn
July 31, 2018
Page 4

building materials are realty and not a fixture. The Court finds that the rest of the CUC, including the CUC Systems, is a fixture.").

Again, in an about face, the AAT now disputes the characterization of building systems that are virtually identical in form and purpose to the portions of the LDT CUC that the AAT had previously conceded are fixtures and, instead, contends that they are ordinary building materials. There are over 10,000 assets of this type that have approximately $279 million in fresh start value — including $38 million in air handling units virtually identical to the air handling units components of the LDT CUC that the AAT had previously conceded are fixtures. Accordingly, defendants' motion will seek a ruling that the previously conceded, now disputed portions of the LDT CUC, including components that provide utilities to the plant generally, are fixtures.

The parties did dispute whether "Common Utilities" that support the CUC itself were fixtures or ordinary building materials. For these components of the CUC (*e.g.*, heating, power and ventilation systems for the CUC building itself), defendants relied upon Eric Stevens' expert testimony that the components had an identity independent from the building itself, indisputably met all three factors of the fixture test, and therefore were fixtures. Eric Stevens Direct Testimony ¶¶ 159-161; Defendants' Proposed Findings of Fact and Conclusions of Law (Dkt. No. 993) at ¶ 668 n. 97, p. 396 n. 151. Plaintiff's expert, David Goesling, testified that these components were "real property" and therefore not fixtures. David Goesling Direct Testimony ¶ 201; *see also* Plaintiff's Post-Trial Brief at 212. Accordingly, defendants' motion will ask the Court to clarify that when it found that all "disputed components of the CUC are fixtures" (Decision at 420), that the Court's ruling encompassed the Common Utilities of the CUC as well.

The Honorable Martin Glenn
July 31, 2018
Page 5

**Motion 3 — Partial summary judgment that the AAT's challenge to the Term Lenders' security interest in the fixtures at GM's Shreveport, Louisiana Assembly Facility is time-barred:** In its Decision, the Court ruled that the AAT's challenge to the validity of the defendants' security interest in the fixtures at LDT was time-barred because the AAT never raised this challenge in either its original or amended complaint. Decision at 390-95. In the face of this ruling, the AAT now raises for the first time a challenge to the Term Lenders' security interest in over 8,000 fixtures at GM's Shreveport Assembly facility. The Term Lenders value this collateral at nearly $40 million.

But again, as with LDT, the AAT has long been aware that defendants claimed a perfected security interest in the fixtures at Shreveport Assembly. And, again, the AAT never raised a challenge to the Shreveport Assembly fixture filing or the scope or validity of defendants' security interest in either its original or amended complaints or, for that matter, at any time until after the Court rendered its Decision. Accordingly, defendants' motion will seek a ruling that the AAT's attempt to invalidate defendants' security interest in the fixtures located at Shreveport Assembly is time-barred for the same reasons as was its challenge to LDT.

**Motion 4 — Partial summary judgment that plaintiff is bound by the Court's ruling that Mr. Goesling's Orderly Liquidation Value In Exchange methodology must be applied to value the assets left with Old GM:** In its Decision, the Court ruled that the valuation methodology proposed by the AAT's expert, David Goesling, rather than defendants' expert, "is the appropriate valuation method for the assets that were not part of the 363 sale" to New GM. Decision at 449-450. Defendants now seek a ruling that plaintiff is estopped by the Court's

Wachtell, Lipton, Rosen & Katz

The Honorable Martin Glenn
July 31, 2018
Page 6

ruling from using a valuation methodology inconsistent with Mr. Goesling's for valuing the assets left with Old GM.

As the Court will recall, the AAT's consistent position at trial was that Mr. Goesling presented the best methodology for valuing the fixtures left with Old GM (and those sold to New GM, for that matter). The Court will also recall that at the conclusion of trial, the Court asked the parties to supply it with a chart showing all of the valuation options, regardless of whether any party had advocated for them during trial. Trial Tr. 3541:17-23. And, of course, the AAT prevailed on this issue and convinced the Court that Mr. Goesling's OLV methodology should be adopted for valuing the assets left with Old GM.

In light of this, defendants' motion will seek a ruling that the AAT is barred from now changing course and seeking to advance a completely different basis for valuing the fixtures left with Old GM. Under the doctrine of judicial estoppel, a party is not permitted to take "a new position [that] is clearly inconsistent with its earlier position," when it had "previously persuaded a court to accept its earlier position," and the shift would give the party "an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012). This is a textbook case for the application of judicial estoppel.

We understand that the AAT plans to oppose this motion on the grounds that it needs additional discovery. Its position is unfounded. The parties selected representative assets left with Old GM precisely so that they could litigate the methodology for valuing those assets and obtain the Court's guidance on the issue. In advance of the trial, the AAT had a full and fair opportunity to take any discovery it deemed necessary on the issue. There is no plausible basis

09-00504-mg    Doc 1061    Filed 07/31/18    Entered 07/31/18 17:27:08    Main Document
Pg 7 of 13

WACHTELL, LIPTON, ROSEN & KATZ

The Honorable Martin Glenn
July 31, 2018
Page 7

for the AAT to now say it needs yet more discovery before it can agree to apply the valuation methodology the Court ruled was appropriate after trial — the AAT's own proposed valuation methodology. Nonetheless, without conceding that the AAT has the right to re-litigate this issue, we asked the AAT to identify what discovery it believed would be necessary to resolve the issue. It failed to do so. There is no need or basis for delaying resolution on the basis of a claimed need for additional discovery.

**Motion 5 — Partial summary judgment that fixtures New GM purchased out of closed plants should be valued using KPMG fresh start values:** The AAT does not (and cannot) dispute that, under the Court's Decision, KPMG's fresh start values are generally appropriate for valuing the fixtures sold to New GM as part of the Section 363 sale of assets from Old GM to New GM. *See, e.g.*, Decision at 449 ("The KPMG Final Fair Value Amounts Are the Best Available Valuation of the Assets Sold to New GM"). The AAT, however, has refused to concede that KPMG's fresh start values should be used to value fixtures that New GM purchased out of plants that were otherwise being left with Old GM. Collectively, there are approximately 6,700 fixtures of this type that KPMG valued at approximately $179 million.[1]

Defendants' motion will show that KPMG was not only aware of the proposed disposition of these assets, it explicitly took that proposed disposition into account. Patrick Furey, one of the KPMG managers in charge of the fresh start accounting project, testified at his

---

[1] An example is an AA Transfer Press (similar to Rep. Asset No. 32) that, as of July 2009, was installed at the GM Grand Rapids Stamping plant. While the plant was left with Old GM, New GM purchased the transfer press as part of the 363 Sale and subsequently moved it to New GM's Flint Stamping plant. While the AAT concedes the asset is a fixture, it has not accepted the fresh start value of $13.4 million that KPMG assigned the asset and that New GM used in its fixed asset ledger.

09-00504-mg    Doc 1061    Filed 07/31/18    Entered 07/31/18 17:27:08    Main Document
Pg 8 of 13

Wachtell, Lipton, Rosen & Katz

The Honorable Martin Glenn
July 31, 2018
Page 8

deposition that, for "assets at specific locations that were identified as planned to be moved, taken from one location to another . . . we estimated an amount for the uninstallation of those assets." Furey Dep. 68:7-14.  His testimony is confirmed by a KPMG memo prepared in connection with the fresh start accounting, which explains that, for assets that "would be transferred to a NewCo [New GM] location," KPMG "applied uninstall percentages to remove installation costs from the fair value estimates" because "these assets were to be transferred and would inherit new installation costs."  KPMG-GM0092221 at 22.  These "uninstall" deductions are then shown in the KPMG workpapers for each asset in this group.

Once again, we understand that the AAT plans to oppose this motion on the grounds that it needs additional discovery.  However, the parties already had ample opportunity to take discovery on this issue, the evidentiary record is clear, and any further delay in resolving this issue is unwarranted.  This issue is suitable for resolution by summary judgment motion now.

**B.      Issues Defendants Believe Can Be Resolved By Motion In The Near Future**

There are two additional issues that defendants believe can readily be resolved by summary judgment motion following limited discovery.  As contemplated by the Joint Scheduling Stipulation, following the pre-motion conference, we will confer with plaintiff's counsel on the timetable and scope of this discovery, but thought that it would nonetheless be helpful to the Court to identify these additional motions now.

**Motion 6 — Partial summary judgment that fixtures at Orion Assembly and Pontiac Stamping should be valued using KPMG fresh start values:**  Similar to its position on assets sold to New GM out of plants left with Old GM (*see* Motion 5 above), the AAT will not agree that KPMG's fresh start values should be used to value nearly 12,000 fixtures that New

The Honorable Martin Glenn
July 31, 2018
Page 9

GM purchased as part of the 363 Sale that were installed at GM Orion Assembly and GM Pontiac Stamping. While the AAT concedes that these plants and the fixtures contained in these plants were sold to New GM, it asserts that these plants were "idled" and that therefore the fresh start values KPMG calculated may not be appropriate. Collectively, these fixtures have a fresh start value of nearly $113 million.[2]

Defendants expect to show that the AAT is simply wrong in describing the Orion and Pontiac plants as "idled." Rather, defendants expect that the evidence will show that both plants were in operation as of June 2009 and that New GM planned to keep them in operation by repurposing them to make new model lines. Thus, as of the June 30, 2009 valuation date, the proposed disposition of the fixtures at those plants was to be operated as part of New GM's ongoing operations — just like the representative assets at LDT, Warren Transmission and Defiance Foundry.

**Motion 7 — Partial summary judgment that GM's Lordstown, Ohio Assembly Facility is a specialized facility.** As with Mansfield Stamping (Motion 1 above), the AAT disputes whether GM's Lordstown, Ohio Assembly Facility is a "specialized" facility. The 13,437 disputed assets in this plant have an aggregate fresh start value of approximately $40 million.

The Court ruled that GM's foundries and stamping, assembly and powertrain plants are specialized facilities. *E.g.*, Decision at 388 ("[T]he evidence relating to the Warren plant, LDT,

---

[2]    The AAT similarly has not agreed that KPMG's fresh start values should be used to value the fixtures at one other facility purchased by New GM, GM Janesville Assembly. While that dispute may ultimately also need to be resolved by the Court, defendants do not currently list it as a likely motion given that the collective fresh start value of the disputed assets at that facility is $8.3 million.

The Honorable Martin Glenn
July 31, 2018
Page 10

and the Defiance Foundry submitted at trial show that the premises likely cannot be designated for any other manufacturing or industrial purpose aside from the purposes for which they were built — namely, to produce parts for automobiles, or produce and assemble automobiles themselves."). And in the Decision, the Court held that for specialized facilities, the Ohio fixture test effectively "blends together" with the Michigan fixture test. *Id.* at 386-87. On summary judgment, defendants expect to show that Lordstown Assembly is a "specialized facility."

Specifically, the evidence will show that GM purpose-built Lordstown Assembly as an auto manufacturing plant in the 1960s, and that it has upgraded the facility and operated it continuously as an auto manufacturing plant for approximately 50 years. The evidence will also show that, like LDT, Lordstown Assembly is a mammoth complex, consisting of over 5 million square feet of manufacturing space on over 900 acres, and includes stamping, body shop, paint and general assembly processes. Like LDT, these processes take place in highly-specialized and customized buildings that are physically connected with each other, are specifically designed to accommodate the assets necessary for the specific manufacturing processes in those structures, and were designed to function as a single integrated operation to produce automobiles. And like LDT, Lordstown Assembly has large customized foundations to support press systems in the stamping area, thousands of feet of conveyance systems, a three-story paint shop, and an assembly building with custom-designed layouts.[3]

\*        \*        \*

---

[3]  The parties similarly dispute whether one other Ohio facility, GM Moraine Assembly, is a specialized facility. While that dispute may ultimately also need to be resolved by the Court, defendants do not currently list it as a likely motion given that the collective fresh start value of the disputed assets at that facility is $9 million.

Wachtell, Lipton, Rosen & Katz

The Honorable Martin Glenn
July 31, 2018
Page 11

    As discussed in the parties' prior Joint Status Reports as well as the Joint Scheduling Stipulation, the parties are continuing to mediate a number of other issues involving the application of the Decision to the assets that constitute the Term Lenders' collateral. If mediation fails to resolve these issues, they would also need to be presented to the Court separately. Some of those issues may be able to be resolved on motion, but others would likely require additional discovery and trial.

    We understand that plaintiff will also seek to raise additional issues with the Court by motion now, namely asking the Court to decide the Term Lenders' constructive trust, earmarking, and UCC-3 ineffectiveness defenses by motion. As contemplated by the Joint Scheduling Stipulation, we plan to submit a brief letter to the Court on August 10, 2018 in response, explaining why we believe resolution of those issues will require limited additional discovery or a trial.

    In addition to the issues identified herein, the issues to be mediated, and the issues we understand that plaintiff intends to raise in its pre-motion letter, there are a handful of other disputes on which defendants currently intend to pursue additional discovery:

- **CWIP Assets:** As the Court may recall, defendants have identified brand-new assets that were physically installed at GM's plants as of June 2009 and intended to be permanent, but that were not yet in active service (*e.g.*, because they were going through final testing) and therefore do not appear on GM's June 2009 fixed asset ledger. Defendants believe that approximately $56 million of these Construction Work in Progress or "CWIP" assets" are fixtures and therefore

09-00504-mg    Doc 1061    Filed 07/31/18    Entered 07/31/18 17:27:08    Main Document
Pg 12 of 13

WACHTELL, LIPTON, ROSEN & KATZ

The Honorable Martin Glenn
July 31, 2018
Page 12

collateral for the Term Loan. Defendants plan to seek additional discovery as to these assets.

- **Saturn Equipment:** Defendants currently believe that there is approximately $7-$50 million of Saturn equipment in a number of the plants listed on the Saturn UCC-1 filed in Delaware, which was never terminated and was indisputably effective to perfect the Term Lenders' security interest in both Saturn fixtures *and* equipment. Defendants plan to seek additional discovery to clarify the ownership, identity, and value of assets subject to the Saturn UCC-1.

- **Fairfax Capital Lease Assets:** There are a number of assets at GM's Fairfax Assembly plant in Kansas that were subject to a "capital lease." KPMG assigned a fresh start value of approximately $24.2 million to these assets. We have reviewed the "capital lease" documentation and, as the Court ruled was the case for the "capital lease" covering the CUC at Lansing Delta Township, believe that the capital lease covering the assets at Fairfax Assembly is actually a financing and therefore did not preclude the creation of the Term Lenders' security interest in those assets. We also understand that the Fairfax capital lease was created as part of a tax incentive package the Kansas locality provided to GM: GM purchased state-issued Industrial Revenue Bonds, the proceeds of which were used by the state to finance GM's purchase of its assets, such that GM effectively owned a complete economic interest in the assets and was able to obtain a tax exemption. Defendants plan to seek additional discovery to support the facts presented above.

The Honorable Martin Glenn
July 31, 2018
Page 13

- **TBD Assets:** Of the over 200,000 assets listed on GM's electronic fixed asset ledger, the Term Lenders' experts believe they need additional information on approximately 100 additional assets worth approximately $5.2 million to finalize their determinations of whether those assets are fixtures. This discovery will facilitate the mediation of the dispute over these assets.

We look forward to discussing these issues with the Court.

Respectfully submitted,

Marc Wolinsky

cc:    Counsel of Record (by ECF and email)