

Eric B. Fisher
Binder & Schwartz LLP                    (T) 212.933.4551
366 Madison Avenue  6th Floor            (F) 212.510.7299
New York, NY 10017                       efisher@binderschwartz.com

October 12, 2018

**Via ECF, Email and Hand Delivery**

The Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 523
New York, New York 10004

    Re:  *Motors Liquidation Company Avoidance Action Trust v. JPMorgan*
       *Chase Bank, N.A.*, Case No. 09-00504 (MG)

Dear Judge Glenn:

    We represent plaintiff Motors Liquidation Company Avoidance Action Trust.  We write
respectfully to seek the Court's assistance in selecting the four representative real property assets
for the next phase of this case.  The parties have conferred extensively about this topic and have
been unable to reach agreement.[1]

**I.   The Next Phase of this Litigation Presents a Genuine Opportunity for Overall
Resolution of the Case**

    Plaintiff's selection of representative assets is informed by its commitment to finding a
path to resolve the entire action before this Court.

    As the Court is aware, the case largely turns on determining what is included in
defendants' collateral and valuing it.  In addition to ruling on the specific representative assets
presented for adjudication, the Court's Opinion, entered on September 26, 2017 and revised on
October 4, 2017 (the "Opinion"), "articulated broad principles of both fixture and valuation law
to serve as guiding principles for the more than 200,000 assets that remain[ed] in dispute" as of
that date.  (Opinion at 2.)  In a stipulation since filed with the Court that reflects plaintiff's
application of the valuation and collateral classification principles described by the Court in its
Opinion, plaintiff stipulated that this Court's guiding principles imply that the collateral securing
the $1.48 billion Term Loan has a value of approximately $810 million, indicating that the loan
is under-secured by approximately $670 million. Stipulation and Order Regarding Fixture
Classification and Valuation (Adv. Pro. Dkt. No. 1073) (the "Asset Stipulation").[2]  This next –
and we hope final – phase of the case turns on whether defendants can prove collateral value in

---

[1] The parties have reached agreement on selection of the robot controller asset and the two
capital repair/intangible assets.

[2] The Asset Stipulation preserves plaintiff's rights to challenge the Court's rulings on appeal,
including but not limited to the rulings on fixture classification and valuation methodology.



excess of that to which plaintiff already has stipulated. Defendants continue to maintain that the Term Loan is over-secured and that they have no liability at all in this case, claiming that there is more than another approximately $670 million in collateral value they will be able to prove as the case proceeds.

The collateral classification and valuation issues to be decided in the next phase of this case, which are identified at pages 4 and 5 of the Stipulation and Order entered on September 14, 2018 (Adv. Pro. Dkt. No. 1080), involve many hundreds of millions of dollars. The single largest asset-classification dispute involves a disagreement about where to draw the line between real property (*e.g.*, building, land improvements, ordinary building materials) and fixtures. Approximately $235 million rides on this dispute alone based on defendants' contentions as to the value of these assets. Below we briefly describe why the four real property assets selected by plaintiff are most likely to lead to the overall resolution of the real property dispute and the assets selected by defendants are not.

## II.    Adjudication of The Four Real Property Assets Proposed by Plaintiff Will Lead to Resolution of the Disputed Real Property Category

The Term Loan was secured by equipment and fixtures at certain plants. The loan was not secured by assets that are real property, including buildings, land improvements and ordinary building materials. No party has ever contended that the loan was secured by real property assets. The real property issue was not the subject of significant testimony at trial because, following the Second Circuit's decision that the UCC-3 termination statement had unperfected the Term Loan lien on personal property, all parties focused their attention on the distinction between fixtures and personal property. The distinction between real property and fixtures was not the focus of the parties' efforts or the Court's Opinion. Since the Court's Opinion, this issue has taken on greater significance. Though the parties have made substantial progress towards resolution based on the Opinion's distinction between personal property and fixtures, there is little in the way of guiding principles from the Court on the real property issue, which is why it remains hotly disputed.

Although the Opinion provides little direction on the real property question, the Court's few rulings on this topic support the view that this is an important category with a substantial impact on the scope of collateral. For example, the Court explained that the Courtyard Enclosure, Representative Asset No. 37, is a building (Opinion at 69) and thus not part of the collateral, and that the additions to the building to create the Courtyard Enclosure—including structural steel framing, a steel truss roof structure, lighting, heating and ventilation ductwork, and sprinkler piping, among other features—are all ordinary building materials (*id.* at 69-70).

Given the importance of the issue—and the fact that the parties have significant disagreement about which assets are fixtures or real property—Plaintiff has proposed four assets at the GM Assembly Plant in Arlington, Texas (the "Arlington Plant") for which guidance would be extremely beneficial in resolving the largest remaining issue concerning asset classification. The Arlington Plant is representative of the older GM assembly plants where potential collateral



is located.  Unlike Lansing Delta Township, the older assembly buildings, like the Arlington Plant, are not built around the T-shape final assembly lines but rather are differently designed and able to accommodate many other industrial processes.

If the Court were to rule on these four assets, plaintiff is confident that the rulings would lead to the parties' ability to resolve the entirety of their dispute about real property assets. Specifically, the four eFAST entries selected by plaintiff are the following:

1. CJY2169500001 – GMT800 B/S ASH (26 air supply houses at the Arlington Plant body shop);

2. CJY2168100001 - GMT800 B/S LIGHTING (lighting at the Arlington Plant body shop);

3. CJY2168000001 - GMT800 B/S FIRE PROT (fire protection system at the Arlington Plant body shop); and

4. CJY2168200001 - 800 BS SANITARY SWRS (sewers at the Arlington Plant body shop).

This Court has not previously been presented with expert testimony from building engineers and construction experts to assist in defining what building features are within the real property category.  Plaintiff plans to offer such testimony, and other evidence, in support of its position that these four assets are real property and thus excluded from the Term Loan collateral. To demonstrate its commitment to fashioning this next phase of the case in a manner that will resolve the entirety of this real property category, plaintiff also agrees as follows:

• Notwithstanding that these four assets are in Texas, plaintiff agrees that the Court should apply Michigan law, though the parties should remain free to cite case law from any jurisdiction that is persuasive.

• Plaintiff has specifically identified for defendants a list of assets that it agrees in advance will rise or fall with the Court's rulings on two of these assets.  In particular, plaintiff has specifically tied 1,119 disputed assets with a value of approximately $42 million to the outcome on the air supply house asset (Asset No. 1 above) alone, and 2,095 assets with a value of approximately $54.8 million to the outcome with respect to the lighting asset (Asset No. 2 above) alone.  This approach will ensure that substantial value automatically and dependably shifts one way or the other, following this Court's ruling on the assets selected by plaintiff.

• The other two proposed assets relate to categories of assets worth more than $30 million. Although plaintiff has not specifically identified in advance the ripple effects of a ruling on those two assets and awaits guidance from the Court, plaintiff expects that the Court's guidance will enable the parties to resolve that additional value as well as the remainder of this real property category.



### III. Adjudication of the Four Real Property Assets Proposed by Defendants Will <u>Not</u> Lead to Resolution of this Category

Although defendants say that they too seek overall resolution of this dispute, their selected assets suggest otherwise because they are not representative of the issues that remain in dispute. Rather than selecting assets that will lead to rulings that will propel this case forward, defendants propose four assets from among two plants (Lansing Delta Township and Warren Transmission) that already have been the subject of considerable attention by the Court in its Opinion. The parties have been mediating for nearly a year, and the parties are now at an impasse. Each side has heard the others' view on the real property issue and though plaintiff's view is that the assets proposed by defendants are not part of their collateral, we know from our own analysis that a ruling in defendants' favor on defendants' proposed assets would not meaningfully impact plaintiff's view of the vast majority of assets in dispute at plants like the Arlington Plant.

By selecting assets that we believe are unlikely to advance this case – a view that we have communicated to defendants – it seems to us that defendants' strategy is to attempt to deploy the same army of hybrid expert-fact witnesses with knowledge about these two plants in the hopes of a targeted win with respect to the assets they have selected. But replaying issues from the prior trial is unlikely to advance the overall case towards resolution.

The four assets proposed by defendants are the following:

1. Asset 100037896 - PAINT BUILDING ELECTRIC POWER & LIGHTING (Location: Lansing Delta Township; Category: Power Systems and Lighting Systems);

2. Asset 100046165 - FIRE PROTECTION SYSTEM – 6 SPEED BLDG (Location: Warren Transmission; Category: Fire Protection Systems);

3. Asset 100044210 - 6 SPD. AIR HOUSE #1 (Location: Warren Transmission; Category: Air Handling/HVAC); and

4. Asset 100046189 - PRISMATIC DOCK-6 SPD. (Location: Warren Transmission; Category: Dock Systems)

This Court previously found that Lansing Delta Township is a unique facility. *See, e.g.,* Opinion at 85 ("LDT is plainly not a generic industrial building…but rather, the LDT facility walls zig-zag at unique angles in a manner plainly evidencing a specific purpose—to accommodate specific assets designed for a specific manufacturing process"). Indeed, built in 2006, according to findings in the Opinion, LDT was the first and last "greenfield plant in the U.S. designed to integrate the best of GM's flexible manufacturing processes." (*Id.* at 17.)



There are 14 assembly plants where defendants contend that there is surviving collateral, and these bear a much closer resemblance to the Arlington Plant than Lansing Delta Township. Further, the asset proposed by defendants within the Lansing Delta Township plant is not representative because it is associated with the paint shop, which the Court found to be a "complex, enormous, highly integrated operation that requires hundreds of specialized machines to work together with great precision." (Opinion at 128). Specifically, according to testimony credited by the Court in the Opinion, the Lansing Delta Township paint shop is the "purest expression of engineering and the policies and procedures, best practices," because of the manner in which the building is built around the processes occurring within the paint shop. (Opinion at 128.)

Plaintiff expects to prevail on each of the four assets it proposes. However, as already described above, plaintiff has been willing to spell out in detail and in advance what the implications would be if the Court were to rule against plaintiff and determine that the lighting asset at the Arlington Plant, for example, is a fixture and not real property. The implications are significant. According to plaintiff, whatever the Court decided with respect to that single asset would govern all of the lighting and electric power assets that defendants continue to maintain to be part of their surviving collateral (included in these concessions would be defendants' proposed Asset No. 1 above). Plaintiff has specifically identified all of these assets for defendants. It would be helpful to the overall resolution of this case, of course, if defendants would correspondingly commit to what the repercussions would be if plaintiff were to prevail on these assets.

Similar to the Lansing Delta Township paint building asset, the other three assets proposed by defendants are not representative because they are all associated with the 6-speed line at Warren Transmission. According to the Opinion, the 6-speed line was "in effect a new building within the Warren transmission facility" (Opinion at 21), and the entire building was built for the 6-speed line (*id.* at 22). The portion of the building that housed the 6-speed line had to be retrofit to work with the existing building as a whole. This kind of idiosyncratic and highly customized built environment is not the best context from which to choose an asset that will be representative of so many others across the 31 other facilities where assets remain in dispute. None of this unique complexity is present at the Arlington Plant. Indeed, all of the assets selected by plaintiff are part of a standalone, generic industrial building at the Arlington Plant.

Other than an unpersuasive argument that considering four assets at a single plant is a burden (addressed below), there is no reason that the trial should not be directed toward assets that plaintiff acknowledges will likely lead to full resolution of the matter before the Court. If defendants' argument is that rulings on the Arlington Plant assets would have the same impact on mediation as those they propose, then they should agree to try the Arlington Plant assets. If they think there are important differences, then the only solution would be to try both sets of assets. No one benefits from a trial that will not advance this case. Accordingly, the Court should direct the parties to litigate the four real property assets at the Arlington Plant proposed by plaintiff.

5



## IV.    Plaintiff's Proposal Is Not Overly Burdensome

In support of their asset proposal, defendants argue that the burdens on all parties and the Court will be lessened because the Court already is familiar with Lansing Delta Township and Warren Transmission.  This point is overstated by defendants.  It always takes more effort to cover ground that has not already been covered; but that additional effort will be well worth it if the result is resolution of this case.  In other words, the modest additional burden of considering assets from the Arlington Plant pales in comparison to the extraordinary burdens that will be imposed on all involved if this next phase of the litigation does not resolve the entire case before this Court.

The Court has not inspected any of the four assets proposed by defendants and so there is no great efficiency to be achieved by defendants' selection of assets at Warren Transmission and Lansing Delta Township.  Further, plaintiff's position is based, in part, on the different characteristics of the Arlington Plant as compared to Lansing Delta Township and Warren Transmission.  In terms of the burdens on GM, we have shared our list of four assets at the Arlington Plant with GM, and plaintiff has been working constructively with GM to minimize the burdens associated with discovering all of the key facts about the four Arlington Plant assets.

In terms of a potential inspection by the parties of these four assets, the Arlington Plant is located approximately 18 miles from the Dallas/Fort Worth airport to which there are regular non-stop flights from all of the New York City area airports.  In the earlier phase of the case, the parties inspected 300 assets to arrive at the selected 40 assets.  Further, at defendants' suggestion and with the agreement of plaintiff, the parties returned again to two plants for a site visit by the Court.  The inspection of just four assets at a single plant is not a significant undertaking in the context of this case, especially in light of the hundreds of millions of dollars still at stake.

*    *    *

In sum, the Court's guiding principles in the Opinion have had a dramatic impact on this case, resulting in a current stipulated value of approximately $810 million for the surviving collateral securing the Term Loan.  The parties have now reached the limits of what they can accomplish based on the principles in the Opinion and seek additional and new guidance to achieve an overall resolution of the case.  In order for the next phase to be successful in ending this case, it is important for the Court to provide guidance with respect to assets that would impact both parties' views of the legal and factual issues that are still unresolved.  Rather than join in this effort to expand the scope of the Court's guidance and thereby maximize the likelihood of a total resolution, defendants seek to revisit arguments and judicial findings about Warren Transmission and Lansing Delta Township.  Such an exercise will be costly and will offer little benefit to resolution of this case.



Accordingly, we respectfully request that the Court direct the parties to prepare for trial on the four representative assets at the Arlington Plant that have been proposed by plaintiff.[3]

Respectfully,

/s/Eric B. Fisher
Eric B. Fisher

cc:    All counsel of record (by ECF)

---

[3] As set out above, if defendants contend that the Arlington Plant assets would not provide them with the guidance that they require to resolve this matter should the Court rule in plaintiff's favor with respect to those assets, plaintiff has no objection to expanding the trial to address all 8 real property assets and allow each side to select 4.  The virtue of this solution is that all parties will have the opportunity to make the record they wish to make, and the likelihood of resolving the dispute as a whole is thereby maximized.  Whether the trial covers 4 assets or 8 assets, plaintiff expects that it could be conducted within a single week.