John W. Spiegel (admitted *pro hac vice*)
Matthew A. Macdonald (admitted *pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100

*Attorneys for* Term Loan Lenders

*[additional counsel listed on signature page]*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case |
| MOTORS LIQUIDATION COMPANY, *et al.*, | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |
| | |
| MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST, by and through Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee, | Adversary Proceeding Case No. 09-00504 (MG) |
| Plaintiff, | |
| vs. | |
| JPMORGAN CHASE BANK, N.A., *et al.*, | |
| Defendants. | |

## RESPONSE OF THE TERM LOAN LENDERS TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE TERM LOAN LENDERS' EFFECTIVENESS DEFENSE

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................5

I.     FACTUAL BACKGROUND ..........................................................................5

II.    PROCEDURAL HISTORY.............................................................................9

ARGUMENT ......................................................................................................10

I.     THE LEGAL TEST FOR EFFECTIVENESS ...............................................11

    A.     Under the Second Circuit's Controlling Agency Test, Mayer Brown's
       Knowledge Is Determinative of Effectiveness ....................................11

    B.     The Delaware Supreme Court's Decision Does Not Modify the Legal Test ........13

II.    THE SECOND CIRCUIT DID NOT DECIDE THIS QUESTION ..................15

III.   THERE IS A GENUINE DISPUTE OF MATERIAL FACT OVER MAYER
    BROWN'S AUTHORITY TO FILE THE TERMINATION STATEMENT..................18

    A.     The Legal Standard for Summary Judgment ........................................19

    B.     Mayer Brown Did Not Believe or Could Not Reasonably Have Believed
       that the Main Term Loan UCC-1 Was Related to the Synthetic Lease ................20

IV.    THE ARGUMENT THAT THE TERM LOAN LENDERS ARE BOUND BY
    JPMORGAN'S ACTS LACKS MERIT.........................................................25

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ..........................................................................12

*Amnesty Am. v. Town of West Hartford*,
    361 F.3d 113 (2d Cir. 2004)...............................................................................19

*Armenian Assembly of Am., Inc. v. Cafesjian*,
    772 F. Supp. 2d 20 (D.D.C. 2011) .....................................................................23

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    141 F. Supp. 2d 320 (E.D.N.Y. 2001) ...........................................................20, 24

*Carino v. O'Malley*,
    No. 05 Civ. 5814, 2007 WL 951953 (D.N.J. Mar. 28, 2007) .................................23

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004)..........................................................................................15

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009)..............................................................................23

*Demarco v. Edens*,
    390 F.2d 836 (2d Cir. 1968)...........................................................11, 12, 15, 24

*Diamond v. J.T. Tai & Co.*,
    No. 96 Civ. 8389, 1998 WL 55350 (S.D.N.Y. Feb. 10, 1998) ...............................19

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..........................................................................................24

*Hensley ex rel. N.C. v. Price*,
    876 F.3d 573 (4th Cir. 2017) .............................................................................16

*Hunt Const. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.*,
    607 F.3d 10 (2d Cir. 2010).................................................................................16

*Khan v. Midwestern Univ.*,
    879 F.3d 838 (7th Cir. 2018) .............................................................................16

*Khulumani v. Barclay Nat'l Bank Ltd.*,
    504 F.3d 254 (2d Cir. 2007), *aff'd* 553 U.S. 1028 (2008) .....................................16

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Lennon v. Miller*,
 66 F.3d 416 (2d Cir. 1995).................................................................19, 25

*Lilly v. Guardian Mortg. Investors*,
 No. 75 Civ. 3230, 1978 WL 1060 (S.D.N.Y. Feb. 21, 1978) ....................24

*In re Motors Liquidation Co.*,
 486 B.R. 596 (Bankr. S.D.N.Y. 2013) .......................................................9

*New Hampshire v. Maine*,
 532 U.S. 742 (2001).................................................................................15

*Oakland Police & Fire Retirement System v. Mayer Brown, LLP*,
 861 F.3d 644 (7th Cir. 2017) ................................................................3, 4

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan
 Chase Bank, N.A.*,
 755 F.3d 78 (2d Cir. 2014)............................................................. 2, passim

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan
 Chase Bank, N.A.*,
 777 F.3d 100 (2d Cir. 2015)........................................................... 1, passim

*Palmieri v. Celebrity Cruise Lines, Inc.*,
 No. 98 Civ. 2037, 1999 WL 494119 (S.D.N.Y. July 13, 1999) ...............19

*Patrick v. LeFevre*,
 745 F.2d 153 (2d Cir. 1984).....................................................................19

*Petaluma FX Partners, LLC v. Comm'r of Internal Revenue*,
 792 F.3d 72 (D.C. Cir. 2015) ...................................................................16

*Peterson v. City of Plymouth*,
 60 F.3d 469 (8th Cir. 1995) .....................................................................16

*Shkreli v. JPMorgan Chase Bank, N.A.*,
 No. 13 Civ. 5647, 2015 WL 1408840 (S.D.N.Y. Mar. 27, 2015) ...........20

*Smart Mktg. Grp., Inc. v. Publ'ns Int'l, Ltd.*,
 No. 04 Civ. 146, 2014 WL 625321 (N.D. Ill. Feb. 18, 2014)..................24

*Stephenson v. Citco Grp. Ltd.*,
 700 F. Supp. 2d 599 (S.D.N.Y. 2010).......................................................24

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Webster v. Fall,*
266 U.S. 507 (1925) ................................................................................................16

**STATE CASES**

*Argentina v. Otsego Mut. Fire Ins. Co.,*
86 N.Y.2d 748 (1995) .............................................................................................19

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan
Case Bank, N.A.,*
103 A.3d 1010 (Del. 2014) .................................................................4, 10, 13, 14

*People v. Fitzgerald,*
45 N.Y.2d 574 (1978) .............................................................................................13

*Reeves v. Safeway Stores, Inc.,*
121 Cal. App. 4th 95 (2004) ..................................................................................23

**STATE STATUTES**

Del. Code Title 6, § 1-103 ...........................................................................................14

Del. Code Title 6, § 9-509 ......................................................................................4, 11

Del. Code Title 6, § 9-510 ...........................................................................................11

**FEDERAL RULES**

Fed. R. Bankr. P. 7056 .................................................................................................19

Fed. R. Civ. P. 56(c) ....................................................................................................19

**TREATISES**

Restatement (Third) of Agency § 1.03 (2006) .......................................................2, 12

Restatement (Third) of Agency § 2.02 (2006) ...................................................2, 12, 13

Restatement (Third) of Agency § 3.01 (2006) .............................................................11

**OTHER**

Model Penal Code § 2.02(2)(d) ...................................................................................13

The Term Loan Lenders[1] respectfully submit the following memorandum of law in

opposition to the Motion for Partial Summary Judgment (ECF No. 1086, "Mot.") filed by

Plaintiff Motors Liquidation Company Avoidance Action Trust ("Plaintiff").

## **INTRODUCTION**

Plaintiff's motion for summary judgment should be denied.  This Court has held that the

Term Loan Lenders are entitled, as a matter of due process, to raise any meritorious legal or

factual defense to the effectiveness of the Termination Statement that was not decided by the

Second Circuit.[2]  That is what the Term Loan Lenders have done:  They have identified disputed

issues of fact that (1) were not litigated before the Second Circuit, let alone resolved by the

Second Circuit's opinion; and (2) are outcome-determinative under the controlling legal test for

effectiveness that the Second Circuit expressly adopted in Phase I.

The disputed issues of material fact concern the extent to which Mayer Brown—Old

GM's counsel on the Synthetic Lease—was aware that the Termination Statement actually

pertained to an unrelated loan.  There is compelling evidence—from contemporaneous

documents, direct witness admissions, expert testimony, and other sources—that Mayer Brown

noticed that there was a problem with the Termination Statement but went ahead and filed it

anyway.  While Plaintiff urges a different conclusion —relying on self-serving testimony from

those at Mayer Brown—the evidence supports a reasonable inference that Mayer Brown did not

believe or could not reasonably have believed that the Termination Statement related to the

Synthetic Lease, and therefore should have known JPMorgan's instructions were in error.

---

[1] This brief is submitted by the Term Loan Lenders identified in Appendix A to ECF No. 753.
All capitalized terms not defined herein have the meaning set forth in Plaintiff's Motion.

[2] *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,
N.A.* ("*Motors II*"), 777 F.3d 100, 102 (2d Cir. 2015).

1

Under the controlling legal test adopted by the Second Circuit, this evidence creates a triable issue of fact on the effectiveness of the Termination Statement. Effectiveness turns on whether Mayer Brown was "authorized" to file the Termination Statement. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 755 F.3d 78, 83 (2d Cir. 2014) ("*Motors I*"). The Second Circuit held that the evaluation of Mayer Brown's authority requires "the application of traditional principles of agency law," *id.* at 84, and specifically the test for actual authority set forth in the Third Restatement of Agency, *Motors II*, 777 F.3d at 104. Under the Restatement, even when the principal's (here, JPMorgan's) literal instructions appear to authorize an act, lack of authority may be shown with evidence that the agent (here, Mayer Brown) either "did not believe or could not reasonably have believed" that the apparently authorized act was consistent with the principal's goals and objectives. Restatement (Third) of Agency § 1.03 (2006). In other words, an agent who knows or should know that the principal's instructions are in error has no authority to carry them out. *Id.* § 2.02. The test focuses on Mayer Brown's state of mind—contrary to Plaintiff's argument, it is *not* limited to an examination of JPMorgan's words and conduct. Because there is a genuine dispute of fact about Mayer Brown's beliefs about the Termination Statement, Plaintiff is not entitled to summary judgment.

Plaintiff's attempts to avoid this conclusion do not withstand scrutiny. *First*, Plaintiff erroneously contends that the Term Loan Lenders' argument "directly contradicts what the Second Circuit has determined" already, but Plaintiff does not and cannot identify any such contradiction. The Second Circuit did not consider—and was not asked to consider—the evidence that Mayer Brown knew or should have known that it was terminating the wrong UCC-1. Rather, despite what the evidence showed, JPMorgan and Plaintiff effectively stipulated in

2

Phase I that Mayer Brown had not noticed that anything was amiss about the Termination

Statement.  The Second Circuit therefore had no occasion to apply the Restatement rule that an

agent cannot carry out instructions it knows (or should know) are in error, and thus did not

"conclude" anything about the evidence showing Mayer Brown noticed the problem.

*Second*, touting self-serving and conclusory denials by Mayer Brown witnesses, Plaintiff

claims that there are "no material facts in dispute" concerning Mayer Brown's beliefs.  But the

statements Plaintiff cites are contradicted by these witnesses' other testimony, by

contemporaneous documents, and by other circumstantial evidence, all of which raise a

reasonable inference that Mayer Brown noticed the problem and chose to ignore it.  Moreover,

even if Mayer Brown *subjectively* believed that the Main Term Loan UCC-1 was related to the

Synthetic Lease, Plaintiff has offered no evidence that this belief was *objectively* reasonable

under the circumstances, no explanation for Mayer Brown's decision, and no expert testimony

defending Mayer Brown's choice.  Resolving the credibility of Mayer Brown's testimony, and

the reasonableness of its claimed beliefs, are factual issues that require a trial.

*Finally*, although Plaintiff does not cite the decision, the Term Loan Lenders recognize

that the Court has raised a question about the relevance of the Seventh Circuit's opinion in

*Oakland Police & Fire Retirement System v. Mayer Brown, LLP*, 861 F.3d 644 (7th Cir. 2017).[3]

The Term Loan Lenders respectfully submit that the Seventh Circuit's opinion has no bearing on

their defense to effectiveness.  The Seventh Circuit addressed the limited question whether

certain Term Loan Lenders could pursue tort claims (malpractice and negligence) against Mayer

Brown under Illinois law.  The court held that no such claims were possible because Mayer

---

[3] *Oakland Police & Fire* was brought as a putative class action by two Term Loan Lenders out of more than 600.  None of the Term Loan Lenders represented by the undersigned counsel were part of that action.

Brown represented Old GM (not the Term Loan Lenders or JPMorgan), and because there was

no applicable exception to the rule that an attorney owes no duty to non-clients. *Id*. at 651–55.

But that question is distinct from the question whether, under the Delaware UCC, Mayer

Brown was "authorized" to file the Termination Statement. The Second Circuit was aware

during Phase I that Mayer Brown represented GM, not the Term Loan Lenders or JPMorgan.

*See, e.g.*, *Motors I*, 755 F.3d at 80 (referring to Mayer Brown as GM's counsel, and to Simpson

Thacher as JPMorgan's counsel). The UCC permits a person other than the secured party of

record, including the debtor, to file a termination statement "only if (1) the secured party of

record authorizes the filing." Del. Code tit. 6, § 9-509(d)(1). The Second Circuit held that

answering the question of what it means to "authorize" a filing involves the application of

"traditional principles of agency law," *Motors I*, 755 F.3d at 84, viewing JPMorgan as the

"principal" and Mayer Brown as the "agent" in the test, even though they sat on opposite sides of

the table in the transaction. *Motors II*, 777 F.3d at 105; *see also Official Comm. of Unsecured*

*Creditors of Motors Liquidation Co. v. JPMorgan Case Bank, N.A.*, 103 A.3d 1010, 1014 (Del.

2014) ("[T]he Second Circuit has said it will consider … whether Mayer Brown had authority as

JPMorgan's agent to file the termination statement …."). In other words, though Mayer Brown

was not JPMorgan's lawyer, under the controlling test of authorization, Mayer Brown's conduct

must be judged by the law of agency, viewing Mayer Brown as if it were JPMorgan's agent.

Whether Mayer Brown had authority under that test, and whether it can be held liable for

exceeding its authority are different questions. There are numerous situations where an agent

(such as a filing service or a courier) has limited liability for unauthorized acts, but insulation

against liability does not change whether an act was authorized. There is thus no conflict

between the Second Circuit's decision and the Seventh Circuit's (and even if there were a

4

conflict, the Second Circuit's decision controls).

It is similarly irrelevant that the Seventh Circuit was told that Mayer Brown noticed the error. The Seventh Circuit had no occasion to pass on the relevance of that fact under the Second Circuit's test for authorization, or assess the inferences that can be drawn from the evidence. Under the Second Circuit's decision, the Termination Statement is ineffective.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.   FACTUAL BACKGROUND

Because the Court is familiar with the factual background of this case by now, we discuss only those facts that are most relevant for the disposition of Plaintiff's motion.

***The Two Distinct Loans.***  The Synthetic Lease and the Term Loan were separate and distinct transactions. The Synthetic Lease was originated in 2001, and provided Old GM with $325 million to finance the acquisition and/or improvement of twelve parcels of real estate, consisting primarily of parking garages and office buildings. (CSMF at ¶ 59.)[4] By the time Old GM repaid the Synthetic Lease in October 2008, only five properties (all in Michigan) were still part of the financing. (CSMF ¶ 61.)

By contrast, the Term Loan was originated in 2006, and provided Old GM with $1.5 billion in financing for operating expenses. (CSMF ¶¶ 65, 68.) It was not secured by real property, but by liens on machinery, equipment, and fixtures at forty-two manufacturing facilities spread across the United States. (CSMF ¶ 65.) The liens were perfected by (among other filings) a single, blanket financing statement in Delaware—file number 6416808 4 (the "Main Term Loan UCC-1"). (CSMF ¶ 69.)

---

[4] All citations to "CSMF" are to the Term Loan Lenders' Counterstatement of Material Facts, filed herewith, which contains citations to evidence in the record.

***The Repayment of the Synthetic Lease.***  In October 2008, Old GM opted to repay the remaining amounts outstanding on the Synthetic Lease.  (CSMF ¶ 73.)  As it had been since the inception of the Synthetic Lease, Old GM was represented in the repayment transaction by Mayer Brown.  (CSMF ¶ 74.)  JPMorgan was represented by Simpson Thacher.  (CSMF ¶ 75.)

Mayer Brown prepared the documentation necessary to unwind the transaction.  (CSMF ¶ 76.)  Its team consisted of a partner (Robert Gordon), an associate (Ryan Green), and two paralegals (Stewart Gonshorek and Michael Perlowski).  (CSMF ¶ 77.)  Gordon assigned responsibility for preparing the documentation to Green.  (CSMF ¶ 78.)

Green understood that JPMorgan (and his client, Old GM) intended to terminate *only* the financing statements filed in connection with the Synthetic Lease, not any other loan.  (CSMF ¶ 79.)  But Green did not have a list of financing statements associated with that transaction.  (CSMF ¶ 80.)  He therefore asked Perlowski to run what he described as "full UCC searches" in Michigan and Delaware for filings in favor of JPMorgan as "Agent" against Old GM.  (CSMF ¶ 81.)  Perlowski ultimately sent Green and Gonshorek an email describing four UCC-1 financing statements in Delaware: three filed in connection with the Synthetic Lease, and the Main Term Loan UCC-1.  (CSMF ¶ 83.)  Perlowski described the three Synthetic Lease financing statements as "blanket-type financing statement[s] as to *real property* and related collateral" at specific properties.  (CSMF ¶ 84 (emphasis added).)  By contrast, he described the Main Term Loan UCC-1 as a "financing statement as to *equipment, fixtures* and related collateral located at certain U.S. manufacturing facilities … file date November 30, 2006."  (CSMF ¶ 85 (emphasis added).)

Green and Gonshorek prepared UCC-3 termination statements for all four of these UCC-1 financing statements.  They listed them in the closing checklist, sent drafts of them to Simpson Thacher (who forwarded them to JPMorgan), and listed them in an escrow letter.  (CSMF ¶¶ 36,

6

86, 87.)  Neither JPMorgan nor Simpson Thacher noticed the error.  (CSMF ¶ 88.)

But Green and Gonshorek did.  At some point before filing the Termination Statement,

Gonshorek reviewed the Main Term Loan UCC-1 and realized that the list of properties on the

financing statement did not line up with the list of properties involved on the Synthetic Lease

checklist.  (CSMF ¶¶ 95-97.)  Gonshorek promptly informed Green of this "concern," raising a

"question about the properties identified," and showed Green a copy of the schedule:

**Schedule 1**
**to Annex 1 to UCC-1 Financing Statement**

| Num | Facility | City | State |
|---|---|---|---|
| 1 | GM ASSEMBLY ARLINGTON | ARLINGTON | TX |
| 2 | GM ASSEMBLY BOWLING GREEN | BOWLING GREEN | KY |
| 3 | GM ASSEMBLY DETROIT HAMTRAMCK | DETROIT | MI |
| 4 | GM ASSEMBLY FAIRFAX | KANSAS CITY | KS |
| 5 | GM ASSEMBLY FLINT | FLINT | MI |
| 6 | GM ASSEMBLY FORT WAYNE | FORT WAYNE | IN |
| 7 | GM ASSEMBLY JANESVILLE | JANESVILLE | WI |
| 8 | GM ASSEMBLY LANSING DELTA TOWNSHIP | LANSING | MI |
| 9 | GM ASSEMBLY LANSING GRAND RIVER | LANSING | MI |
| 10 | GM ASSEMBLY LORDSTOWN | LORDSTOWN | OH |
| 11 | GM ASSEMBLY MORAINE | DAYTON | OH |
| 12 | GM ASSEMBLY ORION | LAKE ORION | MI |
| 13 | GM ASSEMBLY PONTIAC EAST | PONTIAC | MI |
| 14 | GM ASSEMBLY SATURN WILMINGTON | WILMINGTON | DE |
| 15 | GM ASSEMBLY SHREVEPORT | SHREVEPORT | LA |
| 16 | GM ASSEMBLY WENTZVILLE | WENTZVILLE | MO |
| 17 | GM MFD AMT (SAMCO) | NEW HUDSON | MI |
| 18 | GM MFD FLINT | FLINT | MI |
| 19 | GM MFD FLINT TOOL & DIE | FLINT | MI |
| 20 | GM MFD GRAND BLANC | GRAND BLANC | MI |
| 21 | GM MFD GRAND RAPIDS | WYOMING | MI |
| 22 | GM MFD INDIANAPOLIS | INDIANAPOLIS | IN |
| 23 | GM MFD LANSING REGIONAL STAMPING | LANSING | MI |
| 24 | GM MFD LORDSTOWN | LORDSTOWN | OH |
| 25 | GM MFD MANSFIELD | MANSFIELD | OH |
| 26 | GM MFD MARION | MARION | IN |
| 27 | GM MFD PARMA | PARMA | OH |
| 28 | GM MFD PONTIAC | PONTIAC | MI |
| 29 | GM MFD SHREVEPORT | SHREVEPORT | LA |
| 30 | GM POWERTRAIN ALLISON BALTIMORE | WHITE MARSH | MD |
| 31 | GM POWERTRAIN BAY CITY | BAY CITY | MI |
| 32 | GM POWERTRAIN BEDFORD | BEDFORD | IN |
| 33 | GM POWERTRAIN DEFIANCE | DEFIANCE | OH |
| 34 | GM POWERTRAIN FLINT ENGINE SOUTH | FLINT | MI |
| 35 | GM POWERTRAIN LIVONIA | LIVONIA | MI |
| 36 | GM POWERTRAIN MASSENA | MASSENA | NY |
| 37 | GM POWERTRAIN PARMA | PARMA | OH |
| 38 | GM POWERTRAIN ROMULUS ENGINE | ROMULUS | MI |
| 39 | GM POWERTRAIN TOLEDO | TOLEDO | OH |
| 40 | GM POWERTRAIN TONAWANDA | BUFFALO | NY |
| 41 | GM POWERTRAIN WARREN TRANSMISSION | WARREN | MI |
| 42 | GM POWERTRAIN WILLOW RUN | YPSILANTI | MI |

(*Id.*)  Green admitted that the "cities and states listed [were] broader" than the list of cities and

states on the closing checklist for the Synthetic Lease.  (CSMF ¶ 97.)  As explained in greater

detail below, given his knowledge of the Synthetic Lease, Green cannot reasonably have

believed that the Main Term Loan UCC-1 related to the Synthetic Lease after seeing Schedule 1.

In addition, the Main Term Loan UCC-1 itself states *on its face* that it was filed in connection with a 2006 "term loan agreement," *not* a 2001 synthetic lease arrangement. (CSMF ¶ 100.) There is evidence that someone at Mayer Brown actually noticed this language because that language is circled by hand on a copy of the Main Term Loan UCC-1 printed from Gonshorek's computer (*id.*):



"Collateral Agreement": the collateral agreement, dated as of November 29, 2006, among the Debtor, Saturn Corporation and JPMorgan Chase Bank, N.A., as administrative agent (as the same may be amended, supplemented or otherwise modified from time to time).

"Credit Agreement": the term loan agreement, dated as of November 29, 2006, among the Debtor, Saturn Corporation, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (as the same may be amended, supplemented or otherwise modified from time to time).

"Documents": all "Documents" as such term is defined in Section 9-102 of the UCC as in effect on November 29, 2006.

Nevertheless, and for reasons that remain unclear, Mayer Brown filed the Termination Statement. (CSMF ¶ 116.) Green has never provided a credible explanation for doing so. When asked at his 2010 deposition what conclusion he drew about Gonshorek's concerns, Green first responded cryptically that he "didn't conclude anything." (CSMF ¶ 125.) Asked if he had shared the concern with anyone at Mayer Brown or JPMorgan, Green said he had not. (CSMF ¶ 106.) None of the lawyers at the deposition—representing JPMorgan and Plaintiff, but not the Term Loan Lenders—pressed Green further on this potentially game-changing admission. (CSMF ¶ 128.) Instead, they ended the inquiry with a leading question about whether, at the time of the filing, Green thought the documents related to the Synthetic Lease. Unsurprisingly, Green gave the answer they asked for. (CSMF ¶ 126.)

Though Gonshorek was deposed the next day, he was not asked *any* questions about his "concern," or about the marks on Annex I. (CSMF ¶ 130.)

8

In 2017, the Term Loan Lenders attempted to explore these topics by deposing Green, Gonshorek, Perlowski, and Gordon. All four witnesses, however, claimed near complete amnesia about the events associated with the repayment of the Synthetic Lease. (CSMF ¶¶ 133, 137–139.) Though this case was widely reported in the legal (and mainstream) press, and though the matter must have been a significant one for him, Green stated that he did not "remember anything about it," and in fact said he did not even remember that he worked on the transaction. (CSMF ¶¶ 133, 136.) As a result, the Term Loan Lenders could not cross-examine Green about his claimed beliefs, ask Gonshorek about the conversation, or follow up about the handwritten circle on the printed Annex I.

## II.   **PROCEDURAL HISTORY**

Old GM filed for bankruptcy protection on June 1, 2009. On July 31, 2009, Plaintiff's predecessor filed the instant adversary proceeding. (ECF No. 1.) Plaintiff opted not to serve the Term Loan Lenders with their Complaint for nearly six years. (*See* ECF Nos. 79 & 90.) Plaintiff instead chose to litigate "Phase I" exclusively against JPMorgan. (*Id.*)

***Proceedings in the Bankruptcy Court.*** After a brief discovery period, Plaintiff and JPMorgan filed cross-motions for summary judgment concerning the effectiveness of the Termination Statement. (*See* ECF Nos. 26 & 29.) While disputing effectiveness, JPMorgan and Plaintiff both agreed that, as a factual matter, Mayer Brown was ignorant of the error. (*See, e.g.*, Plaintiff's Mem. in Opp. to Defendant's Mot. Summary Judgment at 13, ECF No. 45 ("While it may be true that Old GM's counsel – like JPMorgan and Simpson Thacher – failed to recognize at the time of filing that the Term Loan Termination Statement related to the Term Loan . . . ."); *see also* CSMF ¶ 140); *In re Motors Liquidation Co.*, 486 B.R. 596, 606 (Bankr. S.D.N.Y. 2013).

***Plaintiff's Appeal.*** Plaintiff appealed. The appeal was ultimately decided through a series of decisions—two by the Second Circuit and one by the Delaware Supreme Court.

Throughout these appeals, both Plaintiff and JPMorgan consistently asserted that Mayer Brown remained unaware of the mistake until after the bankruptcy.  For example, Plaintiff argued to the Second Circuit that "Mayer Brown (and all other parties involved) believed, incorrectly, that the 2006 Financing Statement related to the 2001 synthetic lease financing."  Plaintiff's Opening Br. at 19, ECF No. 32, No. 13-2187 (2d Cir. Sept. 17, 2013).  The parties included some version of this statement in nearly every brief filed during the lengthy appeal process. (CSMF ¶ 141.)  Neither JPMorgan nor Plaintiff ever argued that Mayer Brown noticed the problem, or otherwise challenge the reasonableness of Mayer Brown's claimed belief that the Main Term Loan UCC-1 related to the Synthetic Lease.

Not surprisingly, both the Second Circuit and the Delaware Supreme Court took it as a given that Mayer Brown had not noticed any error in the Termination Statement.  In its initial decision certifying a question to the Delaware Supreme Court, the Second Circuit stated that Green had acted "[n]ot noticing that one of the UCC–1s was unrelated to the Synthetic Lease …." *Motors I*, 755 F.3d at 80.  Similarly, the Delaware Supreme Court assumed that "no one at General Motors, Mayer Brown, or [Simpson Thacher] noticed" the error in the Termination Statement. *Official Comm.*, 103 A.3d at 1012.  The Second Circuit repeated the same assumption in its third and controlling decision.  *See Motors II*, 777 F.3d at 102.

***Proceedings on Remand.***  On remand, the Court ruled that the non-JPMorgan Term Loan Lenders, though bound by the Second Circuit's decision as precedent, have a due process right to assert "legal and factual defenses" that were "untested" in Phase I that "may still lead to a different result, at least as to them."  (Mem. Op. at 36, 37, ECF No. 643.)  This is such a defense.

## ARGUMENT

Summary judgment is inappropriate because whether Mayer Brown knew or reasonably should have known that JPMorgan's instructions to file the Termination Statement were in error

is a genuine issue of material fact that is in dispute. The resolution of this factual dispute is

outcome-determinative under the Second Circuit's test for authorization. Nevertheless, this

factual question was not presented to or decided by the Second Circuit in *Motors II*.

Accordingly, it remains to be decided by this Court in the first instance at trial.

## I.    THE LEGAL TEST FOR EFFECTIVENESS

In *Motors I*, the Second Circuit held that the effectiveness of the Termination Statement

turns on whether JPMorgan "authorized" Mayer Brown to file that statement. *Motors I*, 755 F.3d

at 83-84 (citing Del. Code tit. 6, §§ 9-509, 9-510). Plaintiff now argues that the authorization

inquiry should focus exclusively on JPMorgan's actions (and inactions). (Mot. at 15–19.) But

that is not the test that the Second Circuit adopted, or the test Plaintiff advocated for in Phase I.

The controlling legal test for authorization set forth in *Motors I* instead requires an examination

of Mayer Brown's understanding of JPMorgan's acts in light of Mayer Brown's understanding

of the facts and JPMorgan's goals and objectives; if Mayer Brown knew or should have known

that JPMorgan was making a mistake, the Termination Statement is ineffective.

### A.    Under the Second Circuit's Controlling Agency Test, Mayer Brown's Knowledge Is Determinative of Effectiveness

In Phase I, the Second Circuit established the legal test for authorization. Whether Mayer

Brown had authority to file the Termination Statement "requires an application of traditional

principles of agency law to assess the scope of Mayer Brown's authori[ty]," *Motors I*, 755 F.3d

at 84, and specifically the Restatement test for actual authority, *Motors II*, 777 F.3d at 105.

Under that test, actual authority "'is created by a principal's manifestation to an agent

that, ***as reasonably understood by the agent***, expresses the principal's assent that the agent take

action on the principal's behalf.'" *Id.* (quoting Restatement (Third) of Agency § 3.01 (2006) and

citing *Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir. 1968)) (emphasis added). As this language

should make clear, under the Restatement test, an agent's lack of authority may be "established by showing either that the agent did not believe or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question." Restatement (Third) of Agency § 2.02 cmt. e (2006); *accord 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250 (10th Cir. 2013) ("'This standard requires that the agent's belief be reasonable, an objective standard, *and that the agent actually hold the belief, a subjective standard.*'").

The agent's reasonable understanding of the principal's manifestations is "interpreted in light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.'" (Plaintiff's Opening Br. at 36–37, ECF No. 32, No. 13-2187 (2d Cir. Sept. 17, 2013) (quoting *Demarco*, 390 F.2d at 844)); *see also* Restatement (Third) of Agency § 2.02 cmt. f (2006). For this reason, "[i]f a literal interpretation of a principal's communication to the agent would authorize an act inconsistent with the principal's interests or objectives known to the agent, it is open to question whether the agent's literal interpretation is reasonable." Restatement (Third) of Agency § 2.02 cmt. e (2006) (emphasis added).

The Restatement illustrates this principle with a hypothetical situation in which the principal instructs its agent to "[s]ell my horse for me." If the agent knows from other facts or circumstances that the principal does not actually intend to sell his horse, but instead desires only to sell his cow, the agent "has actual authority to sell only the cow." *Id.* § 1.03 illus. 3.[5]

---

[5] Plaintiff incorrectly suggests that the phrase "nothing more is needed" in *Motors II* suggests that Mayer Brown's state of mind is irrelevant. (Mot. at 20–21.) In the very same paragraph, the court expressly endorsed the Restatement test and its focus on Mayer Brown's reasonable understanding. *Motors II*, 777 F.3d at 105. Moreover, at the time, neither party disputed that Mayer Brown reasonably understood that the Main Term Loan UCC-1 related to the Synthetic Lease, and the court was offered no reason to focus on anything other than JPMorgan's acts.

12

In determining whether an agent's beliefs are objectively reasonable, the Restatement incorporates the definition of negligence from the Model Penal Code. *See id.* § 2.02 reporter's note e. Under this standard, an agent's beliefs are unreasonable when he or she "'should be aware of a substantial and unjustifiable risk … of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.'" Model Penal Code § 2.02(2)(d); *see also* Restatement (Third) of Agency § 2.02 reporter's note e (2006); *People v. Fitzgerald*, 45 N.Y.2d 574, 579 (1978). Simple errors are, thus, not enough. But where (as here) the agent is on notice of a substantial and unjustifiable risk of error and simply ignores that risk, the agent lacks authority to proceed.

In short, under the test adopted by the Second Circuit, the effectiveness of the Termination Statement turns on whether Mayer Brown knew or reasonably should have known that JPMorgan's instructions were in error. As explained below, there is ample evidence to support a reasonable inference either that Mayer Brown was actually aware of the error or that its failure to actually realize the truth was a result of a gross deviation from the standard of care in the face of an obvious and unjustifiable risk.

### B.    The Delaware Supreme Court's Decision Does Not Modify the Legal Test

Ignoring the legal standard set forth in the Second Circuit's decisions, Plaintiff argues that the Delaware Supreme Court's decision establishes that Mayer Brown's knowledge of the error is irrelevant. (*See* Mot. at 15–16.) This argument fails for two reasons.

*First*, the Delaware Supreme Court stated it was *not* passing on the "issues of agency law that come into play whenever an entity, such as JPMorgan, acts through agents." *Official Comm.*, 103 A.3d at 1013. Contrary to Plaintiff's expansive reading of the language of the opinion, the court said it was answering a "narrow" and "precise" question about what JPMorgan

13

had to authorize—the "act of . . . fil[ing]" the Termination Statement or the termination of the

Main Term Loan UCC-1. *Id.* at 1011, 1014, 1017. Thus, the only question it considered was

whether *JPMorgan's* subjective intentions, standing alone, mattered; it said nothing about the

relevance of *Mayer Brown's* understanding of those intentions as a matter of agency law. *See id.*

at 1012. The Second Circuit's certification order explicitly said it would consider Mayer

Brown's authority through the application of "traditional principles of agency law," *Motors I*,

755 F.3d at 84. The Delaware court did not take issue with that position. *See Official Comm.*,

103 A.3d at 1014 ("[T]he Second Circuit has said it will consider the fact-based question of

whether Mayer Brown had authority as JPMorgan's agent …."). [6]

 *Second*, Plaintiff's proposed interpretation of the Delaware Supreme Court's decision is

contrary to both the Second Circuit's ruling in *Motors II* and Plaintiff's own arguments on

appeal. After receiving the Delaware court's decision, the Second Circuit (i) adopted the

Restatement test for actual authority, which includes the rule that an agent cannot carry out

instructions it knows are contrary to the principal's intentions; (ii) quoted the portion of the

Restatement that focuses on the agent's "reasonabl[e] underst[anding]" of the instructions, thus

foreclosing an argument that the focus should be exclusively on the words of the instructions

themselves; and (iii) cited with approval the *Demarco* decision, which requires that the agent's

reasonable understanding be evaluated in light of "all the circumstances" known to the agent.

---

[6] The Delaware UCC explicitly incorporates existing doctrines concerning the law "relative to . . . principal and agent." Del. Code tit. 6, § 1-103; (*see also* Harris Decl. Ex. A at 21 ("The Drafting Committee understood that, if litigation over the effectiveness of a termination statement should occur, the court resolving the dispute may need to resort to the non-UCC law of agency.")). This reflects a considered decision to incorporate another, well-developed body of law with all of its attendant costs and benefits. (*See id.*) The framers of the UCC concluded that the law of agency provided a fair, reasonable, and administrable test for effectiveness, notwithstanding that such a rule might require investigation in some cases.

*See Motors II*, 777 F.3d at 105; *Demarco*, 390 F.2d at 845.  The Second Circuit's decision is

precedent of the Circuit and forecloses Plaintiff's argument.

Moreover, Plaintiff successfully urged the Second Circuit to adopt this test, and should

not be permitted to argue for a different one now.  Plaintiff repeatedly argued that the term

"authorizes" in the Delaware UCC incorporates the law of agency from the Restatement, that the

Restatement required an analysis of Mayer Brown's reasonable understanding of JPMorgan's

instructions (including both Mayer Brown's subjective beliefs and the objective reasonableness

of those beliefs), and that Mayer Brown's reasonable understanding should be judged in light of

*all* the facts of which Mayer Brown was aware.  (*See* CSMF ¶ 142.)  Having prevailed on its

preferred interpretation in Phase I, Plaintiff is estopped from "relying on a contradictory

argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

## II.    <u>THE SECOND CIRCUIT DID NOT DECIDE THIS QUESTION</u>

Plaintiff's principal argument is that the Second Circuit already "concluded" that Mayer

Brown reasonably believed that the Main Term Loan UCC-1 related to the Synthetic Lease,

and—because the Mayer Brown witnesses claimed total amnesia—there is no "new" evidence to

contradict that conclusion.  (Mot. at 2, 15, 20–22.)  Plaintiff is wrong on both counts.

*First*, the Term Loan Lenders do not need any "new" evidence because the Second

Circuit has not decided the factual question presented by this motion.  As this Court's ruling

makes clear, the Term Loan Lenders are bound by the Second Circuit's ruling only as precedent

"decided in completely unrelated litigation between different parties."  (*See* Mem. Op. at 35–37,

ECF No. 643.)  It is well settled that a case is not "precedent" for issues that are not disputed or

that are not presented for decision:  "'Questions which merely lurk in the record, neither brought

to the attention of the court nor ruled upon, are not to be considered as having been so decided as

to constitute precedents.'"  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004)

15

(quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *accord Hunt Const. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C.*, 607 F.3d 10, 18 (2d Cir. 2010); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 321 (2d Cir. 2007), *aff'd* 553 U.S. 1028 (2008). It is of no moment that Green's testimony was in the appellate record because "[a]ppellate courts 'are not like pigs, hunting for truffles buried in briefs,'" and are not obligated to "'wade through the record and make arguments for either party.'" *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (citations omitted); *see also Khan v. Midwestern Univ.*, 879 F.3d 838, 846 & n.8 (7th Cir. 2018) ("[I]t is not the role of an appellate court to dig through the record to formulate a theory to determine if there is any set of facts under which the plaintiff could survive a motion for summary judgment.").[7] Here, both Plaintiff and JPMorgan affirmatively argued that Mayer Brown believed that the Main Term Loan UCC-1 was related to the Synthetic Lease; neither party ever apprised the Second Circuit that there was evidence Mayer Brown noticed there was a problem; and neither party questioned whether Mayer Brown's beliefs were reasonable in light of Gonshorek and Green's discussion. The Second Circuit had no reason or occasion to wade through the record in order to address an argument that neither party made—it merely assumed, but did not "find," that Mayer Brown had not noticed the issue.

This assumption, however, was determinative of the Second Circuit's ultimate decision. On appeal, JPMorgan attempted to invoke some of the same legal principles we cite here, asserting that Mayer Brown lacked authority because filing of the Termination Statement was contrary to JPMorgan's goals and objectives. (*E.g.*, JPMorgan's Opposition Br. at 37–38, ECF

---

[7] *See also Petaluma FX Partners, LLC v. Comm'r of Internal Revenue*, 792 F.3d 72, 79 (D.C. Cir. 2015) ("an issue 'assumed' by an appellate court in an initial appeal does not become the law of the case"); *Peterson v. City of Plymouth*, 60 F.3d 469, 473 (8th Cir. 1995) (law of case doctrine not applicable where party offered evidence "disputing the version of events upon which" prior holding was based).

No. 58, No. 13-2187 (2d. Cir. Dec. 9, 2013).)  JPMorgan even invoked the horse/cow example in

the Restatement.  (JPMorgan's Letter Br. to 2d Cir. at 1–2, ECF No. 128, No. 13-2187 (Dec. 1,

2014).)  But JPMorgan could not effectively invoke this *legal* principle because JPMorgan had

conceded the necessary *factual* predicate.  Plaintiff rebutted JPMorgan's claim by pointing

squarely at JPMorgan's factual concession:

> The[] principles [of Section 2.02 of the Restatement] do not, however, suggest a
> lack of authority here, because it is undisputed that none of the parties involved,
> including Mayer Brown, had any awareness at the time of the transaction that
> JPMorgan's communications to its agent were authorizing an act inconsistent with
> JPMorgan's interests or objectives *known to the agent*.  Indeed, at the time that
> JPMorgan authorized the filing, [Mayer Brown] was unaware of the consequences
> of the filing. … There is no doubt that at the time of the Synthetic Lease Payoff,
> no one understood or appreciated that JPMorgan had approved the filing of a
> termination statement that would result in the termination of [an unrelated
> financing statement].

(Plaintiff's Reply Br. at 16–17, ECF No. 74, No. 13-2187 (2d Cir. Dec. 23, 2013) (emphasis in

original).)  Plaintiff also emphasized that no one, including JPMorgan, had ever accused Mayer

Brown of misconduct.  (*See, e.g.*, *id.* at 15.)

This Court has already held that the Term Loan Lenders are not bound by JPMorgan's

strategic decisions in Phase I, and for good reason.  JPMorgan had incentives not to press Green,

and not to challenge the reasonableness of Mayer Brown's beliefs.  Doing so was inconsistent

with the theory JPMorgan pursued on summary judgment, which focused on its own intent.  And

successfully doing so would have required JPMorgan to point out just how obvious the error

was, an argument that might have exposed JPMorgan itself to criticism.  Whatever the reason,

the Term Loan Lenders should not be prejudiced by that decision.  Whether Mayer Brown

believed that the Main Term Loan UCC-1 related to the Synthetic Lease (and the reasonableness

of that belief) is the kind of "untested" defense the Court carved out in its 2016 decision.

*Second*, there *is* new evidence.  As discussed in greater detail below, the Term Loan

17

Lenders intend to present two new sources of evidence that were not before the Second Circuit: (i) the testimony of two highly qualified experts in the area of secured lending who will testify that no practitioner in Green's position could reasonably have believed that the Main Term Loan UCC-1 related to the Synthetic Lease, and that Green's conduct reflected an extreme departure from the standard of care (CSMF ¶¶ 114–115); and (ii) the testimony from Mayer Brown witnesses who now claim to have zero recollection about the underlying events (CSMF ¶¶ 133, 137), which will permit a trier of fact to infer they have something to hide.[8]

The Second Circuit's decision simply says nothing about a question that was not presented. The question is thus untested and must now be resolved for the first time.

## III.    THERE IS A GENUINE DISPUTE OF MATERIAL FACT OVER MAYER BROWN'S AUTHORITY TO FILE THE TERMINATION STATEMENT

Under the legal standard set forth by the Second Circuit, the termination statement is legally ineffective if Mayer Brown knew or should have known that JPMorgan was making a mistake by directing Mayer Brown to file it. There is more than sufficient evidence for a reasonable trier of fact to reach that conclusion. Mayer Brown was aware of glaring red flags showing that there was a problem with the filing, but inexplicably filed it anyway without any effort to reconcile the many discrepancies between the Main Term Loan UCC-1 and the Synthetic Lease documentation. Under the Second Circuit's test, Mayer Brown lacked authority to act under such circumstances. Plaintiff is not entitled to summary judgment.

---

[8] To the extent that the Term Loan Lenders need additional new evidence to prevail on this defense, their inability to procure that evidence is the proximate result of the delay in service. The attorneys at Green and Gonshorek's 2010 deposition made a decision not to cross the witnesses about Gonshorek's "concern." (CSMF ¶¶ 126–130.) The practiced lack of memory that Green and Gonshorek demonstrated in 2017 was absent in 2010. If necessary evidence is missing, then Plaintiff's delay in serving the complaint was prejudicial, and the Term Loan Lenders are entitled to dismissal.

A.    **The Legal Standard for Summary Judgment**

Summary judgment is appropriate only if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (made applicable here by Fed. R. Bankr. P. 7056). In reviewing the record, the Court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). The court is not to weigh the evidence, and may not make credibility assessments; instead the court must determine whether a genuine issue exists for trial. *Id.*

Of particular relevance here, the Second Circuit has "consistently held where subjective issues regarding [one's] state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable. The need for a full exposition of facts is profound under such circumstances since determining a man's state of mind is 'an awesome problem,' capable of resolution only by reference to a panoply of subjective factors." *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (citations omitted).

Similarly, the reasonableness of a person's conduct or beliefs generally presents a question of fact, inappropriate for resolution on summary judgment. *See, e.g., Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) ("Disputes over reasonableness are usually fact questions for juries" unless the factual record is not disputed); *Palmieri v. Celebrity Cruise Lines, Inc.*, No. 98 Civ. 2037, 1999 WL 494119, at *3 (S.D.N.Y. July 13, 1999) ("the assessment of reasonableness is generally a question of fact in all but the most extreme situations" in negligence cases (quotation marks omitted)); *Diamond v. J.T. Tai & Co.*, No. 96 Civ. 8389, 1998 WL 55350, at *5 (S.D.N.Y. Feb. 10, 1998) (whether one's "belief is reasonable ordinarily is an issue of fact"); *Argentina v. Otsego Mut. Fire Ins. Co.*, 86 N.Y.2d 748, 750 (1995) (existence of a belief and "whether the belief was reasonable, are ordinarily questions of fact for the fact finder").

19

Finally, Plaintiff cannot carry its burden on summary judgment by pointing to "facts" recited in the Second Circuit's decision. Judicial statements of facts that were assumed but not found are not "admissible evidence," and the court may disregard any statement in Plaintiff's statement of undisputed facts that is not supported by citation to admissible evidence in the record (rather than a judicial decision). *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001); *accord Shkreli v. JPMorgan Chase Bank, N.A.*, No. 13 Civ. 5647, 2015 WL 1408840, at *1 n.1 (S.D.N.Y. Mar. 27, 2015).

**B.    Mayer Brown Did Not Believe or Could Not Reasonably Have Believed that the Main Term Loan UCC-1 Was Related to the Synthetic Lease**

The direct and circumstantial evidence supports a reasonable inference that Mayer Brown either did not subjectively believe, or could not reasonably have believed, that the Main Term Loan UCC-1 was related to the Synthetic Lease.[9] Put simply, Mayer Brown (through Green and Gonshorek) actually noticed major discrepancies that made it obvious that the Main Term Loan UCC-1 concerned an unrelated loan, and that JPMorgan's instructions were therefore in error.

The evidence is as follows. At his deposition, Green admitted that prior to the filing, Gonshorek raised a "concern" that the list of forty-two properties on Schedule 1 to Annex I of the Main Term Loan UCC-1 was "broader" than the list of properties involved in the Synthetic Lease. (CSMF ¶¶ 97, 124.) Gonshorek then showed Green Schedule 1 to the Main Term Loan UCC-1, a schedule that alerted or should have alerted Green that the Main Term Loan UCC-1 had been filed in connection with an unrelated loan. (CSMF ¶¶ 96, 123.) Green and Gonshorek each spent about 50 hours over five weeks working on the Synthetic Lease, and by Green's own

---

[9] It is undisputed that Mayer Brown knew that JPMorgan intended only to terminate UCC-1 financing statements filed in connection with the Synthetic Lease, and that it did not intend to authorize the termination of any other UCC filings. (SUMF ¶ 46, CSMF ¶ 79.)

admission, he was familiar with the relevant Synthetic Lease collateral and agreements (CSMF

¶¶ 90–92).  Green, thus, must have known there was a problem the moment he saw Schedule 1,

given the following discrepancies that were evident on its face:

- The Synthetic Lease involved only twelve properties—not forty-two—and said as much in black and white on both Exhibit A to the key Synthetic Lease agreement and on the front page of Mayer Brown's own internal closing binder (CSMF ¶¶ 59–60, 98);

- At the time of the repayment, the Synthetic Lease involved just *five* properties, all of which were in Michigan (CSMF ¶¶ 61, 98);

- At least forty-one of the forty-two properties on Schedule 1—and most of the associated cities and states, including Texas, Kentucky, Missouri, and New York—are not mentioned anywhere in the Synthetic Lease documentation  (CSMF ¶¶ 59–60, 98);

- At least eleven of the twelve properties that are involved in the Synthetic Lease are not on Schedule 1 (CSMF ¶ 98);

- The properties on Schedule 1 are overwhelmingly manufacturing related facilities, while the Synthetic Lease overwhelmingly involved warehouses and office buildings.  (CSMF ¶¶ 60, 72.)

There is no plausible reason Green could have imagined that this list of forty-two properties had

anything to do with the Synthetic Lease.

There were other strong indications that either did or should have made Green aware of

the error.  Perlowski's email forwarding the underlying UCC filings to Green described the Main

Term Loan UCC-1 a "financing statement as to *equipment, fixtures* and related collateral located

at certain U.S. manufacturing facilities," but described the three Synthetic Lease UCC-1

statements as "blanket-type financing statement[s] as to *real property* and related collateral" at

specific properties."  (CSFM ¶¶ 84–85 (emphasis added).)  Green also knew that there was a risk

that the "full UCC searches" Perlowski ran would return false positives because Perlowski told

him that there were *thousands* of filings against GM in Delaware alone.  (CSMF ¶ 82.)

Moreover, the very first page Annex I to the Main Term Loan UCC-1 (which was

attached to the Schedule and which was sent to Green by email) said that the document was

related to "a term loan agreement dated as of November 29, *2006*," *not* a *2001* synthetic lease

transaction. (CSMF ¶ 71.) A trier of fact could logically conclude that Gonshorek actually saw

this language during his review of the UCC-1s (Schedule 1 is the last page of the Main Term

Loan UCC-1 itself and is part of Annex I), and that Green logically would have looked at this

language when Gonshorek showed him Schedule 1. (CSMF ¶ 99.) The fact that this language is

circled on a printed copy of the Main Term Loan UCC-1 is further evidence that someone at

Mayer Brown *actually* took note of this language. (CSMF ¶ 100.)

The evidence also shows that Green did nothing at all to resolve these discrepancies. He

did not consult with Gordon, the Mayer Brown partner responsible for the transaction. (CSMF

¶¶ 105, 125.) He not alert JPMorgan or Simpson Thacher to the issue. (CSMF ¶¶ 105, 125.)

Indeed, there is no evidence that Green did anything to investigate Gonshorek's concerns. Nor

has Green offered any explanation for how he could possibly have concluded that the forty-two

properties listed on Schedule 1 were involved in the Synthetic Lease. In fact, Green testified in

2010 that he never "concluded anything" about Gonshorek's concerns. (CSMF ¶¶ 125, 127.)[10]

New evidence, developed in 2017, could lead a trier of fact to draw a negative inference

from Green and Gonshorek's lack of memory. Both claimed near total amnesia about the 2008

Synthetic Lease transaction. Green testified that he did "not recall anything about the transaction

during the time of October 2008." (CSMF ¶ 133.) Similarly, Gonshorek responded "no" when

asked if he had "any memory at all of working on a transaction involving GM, JPMorgan, and a

---

[10] Green's subsequent conduct further undermines the notion that Green thought the Main Term
Loan UCC-1 was related to the Synthetic Lease. If Green genuinely believed that his client's
assets were subject to a previously undiscovered lien on forty-two properties across the country
that was not mentioned in the Synthetic Lease documentation, he would have taken additional
steps to investigate that lien. For example, he would have wanted to find the instrument creating
that lien (so it could be terminated), and he would have needed to conduct additional searches for
local UCC filings and mortgages. There is no evidence he did so. (CSMF ¶¶ 105, 125.)

synthetic lease in the fall of 2008" or at any time while at Mayer Brown. (CSMF ¶ 137.) The

Term Loan Lenders have ample cause to question the credibility of their testimony on this point,

particularly given that this event must have been a very significant one in Green's legal career.

(CSMF ¶ 135.) As a result, a trier of fact will be permitted to infer from their studied lack of

memory that, at minimum, Green has no plausible explanation for his conduct.[11]

In addition, the Term Loan Lenders have proffered the testimony of two experts on

secured lending, Sandra Stern and Steven Harris. Both Ms. Stern and Professor Harris have

testified that no reasonable person in Green's position could have concluded that the Main Term

Loan UCC-1 was related to the Synthetic Lease. (CSMF ¶ 104–115.) The inconsistencies

between the Main Term Loan UCC-1 and the Synthetic Lease UCC filings and documents are so

stark that the problem would have been obvious to anyone, particularly someone with Green and

Gonshorek's familiarity with the Synthetic Lease. (*Id.*).

Plaintiff's sole response to this evidence is to point to self-serving and conclusory

testimony by Green and Gonshorek in which they professed that they believed that the Main

Term Loan UCC-1 was part of the Synthetic Lease. (*See, e.g.*, Mot. at 10–12, 21–22.) Green's

self-serving denial is not sufficient to justify granting summary judgment in Plaintiff's favor.

*See In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) ("the self-serving nature of a witness's

statements goes to the statements' weight" which cannot be resolved on summary judgment); *id.*

(wrongdoer "denials" do not "justify the entry of summary judgment because it is well-

---

[11] *See Carino v. O'Malley*, No. 05 Civ. 5814, 2007 WL 951953, at *12 (D.N.J. Mar. 28, 2007)
("A reasonable factfinder could also conclude that [one's] inability to remember simple details
… is a deliberate attempt to downplay the significance of their relationship."); *Armenian
Assembly of Am., Inc. v. Cafesjian*, 772 F. Supp. 2d 20, 51 (D.D.C. 2011); *Reeves v. Safeway
Stores, Inc.*, 121 Cal. App. 4th 95, 118 (2004) ("A fact finder could also draw an adverse
inference from [one's] arguably pointed evasion of the direct question . . . .") (citation omitted).

established that [knowledge and intent] may be established through circumstantial evidence");

*accord Lilly v. Guardian Mortg. Investors*, No. 75 Civ. 3230, 1978 WL 1060, at *2 (S.D.N.Y.

Feb. 21, 1978).  Rather, it is sufficient to raise a triable issue of fact that Green knew or should

have known that Mayer Brown was making a mistake.  *See, e.g.*, *Farmer v. Brennan*, 511 U.S.

825, 842 (1994); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 622 (S.D.N.Y. 2010).[12]

Furthermore, even were the Court to credit Green and Gonshorek's testimony that they

subjectively believed that the Main Term Loan UCC-1 was related to the Synthetic Lease,

Plaintiff is not entitled to summary judgment because Plaintiff has not offered *any* evidence that

this belief was objectively reasonable.[13]  Despite clear awareness of a substantial risk that the

Main Term Loan UCC-1 was related to a different loan, Green and Gonshorek grossly deviated

from the applicable standard of care by simply ignoring that risk and taking no steps to

investigate or resolve their concerns.  (CSMF ¶ 115.)  Green has offered no explanation for his

claimed beliefs, and Plaintiff has attempted to offer none.  (CSMF ¶¶ 105, 125.)  Moreover,

Green's lack of memory will foreclose Plaintiff from ever offering any explanation that is

anything other than sheer speculation because Plaintiff has not offered any expert testimony that

Green's belief was reasonable.  By contrast, two experts will testify at trial that Green's beliefs

---

[12] Plaintiff may argue on reply that Mayer Brown assumed that JPMorgan or Simpson Thacher had checked the UCC filings.  This is pure speculation.  No Mayer Brown witness has testified that they were aware that JPMorgan or Simpson Thacher actually checked their work.  It also does not render Mayer Brown's belief reasonable.  Ms. Stern will testify that industry custom and practice precludes attorneys in the secured lending business from simply assuming that a counter-party has checked his or her work.  (*See* Stern Decl. Ex. A at 12); *see Demarco*, 390 F.2d at 844 (industry custom is relevant to judge an agent's reasonable understanding).

[13] Citation to the Second Circuit's decision is, to state the obvious, not *evidence*, particularly because the Second Circuit never addressed the reasonableness of Mayer Brown's asserted beliefs.  *See Blue Cross*, 141 F. Supp. 2d at 323; *accord Smart Mktg. Grp., Inc. v. Publ'ns Int'l, Ltd.*, No. 04 Civ. 146, 2014 WL 625321, at *4 (N.D. Ill. Feb. 18, 2014) ("The Seventh Circuit's opinion is not evidence that is admissible at trial.").

24

were *un*reasonable.  This evidence (and Plaintiff's failure to offer *any* evidence) is more than

sufficient to create a triable issue of fact.  *See, e.g.*, *Lennon*, 66 F.3d at 421.  A trial is required.

## IV.    THE ARGUMENT THAT THE TERM LOAN LENDERS ARE BOUND BY JPMORGAN'S ACTS LACKS MERIT

Plaintiff's last-ditch argument that the Term Loan Lenders are "bound" by JPMorgan's

actions (Mot. at 15-19) is a non-sequitur.  To the extent that Plaintiff is arguing that the Term

Loan Lenders are bound by JPMorgan's *litigation* decisions, this Court has already addressed

that argument and rejected it.  (*See* Mem. Op. at 35–37, ECF No. 643.)  To the extent Plaintiff is

arguing that the Term Loan Lenders are bound by JPMorgan's acts of authorization, the claim

misses the point.  This brief assumes that the Term Loan Lenders are bound by the acts

JPMorgan took in October 2008, but argues that notwithstanding those acts, Mayer Brown was

not authorized to file the Termination Statement given its state of mind.  And Mayer Brown's

state of mind (or the reasonableness thereof) is a factual determination that cannot be resolved on

summary judgment.

## CONCLUSION

The Second Circuit's test for authorization is straightforward: if Mayer Brown did not

believe or could not reasonably have believed that the Main Term Loan UCC-1 related to the

Synthetic Lease, then it was not authorized to file it, and the Termination Statement is legally

ineffective.  While the Second Circuit assumed that Mayer Brown acted wholly ignorantly, the

Term Loan Lenders are not bound by that assumption.  The evidence is more than sufficient to

support a contrary inference.  A trial is required to judge the credibility of Mayer Brown's

witnesses and the reasonableness of its asserted beliefs.  Plaintiff is not entitled to summary

judgment.

DATED:  October 12, 2018

_/s/ John W. Spiegel_

John W. Spiegel (admitted _pro hac vice_)
Matthew A. Macdonald (admitted _pro hac vice_)
Bradley R. Schneider (admitted _pro hac vice_)
Nicholas D. Fram (admitted _pro hac vice_)

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Email:  john.spiegel@mto.com
Email:  matthew.macdonald@mto.com
Email:  bradley.schneider@mto.com
Email:  nicholas.fram@mto.com