John W. Spiegel (admitted *pro hac vice*)
Matthew A. Macdonald (admitted *pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100

*Attorneys for* Term Loan Lenders

*[additional counsel listed on signature page]*

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, *et al.*,<br><br>Debtors. | Chapter 11 Case<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |
| MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST, by and through Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>JPMORGAN CHASE BANK, N.A., *et al.*,<br><br>Defendants. | Adversary Proceeding<br><br>Case No. 09-00504 (MG) |

### THE TERM LOAN LENDERS' COUNTER-STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1

Pursuant to Rule 7056-1(c) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York, the Term Loan Lenders, by their counsel, respond to the Rule 7056-l(b) Statement of Undisputed Material Facts ("SUMF") of Plaintiff Motors Liquidation Company Avoidance Action Trust (the "Avoidance Action Trust" or "Plaintiff"), in Support of its Motion for Partial Summary Judgment concerning the Term Loan Lenders' Effectiveness Defense, and submit the following counter-statement of material facts:

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    THE COMMENCEMENT OF THE ACTION

1.    On June 1, 2009 (the "Petition Date"), General Motors Corporation ("Old GM") filed for bankruptcy protection. Bankr. Dkt. No. 1.[1]

**Response No. 1: Undisputed.**

2.    Three weeks after the Petition Date, Old GM repaid a loan of approximately $1.5 billion (the "Term Loan") to a syndicate of lenders (the "Term Lenders"). Bankr. Dkt. No. 2529.

**Response No. 2: Undisputed, although Bankr. Dkt. No. 2529 is the order approving repayment, not evidence that repayment was actually made or evidence that the proper parties were repaid.**

---

[1] All references to the Adversary Docket are to *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 09-00504.  All references to the Bankruptcy Docket are to *In re: Motors Liquidation Co. f/k/a General Motors Corporation*, Case No. 09-50026.

3.     The Term Loan was secured in part by a UCC-1 filed with the Delaware Secretary of State and bearing the filing number "6416808 4" (the "Main Lien"). *Official Comm. of Unsecured Creditors or Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.* (*In re Motors Liquidation Co.*), 777 F.3d 100, 101 (2d Cir. 2015).

**Response No. 3: Disputed in part, but the dispute is irrelevant.  The Term Loan was not secured by a UCC-1 filing.  Rather, it was secured by a lien on a substantial portion of Old GM's assets.  That lien was perfected, in part, by the filing of the Main Term Loan UCC-1.  Further, the Term Loan Lenders refer to Delaware file number 6416808 4 as the "Main Term Loan UCC-1" rather than the "Main Lien," in accordance with the nomenclature used by the Second Circuit and the Delaware Supreme Court.**

4.     The Term Loan was governed by a term loan agreement, dated as of November 29, 2006, as amended on March 4, 2009 (the "Term Loan Agreement") and an accompanying collateral agreement between JPMorgan, Old GM, and Saturn Corporation, dated as of November 29, 2006 (the "Collateral Agreement"). *Id.*

**Response No. 4:  Disputed in part, but the dispute is irrelevant.  Undisputed that aspects of the Term Loan were governed by the Term Loan Agreement; undisputed that the Term Loan Agreement was amended on or about March 4, 2009; undisputed that the Term Loan was governed by the Collateral Agreement; but disputed to the extent that Statement of Undisputed Fact ("SUMF") 4 suggests that the Term Loan Agreement and Collateral Agreement were the only sources of law governing the Term Loan.  The Term Loan was also governed by legal doctrines**

**and duties not set forth in the Term Loan Agreement or the Collateral Agreement,**

**but these are not relevant to this motion.**

5.      Pursuant to the Collateral Agreement, JPMorgan, as Administrative Agent, took a

first priority security interest in the collateral securing the Term Loan (the "Collateral").

Declaration of Eric B. Fisher in Support of Plaintiff's Motion for Partial Summary Judgment

Dismissing the Non-JPMorgan Term Lenders' Effectiveness Defense, dated September 13, 2018

(the "Fisher Declaration") Ex. T (Collateral Agreement at Article II).

**Response No. 5**:  **Undisputed.  The Term Loan Lenders refer the Court to the**

**Collateral Agreement itself (Fisher Decl. Ex. T) for the full contents thereof.**

6.      The Term Loan Agreement set forth the scope of JPMorgan's role and

responsibilities as Administrative Agent with respect to the Term Lenders and the Collateral.

Fisher Decl. Ex. U (Term Loan Agreement § 8.01).

**Response No. 6**:  **Undisputed that certain aspects of JPMorgan's role and**

**responsibilities as Administrative Agent were set forth in the Term Loan**

**Agreement.  Disputed to the extent SUMF 6 suggests that the Term Loan**

**Agreement was the only source of JPMorgan's responsibilities.  Although not**

**relevant here, the law of the State of New York imposed other duties on JPMorgan**

**as Administrative Agent.  *See* ECF No. 241 (Answer and Cross-Claims of Term**

**Loan Lenders).**

7.      Pursuant to the Term Loan Agreement:

> Each Lender hereby irrevocably designates and appoints the Agent
> [JPMorgan] as the agent of such Lender and each such Lender
> irrevocably authorizes the Agent, as the agent for such Lender, to
> take such action on its behalf under the provisions of this
> Agreement and the other Loan Documents and to exercise such
> powers and perform such duties as are expressly delegated to the

3

Agent by the terms of this Agreement and the other Loan
Documents, together with such other powers as are reasonably
incidental thereto.

*Id.*

**Response No. 7**:  **Undisputed that the Term Loan Agreement contains the language set forth in SUMF 7.  The Term Loan Lenders refer the Court to the Term Loan Agreement (Fisher Decl. Ex. U) for the full contents thereof.**

8.    The Collateral Agreement provided that JPMorgan's "sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession . . . shall be to deal with it in the same manner as the Agent deals with similar property for its own account." Fisher Decl. Ex. T (Collateral Agreement § 6.02).

**Response No. 8**:  **Undisputed that the Collateral Agreement contains the language set forth in SUMF 8.  The Term Loan Lenders refer the Court to the Collateral Agreement (Fisher Decl. Ex. T) for the full contents thereof.**

9.    The Collateral Agreement also states that JPMorgan "shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor [Old GM and Saturn] shall be under any obligation, or entitlement, to make any inquiry respecting such authority." *Id.* (Collateral Agreement § 6.04).

**Response No. 9**:  **Undisputed that the Collateral Agreement contains the language set forth in SUMF 9.  The Term Loan Lenders refer the Court to the Collateral Agreement (Fisher Decl. Ex. T) for the full contents thereof.**

10.    Prior to the loan being repaid (as set forth in paragraph 2 above), however, JPMorgan Chase Bank N.A. ("JPMorgan"), as administrative agent for the Term Loan, informed the Committee of Unsecured Creditors (the "Committee") that a UCC-3 termination statement relating to the Main Lien (the "2008 Termination Statement"), had been inadvertently filed back

in 2008, calling into question whether the Main Lien remained perfected. *In re Motors Liquidation Co.*, 777 F.3d at 102.

> **Response No. 10**:  **Disputed in part.  Undisputed that JPMorgan told the Committee in June 2009 that the Termination Statement was filed in 2008.  Disputed that JPMorgan did so in its capacity as administrative agent, rather than in its individual capacity.  Plaintiff offers no evidence that JPMorgan did so in its capacity as administrative agent.  Undisputed that JPMorgan said the Termination Statement was "inadvertently filed" in its June 2009 communication.  The phrase "calling into question whether the Main Lien remained perfected" is vague and ambiguous and a legal conclusion.  Disputed to the extent SUMF 10 suggests that the filing of the Termination Statement was legally effective to destroy the perfection of the Main Term Loan UCC-1, which is a legal conclusion and the subject of Plaintiff's motion.**

11.    On June 25, 2009, the Bankruptcy Court entered the Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties (the "DIP Order"), which preserved the right of the Committee to investigate and, if appropriate, challenge the purported perfection of the security interest related to the Term Loan. Bankr. Dkt. No. 2529 (DIP Order ¶ 19(d)).

**Response No. 11**:  **Undisputed that the Bankruptcy Court entered the "DIP Order"**
**on June 25, 2009.  The Term Loan Lenders refer the Court to the DIP Order itself**
**for the full and complete contents thereof.**

12.   A month after repayment of the Term Loan and following its investigation, the
Committee filed its complaint in this action, seeking a determination that the 2008 Termination
Statement was effective to terminate the Main Lien. Adv. Pro. Dkt. No. 1.

**Response No. 12**:  **Undisputed that on or about July 30, 2009, the Committee filed its**
**complaint.  The Term Loan Lenders refer the Court to the complaint itself for the**
**full and complete contents thereof.  Disputed but irrelevant to this motion to the**
**extent that the AAT claims that it performed an "investigation," as the AAT has**
**offered no evidence that it did so.**

13.   The Bankruptcy Court ordered that the litigation would occur in two phases: (i)
the Committee (and later the Avoidance Action Trust, as successor plaintiff), and JPMorgan
would first litigate whether the 2008 Termination Statement terminated the Main Lien ("Phase
I") and (ii) if the 2008 Termination Statement was held to be effective as to the Main Lien,
Plaintiff would then serve the summons and complaint on the remaining Term Lenders and
litigate the value of the Term Lenders' remaining perfected security interest ("Phase II").
*Official Comm. of Unsecured Creditors or Motors Liquidation Co. v. JPMorgan Chase Bank,*
*N.A. (In re Motors Liquidation Co.)*, 552 B.R. 253, 262-63 (Bankr. S.D.N.Y. 2016).

**Response No. 13**:  **Disputed in part.  Undisputed that the Bankruptcy Court issued a**
**series of orders directing that this case be litigated in two phases and extending**
**Plaintiff's deadline to serve the complaint on the non-JPMorgan Term Lenders.**
**The Term Loan Lenders refer the Court to the orders themselves for the full and**

complete contents thereof.  Disputed that the sole issue to be litigated in "Phase II" was the "value of the Term Lenders' remaining perfected security interest."  The Court reserved the resolution of issues other than the valuation of the remaining collateral for Phase II, including issues such as constructive trust, earmarking, and other defenses.  *See* **ECF No. 683 at 15; ECF No. 1080 (scheduling order describing issues that are currently being litigated in Phase II).**

II.    PHASE I SUMMARY JUDGMENT AND THE SECOND CIRCUIT APPEAL

14.    After the conclusion of the discovery period for Phase I, Plaintiff and JPMorgan cross-moved for summary judgment on the effectiveness of the 2008 Termination Statement as to the Main Lien. Adv. Pro. Dkt. Nos. 24, 28; *see also Official Comm. of Unsecured Creditors or Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 82 (2d Cir. 2014).

**Response No. 14**:  **Undisputed.**

15.    On March 1, 2013, the Bankruptcy Court granted summary judgment for JPMorgan, concluding that the 2008 Termination Statement was not a legally effective filing and thus did not cause the Main Lien to become unperfected. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A (In re Motors Liquidation Co.)*, 486 B.R. 596, 623-27 (Bankr. S.D.N.Y. 2013).

**Response No. 15**:  **Undisputed.  The Term Loan Lenders also note that the Bankruptcy Court denied Plaintiff's motion for summary judgment.  The Term Loan Lenders refer the Court to the Decision (ECF No. 71) and Order (ECF No. 72) themselves for the full and complete contents thereof.**

16.     The Bankruptcy Court certified its summary judgment decision for direct appeal

to the Second Circuit, Adv. Pro. Dkt. No. 74, and on March 7, 2013, Plaintiff appealed to the

Second Circuit, *Id.* 76.

**Response No. 16**:  **Undisputed.**

A.     The Record on Appeal to the Second Circuit

17.     The evidence in the record before the Second Circuit in connection with

Plaintiff's appeal included the complete deposition testimony of witnesses from JPMorgan, its

counsel Simpson Thacher & Bartlett LLP ("Simpson Thacher"), Old GM, and Mayer Brown

LLP ("Mayer Brown"), counsel for Old GM. *See generally* Fisher Decl. Ex. A (Gordon 2010

Deposition Tr.); *Id.* Ex. B (Green 2010 Deposition Tr.); *Id.* Ex. C (Gonshorek 2010 Deposition

Tr.); *Id.* Ex. H (Merjian 2010 Deposition Tr.); *Id.* Ex. N (Duker 2010 Deposition Tr.).

**Response No. 17**:  **Undisputed but irrelevant.  Neither Plaintiff nor JPMorgan**

**contended on appeal that Mayer Brown did not believe or could not reasonably**

**have believed that the Main Term Loan UCC-1 had been filed in connection with**

**the Synthetic Lease.  *See* Plaintiff's Opening Br. at 19, ECF No. 32, No. 13-2187 (2d**

**Cir. Sept. 17, 2013) ("Mayer Brown (and all other parties involved) believed,**

**incorrectly, that the 2006 Financing Statement related to the 2001 synthetic lease**

**financing."); JPMorgan's Opp. Br. at 14, ECF No. 58, No. 13-2187 (2d. Cir. Dec. 9,**

**2013) ("Without dispute, everyone at Mayer Brown, GM's counsel …, believed that**

**all of the Delaware UCC-1 financing statements referenced in the checklist**

**pertained only to the Synthetic Lease …."); Plaintiff's Reply Br. at 2, ECF No. 74,**

**No. 13-2187 (2d Cir. Dec. 23, 2013) ("[A]s JPMorgan also repeatedly acknowledges,**

**no one realized at the time … that the 2008 Termination Statement was erroneously**

**included among the closing documents …."); Plaintiff's Opening Br. to Del. Sup. Ct.**

**at 8, No. 325,2014 (July, 21, 2014); JPMorgan's Answering Br. to Del. Sup. Ct. at 12,**

**No. 325,2014 (Aug. 21, 2014); Plaintiff's Letter Br. to 2d Cir. at 4–5, ECF No. 123,**

**No. 13-2187 (Nov. 26, 2014); Plaintiff's Letter Br. to 2d. Cir at 1, ECF No. 130,** *id.*

**(Dec. 1, 2014). Accordingly, the Second Circuit had no occasion to decide that**

**question, and no reason to review this portion of the record to evaluate whether**

**Mayer Brown reasonably believed that the Main Term Loan UCC-1 related to the**

**Synthetic Lease.**

        1.     The Synthetic Lease Termination Documents Included the Main Lien

18.     The record before the Second Circuit established that, in 2001, Old GM entered

into a synthetic lease financing transaction (the "Synthetic Lease") with a syndicate group of

lenders, secured by liens on twelve parcels of real estate. *In re Motors Liquidation Co.*, 777 F.3d

100, 101 (2d Cir. 2015).

**Response No. 18: Disputed in part. Undisputed that the record before the Second**

**Circuit contained information that Old GM entered into the Synthetic Lease in**

**2001. Undisputed that at times there were twelve parcels of real estate involved in**

**the Synthetic Lease. Disputed to the extent SUMF 18 suggests that the Synthetic**

**Lease was secured at all times by liens on twelve parcels of real estate. As of**

**October 2008, there were only five parcels remaining in the Synthetic Lease, all in**

**Michigan. Declaration of Matthew A. Macdonald in Support of the Term Loan**

**Lenders' Opposition to Plaintiff's Motion for Partial Summary Judgment**

**("Macdonald Decl.") Ex. A (October 14, 2008 Email from Green to Braybrook and**

**Gonshorek).**

19.     JPMorgan served as the administrative agent for the Synthetic Lease and was identified as the secured party of record on the UCC-1 financing statements.  *Id*.

**Response No. 19**:  **Undisputed, except that the Chase Manhattan Bank (JPMorgan's predecessor) was the original administrative agent for the Synthetic Lease.**

**Macdonald Decl. Ex. B (Origination Closing Binder).**

20.     In 2006, Old GM entered into the unrelated Term Loan and JPMorgan again served as the administrative agent and was identified as the secured party of record on the Main Lien. *Id*.

**Response No. 20**:  **Undisputed.**

21.     In the fall of 2008, Old GM planned to pay off the Synthetic Lease and asked its counsel, Mayer Brown, to prepare the necessary documents to repay JPMorgan and the other lenders and release the interests the Synthetic Lease lenders held in Old GM's property. Fisher Decl. Ex. A (Gordon 2010 Deposition Tr. at 5:13-6:1); *Id*. Ex. B (Green 2010 Deposition Tr. at 18:22-20:17); *Id*. Ex. C (Gonshorek 2010 Deposition Tr. at 7:16-10:18); *Id*. Ex. D (October 7, 2008 Email from Green to Perlowski); *see also In re Motors Liquidation Co.*, 777 F.3d at 102.

**Response No. 21**:  **Disputed in part, but the dispute is irrelevant.  Undisputed that Mayer Brown undertook to prepare the necessary documents, but disputed that Old GM "asked" Mayer Brown to do this.  Contemporaneous emails indicate that Gordon volunteered to Old GM that Mayer Brown would "put together an initial draft of a brief checklist of required documents for the release and transfer" after Old GM asked Gordon to "advise what paper work [sic] we should do."  Macdonald Decl. Ex. C (October 1, 2008 Email from Gordon to Green).**

22.    A partner at Mayer Brown, Robert Gordon, asked an associate, Ryan Green, to prepare a closing checklist and drafts of the documents required to pay off the Synthetic Lease and release the interests the Synthetic Lease lenders held in Old GM's property. Fisher Decl. Ex. A (Gordon 2010 Deposition Tr. at 5:13-21); *see also In re Motors Liquidation Co.*, 777 F.3d at 102.

**Response No. 22:  Undisputed.**

23.    Green asked a paralegal, Michael Perlowski, to perform a search for UCC-1 financing statements that had been recorded against Old GM in Delaware. *See* Fisher Decl. Ex. D (October 7, 2008 Email from Green to Perlowski); *see also In re Motors Liquidation Co.*, 777 F.3d at 102; *In re Motors Liquidation Co.*, 486 B.R. at 610.

**Response No. 23:  Undisputed but incomplete.  As explained further below (*see Response No. 25, infra*) rather than identifying the UCC-1 financing statements that needed to be terminated by reference to an existing list of financing statements relevant to the transaction, Green asked Perlowski to perform a search.  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 21:2–11.  Green did this after being told that this was what had been done previously for this transaction.  Macdonald Decl. Ex. D (October 7, 2008 Email from Romick to Green).  Perlowski told Green that a "full search" for UCC filings in Delaware against GM would return thousands of UCC filings and that it would be extremely expensive to obtain copies of all such filings. *Id.* Ex. E (October 7, 2008 Email from Perlowski to Green and Gonshorek). Perlowski indicated that he previously had performed such a search, and forwarded the results of that search to Green.  *Id.*  Green then asked Perlowski to request the UCC filings against Old GM in favor of JPMorgan Chase Bank or the trust that had**

been set up for the Synthetic Lease, Auto Facilities Real Estate Trust 2001-1. *Id.* Ex.
P (Perlowski 2010 Dep. Tr.) at 12:3–18; *id.* Ex. F (October 7, 2008 Email from
Green to Perlowski). Perlowski sent Green an email describing four UCC-1
financing statements: three related to the Synthetic Lease, but the fourth was the
Main Term Loan UCC-1. *Id.* Ex. G (October 9, 2008 Email from Perlowski to
Green and Gonshorek). Attached to this email were several financing statements,
including the Main Term Loan UCC-1. *Id.*

24.     The paralegal identified three UCC-1 financing statements, only two of which
were related to the Synthetic Lease. See Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 20:13-
22:7); *see also In re Motors Liquidation*, 777 F.3d at 102; *In re Motors Liquidation Co.*, 486
B.R. at 610.

**Response No. 24**: Disputed. Perlowski's email to Green described four Delaware
UCC-1 financing statements and three of them related to the Synthetic Lease.
Macdonald Decl. Ex. G (October 9, 2008 Email from Perlowski to Green and
Gonshorek). Two were against Old GM, and two were against the trust that had
been created as the borrower in the Synthetic Lease, "Auto Facilities Real Estate
Trust 2001-1." *Id.* It is not clear why the Second Circuit stated that there were only
three UCC-1 financing statements attached to Perlowski's email. A possible
explanation is that the closing checklist listed termination of three UCC-1 financing
statements under the "General Documentation" heading of the checklist. *See* Fisher
Decl. Ex. I at 8. But Perlowski's email identified four active UCC statements
against either Old GM or Auto Facilities Real Estate Trust 2001-1 in favor of

**JPMorgan filed with the Delaware Secretary of State.  Macdonald Decl. Ex. G**

**(October 9, 2008 Email from Perlowski to Green and Gonshorek).**

25.     Neither the paralegal nor Green realized that the third UCC-1 financing statement related instead to the Term Loan Main Lien.  *In re Motors Liquidation*, 777 F.3d at 102; *In re Motors Liquidation*, 486 B.R. at 610.

**Response No. 25:  Disputed.**

    **Citation to legal opinions is not "citation to evidence which would be admissible," as required by Local Rule 7056-1(e).  This Court, the Second Circuit, and the Delaware Supreme Court did not make the factual finding that neither Green nor Gonshorek realized anything.  Their opinions are not "admissible evidence" that "[n]either the paralegal nor Green realized that the third UCC-1 financing statement related instead to the" Term Loan.  Even if they had, "[j]udicial findings in other cases proffered as evidence are generally characterized as inadmissable [sic] hearsay."  *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001); *accord Smart Mktg. Grp., Inc. v. Publications Int'l, Ltd.*, No. 04 C 146, 2014 WL 625321, at \*4 (N.D. Ill. Feb. 18, 2014) ("The Seventh Circuit's opinion is not evidence that is admissible at trial.").  The Court would be within its discretion to disregard any fact in Plaintiff's SUMF that is not supported by a citation to admissible evidence from the record.  *See, e.g., Shkreli v. JPMorgan Chase Bank, N.A.*, No. 13 CIV. 5647 LGS, 2015 WL 1408840, at \*1 n.1 (S.D.N.Y. Mar. 27, 2015) (declining to consider paragraphs from SUMF that were not supported by evidence); *IBS Ketel, Ltd. v. Korea Telecom Am., Inc.*, No. 98**

13

Civ. 4856, 2000 WL 821013, at *1 n.1 (S.D.N.Y. June 22, 2000) (SUMF that "fails to cite to evidence" not relied on by Court).

Important evidence supports the opposite conclusion: that Green and Gonshorek noticed a very significant discrepancy between the collateral covered by the Main Term Loan UCC-1 and the collateral for the Synthetic Lease that caused them to realize that the Main Term Loan UCC-1 was not related to the Synthetic Lease.

Gonshorek reviewed the financing statements attached to Perlowski's email and then raised a "concern" with Green about the Schedule 1 to Annex I to the Main Term Loan UCC-1.  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 97:1–9; *id.* Ex. C (Gonshorek 2010 Dep. Tr.) at 9:17–24.  Green testified that this conversation concerned "a question about whether the properties identified relate to the synthetic lease." *Id.* Ex. B (Green 2010 Dep. Tr.) at 97:10–11; *see also id.* at 97:24–25 ("I think Stewart [Gonshorek] raised a question about the properties identified"). Green testified that the "concern" that Gonshorek raised was that "the cities and states listed is broader than what the properties in – say on the checklist is broader." *Id.* at 98:11–13.

Green was familiar with the collateral for the Synthetic Lease.  Green's responsibilities included determining which liens needed to be released as part of the termination of the Synthetic Lease.  *Id.* at 7:14–22.  To do this, Green had to understand the collateral for that loan.  Green reviewed the Synthetic Lease Participation Agreement and other documentation associated with the Synthetic Lease.  *Id.* at 8:15–20.  Exhibit A to the First Amendment to the Participation

Agreement, dated January 6, 2003, stated that the Synthetic Lease was secured by twelve specific parcels of real estate. Macdonald Decl. Ex. H (Participation Agreement) at MB006840–41; *id.* Ex. B (Origination Closing Binder). Green spent approximately fifty hours working on the release of the Synthetic Lease liens. Macdonald Decl. Ex. I (Mayer Brown Billing Records). Gonshorek spent nearly as much time on the transaction. *Id*.

Schedule 1 to the Main Term Loan UCC-1 made it obvious to Green and Gonshorek that the Main Term Loan UCC-1 had been filed in connection with a loan unrelated to the Synthetic Lease. Declaration of Sandra Stern in Support of the Term Loan Lenders' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Stern Decl.") Ex. A at 10. Schedule 1 listed at least forty-one properties that were not among the twelve properties involved in the Synthetic Lease. Macdonald Decl. Ex. J (October 9, 2008 Email from Perlowski to Green and Gonshorek with handwritten marks). Schedule 1 did not list at least eleven of the properties that were part of the Synthetic Lease. *Id.* The properties on Schedule 1 included many cities and states that were not involved in the Synthetic Lease, including Arlington, Texas; Janesville, Wisconsin; Wentzville, Missouri; and Buffalo, New York. *Id.* The properties on Schedule 1 were overwhelmingly manufacturing and related facilities—designated on Schedule 1 as "Assembly," "MFD," or "Powertrain," facilities, *id.*—while the properties involved in the Synthetic Lease consisted principally of parking garages and office buildings, Macdonald Decl. Ex. H (Participation Agreement) at MB006840–41.

There were other indications that the Main Term Loan UCC-1 related to a loan other than the Synthetic Lease. Perlowski's October 9 email stated that the Main Term Loan UCC-1 had been filed in 2006, five years after the Synthetic Lease closed. Macdonald Decl. Ex. G (October 9, 2008 Email from Perlowski to Green and Gonshorek). Perlowski's email also described the Main Term Loan UCC-1 in terms very different than his description of the three UCC-1s that had been filed with the Synthetic Lease. The Main Term Loan UCC-1 was described as covering "equipment, fixtures and related collateral located at certain U.S. manufacturing facilities," while the other three UCC-1 financing statements Perlowski listed were described as covering "real property and related collateral" located in specific counties. *Id.* Gonshorek put this detailed description of the Main Term Loan UCC-1 on the checklist, according to Green. Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 14:11–15:10.

Further, the Main Term Loan UCC-1 stated on its face that it had been filed in connection with a different loan. On the first page of Annex I, the Main Term Loan UCC-1 stated that it had been filed in connection with a "term loan agreement, dated as of November 29, 2006," not a synthetic lease arrangement dated as of 2001. Macdonald Decl. Ex. J (October 9, 2008 Email from Perlowski to Green and Gonshorek with handwritten marks).

Someone at Mayer Brown actually noticed this information. A version of the Main Term Loan UCC-1 printed from Gonshorek's computer contains a handwritten notation circling the reference to the term loan. *Id.* When asked, none of the Mayer Brown witnesses recalled or knew whose handwriting this was. *See*

16

Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 27:10–14; *id.* Ex. P (Gordon 2017 Dep.

Tr.) at 87:15–18; *id.* Ex. R (Gonshorek 2017 Dep. Tr.) at 144:6–145:14.

Other statements in Annex I to the Main Term Loan UCC-1 made clear that

the financing statement pertained to equipment, fixtures, and documents relating

thereto; that the financing statement had been filed in connection with a "Collateral

Agreement," also dated November 29, 2006; and that Saturn Corporation was a

party to the transaction. Macdonald Decl. Ex. J (October 9, 2008 Email from

Perlowski to Green and Gonshorek with handwritten marks).

Given these and other red flags, it was not reasonable for Green or

Gonshorek to conclude that the Main Term Loan UCC-1 pertained to the Synthetic

Lease. Stern Decl. Ex. A at 8; Declaration of Steven L. Harris in Support of the

Term Loan Lenders' Opposition to Plaintiff's Motion for Partial Summary

Judgment ("Harris Decl.") Ex. A at 9.

The Term Loan Lenders dispute the accuracy of the portions of Green's

testimony where he stated that "the documents related to the synthetic lease" (*e.g.*,

Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 99:1–8) in light of the evidence

contradicting this account. The Court cannot resolve this credibility issue on

summary judgment. *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) ("Summary

judgment should be denied if, when the party against whom summary judgment is

sought is given the benefit of all permissible inferences and all credibility

assessments, a rational factfinder could resolve all material factual issues in favor of

that party."). Green's testimony about his own beliefs is self-serving and

conclusory, and impacts the weight that the finder of fact should attribute to it. *In*

17

*re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) ("the self-serving nature of a witness's statements goes to the statements' weight . . . the weighing of such statements is a matter for the finder of fact at trial, not the prerogative of the court on a motion for summary judgment" (citation and quotation marks omitted)).

26.     Green drafted a closing checklist for the Synthetic Lease that identified all three UCC-1 financing statements as statements that would be terminated. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 8:12-14); *see also In re Motors Liquidation*, 777 F.3d at 102; *In re Motors Liquidation*, 486 B.R. at 610.

> **Response No. 26**: Disputed in part.  Undisputed that Green helped draft the closing checklist, although Gordon and Gonshorek helped too.  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 8:21–25.  Disputed that the closing checklist only listed "three UCC-1 financing statements as statements that would be terminated."  The closing checklist, of which there are various drafts, listed approximately thirteen UCC-1 financing statements to terminate.  Macdonald Decl. Ex. K (October 6, 2008 Email from Green to Braybrook).  The Term Loan Lenders refer the Court to the checklists themselves for the full and complete contents thereof.  Further, the Term Loan Lenders state that the closing checklist "identified" the Main Term Loan UCC-1 as "Financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities recorded on 11.30.08 as File Number 6416808 4."  *Id.* at MB004233.

27.     Green asked a second paralegal, Stewart Gonshorek, to prepare the required UCC-3 termination statements and Gonshorek created three—two identifying the financing statements for the Synthetic Lease and one identifying the Main Lien. *See* Fisher Decl. Ex. C

(Gonshorek 2010 Deposition Tr. at 9:6-10:8); *In re Motors Liquidation*, 486 B.R. at 611; *In re Motors Liquidation*, 777 F.3d at 102.

**Response No. 27**:  **Disputed to the extent the term "required" is vague and ambiguous as used.  We construe the term to mean that Green asked Gonshorek to prepare the UCC-3 termination statements necessary to terminate those UCC-1 financing statements that had been filed in connection with the Synthetic Lease.  So construed, undisputed, except that Gonshorek (or others at Mayer Brown) prepared approximately thirteen draft UCC-3 financing statements, not three.  Macdonald Decl. Ex. L (October 15, 2008 Email from Merjian to Duker); Fisher Decl. Ex. M (Escrow Agreement).**

28.    Green and Gonshorek also drafted an escrow agreement for the Synthetic Lease, identifying the documents that would be delivered to the title company and which, once Old GM repaid the Synthetic Lease, would be handled by the title company in accordance with the instructions in the escrow agreement. *See* Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 52:4-53:3); *In re Motors Liquidation*, 486 B.R. at 612; *In re Motors Liquidation Co.*, 755 F.3d at 81.

**Response No. 28**:  **Undisputed.  The Term Loan Lenders refer the Court to the Escrow Agreement (Fisher Decl. Ex. M) itself for the full and complete contents thereof.**

2.    <u>JPMorgan and Its Counsel Reviewed and Approved the Termination Documents</u>

29.    The escrow agreement identified the three UCC-3 termination statements, including the one for the Main Lien, and provided that upon closing, the title company would forward the UCC-3 termination statements to Mayer Brown which would file them on Old GM's behalf.  Fisher Decl. Ex. J (October 24, 2018 Email from Green to Wineman, Merjian and

19

Ledyard, at JPMCB-STB-00000430); *In re Motors Liquidation Co.*, 755 F.3d at 81; *see also In re Motors Liquidation Co.*, 486 B.R. at 612.

> **Response No. 29:** **Disputed in part but the dispute is irrelevant. The Escrow Agreement identified approximately thirteen UCC-3 termination statements that would need to be filed, and allocated responsibility to the title company for filing all but three of them. Fisher Decl. Ex. M. The Escrow Agreement did not specify who would file the remaining UCC-3 termination statements, including the termination statement for financing statement number 6416808 4, but provided that upon closing, the title company was to return "any extra original documents and copies of all Escrow Documents" to the counsel for Old GM, Mayer Brown. *Id.* at MB00029.**

30.    Drafts of the closing checklist, the 2008 Termination Statement, and the escrow instructions that referenced the Main Lien were sent to and reviewed by JPMorgan and its counsel Simpson Thacher. Fisher Decl. Ex. E (October 15, 2008 Email from Green to Merjian); id. Ex. G (October 15, 2008 Email from Merijian to Duker); *In re Motors Liquidation*, 755 F.3d at 80-81; *see also In re Motors Liquidation*, 486 B.R. at 611-12.

> **Response No. 30:** **Disputed in part but the dispute is irrelevant. Undisputed that drafts of the closing checklist, the Termination Statement, and the escrow instructions were sent to Mardi Merjian at Simpson Thacher, who forwarded them to Richard Duker at JPMorgan. Macdonald Decl. Ex. L (October 15, 2008 Email from Merjian to Duker). These documents included references to Delaware filing number 6416808 4, using various terminology. But disputed that JPMorgan and Simpson Thacher reviewed the drafts. JPMorgan has contended that the information sent to Duker was "corrupted" and "unreadable." *See* ECF No. 48**

**(JPMorgan's Memorandum of Law in Opposition to Plaintiff's Motion for**
**Summary Judgment) at 13, n.6; ECF Nos. 51 and 51-1 (Supplemental Duker**
**Affidavit). Duker testified that he "would have relied on counsel to review" draft**
**termination documents and he did not think that he would have reviewed them.**
**Macdonald Decl. Ex. M (Duker 2017 Dep. Tr.) at 198:10–24. Plaintiff never asked**
**Merjian about the extent of his review of the draft documents when Plaintiff**
**deposed him in 2010. Fisher Decl. Ex. H (Merjian 2010 Dep. Tr.) at 22:20–24:24.**
**When Merjian was deposed in 2017, he stated "I'm sure I reviewed some, but I**
**don't know whether I reviewed all of them or not," in reference to the draft closing**
**documents. Macdonald Decl. Ex. N (Merjian 2017 Dep. Tr.) at 159:14–22.**

31.     Green circulated an initial draft of the closing checklist to Old GM and Simpson
Thacher, which forwarded it to JPMorgan. *See* Fisher Decl. Ex. I (October 15, 2008 Email from
Merjian to Duker); *In re Motors Liquidation Co.*, 486 B.R. at 610.

**Response No. 31**: **Undisputed that Green circulated a draft of the closing checklist**
**on October 15, 2008 to Mardi Merjian. The cited exhibit does not support the**
**assertion that Green sent the checklist to Old GM, as the only other recipient on**
**Green's email was "Kenton@rlf.com," not any person at Old GM.**

32.     Green subsequently circulated updated, but largely similar, drafts of the closing
checklist to Simpson Thacher, among other parties. See Fisher Decl. Ex. G (October 15, 2008
Email from Green to Merjian and Leyard); *see also In re Motors Liquidation*, 486 B.R. at 610.

**Response No. 32**: **Undisputed, except that the Term Loan Lenders respectfully refer**
**the Court to the drafts of the checklists for the complete contents thereof.**

33.    All of the drafts of the closing checklist identified the Main Lien as one of the financing statements to be terminated in connection with the payoff of the Synthetic Lease. Fisher Decl. Ex. G (October 15, 2008 Email from Green to Merjian and Leyard); *see also In re Motors Liquidation*, 486 B.R. at 610.

**Response No. 33**:  **Undisputed, but the Term Loan Lenders state that the draft Termination Statement identified the Main Term Loan UCC-1 using the following description "Financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities recorded on 11.30.08 as File Number 6416808 4."  *See* Fisher Decl. Ex. I at 8.**

34.    Green also sent the draft UCC-3 termination statements, including the one identifying the Main Lien for termination, to Simpson Thacher. Fisher Decl. Ex. F (October 17, 2008 Email from Merjian to Green); *see also In re Motors Liquidation Co.*, 486 B.R. at 611-12.

**Response No. 34**:  **Undisputed, but the Term Loan Lenders state that the draft Termination Statement sent to Simpson Thacher identified the Main Term Loan UCC-1 only by its file number.  Macdonald Decl. Ex. L (October 15, 2008 Email from Merjian to Duker) at JPMCB-2-00042840.**

35.    The lawyer at Simpson Thacher in charge of the matter for JPMorgan, Mardi Merjian, responded to Green, stating, "Nice job on the documents." *Id*.

**Response No. 35**:  **Undisputed, except that the cited evidence offers no support for the claim that Merjian was the "lawyer … in charge."**

36.    Merjian forwarded the documents to his client contact, the responsible managing director at JPMorgan. Fisher Decl. Ex. H (Merjian 2010 Deposition Tr. at 18:15-19:11; 24:25-

25:24); *Id.* Ex. I (October 15, 2008 Email from Merjian to Duker); *Id.* Ex. G (October 15, 2008

Email from Merjian to Duker).

> **Response No. 36**:  **Undisputed.**

37.    No further comments were provided to Mayer Brown on the UCC-3 termination

statements. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 47:1-17).

> **Response No. 37**:  **The Term Loan Lenders state that SUMF 37 is vague and**
>
> **ambiguous.  The Term Loan Lenders will construe it to mean that no one at Old**
>
> **GM, JPMorgan, or Simpson Thacher provided further comments on the UCC-3**
>
> **terminations.  So construed, undisputed.**

38.    Green also sent Merjian the draft escrow instructions that identified the Main Lien

as one of the financing statements that would be terminated once the Synthetic Lease was repaid.

Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 51:23-54:4); *Id.* Ex. J (October 24, 2008 Email

from Green to Wineman, Merjian and Ledyard); *Id.* Ex. C (Gonshorek 2010 Deposition Tr. at

25:9-26:8); *Id.* Ex. H (Merjian 2010 Deposition Tr. at 29:15-32:11); *see also In re Motors*

*Liquidation Co.*, 486 B.R. at 612.

> **Response No. 38**:  **Disputed in part, but the dispute is irrelevant.  The Escrow**
>
> **Agreement did not explicitly state what would happen to the UCC-3 termination**
>
> **statements upon closing, except that the title company would return them to Old**
>
> **GM's counsel.  Fisher Decl. Ex. M.  The Term Loan Lenders refer the Court to the**
>
> **Escrow Agreement itself for the full contents thereof.**

39.    Green asked Merjian if he had any comments and Merjian replied that "it was

fine." Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 54:5-55:23); *Id.* Ex. J (October 27, 2008

Email from Merjian to Green); *see also Motors Liquidation*, 486 B.R. at 614.

**Response No. 39**:  **Undisputed.**

40.    Merjian signed the escrow agreement on behalf of JPMorgan. Fisher Decl. Ex. B
(Green 2010 Deposition Tr. at 55:24-56:18); *Id.* Ex. M (Final Fully Executed Escrow
Instructions).

**Response No. 40**: **Undisputed.**

41.    Before signing, Merjian reviewed the escrow instructions and understood that the
termination statements listed on the document would be released upon the closing of the
Synthetic Lease. *Id.* Ex. H (Merjian 2010 Deposition Tr. at 34:19-35:5).

> **Response No. 41**:  **Disputed, but the dispute is irrelevant to this motion.  Merjian
> testified in 2010, "I'm sure I looked at them," but did not specifically recall
> reviewing them or testify as to what he did to review them.  Fisher Decl. Ex. H
> (Merjian 2010 Dep. Tr.) at 34:5–9.**

        3.    <u>The Parties and Their Counsel Did Not Recognize the Error in the
Termination Statements</u>

42.    Neither the parties to the Synthetic Lease transaction nor their counsel realized
that one of the UCC-3 termination statements filed as part of the Synthetic Lease transaction
covered a financing statement unrelated to the Synthetic Lease, let alone one that would
terminate the Main Lien. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 85:8- 87:25); *see also
In re Motors Liquidation*, 777 F.3d at 102.

> **Response No. 42**:  **Disputed.  The cited portions of Green's testimony do not support
> the assertions in SUMF 42, as it pertains to the intent of the parties to the
> transaction, not whether Green "realized" that the draft termination documents
> included the Termination Statement.  The Second Circuit's decision is not evidence
> and did not decide this question because Plaintiff and JPMorgan both informed the**

**Second Circuit that Mayer Brown and others had not realized that one of the UCC-3 termination statements filed covered a financing statement unrelated to the Synthetic Lease.  *See* Response No. 17, *supra*.  Because that issue was not in dispute on appeal, the *Motors II* decision is not probative of that question.  *See* Response No. 25, *supra*.  The Term Loan Lenders further dispute this statement for the reasons set forth in Response No. 25.**

43.       Neither Green nor Perlowski realized that one of the three UCC-1 financing statements identified by Perlowski was unrelated to the Synthetic Lease. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 99:1-8); *see also In re Motors Liquidation*, 777 F.3d at 102.

**Response No. 43**:  **Disputed.  The Second Circuit's decision is not evidence and did not decide this question because Plaintiff and JPMorgan both informed the Second Circuit that Mayer Brown and others had not realized that one of the UCC-3 termination statements filed covered a financing statement unrelated to the Synthetic Lease.  *See* Response No. 17, *supra*.  Because that issue was not in dispute on appeal, the *Motors II* decision is not probative of that question.  *See* Response No. 25, *supra*.  The Term Loan Lenders further dispute this statement for the reasons set forth in Response No. 25.**

**Further, the cited evidence does not support the assertions in SUMF 43. Green's testimony does not address Perlowski's beliefs at all, Plaintiff offers no basis on which Green could testify about Perlowski's beliefs, and Plaintiff does not offer any direct evidence of Perlowski's beliefs whatsoever.**

44.       Similarly, no one at Mayer Brown involved in drafting the closing checklist, and no one at JPMorgan or Simpson Thacher which reviewed it, recognized that one of the financing

statements was unrelated to the Synthetic Lease. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 99:1-8); *Id.* Ex. H (Merjian 2010 Deposition Tr. at 33:14-18); *In re Motors Liquidation*, 486 B.R. at 610-11.

> **Response No. 44**:  **Disputed for the reasons set forth in Response No. 25.  Green testified that Gonshorek noticed "that the cities and states listed is broader" on Schedule 1 to the Main Term Loan UCC-1, and that this was a "concern."  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 98:9–13.  Undisputed but irrelevant that no one at JPMorgan or Simpson Thacher noticed.  Also disputed to the extent that this SUMF relies on judicial opinions, which are not admissible evidence.  *See* Response No. 25, *supra*.**

45.    The record showed that when Gonshorek drafted the UCC-3 termination statements for the Synthetic Lease transaction, he intended to terminate only UCC financing statements related to the Synthetic Lease. Fisher Decl. Ex. C (Gonshorek 2010 Deposition Tr. at 9:6-10:18); *see also In re Motors Liquidation Co.*, 486 B.R. at 610-11.

> **Response No. 45**:  **SUMF 45 is vague and ambiguous and the cited testimony does not support the fact asserted.  Undisputed that Green initially intended to create UCC-3 termination statements only for the UCC-1 financing statements filed in connection with the Synthetic Lease, and undisputed that Green understood he was not authorized to file any UCC-3 termination statements for UCC-1 filings for other loans.**

> **Disputed to the extent SUMF 45 suggests that, at the time of the filing, Green reasonably believed that the Main Term Loan UCC-1 was related to the Synthetic Lease for the reasons stated in Response No. 25.**

46.    Both Gordon and Green from Mayer Brown thought they were filing documents exclusively relating to the Synthetic Lease and believed they were only authorized by JPMorgan to make filings as to the Synthetic Lease. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 85:8-89:9).

**Response No. 46**:  **Disputed in part.  Undisputed that Green and Gordon understood that they were only authorized by JPMorgan to make filings related to the Synthetic Lease.**

**Disputed that Green thought Mayer Brown was filing documents exclusively relating to the Synthetic Lease for the reasons stated in Response No. 25, *supra*, and because the cited evidence pertains only to Green's intention and does not refer at all to what Gordon may have "thought"; therefore, it does not support the conclusion that Gordon thought the documents all related to the Synthetic Lease.**

47.    In fact, no one from Mayer Brown involved in the Synthetic Lease transaction knew about the existence of the Term Loan at that time. *Id.* Ex. B (Green 2010 Deposition Tr. at 84:12-23); *Id.* Ex. C (Gonshorek 2010 Deposition Tr. at 47:2-19); *Id.* Ex. A (Gordon 2010 Deposition Tr. at 66:18-67:6); *Id.* Ex. H (Merjian 2010 Deposition Tr. at 54:17-55:15); *Id.* Ex. N (Duker 2010 Deposition Tr. at 25:25-26:17).

**Response No. 47**: **Disputed.**

**Gordon testified, "I don't know" when asked if he knew of the existence of the Term Loan prior to June 2009.  Fisher Decl. Ex. A (Gordon 2010 Dep. Tr.) at 66:18–67:6.**

**Gonshorek was asked whether he ever worked on the Term Loan, to which he responded "I don't recall."  *Id.* Ex. C (Gonshorek 2010 Dep. Tr.) at 47:15–19.**

Gonshorek was not asked whether he ever "knew about the existence" of the Term

Loan.  Further, Gonshorek reviewed the Main Term Loan UCC-1, which stated on

its face that the document had been filed in connection with a 2006 term loan

agreement.  *See* **Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 97:1-98:15;** *id.* **Ex. C**

**(Gonshorek 2010 Dep. Tr.) at 9:17-24; Macdonald Decl. Ex. J (October 9, 2008**

**Email from Perlowski to Green and Gonshorek with handwritten marks).**

Green logically would have reviewed the complete Main Term Loan UCC-1

in response to Gonshorek's concern about Schedule 1 (which was attached to the

Main Term Loan UCC-1).  Green was emailed a copy of the complete Main Term

Loan UCC-1.  *Id.* **Ex. G (October 9, 2008 Email from Perlowski to Green and**

**Gonshorek).**

The cited evidence says nothing about Perlowski's knowledge.

Further, someone at Mayer Brown circled the portion of Annex I to the Main

Term Loan UCC-1 that references the Term Loan Agreement.  *Id.* **Ex. J (October 9,**

**2008 Email from Perlowski to Green and Gonshorek with handwritten marks).**

48.     Evidence regarding a conversation between Green and Gonshorek was also in the

record before the Second Circuit. *Id.* Ex. B (Green 2010 Deposition Tr. at 96:22-98:1).

**Response No. 48**:  **Undisputed but irrelevant because the Second Circuit did not**

**have occasion to rule on the inferences to be drawn from that testimony.**  *See*

**Response No. 17,** *supra*.

49.     Green testified during his deposition that Gonshorek had asked him whether the

properties identified in a schedule attached to one of the financing statements related to the

Synthetic Lease because the cities and states listed in the schedule were broader than the properties involved in the Synthetic Lease. *Id.* at 98:2-98:13.

**Response No. 49**:  **Undisputed.**

50.     Green could not remember further specifics about the conversation, but testified that he never reached the conclusion that the documents included a UCC-3 termination statement for a financing statement unrelated to the Synthetic Lease. *Id.* at 98:20.

**Response No. 50**:  **Disputed.  Green did not testify at his 2010 deposition that he could not remember further specifics about his conversation with Gonshorek.  The absence of more detail in the record about this conversation is the result of the fact that the lawyers then present did not ask follow-up questions about the conversation.  *See* Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 96–99.**

**Further, when asked in 2010 what he concluded with respect to the concern that Gonshorek raised, Green testified "I didn't conclude anything."  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 98:16–20.**

51.     Green did not investigate and did not bring the issue to the attention of Gordon or anyone else. *Id.* at 98:21-25.

**Response No. 51**:  **Disputed in part.  Undisputed that Green did not discuss the concern with anyone other than Gonshorek.  The evidence supports an inference that Green reviewed the Main Term Loan UCC-1 after Gonshorek brought it to his attention, and it was obvious from the face of the Main Term Loan UCC-1 that it did not pertain to the Synthetic Lease.  *See* Response No. 25, *supra*.  Otherwise undisputed that Green did not investigate Gonshorek's concern.**

52.     Following this conversation, Green still thought that the documents that he had prepared would only terminate financing statements relating to the Synthetic Lease. *Id.* at 99:1-8.

**Response No. 52**:  **Disputed.  Green did not subjectively believe that the Main Term Loan UCC-1 related to the Synthetic Lease.  *See* Response No. 25, *supra*.**

53.     No one at Mayer Brown (or at Simpson Thacher or JPMorgan) realized that the 2008 Termination Statement covered the Main Lien until June 2009, when the error was discovered by Morgan Lewis & Bockius LLP, JPMorgan's counsel on the Term Loan. Fisher Decl. Ex. B (Green 2010 Deposition Tr. at 64:8-66:9); *Id.* Ex. C (Gonshorek 2010 Deposition Tr. at 26:5-28:1, 35:5-15); *see also In re Motors Liquidation*, 486 B.R. at 614; *In re Motors Liquidation*, 755 F.3d at 82.

**Response No. 53**:  **Disputed for the reasons stated in Response No. 25 and Response No. 47.  Undisputed that Morgan Lewis brought the Termination Statement to the attention of JPMorgan, Old GM, and others in June 2009.  Also disputed to the extent that this SUMF relies on the judicial opinions, which are not admissible evidence.  *See* Response No. 25, *supra*.**

54.     After the error was discovered, Gordon, the Mayer Brown partner in charge of the Synthetic Lease transaction, signed an affidavit explaining that Mayer Brown had intended to terminate only liens related to the Synthetic Lease. Fisher Decl. Ex. O (June 19, 2009 Email attaching Gordon Affidavit); *see also In re Motors Liquidation*, 755 F.3d at 82.

**Response No. 54**:  **Undisputed, except as to the phrase "after the error was discovered."  As stated in Response No. 25, Green and Gonshorek discovered the error prior to the filing of the Termination Statement.  The affidavit speaks for**

itself, and the Term Loan Lenders refer the Court to the affidavit for the full contents thereof.

      B.    The Second Circuit's Holding

55.    On January 21, 2015, the Second Circuit issued its decision, reversing the Bankruptcy Court and ruling that the 2008 Termination Statement was effective to cause the Main Lien to become unperfected because JPMorgan had authorized the filing. *In re Motors Liquidation*, 777 F.3d at 105

**Response No. 55**: **Undisputed. The Term Loan Lenders refer the Court to the Second Circuit's decision in *Motors II*, which speaks for itself.**

56.    On that basis, the Second Circuit remanded with instructions to the Bankruptcy Court to enter partial summary judgment in favor of the Avoidance Action Trust on the question of the effectiveness of the Termination Statement. *Id.* at 105-06.

**Response No. 56**: **Undisputed. The Term Loan Lenders refer the Court to the Second Circuit's decision in *Motors II*, which speaks for itself.**

      C.    Phase II Discovery by the Non-JPMorgan Term Lenders

57.    Following remand, the Bankruptcy Court permitted the Non-JPMorgan Term Lenders to retake discovery on the Phase I issues. See Adv. Pro. Dkt. No. 634.

**Response No. 57**: **Undisputed. The Term Loan Lenders refer the Court to the Court's decision in ECF No. 634, which speaks for itself.**

58.    Fact discovery on these issues is now complete. *Id.*

**Response No. 58**: **Undisputed, although the proper citation for the notion that discovery on effectiveness issues is now complete is ECF No. 789.**

## THE TERM LOAN LENDERS' COUNTER-STATEMENT OF MATERIAL FACTS

I.    THE TRANSACTIONS

A.    The Synthetic Lease

59.    The Synthetic Lease was a real estate transaction originated in 2001, and provided Old GM with $325 million to finance the acquisition and/or improvement of twelve parcels of real estate, consisting primarily of parking garages and office buildings.  Macdonald Decl. Ex. B (Origination Closing Binder).  The list of properties is prominently displayed in the first pages of a closing binder where Mayer Brown assembled relevant contracts.  *Id.*

60.    The properties involved in the Synthetic Lease were:  (i) SPO Warehouse (Ontario, CA); (ii) SPO Warehouse (Bolingbrook, IL); (iii) Transmission Parts Distribution Center (Indianapolis, IN); (iv) SPO Warehouse (Reno, NV); (v) SPO Headquarters Building (Grand Blanc, MI); (vi) Franklin Parking Deck (Detroit, MI); (vii) Parcel 6/C (Detroit, MI); (viii) River East Parking Deck (Detroit, MI); (ix) SPO Warehouse (Denver, CO); (x) SPO Warehouse (Brandon, MS); (xi) SPO Warehouse (Charlotte, NC); and (xii) Powertrain L6 Engine Plant (Flint, MI).  *Id.*

61.    By the time Old GM repaid the Synthetic Lease in October 2008, only five properties (all in Michigan) were still part of the financing.  Macdonald Decl. Ex. A (October 14, 2008 Email from Green to Braybrook and Gonshorek).  Those properties were: (i) SPO Headquarters (Grand Blanc, MI); (ii) Franklin Parking Deck (Detroit, MI); (iii) Parcel 6/C (Detroit, MI); (iv) River East Parking Deck (Detroit, MI); and (v) Powertrain L6 Engine Plant (Flint, MI).  *Id.*

62.    The key documents comprising the Synthetic Lease transaction were a Participation Agreement; a lease between Old GM and the trust that was specially created for the transaction; an Agency Agreement; a Structural Support Agreement; a Loan Facility Agreement

among the Backup Facility Banks, JPMorgan, and RFC; a Pledge Agreement and Control

Agreement between the Trust and JPMorgan; and a Liquidity Agreement among RFC, the

Backup Facility Banks, and JPMorgan.  *Id.* Ex. B (Origination Closing Binder).

63.     The parties involved in the Synthetic Lease included Old GM, Auto Facilities

Real Estate Trust 2001-1, Wilmington Trust Company, BMT Capital Corporation, JH Equity

Realty Investors, Inc., Relationship Funding Company, LLC, and a series of banks, including

JPMorgan.  *Id.*

64.     The amount of financing from the Synthetic Lease was $325 million.  *Id.*

### B.     The Term Loan

65.     The Term Loan originated in 2006 was secured by liens on machinery,

equipment, and fixtures at forty-two manufacturing facilities (as these terms were defined,

respectively, in the Collateral Agreement) spread across the United States.  *See* Fisher Decl. Ex.

T at 23 (Schedule 1 to Collateral Agreement).  These forty-two manufacturing facilities were

located in thirty-five different cities in twelve different states.  *Id.*

66.     The collateral for the Term Loan consisted of machinery, equipment, and fixtures.

*Id.*  The key documents comprising the Term Loan transaction were a Term Loan Agreement and

a Collateral Agreement.  Fisher Decl. Exs. U & T.

67.     The participants appearing on the cover pages of the key documents for the Term

Loan were Old GM, Saturn Corporation, and a group of banks including JPMorgan.  Fisher Decl.

Exs. U & T.

68.     The amount of financing from the Term Loan was $1.5 billion.  *Id.*

69.     The Term Loan Lenders' liens were perfected in part by a single, blanket

financing statement filed with the Delaware Secretary of State, file number 6416808 4.

Macdonald Decl. Ex. O (Main Term Loan UCC-1).

70.    The Main Term Loan UCC-1 consists of a UCC-1 financing statement dated November 30, 2006 bearing file number 6416808 4.  *Id.*

71.    This financing statement includes Annex I, which immediately follows the cover page of the Main Term Loan UCC-1.  Annex I is a four-page document that lists Old GM as the debtor and JPMorgan as the secured party of record; a description of the collateral that the financing statement covers, which defines the collateral to include "(1) all Equipment and all Fixtures, other than Excluded Equipment and Fixtures; (2) all Documents and General Intangibles attributable solely to Equipment or Fixtures, other than Excluded Equipment and Fixtures; (3) all books and records pertaining solely to Equipment or Fixtures . . .; and (4) . . . all Proceeds and products of any and all of the foregoing"; two and a half pages of defined terms, including "Credit Agreement," which is defined as "the term loan agreement dated as of November 29, 2006, among the Debtor [Old GM], Saturn Corporation and JPMorgan," and "Collateral Agreement," which is defined as "the collateral agreement, dated as of November 29, 2006, among the Debtor [Old GM], Saturn Corporation and JPMorgan."  *Id.*

72.    Annex I is followed by Schedule 1, which lists forty-two manufacturing facilities in thirty-five cities in twelve states.  *Id.*  All of the facilities listed are either "assembly," "MFD," or "Powertrain" facilities.  *Id.*  In order to reach Schedule 1, one has to page through Annex I.

II.    THE REPAYMENT OF THE SYNTHETIC LEASE

A.    Mayer Brown Begins to Work on the Repayment Transaction

73.    In October 2008, Old GM decided to repay the remaining amounts outstanding on the Synthetic Lease.  Macdonald Decl. Ex. C (October 1, 2008 Email from Gordon to Green).

74.    Old GM was represented in the repayment transaction by Mayer Brown.  *Id.*; *see also* Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 10:19–21.

34

75.     JPMorgan was represented in the repayment transaction by Simpson Thacher. Fisher Decl. Ex. H (Merjian 2010 Dep. Tr.) at 9:2–10.

76.     Mayer Brown prepared the documentation necessary to unwind the Synthetic Lease.  Macdonald Decl. Ex. L (October 15, 2008 Email from Merjian to Duker).

77.     The professionals at Mayer Brown who worked on the Synthetic Lease termination included Gordon, Green, Gonshorek, and Perlowski.  *See generally*, Fisher Decl. Exs. A (Gordon 2010 Dep. Tr.), B (Green 2010 Dep. Tr.), and C (Gonshorek 2010 Dep. Tr.); Macdonald Decl. Ex. P (Perlowski 2010 Dep. Tr.).

78.     Gordon assigned to Green responsibility for preparing the documentation necessary to terminate the Synthetic Lease.  Macdonald Decl. Ex. C (October 1, 2008 Email from Gordon to Green); Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 5:13–20.

79.     Green understood that JPMorgan (and his client, Old GM) intended to terminate *only* the financing statements filed in connection with the Synthetic Lease, and not any other loan.  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 83:6–11, 87:7–88:8, 88:21–90:19.

80.     Green did not have a list of financing statements associated with the Synthetic Lease.  Macdonald Decl. Ex. D (October 7, 2008 Email from Romick to Green).

81.     On October 7, 2008, at 3:21 p.m., Green asked Perlowski to run "full UCC searches" in Michigan and Delaware for filings in favor of JPMorgan as "Agent" against Old GM.  Fisher Decl. Ex. D.

82.     On October 7, 2008 at 4:39 p.m., Perlowski emailed Green, informing Green that as of May 7, 2008, there were 1,777 financing statements against Old GM filed with the Delaware Secretary of State.  Macdonald Decl. Ex. E (October 7, 2008 Email from Perlowski to Green and Gonshorek).

83.     On October 9, 2008, Perlowski sent Green and Gonshorek an email describing four UCC-1 financing statements: three filed in connection with the Synthetic Lease, and the Main Term Loan UCC-1.  Macdonald Decl. Ex. G (October 9, 2008 Email from Perlowski to Green and Gonshorek).

84.     Perlowski described the three Synthetic Lease financing statements as "blanket-type financing statement[s] as to *real property* and related collateral" at specific properties.  *Id.* (emphasis added).

85.     Perlowski described the Main Term Loan UCC-1 as a "financing statement as to *equipment, fixtures* and related collateral located at certain U.S. manufacturing facilities … file date November 30, 2006."  *Id.* (emphasis added).

86.     Green and Gonshorek prepared termination statements for all four of these UCC-1 financing statements and listed all four (among others) in the closing checklist they sent to Simpson Thacher.  Macdonald Decl. Ex. L (October 15, 2008 Email from Merjian to Duker).

87.     Mayer Brown also listed all four UCC-1 financing statements (among others) in the Escrow Agreement that Mayer Brown sent to Simpson Thacher.  Fisher Decl. Ex. M.

88.     Neither Merjian nor Duker noticed the presence of the Main Term Loan UCC-1 among the liens to be terminated.  Fisher Decl. Ex. H (Merjian 2010 Dep. Tr.) at 34:19–35:5; Duker Affidavit (ECF No. 31) ¶ 16 ("I did not believe that any of the documents I received related to anything but the Synthetic Lease Transaction").

> B.     Green and Gonshorek Were Familiar with the Synthetic Lease

89.     Green had worked on transactions involving the release of security "a number of times before."  Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 7:23–8:20, 9:24–10:7, 83:6–11.

90.    Green was familiar with the Synthetic Lease transaction and had reviewed the

Participation Agreement.  *Id.* at 7:23–8:20, 83:6–11.

91.    Green spent more than 50 hours over five weeks working on the Synthetic Lease.

*See* Macdonald Decl. Ex. I (Mayer Brown Billing Records).

92.    Gonshorek spent almost as much time as Green working on the Synthetic Lease.

*See id.*

> C.    Green and Gonshorek Noticed the Obvious Differences Between
> the Term Loan and the Synthetic Lease and Did Not Subjectively Believe
> that the Main Term Loan UCC-1 Pertained to the Synthetic Lease

93.    Gonshorek testified that he used the October 9, 2008 email from Perlowski

describing the UCC-1 financing statements against Old GM and Auto Facilities Real Estate Trust

2001-1 (Macdonald Decl. Ex. G), which attached the Main Term Loan UCC-1, "as the basis for

the preparation" of "which filings needed to have terminations prepared for."  Fisher Decl. Ex. C

(Gonshorek 2010 Dep. Tr.) at 12:21–23.

94.    Gonshorek reviewed the Main Term Loan UCC-1.  Fisher Decl. Ex. B (Green

2010 Dep. Tr.) at 96–99; *id.* Ex. C (Gonshorek 2010 Dep. Tr.) at 9:17–24.

95.    Gonshorek reviewed Schedule 1 and realized that the list of properties on

Schedule 1 did not line up with the list of properties involved on the Synthetic Lease checklist.

Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 96–99.

96.    Gonshorek informed Green of his "concern," raising a "question about the

properties identified," and showed Green a copy of Schedule 1.  *Id.*

97.    Green testified that Gonshorek pointed out to him that the "cities and states listed

[on Schedule 1 to the Main Term Loan UCC-1] is broader than what the properties in" the

Synthetic Lease were.  *Id.* at 98.

98.     There were many "red flags indicating that the Main Term Loan UCC-1 had nothing to do with the Synthetic Lease" (Stern Decl. Ex. A at 8), including the following just on the face of Schedule 1:

(i) at least forty-one of the forty-two properties listed on Schedule 1 were not properties in the Synthetic Lease;

(ii) four of the five properties remaining in the Synthetic Lease were not listed on Schedule 1.

(iii) the only remaining properties in the Synthetic Lease were in Michigan, whereas Schedule 1 listed properties in twelve states; and

(iv) the only properties remaining in the Synthetic Lease were in Grand Blanc, Detroit, and Flint, whereas Schedule 1 listed properties in thirty-two other cities.

Stern Decl. Ex. A at 5, 8; Harris Decl. Ex. A at 6, 8, 11–12.

99.     It is likely that Green and Gonshorek also read Annex I, as Schedule 1 is the last page of Annex I.  Macdonald Decl. Ex. O (Main Term Loan UCC-1).  Reading Annex I, it is obvious that the Main Term Loan UCC-1 pertains to another transaction because:

(i) it describes parties, including Saturn Corporation, that were not involved in the Synthetic Lease;

(ii) it describes documents, including the Term Loan Agreement and the Collateral Agreement, that were not involved in the Synthetic Lease;

(iii) it describes that these documents were dated November 29, 2006, which was approximately five years after the Synthetic Lease originated;

(iv) it did not describe any of the agreements relating to the Synthetic Lease;

(v) it describes the collateral for the Term Loan as including "equipment," which was not collateral in the Synthetic Lease; and

(vi) it did not describe many of the parties, including BTM Capital Corporation (secured investor); JH Equity Realty Investors, Inc. (equity investor); Relationship Funding Company, LLC (provider of RFC loans); and Auto Facilities Real Estate Trust 2001-1 (lessor).

Stern Decl. Ex. A at 7, 9, 10; Harris Decl. Ex. A at 12–13.

100.    Someone at Mayer Brown actually noticed the language on the Main Term Loan

UCC-1 stating it had been filed in connection with a 2006 "term loan agreement" because this

language is circled by hand on a copy of the Main Term Loan UCC-1 printed from Gonshorek's

computer.  Macdonald Decl. Ex. J (October 9, 2008 Email from Perlowski to Green and

Gonshorek with handwritten marks).

101.    None of the Mayer Brown witnesses that were asked recalled or knew whose

handwriting this was.  *See* Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 27:10–14; *id.* Ex. P

(Gordon 2017 Dep. Tr.) at 87:15–18; *id.* Ex. R (Gonshorek 2017 Dep. Tr.) at 144:6–145:14.

Gonshorek testified in 2017 that he did not believe that the handwriting on the first page of

Exhibit 3 was his because it was not the style he uses.  *Id.* Ex. R. (Gonshorek 2017 Dep. Tr.) at

144:6–145:14.

102.    Green's conduct following this conversation is inconsistent with an assertion that

he believed that the Main Term Loan UCC-1 related to the Synthetic Lease.  A reasonable

practitioner in Green's position would have (i) escalated the concern internally and discussed the

issue with other Mayer Brown attorneys familiar with the transaction; (ii) raised the concern with

Simpson Thacher to see if its attorneys could explain the filing and confirm that JPMorgan

intended to terminate the financing statement; or (iii) conducted additional research on his own

into the provenance of the Main Term Loan UCC-1, including review of the documents referred

to on it.  Stern Decl. Ex. A at 10–11.

103.    In sum, any lawyer or paralegal with even basic familiarity with the UCC system

would have recognized the very significant risk that the Main Term Loan UCC-1 did not related

to the Synthetic Lease.  Stern Decl. Ex. A. at 11–12.

> D.    Even if Green and Gonshorek Subjectively Believed that the Main
> Term Loan UCC-1 Related to the Synthetic Lease, that Belief Was Not
> Objectively Reasonable

104.    The "red flags" obvious on the Main Term Loan UCC-1 would have been significant to any reasonable practitioner in Green's position.  Stern Decl. Ex. A at 8; Harris Decl. Ex. A at 11–12.

105.    Nevertheless, Green failed to take any steps to resolve Gonshorek's concern. Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 98:21–25.

106.    Attorneys and paralegals handling UCC filings understand and are thoroughly trained about the importance of accuracy in UCC filings, and the necessity of resolving any potential discrepancies before a filing is completed.  Stern Decl. Ex. A at 11.

107.    This custom and practice is necessitated by the potentially serious consequences of errors with respect to UCC filings for creditors and debtors alike, including consequences not just for the secured party, but also for the debtor because the termination of a financing statement for an active loan can trigger events of default or other legal remedies.  *Id.*; Harris Decl. Ex. A at 15.

108.    Avoiding errors is even more important when handling filings involving large organizations that may have many filings in the public record.  Stern Decl. Ex. A at 11

109.    It is industry practice for such persons to handle filings scrupulously in order to avoid error.  *Id.*

110.    Given the red flags described above (*supra*, paragraphs 98–99), it was not objectively reasonable for Green to conclude that the Main Term Loan UCC-1 had been filed in connection with the Synthetic Lease, as there was nothing that pointed to the fact that it was part of the Synthetic Lease, and every indication that it was not.  Stern Decl. Ex. A at 11.

111.    The fact that the Main Term Loan UCC-1 was filed against Old GM and in favor of JPMorgan is not sufficient to make any belief that Green may have had reasonable, as it is not uncommon for large corporations such as Old GM to have several lines of secured financing in favor of the same secured party.  *Id.* at 12.

112.    The fact that neither JPMorgan nor its counsel, Simpson Thacher, objected would not render Mayer Brown's belief reasonable either, as it is not consistent with industry custom and practice for debtor's counsel to assume that creditor's counsel has reviewed financing statements for accuracy.  *Id.*; Macdonald Decl. Ex. R (Stern Dep. Tr.) at 32:7–33:9.

113.    Neither Merjian's "nice job on the documents" email nor his execution of the Escrow Agreement renders any belief that Green had that the Main Term Loan UCC-1 pertained to the Synthetic Lease reasonable.  Harris Decl. Ex. A at 15.

114.    An attorney advised of Gonshorek's concern would not reasonably believe that the Main Term Loan UCC-1 pertained to the Synthetic Lease.  *Id.*; Harris Decl. Ex. A at 10–11.  *See* Macdonald Decl. Ex. Q (Harris Dep. Tr.) at 30:23–31:2 ("Q: So when it comes to Mayer Brown's belief, is it fair to say that your opinion in this case is that the belief was not objectively reasonable?"  A: "Yes. . . ."); Harris Decl. Ex. A at 9 ("In my opinion, Mayer Brown's belief that the Main Term Loan UCC-1 pertained to the Synthetic Lease Transaction (assuming it was subjectively held) was not objectively reasonable.").  Macdonald Decl. Ex. R (Stern Dep. Tr.) at 33:4–9 ("Q: And it's your opinion that . . . Mr. Green behaved in a way that was objectively unreasonable in proceeding with the filing of the UCC-3 termination statement?  A: That is my opinion."); Stern Decl. Ex. A at 3 ("in light of the facts known to Mayer Brown and concerns raised by Mayer Brown employees, Mayer Brown could not reasonably have concluded that it

41

was authorized to file the UCC-3 termination statement (the 'Termination Statement') that is at issue in this case").

115.    Green's failure to act in response to Mr. Gonshorek's concerns reflects an extreme departure from the standard expected from a lawyer practicing in the area of secured transactions.  Stern Decl. Ex. A at 8.

E.    Filing of the Termination Statement

116.    Despite the significance of Gonshorek's concern, all of the obvious red flags, and Mayer Brown's complete failure to resolve Gonshorek's concern, Mayer Brown filed the Termination Statement on October 30, 2008.  Macdonald Decl. Ex. S (October 29, 2008 Email from Gonshorek to Kluever).

III.    THE LITIGATION

A.    Green and Gonshorek's 2010 Depositions Fail to Explore Gonshorek's Concerns

117.    Plaintiff brought this action on July 31, 2009.  ECF No. 1.

118.    Plaintiff and JPMorgan litigated "Phase I" of this action without the involvement of the Term Loan Lenders.  *See* SUMF 13, *supra*; Response No. 13, *supra*.

119.    As such, the Term Loan Lenders were not invited to participate in the 2010 depositions of Gordon, Green, Gonshorek, and Perlowski.  *See* Fisher Decl. Ex A (Gordon 2010 Dep. Tr.); *id.* Ex. B (Green 2010 Dep. Tr.); *id.* Ex. C (Gonshorek 2010 Dep. Tr.); Macdonald Decl. Ex. P (Perlowski 2010 Dep. Tr.).

120.    In his 2010 deposition, Green testified "I do remember having a conversation about a schedule to the financing statement" to the Main Term Loan UCC-1 with Gonshorek. Fisher Decl. Ex. B (Green 2010 Dep. Tr.) at 97:1–3, 17.

121.    Green testified that "[t]here was a question about whether the properties identified relate to synthetic lease." *Id.* at 97:10–11.

122.    Green did not "remember exactly when" the conversation took place, but that it was "[p]rior to closing." *Id.* at 97:14–15.

123.    Green testified that Gonshorek "showed me the exhibit and raised a question about the properties identified.  And I didn't have any additional discussions about it." *Id.* at 97:24–98:1.

124.    When asked by JPMorgan's counsel "what is it about the schedule that you discussed" with Gonshorek, Green testified "[j]ust that the cities and states listed is broader than what the properties in – say on the checklist is broader.  That was the concern." *Id.* at 98:9–13.

125.    When asked "[w]hat did you conclude with respect to the issue" Gonshorek raised, Green testified "I didn't conclude anything," and did not talk about it with Gordon or anybody else from JPMorgan. *Id.* at 98:16–25.

126.    Then, counsel for JPMorgan asked the following question: "At the time of the closing, sir, which I believe was in the end of October 2008, did you have any understanding that any of the documentation that was prepared in connection with that closing purported to release security in connection with the term loan financing between General Motors and JPMorgan?" to which Green responded "No.  At the time of closing I understood that the documents related to the synthetic lease." *Id.* 99:1–8.

127.    Green did not offer any explanation for how he came to this belief. *Id.*

128.    None of the attorneys present at Green's 2010 deposition asked any additional follow-up questions about Gonshorek's "concern" about the Main Term Loan UCC-1. *Id.*

43

129.    Green was not asked about the handwritten circle around the definition of credit agreement in the version of the Main Term Loan UCC-1 printed from Gonshorek's computer. Green testified that he did not know who made the handwritten notations on the cover email that attached the printed Main Term Loan UCC-1. *Id.* 27:10–14.

130.    Gonshorek was deposed the next day in 2010, and was not asked any questions about the conversation he had with Green about his "concern" regarding the Main Term Loan UCC-1. *See generally* Fisher Decl. Ex. C (Gonshorek 2010 Dep. Tr.).

B.    The Mayer Brown Witnesses Claimed Amensia at Deposition in 2017

131.    In 2015, Plaintiff began serving the Term Loan Lenders. *See* ECF No. 90.

132.    Green, Gonshorek, Gordon, and Perlowski were deposed by the Term Loan Lenders in 2017. Fisher Decl. Exs. P–S.

133.    In his 2017 deposition, Green claimed near total amnesia about the Synthetic Lease Transaction: he testified that he did not remember or he did not recall over 100 times (*see generally* Fisher Decl. Ex. Q); he testified "I don't remember working on the synthetic lease transaction in September – or in 2008" (*id.* at 78:16–17); he testified "Sitting here today, I do not recall anything about the transaction during the time of October 2008" (*id.* at 169:1–3); he testified "I don't recall anything about the transaction" (*id.* at 169:16–17); and he testified "I don't recall the transaction"—twice (*id.* at 170:9, 15).

134.    Green was not able to offer any explanation for the belief that he claimed in 2010 that the Main Term Loan UCC-1 related to the Synthetic Lease. *Id.* at 73:15–77:24.

135.    The Synthetic Lease was a notable transaction in Green's career and he read about it in at least one news story. *Id.* at 82:21–83:11.

44

136.    The lawsuit has received substantial media coverage. *See, e.g.*, Macdonald Decl. Ex. T (Above the Law article); Ex. U (Reuters Article) & Ex. V (Wall Street Journal article).

137.    In 2017, Gonshorek also did not remember any of the events associated with the repayment: he testified "I do not recall the specifics of any matter that I may have worked on during" the fall of 2008 (Fisher Decl. Ex. R (Gonshorek 2017 Dep. Tr.) at 21:11–20); he testified "no" when asked if he had "any memory at all of working on a transaction involving GM, JPMorgan, and a synthetic lease in the fall of 2008" or at any time while at Mayer Brown (*id.* 30:4–12); when asked whether he had "any memory about the subject of your 2010 deposition," he testified that he had a "vague memory that it involved a UCC-3 termination" (*id.* at 50:7–14); when asked to confirm that his "mind remains a complete blank" about the events of 2008, he testified "Sadly, yes" (*id* at 57:15–17); none of his time entries from 2008 refreshed his memory (*id.* at 80:5–17); and he did not recall the conversation he had with Green in 2008 where he expressed "concern" about Schedule 1 to the Main Term Loan UCC-1 (*id.* at 128:22–129:11).

138.    Gordon recalled few details about the Synthetic Lease transaction from October 2008 in his 2017 deposition. *See, e.g.,* Fisher Decl. Ex. P (Gordon 2017 Dep. Tr.) at 58:22–23 ("I really don't remember what I did on one particular day over 8 years ago"); *id.* at 64:9–11 ("I remember working on the payoff of the Chase synthetic lease, but I don't remember specific discussions I had with Ryan [Green]"); *id.* at 81:14–18 (when asked "have you ever had a discussion with anybody about the list of properties that's contained here on Schedule 1 to Annex I to UCC-1 financing statement," he responded "no"); *id.* at 113:7–10 (when asked "do you recall reviewing a draft closing checklist for a payoff and release of the properties related to this transaction," he responded "that I do not recall").

45

139.    Perlowski recalled very little about the 2008 Synthetic Lease transaction in his

2017 deposition.  *See* Fisher Decl. Ex. S (Perlowski 2017 Dep. Tr.) at 20:12–14 ("I don't

remember anything with respect to Mr. Green and working with Mr. Green"); *id.* at 38:6–16

(when asked "so do you recall anything else about this transaction, other than the fact that you

were assigned to work on the transaction" he responded "the only thing I remember specific[ly]

– doing is looking at this report, the list of financing statements from the Secretary of State's

office, because it was so voluminous, so I remember going through that.  But that's, you know,

the extent of it.").

C.    Phase I Briefing and Appeal

140.    Both JPMorgan and Plaintiff consistently asserted to this Court in their Motion for

Summary Judgment papers in Phase I that nobody at Mayer Brown was aware that the Main

Term Loan UCC-1 concerned a transaction other than the Synthetic Lease.  *See* Memorandum of

Law in Support of JPMorgan's Motion for Summary Judgment (ECF No. 29) at 11 ("But Mr.

Green, along with Mr. Gonshorek, believed that all of the Delaware UCC-1 financing statements

identified by Mr. Perlowski pertained only to the Synthetic Lease Transaction . . . "); *id.* at 32

("Mayer Brown, [Old] GM's counsel for the purpose of winding up the Synthetic Lease

Transaction, has provided un-controverted testimony that they did not know they had filed a

UCC-3 unrelated to the Synthetic Lease Transaction . . . ."); JPMorgan's Memorandum of Law

in Opposition to the Plaintiff's Motion for Partial Summary Judgment (ECF No. 48) at 9 (Green

"was never aware that Mayer Brown prepared and filed a UCC-3 relating to the Term Loan"); *id.*

("Gonshorek, the paralegal who assisted Mr. Green, testified that he believed that all of the work

that he performed in October 2008 related to the repayment of the Synthetic Lease Transaction");

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment

(ECF No. 45) at 13 ("While it may be true that Old GM's counsel – like JPMorgan and Simpson

Thacher – failed to recognize at the time of filing that the Term Loan Termination Statement

related to the Term Loan . . . ."); *id.* at 14 ("JPMorgan correctly asserts that this 'is not a situation

in which Mayer Brown recognized it was filing a UCC-3 connected to the Term Loan but for

whatever reason believed it was appropriate.' . . . Mayer Brown prepared a draft UCC filing,

presumably without appreciating that the termination statement terminated collateral securing the

Term Loan").

141.    Both JPMorgan and Plaintiff consistently asserted on appeal that nobody at Mayer

Brown was aware that the Main Term Loan UCC-1 concerned a transaction other than the

Synthetic Lease.  Plaintiff's Opening Brief at 19, ECF No. 32, No. 13-2187 (2d Cir. Sept. 17,

2013) ("Mayer Brown (and all other parties involved) believed, incorrectly, that the 2006

Financing Statement related to the 2001 synthetic lease financing."); JPMorgan's Opposition

Brief at 14, ECF No. 58, No. 13-2187 (2d. Cir. Dec. 9, 2013) ("Without dispute, everyone at

Mayer Brown, GM's counsel …, believed that all of the Delaware UCC-1 financing statements

referenced in the checklist pertained only to the Synthetic Lease …."); Plaintiff's Reply Brief at

2, ECF No. 74, No. 13-2187 (2d Cir. Dec. 23, 2013) ("[A]s JPMorgan also repeatedly

acknowledges, no one realized at the time … that the 2008 Termination Statement was

erroneously included among the closing documents …."); *id.* at 15 ("It is undisputed that, at the

time of the transaction, neither he [Gordon] nor anyone else realized that the 2008 Termination

Statement was unrelated to the Synthetic Lease transaction and mistakenly included within the

batch of documents prepared for the Synthetic Lease Payoff."); Plaintiff's Opening Br. to Del.

Sup. Ct. at 8, No. 325,2014 (July, 21, 2014); JPMorgan's Answering Br. to Del. Sup. Ct. at 12,

No. 325,2014 (Aug. 21, 2014); Plaintiff's Letter Br. to 2d Cir. at 4–5, ECF No. 123, No. 13-2187

(Nov. 26, 2014); Plaintiff's Letter Br. to 2d. Cir. at 1, ECF No. 130, *id.* (Dec. 1, 2014).

142.    On appeal, Plaintiff also repeatedly argued that the term "authorizes" in the Delaware UCC incorporates the law of agency, that the Court should follow the Restatement, that the Restatement required an analysis of Mayer Brown's reasonable understanding of JPMorgan's instructions (including both Mayer Brown's subjective beliefs and the objective reasonableness of those beliefs), and that Mayer Brown's reasonable understanding should be judged in light of *all* the facts of which Mayer Brown was aware.  *See, e.g.*, Plaintiff's Opening Brief at 35–37,  ECF No. 32, No. 13-2187 (2d Cir. Sept. 17, 2013) (citing Restatement (Third) of Agency §§ 3.01, 2.01, 1.01); Plaintiff's Reply Brief at 9, 16–17, ECF No. 74, No. 13-2187 (2d Cir. Dec. 23, 2013) (arguing that the Termination Statement was not authorized based on the law of agency "because it is undisputed that none of the parties involved, including Mayer Brown, had any awareness at the time of the transaction that JPMorgan's communications to its agent were authorizing an act inconsistent with JPMorgan's interests or objectives *known to the agent*"); Plaintiff's Letter Br. to 2d Cir. at 3, ECF No. 123, No. 13-2187 (Nov. 26, 2014) (arguing for application of the Restatement (Third) of Agency).

DATED:  October 12, 2018

                                             */s/ John W. Spiegel*

John W. Spiegel (admitted *pro hac vice*)
Matthew A. Macdonald (admitted *pro hac vice*)
Bradley R. Schneider (admitted *pro hac vice*)
Nicholas D. Fram (admitted *pro hac vice*)

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100
Email:  john.spiegel@mto.com
Email:  matthew.macdonald@mto.com
Email:  bradley.schneider@mto.com
Email:  nicholas.fram@mto.com