John W. Spiegel (admitted *pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
Tel: (213) 683-9100

Bruce Bennett (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Tel: (213) 489-3939

*Attorneys for* Term Loan Lenders

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case |
| MOTORS LIQUIDATION COMPANY, *et al.*, | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |
| MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST, by and through Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee, | Adversary Proceeding<br><br>Case No. 09-00504 (MG) |
| Plaintiff, | |
| vs. | |
| JPMORGAN CHASE BANK, N.A., *et al.*, | |
| Defendants. | |

## DECLARATION OF STEVEN L. HARRIS IN SUPPORT OF THE TERM LOAN LENDERS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE TERM LOAN LENDERS' EFFECTIVENESS DEFENSE

I, Steven L. Harris, declare as follows:

1.      I have been retained as an expert witness on behalf of certain of the Term Loan

Lenders in this matter.  I submit this declaration in support of the Term Loan Lenders'

Opposition to Plaintiff's Motion for Partial Summary Judgment on the Term Loan Lenders'

Effectiveness Defense.  I have personal knowledge of the facts set forth herein, and if called as a

witness, I could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of my expert report in this

matter, which is incorporated herein as though set forth in full.


I declare under penalty of perjury under the laws of the State of Illinois that the foregoing

is true and correct.

DATED:  October 9, 2018                          _____
Chicago, Illinois

                                                 Steven L. Harris

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11**<br>**Case No.:  09-50026 (MG)** |
| **MOTORS LIQUIDATION COMPANY,** *et al.,* | |
| **Debtors.** | |
| **MOTORS LIQUIDATION COMPANY**<br>**AVOIDANCE ACTION TRUST** | **Adversary Proceeding**<br>**Case No.:  09-00504 (MG)** |
| **Plaintiff,** | |
| **v.** | |
| **JPMORGAN CHASE BANK, N.A.,** *et al.,* | |
| **Defendants.** | |

## EXPERT REPORT OF PROFESSOR STEVEN L. HARRIS

### CONFIDENTIAL

**January 31, 2017**

## I.   **EXPERT QUALIFICATIONS**

1.      I am a Professor at Chicago-Kent College of Law, where I teach secured transactions, contracts, remedies, and bankruptcy. Since I joined the faculty of Chicago-Kent in 1997, I have been named a Norman & Edna Freehling Scholar and served as Acting Director of the Graduate Program in Financial Services Law. Immediately prior to joining the faculty at Chicago-Kent, I was a professor at the University of Illinois College of Law for approximately 12 years. I also have taught commercial law as a Visiting Professor at the law schools of the University of Chicago, University of Michigan, and Northwestern University. During 1990-91, I was a scholar in residence at the Chicago law firm of Sidley & Austin, where my practice centered on commercial law and financing, workouts, and bankruptcy.

2.      I am the author or co-author of more than two dozen publications discussing secured transactions and related issues. These publications include articles in academic law journals as well as law journals intended primarily for practicing lawyers. They also include *Security Interests in Personal Property*, a casebook on Uniform Commercial Code Article 9, the sixth edition of which was published in 2016.

3.      I am an elected member of the American Law Institute and a fellow of the American College of Commercial Finance Lawyers.

4.      I have served as an expert on secured financing and related issues in both State and Federal courts. Exhibit A, which is attached hereto, lists the cases in which I have testified in the last four years.  Exhibit B, also attached, lists all publications I have authored in the last ten years.

5.      I have frequently consulted with law firms concerning issues arising under Article 9, including with respect to documentation of transactions.

-1-

6.       I was actively involved in the drafting of Revised Article 9 of the Uniform Commercial Code ("Article 9"), which, as part of the Official Text of the Uniform Commercial Code ("UCC"), has been enacted with some amendments by Delaware (as Article 9 of the Delaware Uniform Commercial Code) and all the other States of the United States. From 1989 to 1993, I served with Professor Charles W. Mooney, Jr., as reporter to the Article 9 Study Committee, which the Permanent Editorial Board for the Uniform Commercial Code established with the support of its sponsors, The American Law Institute and the National Conference of Commissioners on Uniform State Laws (collectively, the "Sponsors").

7.       As reporters to the Study Committee, Professor Mooney and I prepared working papers for the members and led the substantive discussions at the Study Committee meetings. We wrote an extensive Report, which the Study Committee adopted.

8.       At the recommendation of the Study Committee, in 1993 the Sponsors established the official Drafting Committee to Revise Uniform Commercial Code Article 9 ("Drafting Committee") and appointed Professor Mooney and me as the reporters, a position we held until 1999. Professor Mooney and I were responsible for drafting Revised Article 9 and its Official Comments. As we had done for the Study Committee, we coordinated the agendas for the Drafting Committee and prepared working papers that analyzed the substantive issues and made policy recommendations. We also crafted statutory language to implement the Drafting Committee's decisions.

9.       In 2008, after Revised Article 9 had been in force for some years, the Sponsors established a Drafting Committee on Amendments to Uniform Commercial Code Article 9 ("Committee"). As the Committee's reporter I was responsible for drafting amendments to Revised Article 9 and its Official Comments, in accordance with the Committee's decisions.

-2-

The Committee's work was approved by the Sponsors in 2010 and has since been enacted into law, with some amendments, in each of the 50 United States.

10.     A copy of my curriculum vitae, which accurately describes significant aspects of my education and professional experience and accomplishments, is attached hereto as Exhibit B.

## II.      PURPOSE OF THE ANALYSIS

11.     I have been engaged by the group of term lenders identified on Exhibit C, which is attached hereto, as an expert on certain issues pertaining to secured transactions and related issues in connection with the above-captioned matter. In particular, I have been asked to express my opinion concerning (a) the reasonableness of any belief that Mayer Brown (as defined below) may have had that JPMorgan (also as defined below) authorized the filing of the Termination Statement (also as defined below); and (b) whether the provisions of Article 9 reflect a deliberate decision of the drafters to place the burden of investigating the legal status of a financing statement on prospective creditors.

12.     For my work in connection with this assignment, I am paid at the rate of $700 an hour and receive reimbursement of expenses. Payment for my services does not depend in any way on the opinions that I form or on the outcome of this matter. No people under my supervision have assisted me in this matter.

## III.     PREPARATION OF THE OPINIONS

13.     In preparing my opinions, I have reviewed, among other things, certain documents and judicial opinions pertaining to this matter. These documents and judicial opinions are listed in Exhibit D, which is attached hereto.

14.    I have been asked to assume that the law of the State of Delaware governs the effectiveness of the Main Term Loan UCC-1 (as defined below). Accordingly, my opinions refer to provisions of Article 9 of the Uniform Commercial Code as enacted by the State of Delaware.[1]

## IV.    OPINIONS

### A.    *Mayer Brown Could Not Reasonably Have Believed that JPMorgan Authorized the Filing of the Termination Statement*

15.    Based on my review of the materials listed in Exhibit D and on reasonable inferences drawn from them, I assume that the following events have occurred:

a.    In 2001, General Motors Corporation, a Delaware corporation ("GM"), Auto Facilities Real Estate Trust 2001-1, a Delaware business trust, and others entered into a financing transaction ("Synthetic Lease Transaction") pursuant to a Participation Agreement dated as of October 31, 2001, which was amended on February 6, 2003 (as amended, "Participation Agreement").

b.    JPMorgan Chase Bank (formerly known as The Chase Manhattan Bank) was the Administrative Agent (in such capacity "JPMorgan") under the Participation Agreement. *See* Annex A to the Participation Agreement.

c.    On or around November 29, 2006, GM as Borrower, Saturn Corporation as Guarantor, JPMorgan Chase Bank, NA, as Administrative Agent, and others entered into a financing transaction pursuant to a Credit

---

[1] Delaware Code, Title 6, Subtitle I, Article 9. Unless indicated to the contrary, all statutory citations are to provisions of Article 9 in effect in Delaware as of October 30, 2008. The provisions cited are substantially identical to provisions of the then-current Official Text of the Uniform Commercial Code.

-4-

Agreement dated as of November 29, 2006 ("Term Loan"). *See* Dep. Ex. 36. The Term Loan was wholly unrelated to the Synthetic Lease Transaction.

d.    The Synthetic Lease Transaction was set to mature on October 31, 2008 ("Maturity Date"). *See* Annex A to the Participation Agreement.

e.    Prior to the Maturity Date, GM decided to exercise its option under the Lease (as defined in Annex A to the Participation Agreement) to purchase the Properties (also as defined in Annex A to the Participation Agreement). *See* Dep. Ex. 7.[2]

f.    On or about October 1, 2008, GM engaged Mayer Brown LLP to prepare the documentation necessary to complete the purchase and unwind the Synthetic Lease Transaction. *Id.*

g.    Of the Mayer Brown LLP personnel who participated in the events that led to the documentation, four are relevant hereto: (i) Robert Gordon, a partner; (ii) Ryan Green, an associate; (iii) Michael Perlowski, a paralegal; and (iv) Stewart Gonshorek, a paralegal (collectively, "Mayer Brown"). Green Dep. Tr., Jan. 27, 2010 ("Green Dep."), at 6-9.

h.    Mayer Brown understood that it was authorized to prepare UCC-3 termination statements for financing statements that had been filed in connection with the Synthetic Lease transaction. Mayer Brown did not understand that it was to prepare termination statements for any

---

[2] Unless indicated to the contrary, deposition exhibit numbers without a prefix refer to the original 2010 deposition exhibit numbers.

financing statement filed in connection with any other transaction. Green Dep. at 88.

i.  On or before October 6, 2008, Mr. Green prepared a draft of a closing checklist for the repayment ("Checklist"). *See* Dep. Ex. TL-109. The Checklist had a section titled "Properties." The section identified five different properties, in three different cities in Michigan. *Id.*

j.  On October 7, 2008, Mr. Green asked Mr. Perlowski to conduct "full UCC searches" in Delaware and Michigan relating to GM as borrower and JPMorgan Chase Bank, as agent. Mr. Green also requested that Mr. Perlowski provide him with "a list of the UCCs that need to be terminated" in connection with the unwinding of the Synthetic Lease Transaction. Dep. Ex. 1.

k.  Mr. Perlowski informed Mr. Green, apparently on October 7, 2008, that it was impossible to perform a search of the Delaware UCC records that was as specific as the one that Mr. Green had requested. Perlowski Dep. Tr., Jan. 27, 2010, at 11.

l.  On October 7, 2008, Mr. Perlowski also informed Mr. Green that "any effective financing statement of record against [GM] would be of record with the Office of the Delaware Secretary of State." Dep. Ex. 2. It appears that Mr. Green also asked Mr. Perlowski to search for filings against Auto Facilities Real Estate Trust 2001-1. *Id.*

m.  On October 9, 2008, Mr. Perlowski e-mailed the results of the search to Mr. Green. Dep. Ex. 4. In the e-mail, Mr. Perlowski explained that the

-6-

search identified four active filings, two against GM and two against Auto Facilities Real Estate Trust 2001-1. *Id.*

n.  Mr. Perlowski's e-mail described the filings against GM as follows:

(i)  "blanket-type financing statement as to real property and related collateral located in Marion County, Indiana (file number 2092526 7, file date April 12, 2002)" ("<u>Synthetic Lease UCC-1</u>") (*id.*); and

(ii)  "financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date November 30, 2006)" ("<u>Main Term Loan UCC-1</u>") (*id.*).

o.  The e-mail attached copies of both of these financing statements. *See id.*

p.  Sometime after the original Checklist was drafted, Mayer Brown added to it a termination statement for each of these financing statements. *See* Dep. Ex. 9. Mayer Brown also prepared draft termination statements for each of these financing statements, including the Main Term Loan UCC-1. I will refer to the termination statement for the Main Term Loan UCC-1 as the "<u>Termination Statement</u>." *See* Dep. Ex. 14.

q.  On October 15, 2008, Mr. Green circulated copies of the drafts of the closing checklist and the termination statements to Mardi Merjian, an attorney at Simpson Thacher & Bartlett LLP. Dep. Ex. 15.

-7-

r.      On October 17, 2008, Mr. Merjian responded, "nice job on the documents." Dep. Ex. 16. I am not aware of evidence that Mr. Merjian objected to the filing of the Termination Statement.

s.      On or about October 29, 2008, Mr. Merjian executed an escrow letter that referred to a termination statement for the Main Term Loan UCC-1. Dep. Exs. 21 & 22.

t.      On or about October 30, 2008, Mr. Gonshorek instructed CT Lien Solutions, a UCC filing service, to file the Termination Statement. Dep. Ex. 25.

u.      Sometime prior to the filing of the Termination Statement, Mr. Gonshorek approached Mr. Green and raised a "concern" about whether the Main Term Loan UCC-1 related to the Synthetic Lease because the list of "cities and states" on Schedule 1 to Annex I to the Main Term Loan UCC-1 ("Schedule 1") was "broader" than the list of cities and states on the closing checklist. During this conversation, Mr. Gonshorek showed Mr. Green a copy of Schedule 1. Green Dep. at 95-99.

v.      Nevertheless, Mr. Green did not have a conversation about Mr. Gonshorek's concern with his superior, Robert Gordon, or with anybody at JPMorgan. *Id.* at 98:21-25. In addition, I am not aware of any evidence that Mr. Green made any effort to resolve Mr. Gonshorek's concern.

w.    Mr. Green has testified that, at the time of the filing of the Termination Statement, he believed that the Main Term Loan UCC-1 was related to the Synthetic Lease Transaction, and not to the Term Loan. *Id.* at 99:1-8.

16.    In my opinion, Mayer Brown's belief that the Main Term Loan UCC-1 pertained to the Synthetic Lease Transaction (assuming it was subjectively held) was not objectively reasonable. Accordingly, Mayer Brown's belief that JPMorgan authorized the filing of the Termination Statement (assuming it was subjectively held) was not objectively reasonable.

17.    An attorney cannot reasonably conclude that a given filed financing statement pertains to a particular transaction merely because the financing statement names the debtor and secured party with respect to that transaction. In particular, the fact that the Main Term Loan UCC-1 names General Motors Corporation as debtor and JPMorgan Chase Bank, as administrative agent, as secured party is an insufficient basis for an attorney charged with preparing or filing termination statements in conjunction with the unwinding of the Synthetic Lease Transaction to form a reasonable belief that the Main Term Loan UCC-1 pertains to the Synthetic Lease Transaction.

18.    There are three main reasons why it would be unreasonable to conclude from the fact that the debtor and secured party named in the Main Term Loan UCC-1 appear to be the debtor and secured party in the Synthetic Lease Transaction, that the Main Term Loan UCC-1 pertains to the Synthetic Lease Transaction:

a.    A given secured party may engage in several transactions with the same debtor and may file a separate financing statement with respect to each transaction.

b.   A given person may act as the collateral agent, administrative agent, or other representative of many different secured parties in many different transactions and, as such, may appear as the secured party of record in filed financing statements that pertain to many different transactions.[3]

c.   The effectiveness of a financing statement is not limited to a particular transaction. A single financing statement may cover multiple transactions. Suppose for example that, in 2015, Debtor granted a security interest to Lender in an item of equipment to secure a $10,000 loan and that Lender perfected the security interest by filing a financing statement covering "equipment." In 2016, the loan was repaid and the security interest discharged, but no termination statement was filed. In 2017, Debtor and Lender entered into an entirely unrelated transaction, in which Debtor granted a security interest in a different item of equipment to secure a new $50,000 loan. The financing statement filed in 2015 ordinarily would be effective to perfect the security interest for the second transaction, and priority as against a competing security interest would date from 2015.

19.   Moreover, the concern that Mr. Gonshorek expressed to Mr. Green is highly significant. An attorney advised of Mr. Gonshorek's concern would not reasonably believe that

---

[3] This factor is particularly likely in the case of a large debtor like GM and a large bank like JPMorgan Chase. Indeed, during the three years at which Mr. Gonshorek was employed by Mayer Brown LLC (February 6, 2006, to April 2, 2009), the firm "did a lot of deals with General Motors and the agent was JPMorgan." Gonshorek Dep. Tr., Jan. 28, 2010, at 8.

the Main Term Loan UCC-1 pertains to the Synthetic Lease Transaction without obtaining

further information.

a.    Even a basic familiarity with UCC filings would be sufficient to enable
      an attorney who reads the Main Term Loan UCC-1 to understand that
      Schedule 1 relates to the collateral covered by the Main Term Loan
      UCC-1.

b.    Schedule 1 lists 42 properties, whereas the Checklist for the Synthetic
      Lease Transaction lists only five.

c.    At least 41 of the 42 properties listed on Schedule 1 are not mentioned
      on the Checklist for the Synthetic Lease Transaction.[4] These properties
      are located in 11 states and 29 cities that are not mentioned on the
      Checklist. At least four of the properties on the Checklist are *not* listed
      on Schedule 1.[5]

d.    I am not aware of anything in the Participation Agreement or any of the
      other transaction documents (MB008285-8840) (collectively, the
      "Transaction Documents") that suggests that any of the 41 properties not
      on the Checklist were included in the Synthetic Lease Transaction.

e.    The fact that the vast proportion, if not all, of the collateral covered by a
      financing statement is unrelated to a given transaction would be highly
      suggestive—even to an attorney with only a basic understanding of the

---

[4] The forty-second property is GM Powertrain Flint Engine South, which conceivably could be
the same as GM Powertrain L6 Engine Plant, which the Checklist shows to be located in Flint.

[5] The fifth property is the GM Powertrain L6 Engine Plant. *See* note 3, *supra*.

UCC filing system—that the financing statement pertains only to a different transaction. It would be customary for an attorney to consider this fact a "red flag" whose warning should not be ignored.

20.     In complex transactions, it is not uncommon for financing statements to indicate the collateral on an annex that incorporates terms from transaction documents relating to the financing statement. The Main Term Loan UCC-1 takes this approach, which gives rise to other aspects of Main Term Loan UCC-1 that strongly suggest that the Main Term Loan UCC-1 is not pertinent to the Synthetic Lease Transaction:

a.     The Main Term Loan UCC-1 refers to loans made pursuant to a transaction that is different from the Synthetic Lease Transaction. Specifically, the Annex to the Main Term UCC-1 ("Annex") refers to loans made to GM "pursuant to the Credit Agreement," which the Annex defines as a "term loan agreement, dated as of November 29, 2006" ("Credit Agreement"). Dep. Ex. 4. The Credit Agreement is not mentioned in any of the Transaction Documents.

b.     The Main Term Loan UCC-1 refers to different parties from those involved in the Synthetic Lease Transaction. Specifically, the Annex refers to Saturn Corporation, which is not mentioned in any of the Transaction Documents.

c.     The Main Term Loan UCC-1 refers to different agreements from those relating to the Synthetic Lease Transaction. In addition to the Credit Agreement, the Annex refers to a Collateral Agreement dated as of

November 29, 2006. Neither of these agreements is mentioned in any of the Transaction Documents.

    d.    The Main Term Loan UCC-1 refers to different properties from those relating to the Synthetic Lease Transaction. Specifically, Schedule 1 refers to at least 41 properties that are not Permitted Properties for the Synthetic Lease Transaction. A list of Permitted Properties appears as Exhibit A to the First Amendment to the Participation Agreement and as Revised Exhibit B to the Agency Agreement (MB008414-16). In addition, this list is displayed on the very first page of a closing binder that was produced from Mayer Brown's files (MB008279) and would commonly have been used as a resource for attorneys working on the Synthetic Loan Transaction. Moreover, of the 12 Permitted Properties, at least 11 are not referred to on Schedule 1 or in the Annex.

21.    Like the Main Term Loan UCC-1, the Synthetic Lease UCC-1 indicates the collateral on an annex that incorporates terms from transaction documents relating to the financing statement. The differences between these two financing statements, both of which were attached to the same e-mail from Mr. Perlowski to Mr. Green (Dep. Ex. 4), strongly suggest that the financing statements pertain to different transactions and that the Main Term Loan UCC-1 was not pertinent to the Synthetic Lease Transaction:

    a.    The Synthetic Lease UCC-1 refers to several entities that are parties to the Synthetic Lease Transaction but that the Main Term Loan UCC-1 does not mention: Auto Facilities Real Estate Trust 2001-1; Relationship

-13-

Funding Company, LLC; Wilmington Trust Company; RFC; and the Backup Facility Banks.

b.      The Synthetic Lease UCC-1 refers to a number of agreements that pertain to the Synthetic Lease Transaction but are not referred to in the Main Term Loan UCC-1: the Participation Agreement, a Liquidity Agreement, and a Loan Facility Agreement.

c.      The Synthetic Lease UCC-1 refers to loans that relate to the Synthetic Lease Transaction but are not referred to in the Main Term Loan UCC-1: Backup Facility Loans and RFC Loans.

22.      The fact that the Main Term Loan UCC-1 was filed more than five years after the closing of the Synthetic Lease Transaction, and three years after the last (and only) time the Participation Agreement was amended, is also significant. Because the priority of a security interest ordinarily dates from the time a financing statement is filed, financing statements are normally (but not necessarily) filed at the time, or before, a transaction closes. If the transaction documents are amended thereafter to cover additional collateral, financing statements are normally (but not necessarily) filed at the time, or before, the amendment takes effect.

23.      I am not aware of any evidence suggesting that Mayer Brown took steps to resolve Mr. Gonshorek's concern about the Main Term Loan UCC-1.

24.      A debtor typically has an interest in making sure that a termination statement is not filed with respect to a transaction in which the debtor owes payment or has other secured obligations. Security agreements not uncommonly include provisions under which the loss of perfection (or the failure of the debtor to advise the secured party of events that might lead to a loss of perfection) constitutes a default, entitling the secured party to accelerate the debt and

enforce its security interest in the collateral and potentially creating a default under other credit agreements. Depending on the type of collateral securing the defaulted obligations, enforcement of the security interest may cause irreparable injury to the debtor's business.

25.     In light of these circumstances, and in light of the custom and practice of attorneys who represent large institutions with respect to secured transactions, Mayer Brown could not reasonably have believed that the Main Term Loan UCC-1 pertained to the Synthetic Lease Transaction, and so could not reasonably have believed that JPMorgan authorized the filing of the Termination Statement.

26.     Practitioners in this field understand and appreciate the serious consequences that may result from terminating the effectiveness of a financing statement when the related secured obligations have not been fully discharged. Accordingly, they address and resolve any doubts or concerns they may have about whether a termination statement that is proposed to be filed affects only the relevant transactions. This is particularly true when the concern is as significant as the one raised by Mr. Gonshorek and the potential for error is as obvious.

27.     Given the significance of this concern and the facts referred to above, neither Mr. Merjian's e-mail (Dep. Ex. 16) nor his execution of the escrow letter (Dep. Exs. 21 & 22) changes my conclusion that Mayer Brown could not reasonably have believed that JPMorgan Chase authorized the filing of the Termination Statement.

### B.     *The Provisions of Article 9 Reflect a Deliberate Decision of the Drafters to Place the Burden of Investigating the Legal Status of a Financing Statement on Prospective Creditors*

28.     Prospective secured creditors typically want to know whether the assets they plan to take as collateral are already encumbered with a security interest. To aid in this determination, they search for financing statements filed against the prospective debtor.

-15-

29.    A filed financing statement indicates to whoever sees it that there may be a security interest in the collateral indicated in the financing statement. As the Official Comments to the UCC explain, "The notice itself indicates merely that a person may have a security interest in the collateral indicated. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." UCC § 9-502 cmt. 2 (Official Text).[6]

30.    This "notice-filing" system, under which a financing statement need not provide the details of the related transaction or identify specific items of collateral, is fundamental to Article 9. It requires a prospective creditor who finds a financing statement that may be relevant to a prospective transaction to conduct an investigation to determine whether the debtor has, in fact, created a security interest and, if so, in which collateral.

31.    Under Article 9's basic priority rule, conflicting security interests in the same collateral rank according to priority in time of filing. That is, the security interest perfected by the earliest filing has priority over the other security interests. § 9-322(a)(1).[7]

32.    As explained above in paragraph 18.c, the effectiveness of a financing statement is not limited to a particular transaction. For this reason, when there is no longer any obligation secured by the collateral covered by a financing statement and there is no commitment to make an advance or otherwise give value, the debtor typically wishes to render ineffective any filed financing statements relating to the discharged obligations.

---

[6] "While Delaware has not adopted the Official Comments prepared by the drafters of the Uniform Commercial Code, these comments are nevertheless useful in interpreting the Code, as it is to be applied in Delaware, in view of the Code's expressed purpose of making uniform the law among the various jurisdictions." *In re Copeland*, 531 F.2d 1195, 1203 n.4 (3d Cir. 1976).

[7] The statement in the text assumes that the conflicting security interests are not perfected by a method other than filing. The basic priority rule is subject to exceptions not relevant hereto. § 9-322(f).

33.    The filing of a termination statement with respect to the financing statement is the statutory mechanism for achieving this result. Generally, upon the authorized filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective. § 9-513(d).

34.    The 1972 Official Text of Article 9 ("Former Article 9") contemplated that, when a termination statement was filed with respect to a financing statement, the financing statement might be removed from the public record. UCC § 9-404(1) (1972). In some circumstances, removal could occur immediately upon receipt of the termination statement; in others, removal could occur as soon as after one year after receipt. *Id.*

35.    Former Article 9 required that a termination statement be signed by a specified person, typically the secured party. *Id.* It did not require the filing office to verify that the person who filed a termination statement was authorized to do so. *Id.* As a result, from time to time a filing office would accept for filing a termination statement that was not signed by the specified person. Such a termination statement was ineffective. Its filing did not render ineffective an otherwise effective financing statement.

36.    When the filing office removed an effective financing statement from the public record, a subsequent search of the filed records by a prospective creditor would not disclose the effective financing statement. Unless the debtor disclosed the facts, the prospective creditor typically had no way to discover that the debtor had encumbered the collateral and that a financing statement had been filed and remained effective. A prospective creditor who relied on the search and proceeded to extend credit as if there were no effective financing statements ran the risk of being subordinated to the creditor whose financing statement was ineffectively terminated.

-17-

37.     The Article 9 Study Committee recognized this problem. It recommended that, to improve the filing system, the Drafting Committee give attention to "existing problems" in, among other areas, "purging of filed financing statements from the records." PEB Study Group, Uniform Commercial Code Article 9, *Report* at 89 (1992).

38.     The Article 9 Drafting Committee followed the recommendation. After discussion, it concluded that a filing office should not be permitted to remove a financing statement from the public record merely because a termination statement is filed with respect to that financing statement. Rather, such a financing statement should remain of record—and searchable—until at least one year after its effectiveness lapses. This approach ultimately was approved by the Sponsors and included in Article 9. UCC § 9-522(a) (1999 Official Text); *id.* § 9-523(c).

39.     The Drafting Committee thought that this approach, under which there is a fixed period of time during which the filing office may not remove information from the public record, was a significant improvement over the approach taken in Former Article 9. The revised approach provides additional information to a prospective creditor who searches the filed records. It discloses effective financing statements that would not have been disclosed under the former approach.

40.     The Drafting Committee recognized that this benefit comes with a cost. A termination statement that was not filed by a person who was entitled to do so is ineffective. UCC § 9-510(a) (1999 Official Text). Any security interest that a prospective creditor might perfect thereafter by filing against the same collateral would be subordinate to a competing security interest perfected by the apparently-terminated financing statement. UCC § 9-

322(a)(1) (1999 Official Text).[8] A prospective creditor who receives a filing-office search report that discloses a financing statement together with a related termination statement ordinarily cannot tell from the search report whether the termination statement was filed by a person who was entitled to do so. To assess the risk that its security interest might be junior, the prospective creditor must make an investigation to determine whether the filing of a termination statement was actually authorized by the secured party of record.

41.    As Official Comment 2 to UCC § 9-522 (1999 Official Text) explains:

[S]ubsection (a) requires the filing office to maintain a record of the information in a financing statement for at least one year after lapse. During that time, the filing office may not delete any information with respect to a filed financing statement; it may only add information. This approach . . . assures searchers that they will receive all information with respect to financing statements filed against a debtor and thereby be able themselves to determine the state of the public record.

42.    The Drafting Committee's approach to termination statements was part of a broad policy (sometimes called the "open drawer" policy) to increase the amount of information available to those who use the UCC filings, even though discovery of the information may impose burdens on prospective creditors. For example, under Former Article 9, some filing offices would reject filings that they thought were legally insufficient. Revised Article 9 permits filing offices to reject filings only for a small number of reasons. UCC § 9-

---

[8] The basic priority rule is subject to exceptions not relevant hereto. UCC § 9-322(f) (1999 Official Text).

520(a) (1999 Official Text); *id.* § 9-516(b). The burden is now those who use the filing system to determine whether a filing is legally sufficient.

43.     The Drafting Committee understood that determining whether the filing of a termination statement was actually authorized by the secured party of record may be easy or difficult, depending on the facts.

44.     Those for whom secured financing is part of their business generally understand that an investigation may be necessary to determine whether a filed termination statement is effective. In any given case, the nature and extent of the investigation will depend on a prospective creditor's willingness to tolerate the risk that collateral is or may become encumbered by a conflicting security interest that has priority.

45.     As part of such an investigation, the prospective creditor may seek information from the debtor, who in some cases may be able to provide sufficient comfort to the prospective creditor that the filing of the termination statement was authorized.

46.     Alternatively, or in addition, the prospective creditor may seek information from the secured party of record. If the secured party of record claims that the filing of a termination statement was unauthorized, the prospective creditor typically will not proceed with the contemplated transaction. This is the case regardless of whether the potential creditor thinks the claim of the secured party of record is legally justified. Resolving the potentially difficult legal determination whether, in fact, the termination statement was authorized is not likely to be cost-effective, and the creditor would not wish to invite litigation by injecting itself into a contentious situation.

47.     As a result, a reasonably prudent prospective creditor would not have relied to its detriment on the presence of the Termination Statement in the public record.

-20-

48.    The Drafting Committee understood that, if litigation over the effectiveness of a termination statement should occur, the court resolving the dispute may need to resort to the non-UCC law of agency. *See* UCC § 1-103 (1999 Official Text) (providing that, unless displaced by the particular provisions of the UCC, the principles of the law of principal and agent supplement its provisions).[9] *See also id.* § 9-511 cmt. 3 ("acts taken by a person who is authorized under generally applicable principles of agency to act on behalf of the secured party of record are effective under this Part").

49.    The Drafting Committee also recognized that, because the secured party of record typically is an organization, in some cases the non-UCC law of agency may be difficult to apply. However, rather than craft a distinct set of agency principles applicable to financing statements (or to Article 9 transactions generally), it chose to leave in place the well-developed package of non-UCC rules.[10]

50.    As the foregoing indicates, the provisions of Article 9 reflect a deliberate decision of the drafters to place the burden of investigating the legal status of a financing statement on prospective creditors. Thus, the fact that a prospective creditor might find it necessary to conduct an inquiry—even a difficult inquiry—into the facts surrounding the authorization of a filed termination statement is consistent with the drafters' intent.

---

[9] As part of the revision of UCC Article 1 in 2001, this provision was renumbered as § 1-103(b).

[10] Those who drafted UCC Article 3 made a different decision. Article 3 contains special rules that address signatures by representatives and employees. *See*, *e.g.*, UCC §§ 3-402 (1999 Official Text); *id.* § 3-405.

Executed this 31st day of January, 2017, in Chicago, Illinois.

Steven L. Harris

## EXHIBIT A

*Deposition testimony*:

A.     International Technical Coatings, Inc. v. Wiretech, Inc., et al., Superior Court of California,

County of Los Angeles, Central District, Case No. BC-445950.

*Arbitration testimony*:

B.     Jaguar Energy Guatemala LLC (U.S.A.) et al. v. China Machine New Energy Corporation

(CHINA), International Court of Arbitration of the International Chamber of Commerce,

Case No. 20013/CYK

<u>EXHIBIT B</u>

# STEVEN L. HARRIS

Chicago–Kent College of Law
565 West Adams Street, Chicago, Illinois  60661
(312) 906–5218

## EMPLOYMENT

<u>Current Position</u>

Professor, Chicago–Kent College of Law.
    Norman & Edna Freehling Scholar, 1999–2002.
    Courses: Secured Transactions, Bankruptcy, Remedies, Payment Systems, Contracts.

<u>Previous Positions</u>

Professor, University of Illinois College of Law, 1985–96. Visiting Professor, Spring, 2008; Spring, 2009. Associate Professor, 1984–85.

Visiting Professor, University of Chicago Law School, Winter, 2000; University of Michigan Law School, Fall, 1995; Northwestern University School of Law, Fall, 1988.

Counsel and scholar–in–residence, Sidley & Austin, Chicago, 1990–91 (on leave from U. of Illinois).

Associate Professor, Wayne State University Law School, 1981–84. Assistant Professor, 1979–81.

Assistant Professor, University of Detroit School of Law, 1978–79.

Associate, Levy and Erens, Chicago, 1975–77.

Law clerk to Justices Robert E. English and Charles R. Barrett, Illinois Appellate Court, Chicago, 1973–75.


## EDUCATION

University of Chicago Law School, 1970–73. J.D., 1973.
    President, Law Students Association.

University of Chicago, The College, 1968–70.
    B.A. with high honors from the department of political science, 1970.
    Phi Beta Kappa; Harold E. Goettler Prize for outstanding senior thesis.

University of California, Los Angeles (UCLA), 1966–68.
    Phi Eta Sigma (academic honorary); Alpha Mu Gamma (foreign language honorary).

## PUBLICATIONS:  Articles

"Making Sense of UCC Section 9-332(b)" (in progress).

"When Is a Dog's Tail Not a Leg: A Property–Based Methodology for Distinguishing Sales of
    Receivables from Security Interests That Secure an Obligation," 82 *University of Cincinnati Law
    Review* 1029 (2014) (with Charles W. Mooney, Jr.).

"Using First Principles of UCC Article 9 to Solve Statutory Puzzles in Receivables Financing," 46
    *Gonzaga Law Review* 297 (2010/11) (with Mooney).

"The International Rail Registry," 12 *Uniform Law Review* 531 (2007).

"Choosing the Law Governing Security Interests in International Bankruptcies," Symposium on
    Bankruptcy Law in the Global Village, 32 *Brooklyn International Law Journal* 905 (2007).

"The Unfortunate Life and Merciful Death of the Avoidance Powers under Section 103 of the Durbin–
    Delahunt Bill:  What Were They Thinking?," 25 *Cardozo Law Review* 1829 (2004) (with Mooney).

"Revised Article 9 Meets the Bankruptcy Code: Policy and Impact," 9 *American Bankruptcy Institute
    Law Review* 85 (2001) (with Mooney).

"How Successful Was the Revision of UCC Article 9?:  Reflections of the Reporters," Symposium on
    Revised UCC Article 9, 74 *Chicago–Kent Law Review* 1357 (1999) (with Mooney).

"Measuring the Social Costs and Benefits and Identifying the Victims of Subordinating Security
    Interests in Bankruptcy," 82 *Cornell Law Review* 1349 (1997) (with Mooney).

"Choosing the Law Governing Perfection:  The Data and Politics of Article 9 Filing," 79 *Minnesota
    Law Review* 663 (1995) (with Mooney).

"A Property–Based Theory of Security Interests:  Taking Debtors' Choices Seriously," 80 *Virginia Law
    Review* 2021 (1994) (with Mooney).

"Article 6:  The Process and the Product—An Introduction," Symposium on Article 6 of the Uniform
    Commercial Code, 41 *Alabama Law Review* 549 (1990).

"The Interface Between Articles 2A and 9," 22 *Uniform Commercial Code Law Journal* 99 (1989).

"The Rights of Creditors Under Article 2A," Symposium on Article 2A of the Uniform Commercial
    Code, 39 *Alabama Law Review* 803 (1988).

"The Interaction of Articles 6 and 9 of the Uniform Commercial Code:  A Study in Conveyancing,
    Priorities, and Code Interpretation," 39 *Vanderbilt Law Review* 179 (1986).

"A Reply to Theodore Eisenberg's 'Bankruptcy Law in Perspective'," 30 *UCLA Law Review* 327
    (1982).

"Non–negotiable Certificates of Deposit: An Article 9 Problem," 29 *UCLA Law Review* 330 (1981).

## PUBLICATIONS: Books, Chapters, and Reports

CASES, PROBLEMS AND MATERIALS ON SECURITY INTERESTS IN PERSONAL PROPERTY (Foundation Press, 6th ed. 2016; 5th ed. 2011; 4th ed. 2006 & Supp. 2010; 3d ed. 2001; 2d ed. 1992 & Supp. 1999) (with Mooney).

RETENTION OF TITLE IN AND OUT OF INSOLVENCY (Globe Law & Business, M. Willems consult. ed., 2015) (chapter on the United States of America).

CASES, PROBLEMS AND MATERIALS ON THE LAW OF PAYMENTS AND OBLIGATIONS (Foundation Press, 5th ed.; in progress) (with the late E. Allan Farnsworth).

"The Convention on International Interests in Mobile Equipment (Cape Town Convention)," in HAWKLAND'S UNIFORM COMMERCIAL CODE SERIES (West 2009) (supplemented annually).

CASES, PROBLEMS AND MATERIALS ON SALES AND SECURED FINANCING (Foundation Press, 7th ed. 2002; 6th ed. 1993 & Supp. 1999) (with J. Honnold, C.W. Mooney, Jr., and C. Reitz).

CASES, PROBLEMS AND MATERIALS ON COMMERCIAL LAW (Foundation Press, 5th ed. 1993) (with E.A. Farnsworth, J. Honnold, C.W. Mooney, Jr., and C. Reitz).

REPORT OF THE PEB ARTICLE 9 STUDY COMMITTEE (1992) (with Mooney, as Reporter) (under the auspices of the Permanent Editorial Board for the Uniform Commercial Code).

"Trade Names, Bulk Sales, and Name Changes—The Challenges of *In re McBee* to Inventory Financing," in P. Coogan, et al., SECURED TRANSACTIONS UNDER THE U.C.C. (1986).

## PUBLICATIONS:  Selected Essays, Short Articles, and Published Talks

"Distinguishing Sales of Receivables from Transfers for Security under U.S. Law," 31 *Butterworths Journal of International Banking and Financial Law* 342 (2016).

"U.C.C. Article 9, Filing–Based Priority, and Fundamental Property Principles: A Response to Professor Plank," 69 *The Business Lawyer* 79 (2013) (with Mooney).

"Perfecting and Maintaining Perfection in Article 9 Security Interests Under the 2010 Amendments: New Sections 9–503 and 9–316," 10 *DePaul Business & Commercial Law Journal* 461 (2012) (with J. Kilborn & M. Livingston).

"Filing and Enforcement Under Revised Article 9," 54 *The Business Lawyer* 1965 (1999) (with Mooney).

"Negotiability, Electronic Commercial Practices, and a New Structure for the UCC Article 9 Filing System," 31 *Idaho Law Review* 835 (1995) (with Mooney).

"Using Fundamental Principles of Commercial Law to Decide UCC Cases," 26 *Loyola of Los Angeles Law Review* 637 (1993).

"The Article 9 Study Committee Report: Strong Signals and Hard Choices," 29 *Idaho Law Review* 561 (1992–93) (with Mooney).

## AWARD

Recipient, Distinguished Service Award, American College of Commercial Finance Lawyers, 2002 (for work in revising UCC Article 9).

## PROFESSIONAL ACTIVITIES

<u>Law Reform Activities</u>

Reporter, National Conference of Commissioners of Uniform State Laws and American Law Institute Drafting Committee on Amendments to UCC Articles 1, 3, and 9, 2016–present.

Reporter, NCCUSL–ALI Drafting Committee on Amendments to UCC Article 9, 2008–2011.

Reporter, NCCUSL–ALI Drafting Committee to Revise UCC Article 9, 1993–99.

U.S. Delegate and Commercial Law Coordinator (appointed by the Department of State), Diplomatic Conference for the Cape Town Convention Protocol on Matters Specific to Space Assets, 2012.

U.S. Delegate and Commercial Law Coordinator (appointed by the Department of State), Diplomatic Conference for the Luxembourg Protocol on Matters Specific to Railway Rolling Stock, 2007.
ALI Liaison, Uniform Law Commission Drafting Committee to Revise the Uniform Residential Landlord and Tenant Act, 2013–15.

American College of Commercial Finance Lawyers Observer, Uniform Law Commission Drafting Committee on Amendments to the Uniform Fraudulent Transfer Act, 2012–14

ALI Representative, Committee to Harmonize North American Law with Regard to the Assignment of Receivables in International Trade Convention, 2006–07.

Advisor to Government of Thailand regarding the Thai Business Secured Transactions Bill, 2002.

Consultant, Center for Economic Analysis of Law (concerning draft Romanian law on security interests in personal property, 1999, and World Bank Secured Transactions Manual, 2005).

Reporter, Permanent Editorial Board UCC Article 9 Study Committee, 1990–93.

Advisor, Permanent Editorial Board of the Uniform Commercial Code (responsible for drafting PEB Commentaries).

Article 9 Study Committee Liaison to the NCCUSL–ALI Drafting Committee to Revise Uniform Commercial Code Article 8, 1991–94.

American Bar Association Advisor to the NCCUSL–ALI Drafting Committee to Revise Uniform Commercial Code Article 6, 1985–87.

Reporter, NCCUSL and ALI Drafting Committee to Revise UCC Article 6, 1987–89.

Member, PEB Study Committee for Uniform Commercial Code Article 2, 1988–91.

Other Selected Professional Service

Elected Member, American Law Institute; Life Member since 2011.

Fellow, American College of Commercial Finance Lawyers; Board of Regents, 1996–99, 2009–2013.

Selected Panels, Speeches, and Programs

Programs on Revised Article 9 (partial list):  American Bar Association; Arkansas State Bar; AALS Section on Commercial Law; Bell, Boyd & Lloyd; California Bankers Association; Chicago Clearing House; Chicago Bar Association; FDIC Legal Division; K&L Gates; Minnesota State Bar Association; Morgan, Lewis & Bockius; National Practice Institute.

Faculty, ALI–ABA and ALI CLE courses of study on various aspects of the Uniform Commercial Code, bankruptcy, commercial law, and commercial lending, since 1989.

"Mortgage Foreclosures and the Uniform Commercial Code," Association of Foreclosure Defense Attorneys, Chicago, 2013.

Panelist, "Bankruptcy Update," 2008 Equipment Leasing and Finance Association Legal Forum.

Panelist, "Globalization of Commercial Law," Association of American Law Schools Conference, Montreal, 2005.

Participant, University of Pennsylvania Journal of International Economic Law Roundtable Symposium on Cross–Border Secured Transactions, 1999.

Moderator, California Financial Lawyers Conference Annual Seminar, 1991, 1999.

Faculty, Conference on Consumer Finance Law program on Secured Lending, 1998.

Faculty, Eastern District of Pennsylvania Bankruptcy Conference, 1998 Bankruptcy Forum.

Panelist, Annual Meeting, National Conference of Bankruptcy Judges, 1997.

Panelist, ABA program on the revision of UCC Article 8, 1993.

Judge Peter Elliott Memorial Lecture, Financial Lawyers Conference, Los Angeles, 1992.

<u>EXHIBIT C</u>

Ares Enhanced Loan Investment Strategy III, Ltd.
Ares Enhanced Loan Investment Strategy IR, Ltd.
Ares IIIR/IVR CLO Ltd.
Ares VIR CLO Ltd.
Ares VR CLO Ltd.
Ares XI CLO Ltd.
Atrium IV
Atrium V
Avery Point CLO, Limited
Bentham Wholesale Syndicated Loan Fund
Black Diamond CLO 2005-1 Ltd.
Black Diamond CLO 2005-2 Ltd.
Black Diamond CLO 2006-1 (Cayman) Ltd.
Black Diamond International Funding, Ltd.
Board of Retirement of the San Diego County Employees Retirement Association
Castle Garden Funding
Caterpillar Inc. Pension Master Trust
Chatham Light II CLO, Limited
Crescent Senior Secured Floating Rate Loan Fund LLC
Eaton Vance CDO IX, Ltd.
Eaton Vance CDO VIII, Ltd.
Eaton Vance CDO X PLC
Eaton Vance Floating Rate Income Trust
Eaton Vance Floating Rate Portfolio
Eaton Vance Institutional Senior Loan Fund
Eaton Vance International (Cayman Islands) Floating Rate Income Portfolio
Eaton Vance Limited Duration Income Fund
Eaton Vance Senior Debt Portfolio
Eaton Vance Senior Floating Rate Trust
Eaton Vance Senior Income Trust
Eaton Vance Short Duration Diversified Income Fund
Eaton Vance Variable Trust Floating Rate Income Fund
Evergreen VA High Income Fund, a series of Evergreen Variable Annuity Trust
FIAM Floating Rate High Income Commingled Pool
FIAM High Yield Bond Commingled Pool
FIAM High Yield Fund, LLC
Fidelity Advisor Series I: Fidelity Advisor Floating Rate High Income Fund
Fidelity Advisor Series I: Fidelity Advisor High Income Advantage Fund
Fidelity Advisor Series I: Fidelity Advisor High Income Fund
Fidelity Advisor Series II: Fidelity Advisor Strategic Income Fund
Fidelity American High Yield Fund
Fidelity Canadian Asset Allocation Fund
Fidelity Central Investment Portfolios LLC: Fidelity Floating Rate Central Fund
Fidelity Central Investment Portfolios LLC: Fidelity High Income Central Fund 1

-29-

Fidelity Central Investment Portfolios LLC: Fidelity High Income Central Fund 2
Fidelity Income Fund: Fidelity Total Bond Fund
Fidelity Puritan Trust: Fidelity Puritan Fund
Fidelity School Street Trust: Fidelity Strategic Income Fund
Fidelity Summer Street Trust: Fidelity Capital & Income Fund
Fidelity Summer Street Trust: Fidelity High Income Fund
First Trust Senior Floating Rate Income Fund II
GE Capital US Holdings, Inc.
General Electric Pension Trust
High Yield Bond Fund, a series of 525 Market Street Fund LLC
IBM Personal Pension Plan Trust
International Paper Company Commingled Investment Group Trust
Iowa Public Employees' Retirement System
Jersey Street CLO, Ltd.
Katonah III, Ltd.
Katonah IV, Ltd.
Legg Mason ClearBridge Capital & Income Fund
Los Angeles Department Water and Power Employees' Retirement, Disability and Death Benefit
        Insurance Plan
Madison Park Funding I Ltd.
Madison Park Funding II Ltd.
Madison Park Funding III Ltd.
Madison Park Funding IV Ltd.
Madison Park Funding V Ltd.
Madison Park Funding VI Ltd.
Marlborough Street CLO, Ltd.
Metropolitan West High Yield Bond Fund
MFS Charter Income Trust
MFS Intermarket Income Trust I
MFS Intermediate High Income Fund
MFS Meridian Funds - Global High Yield Fund
MFS Multimarket Income Trust
MFS Series Trust III on behalf of MFS Global High Yield Fund
MFS Series Trust III on behalf of MFS High Income Fund
MFS Series Trust VIII on behalf of MFS Strategic Income Fund
MFS Series Trust XIII on behalf of MFS Diversified Income Fund
MFS Special Value Trust
MFS Variable Insurance Trust II on behalf of MFS High Yield Portfolio
MFS Variable Insurance Trust II on behalf of MFS Strategic Income Portfolio
Microsoft Global Finance
Momentum Capital Fund Ltd.
Mt. Wilson CLO II, Ltd.
Napier Park Distressed Debt Opportunity Master Fund Ltd.
Nash Point CLO
Northern Trust Global Advisors, Inc., as Named Fiduciary to the Central States, Southeast, and
        Southwest Areas Pension Fund

-30-

Oaktree High Yield Fund II, L.P.
Oaktree High Yield Fund, L.P.
Oaktree High Yield Plus Fund, L.P.
Oaktree Loan Fund 2x (Cayman), L.P.
Oaktree Senior Loan Fund, L.P.
OCM High Yield Trust
Pacific Gas and Electric VEBA
PG&E Corporation Retirement Master Trust
Race Point II CLO, Limited
Race Point III CLO, Limited
Race Point IV CLO, Ltd.
Reinsurance Group of America, Inc.
Sankaty High Yield Partners III Grantor Trust
State Street Bank and Trust Company as Trustee of the FCA US LLC Master Retirement Trust
State Teachers Retirement System of Ohio
TCW High Income Partners Ltd.
TCW Senior Secured Loan Fund L.P.
Texas County & District Retirement System
TMCT II, LLC
TMCT, LLC
Transamerica Aegon High Yield Bond VP, a series of Transamerica Series Trust
Variable Insurance Products Fund: High Income Portfolio
Variable Insurance Products Fund: Strategic Income Portfolio
Velocity CLO Ltd.
Vitesse CLO Ltd.
Wells Fargo & Company Master Pension Trust
Wells Fargo Core Plus Bond Fund, a series of Wells Fargo Funds Trust
Wells Fargo High Yield Bond Fund, a series of Wells Fargo Funds Trust
Wells Fargo Income Opportunities Fund
Wells Fargo Multi-Sector Income Fund
Wells Fargo Principal Investments, LLC
Wells Fargo Utilities and High Income Fund
Wespath Benefits and Investments
West Bend Mutual Insurance Company
Western Asset Floating Rate High Income Fund, LLC

Continental Casualty Company

EXHIBIT D

List of Materials Considered

| Description | Beg Prod No |
|---|---|
| Memorandum of Opinion, *In re Motors Liquidation Co.*, No. 325, 2014 (Del. Oct. 17, 2014) | |
| *In re Motors Liquidation Co.*, 486 B.R. 596 (Bankr. S.D.N.Y. 2013) | |
| Memorandum of Opinion, *In re Motors Liquidation Co.*, No. 13-2187 (2d. Cir. Jan. 21, 2015) | |
| Order, *In re Motors Liquidation Co.*, No. 13-2187 (2d. Cir. Apr. 13, 2015) | |
| First Amended Adversary Complaint, *In re Motors Liquidation Co.*, No. 09-00504 (S.D.N.Y. Bankr. May 20, 2015) | |
| A. Scurria, *2nd Circ. Holds JPMorgan To Faulty Mayer Brown Loan Deal,* Law 360, http://www.law360.com/articles/613544/print?section=appellate (Jan. 21, 2015) | |
| G. Broady, *2nd Circ. Won't Rehear Simpson Thacher $1.5B GM Loan Gaffe*, Law 360, http://www.law360.com/articles/642874/print?section=appellate (Apr. 14, 2015) | |
| M. Chiappardi, *Filing Mistake Can End GM Secure Interest, Del. Justices Say*, Law 360, http://www.law360.com/articles/588160/print?section=appellate (Oct. 17, 2014) | |
| UCC-1 Financing Statement (Ex. 1 to First Am. Compl.) | |
| UCC-3 Financing Statement (Ex. 2 to First Am. Compl.) | |
| Term Loan Agreement dated November 29, 2006 | |
| Collateral Agreement dated November 29, 2006 | |
| Deposition of Ryan Green, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 27, 2010) | |
| Deposition of Michael Perlowoski, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 27, 2010) | |

| Description | Beg Prod No |
|---|---|
| Deposition of Stewart Gonshorek, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 28, 2010) | |
| Deposition of Robert Gordon, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 28, 2010) | |
| Deposition of Mardi Merjian, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Feb. 4, 2010) | |
| Deposition of Ryan Green, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 10, 2017) | |
| Deposition of Stewart Gonshorek, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 11, 2017) | |
| Deposition of Michael Perlowski, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 12, 2017) | |
| Deposition of Robert Gordon, *In re Motors Liquidation Co.*, No. 09-50026 (S.D.N.Y. Bankr. Jan. 12, 2017) | |
| UCC article 9 | |
| UCC article 9 (1972 Official Text) | |
| UCC article 1 (1999 Official Text) | |
| UCC article 3 (1999 Official Text) | |
| UCC article 9 (1999 Official Text) | |
| PEB Study Group, Uniform Commercial Code Article 9 (1992) | |
| Escrow instructions | MB000024 |
| Email: Perlowski > Bailey | MB000111 |
| Email Perlowski > Green | MB000129 |
| Email Green > Perlowski | MB000291 |
| Email Perlowski > Green, Gonshorek | MB000292 |
| Email Merjian > Green (and others) | MB000348 |

| Description | Beg Prod No |
|---|---|
| Emal Green > Merjian and others | MB000350 |
| UCC Compliance Review Results | MB000441 |
| Email CT Lien > Gonshorek | MB000447 |
| UCC Review Request | MB000491 |
| As-filed version of TL UCC-3 | MB000539 |
| Email Green > Merjian, Duker and others | MB001390 |
| Email Perlowski > Green, Gonshorek | MB002414 |
| Email Gordon > Green | MB002461 |
| Email Green > Merjian and others | MB002563 |
| Email Green > Merjian, Ledyard and others | MB002565 |
| Email Duker > Green, Merjian, others | MB002769 |
| Email Holy (GM) > Duker | MB002792 |
| Email Green > Merjian, and others | MB002877 |
| Email Holy > Green | MB002932 |
| Email Gonshorek > Green | MB003019 |
| Email Green > Gonshorek | MB003021 |
| Email Duker > Green, GM | MB003163 |
| Email Carlucci > MB Team | MB003210 |
| Email Gonshorek > Kluever | MB003226 |
| Email Gonshorek > UCC Team | MB003388 |
| Email Gonshorek > Kluever | MB003393 |
| Email Gonshorek > Kluever, Carlucci, Green | MB003395 |

| Description | Beg Prod No |
|---|---|
| Email Nadolski > Green, Gonshorek | MB003797 |
| Email Merjian > Green | MB003801 |
| UCC Search | MB004084 |
| Email Perlowski > Gonshorek | MB004140 |
| Email Green > Braybrook | MB004228 |
| Email Green > Romick | MB004246 |
| Email Green > Braybrook | MB004273 |
| Email Green > Gonshorek | MB004608 |
| Email Green > Gonshorek | MB004917 |
| Email Merjian > Green, others | MB004969 |
| Email Gonshorek > Merjian | MB005122 |
| Email Green > Perlowski | MB005366 |
| Email Merjian > Proffitt, Green | MB005450 |
| Email Green > GM | MB005602 |
| Email Green > Merjian | MB005604 |
| Email Sundaram > Duker | MB005622 |
| Email Glenn > Green, Merjian | MB005630 |
| Email Merjian > Green | MB006367 |
| Initial SL checklist | MB008260 |
| Closing Binder prepared by Mayer Brown | MB008279-9165 |
| Email Gordon > Klickmann | MB009176 |
| Email Swanger > Gordon | MB009181 |
| Billing Entry | MB009233 |

**Deposition Exhibits Reviewed**

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| 1 | Email from Ryan Green to Stewart Gonshorek entitled "GM - 00652500" | MB001110 | MB001110 | 10/7/2009 |
| 2 | Email string between Ryan Green and Michael Perlowski et al re General Motors Corporation/ JPMorgan Delaware Financing Statement Filings | | | 10/7/2008 |
| 3 | Email from Michael Perlowski to Ryan Green entitled "Auto Facilities Real Estate Trust 2001-1 / GM--JPMorgan" | MB001023 | MB001103 | 10/9/2008 |
| 4 | Email string between Michael Perlowski to Ryan Green re Auto Facilities Real Estate Trust 2001-1 / GM--JPMorgan | MB001023 | MB001103 | 10/9/2008 |
| 5 | Termination Statement (GM) | MB006384 | MB006384 | 10/30/2008 |
| 6 | GM Mayer Brown Affidavit | JPMCB - 00000076 | JPMCB - 00000111 | 6/19/2009 |
| 7 | Email From Robert Gordon to Ryan Green entitled "Fw: Chase Synthetic Lease" | MB002461 | MB002463 | 10/1/2008 |
| 8 | Email from Ryan Green to Stacey Braybook (Draft of Closing Checklist attached) | MB004228 | MB004234 | 10/6/2008 |
| 9 | Email string between Ryan Green, Stacy Braybrook and Stewart Gonshorek re GM Checklist-Release of Properties from JPM Chase Synthetic Lease | MB005452 | MB005465 | 10/14/2008 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| 10 | Email from Ryan Green to Arun Sundaram and Tim Conder entitled "GM/JPMorgan Chase Synthetic Lease Releases" | MB005592 | MB005599 | 10/15/2008 |
| 11 | Email from Ryan Green to Arun Sundaram entitled "Re: GM/JPMorgan Chase Synthetic Lease Release" | MB005602 | MB005602 | 10/15/2008 |
| 12 | Email string between Arun Sundaram and Richard Dunker re Auto Facilities Real Estate Trust | JPMCB-STB-00000906 | JPMCB-STB-00000908 | 10/15/2008 |
| 13 | Email string between Ryan Green, Mardi Merjian and Glenn Kenton re GM/JPMorgan Chase Synthetic Lease Property Releases (GM Checklist attached) | JPMCB-STB-00000072 | JPMCB-STB-00000077 | 10/15/2008 |
| 14 | Email string between Ryan Green, Mardi Merjian and Michael Ledyard re GM/JPMorgan Chase (documents attached) | JPMCB-STB-00000184 | JPMCB-STB-00000206 | 10/15/2008 |
| 15 | Email string between Ryan Green and Mardi Merjian and Michael Ledyard entitled "GM/JPMorgan Chase-Synthetic Lease" | JPMCB-STB-00000184 | JPMCB-STB-00000272 | 10/15/2008 |
| 16 | Email string between Mardi Merjian and Ryan Green re Re: GM/JPMorgan Chase - Synthetic Lease | JPMCB-STB-00000366 | JPMCB-STB-00000367 | 10/17/2008 |
| 17 | Email string between Ryan Green and Mardi Merjian et al re Re: GM/JPMorgan Chase Synthetic Lease | MB000005 | MB000018 | 10/21/2008 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| 18 | Email string between Ryan Green and Jamie Romick re Re: Auto Facilities Real Estate Trust | MB004295 | MB004295 | 10/23/2008 |
| 19 | Email string between Ryan Green and William Wineman et al re GM/JPMorgan Chase Synthetic Lease (High Importance) | JPMCB-STB-00000427 | JPMCB-STB-00000437 | 10/24/2008 |
| 20 | Email string between Mardi Merjian and Ryan Green re FW: GM/JPMorgan Chase Synthetic Lease | JPMCB-STB-00000452 | JPMCB-STB-00000454 | 10/27/2008 |
| 21 | Email string between Mardi Merjian and Ryan Green et al re Re: Auto Facilities Real Estate Trust | JPMCB-STB-00000885 | JPMCB-STB-00000887 | 10/29/2008 |
| 22 | Draft Escrow Instructions | MB000024 | MB000030 | 10/29/2008 |
| 23 | Email string between William Wineman to Mardi Merjian et al re Re: Auto Facilities Real Estate Trust | JPMCB-STB-00000891 | JPMCB-STB-00000893 | 10/29/2008 |
| 24 | Email from Mary Swanger to Ryan Green entitled "GM Terminations from 2008" | MB000003 | MB000003 | 6/16/2009 |
| 25 | Final status report - UCC filings | MB000443 | MB000446 | 11/4/2008 |
| 26 | Email (with attachments) | JPMCB-STB-00000112 | JPMCB-STB-00000115 | 6/17/2009 |
| 27 | Email from Fem Bomchill to Richard Toder entitled "FW: Affidavit of Bob Gordon" (Affidavit of Bob Gordon attached) | JPMCB-STB-00006319 | JPMCB-STB-00006322 | 6/18/2009 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| 28 | Email from Fem Bomchill to Andrew Gottfried entitled "GM" | JPMCB-STB-00006334 | JPMCB-STB-00006334 | 6/29/2009 |
| 29 | Email from Mardi Merjian to sprofitt@mayerbrown.com entitled "GM syn lease" | JPMCB-STB-00000001 | JPMCB-STB-00000001 | 10/9/2008 |
| 30 | Email string between Mardi Merjian, Ryan Green et al re JPMorgan/Chase GM Synthetic Lease | JPMCB-00000950 | JPMCB-00000950 | 10/13/2008 |
| 31 | Email string between Mardi Merijian and Richard Duker et al re GM/JPMorgan Chase Synthetic Lease Property Releases (includes checklist) | JPMCB-00000919 | JPMCB-00000920 | |
| 32 | Email string between Mardi Merjian and Richard Duker et al re  GM/JPMorgan Chase Synthetic Lease (with attachments) | JPMCB-00000273 | JPMCB-00000362 | 10/15/2008 |
| 33 | Email string between Mardi Merjian Ryan Green re Re: Chase/GM Closing | JPMCB-00002012 | JPMCB-00002014 | 10/21/2008 |
| 34 | Email string between Ryan Green and William Wineman et al re Re GM/JPMorgan Chase Synthetic Lease (High Importance) | JPMCB-00000427 | JPMCB-00000440 | 10/24/2008 |
| 35 | Email from Richard Duker to jeffrey.holy@gm.com entitled "Fw: GM Payroll" | JPMCB-00002042 | JPMCB-00002043 | 10/24/2008 |
| 36 | Term Loan Agreement | JPMCB-1-00000060 | JPMCB-1-00000126 | 11/29/2006 |
| 37 | Collateral Agreement | JPMCB-CSM- | JPMCB-CSM-0000158 | 11/29/2006 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| | | 0000112 | | |
| 38 | UCC Financing Statement filed in connection with Term Loan | MB005358 | MB005362 | 11/30/2006 |
| 39 | Initial Closing of $325,000,000 Synthetic Lease Financing; Participation Agreement | JPMCB-STB-0000896 | JPMCB-STB-0001033 | 1/6/2003; 10/31/2001 |
| 40 | Email string between Richard Duker and Mary Gherty et al. re Auto Facilities Real Estate Trust | JPMCB-00000231 | JPMCB-00000232 | 10/1/2008 |
| 41 | Email string between Richard Duker and Scott Quigley et al. re GM Term Loan Question | JPMCB-00000944 | JPMCB-00000945 | 10/10/2008 |
| 42 | Email string between Richard Duker and Mardi Merjian et al. re Auto Facilities Real Estate Trust | JPMCB-STB-0000363 | JPMCB-STB-0000365 | 10/17/2008 |
| 43 | Email string between Richard Duker and Arun Sundaram et al. re General Motors  Real Estate Trust 2001 | JPMCB-00001643 | JPMCB-00001645 | 10/27/2008 |
| 44 | Email string between Richard Duker and Carey Fear et al. re General Motors  Real Estate Trust 2001 | JPMCB-00001092 | JPMCB-00001098 | 10/28/2008 |
| 45 | Email string between Richard Duker and Arun Sundaram et al. re GM/JPMorgan Chase - Synthetic Lease Maturity | JPMCB-00001230 | JPMCB-00001232 | 10/29/2008 |
| 46 | Email string between Richard Duker and David Walker et al. re GM Synthetic Lease | JPMCB-00001803 | JPMCB-00001803 | 10/30/2008 |
| 47 | Email from Robert Scheibe to Julie Engell et al. re JPM/GM | JPMCB-MLB- | JPMCB-MLB-0000494 | 2/13/2009 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| | Fee Letter | 0000490 | | |
| 48 | Screen shot entitled "Incoming Money Transfer Detail" depicting wire transfer in March 2009 | JPMCB-1-00000001 | JPMCB-1-00000001 | 3/4/2009 |
| 49 | Email string between Richard Duker and Elizabeth Rarich et al. re GM Term Loan | JPMCB-00000217 | JPMCB-00000218 | 5/10/2009 |
| 50 | Screen shot entitled "Incoming Money Transfer Detail" depicting wire transfer in May 2009 | JPMCB-1-00000002 | JPMCB-1-00000002 | 5/27/2009 |
| 51 | Spreadsheet entitled "5/27/09 General Motors Interim Interest Payment" | JPMCB-1-00000017 | JPMCB-1-00000026 | 5/27/2009 |
| 52 | Email string between Richard Duker and Ann Kurinskas et al. re GM TLB: Q1-09 Collateral Certificate & Report | JPMCB-1-00000174 | JPMCB-1-00000178 | 6/3/2009 |
| 53 | Email from Richard Duker to TCP_Corporates@jpmchase.com entitled "GM" | JPMCB-00000075 | JPMCB-00000075 | 6/22/2009 |
| 54 | Email from Richard Duker to Elizabeth Rarich entitled "General Motors: urgent" | JPMCB-00000069 | JPMCB-00000069 | 6/22/2009 |
| 55 | Letter from Richard Duker to General Motors Corporation entitled (no title) re amounts outstanding under the Term Loan Agreement | JPMCB-1-00000287 | JPMCB-1-00000289 | 6/30/2009 |
| 56 | Email string between Justin Forlenza and Z. Sorman et al. re UCC Terminations | JPMCB-MLB-0002387 | JPMCB-MLB-0002388 | 6/30/2009 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| 57 | Spreadsheet untitled depicting parties who were lenders under the term loan as of the date the term loan was paid off | JPMCB-1-00000027 | JPMCB-1-00000031 | |
| TL_100 | Bill and Payment chart | MB009233 | MB009243 | N/A |
| TL_101 | Deposition of Ryan Green dated Jan 27, 2010 | n/a | n/a | 1/27/2010 |
| TL_102 | email From: Michael Perlowski To: Ryan Green | MB002414 | MB00220 | 10/9/2008 |
| TL_103 | Email From: Michael Perlowski To: Ryan Green | MB002414 | MB002420 | 10/9/2008 |
| TL_104 | email From: Ryan Green To: Stewart Gonshorek | MB003021 | MB003022 | 10/21/2008 |
| TL_105 | Email From Ryan Green To: Mardi Merjian | MB001390 | MB00436 | 10/27/2008 |
| TL_106 | Deposition of Stewart Gonshorek dated Jan 28, 2010 | n/a | n/a | 1/28/2010 |
| TL_107 | Deposition of Ryan Green dated Jan 27, 2010 | n/a | n/a | 1/27/2010 |
| TL_108 | Deposition of Robert Gordon dated Jan. 28, 2010 | n/a | n/a | 1/28/2010 |
| TL_109 | Email From: Ryan Green To: Stacy Braybrook | MB009435 | MB009436 | 10/6/2008 |
| TL_110 | Email From: Catherine Loh To: Scott Forchheimer | WEILJPMGM00864147 | WEILJPMGM00864155 | 1/31/2007 |

| Exhibit No. | Description | Beg Prod No. | End Prod No. | Date of Doc |
|---|---|---|---|---|
| JPM_MB_001 | Email from Perlowski to Gonshorek re General Motors Corp / JPM Delaware Financ. Statement | MB009437 | MB009636 | 10/7/2008 |
| JPM_MB_002 | Email from Perlowski to Green re Auto Facilities Real Estate Trust 2001-1/GM Corp etc. | MB001023 | MB001103 | 10/9/2008 |
| JPM_MB_003 | Email from Green to Holy re GM end of Term Purchase | MB009655 | MB009658 | 10/24/2008 |
| JPM_MB_004 | Email from Gonshorek to Conder re GM-2000 Synthetic Lease Unwinding | MB006380 | MB006380 | 2/11/2009 |
| JPM_MB_005 | Email from Perlowski to Gonshorek re General Motors Corp - 00652500 | MB009347 | MB009364 | 10/8/2008 |
| JPM_MB_006 | Email from Gonshorek to Green re GM/2000 lease financing | MB005921 | MB005921 | 10/15/2008 |