**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008
Facsimile: (212) 510-7299

*Attorneys for the Motors Liquidation*
*Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                       Debtors.

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

-------------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

                                       Plaintiff,

against

JPMORGAN CHASE BANK, N.A., *et al.*,

                                       Defendants.

Adversary Proceeding

Case No. 09-00504 (MG)

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO TERM LENDERS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING FIXTURES AT**
**SHREVEPORT ASSEMBLY**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND .............................................. 2

      A.    Identification of Surviving Collateral ........................................... 2

      B.    Collateral Identification Issues Briefing ..................................... 3

      C.    The Joint Pretrial Order ................................................................ 4

      D.    The Representative Assets Trial ................................................... 5

      E.    The Stipulation and Order Regarding Discovery and Scheduling.............. 7

ARGUMENT ........................................................................................................ 7

I.    THE SHREVEPORT MOTION IS APPROPRIATELY RESOLVED IN THIS
    ADVERSARY PROCEEDING ........................................................................ 7

      A.    The Purpose Of This Adversary Proceeding Is To Determine The Scope
            Of The Term Lenders' Security Interest................................................ 8

      B.    The Court's Prior Decisions In This Adversary Proceeding Confirm That
            No Additional Adversary Proceeding Is Needed To Determine The Scope
            Of The Term Lenders' Security Interest................................................ 9

           1.    The "Additional Facilities" Decision Involved A Determination Of
                 The Scope Of The Security Interest Granted By The Collateral
                 Agreement.................................................................................. 10

           2.    The CUC Decision Involved A Determination Of The Scope Of
                 The Security Interest Granted By The Collateral Agreement....... 11

           3.    The LDT Dispute Was Construed As A Challenge To The Priority
                 Of The Security Interest, An Issue Not Present Here ...................12

      C.    The Shreveport Motion Seeks To Determine The Scope Of The Term
            Lenders' Security Interest Under The Collateral Agreement And Louisiana
            Law .................................................................................................. 14

      D.    The Collateral Agreement Did Not Grant A Security Interest In Real
            Property ............................................................................................. 16

i

II.     THE SCOPE OF THE GRANT OF COLLATERAL HAS BEEN TRIED AS PART OF
        THIS ADVERSARY PROCEEDING ................................................................................ 18

III.    NOT ALL FIXTURES ARE SURVIVING COLLATERAL ........................................... 20

CONCLUSION ......................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Grayson v. Mayview State Hosp.*,
  293 F.3d 103 (3d Cir. 2002) ........................................................................ 20

*In re Beard*,
  112 B.R. 951 (Bankr. N. D. Ind. 1990) ....................................................... 8

*In re Branford Partners, LLC*,
  Nos. CC-08-1021-PaMkK, CC-08-1044-PaMkK, 2008 WL 8448329 (B.A.P. 9th Cir. B.A.P.
  Oct. 24, 2008) ............................................................................................. 8

*In re Coss*,
  No. 02-65893, 2005 WL 5419055 (Bankr. N.D.N.Y. July 14, 2005) ........... 8

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008) ....................................................................... 8

*In re NJ Affordable Homes Corp.*,
  2013 WL 6048836 (Bankr. D.N.J. Nov. 8, 2013) ....................................... 20

*Litwiller Mach. & Mfg., Inc. v. NBD Alpena Bank*,
  457 N.W.2d 163 (Mich. Ct. App. 1990) ..................................................... 12

*Network Enters., Inc. v. APBA Offshore Prods., Inc.*,
  264 F. App'x. 36 (2d Cir. 2008) ................................................................ 19

*Ontra, Inc. v. Wolfe*,
  192 B.R. 679 (W.D. Va. 1996) ................................................................... 8

*Ostano Commerzanstalt v. Telewide Sys., Inc.*,
  880 F.2d 642 (2d Cir. 1989) ....................................................................... 20

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
  813 F. Supp. 2d 489 (S.D.N.Y. 2011) ....................................................... 20

*Serv. One Cable T.V., Inc. v. Scottsdale Ins. Co.*,
  No. 2011 CA 1469, 2012 WL 602209  (La. Ct. App. Feb. 10, 2012) ......... 17

**Statutes & Rules**

Fed. R. Civ. P. 15(b)(2) .................................................................................. 19

LA. REV. STAT. ANN. § 10:9-102 (2018) ..................................................... 16

LA. REV. STAT. ANN. § 10:9-109 (2018) ................................................. 15, 16

LA. REV. STAT. ANN. § 10:9-334 (2018) ................................................. 15, 16

MICH.COMP.LAWS § 440.9203 (2013) ........................................................ 12

N.Y. U.C.C. § 9-203 ...................................................................................... 12

U.C.C. § 9-334(a)..................................................................................................................... 16

U.C.C. § 9-334(a) cmt. (3)..................................................................................................... 16

Plaintiff Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") respectfully submits this Memorandum of Law in opposition to the Term Lenders' Motion for Partial Summary Judgment ("**Defendants' Motion**") pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7056 of the Federal Rules of Bankruptcy Procedure, and Rule 7056-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

## PRELIMINARY STATEMENT

The Avoidance Action Trust moved on September 14, 2018 for partial summary judgment, seeking a ruling that the Collateral Agreement[1] did not and could not, as a matter of Louisiana law, grant a security interest in assets already incorporated as fixtures in the Shreveport Plant (the "**Shreveport Motion**").  The Term Lenders moved that same day, seeking partial summary judgment that the Avoidance Action Trust's anticipated motion—which the Term Lenders characterized as a "challenge to the Term Lenders' lien on fixtures at Shreveport Assembly"—could only be resolved in a separate adversary proceeding.  Having moved in this preemptive manner, the Term Lenders were without the benefit of the Avoidance Action Trust's actual briefing and were left to guess at the substance of the Avoidance Action Trust's argument.  As a result, Defendants' Motion is rooted in an erroneous premise—that the Avoidance Action Trust contends that "without a prior fixture filing, 'there are no fixtures'" at the Shreveport Plant,

---

[1] Unless otherwise noted, capitalized terms used herein have the same definitions as in the Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Certain Assets Located in the Shreveport Plant ("Pl. Br."), Adv. Pro. Dkt. No. 1090.  The Term Lenders' Memorandum of Law in Support of Term Lenders' Motion for Partial Summary Judgment Regarding Fixtures at Shreveport Assembly, Adv. Pro. Dkt. No. 1082, is referenced herein as "Defs. Br."

Defs. Br. at 1, 12—and proceeds from that misunderstanding to make the irrelevant argument

that, irrespective of any fixture filing, fixtures exist at the Shreveport Plant whether or not they

were attached to real property at the time of the creation of the lien.  *Id.* at 12-14.

Defendants' Motion misapprehends the Avoidance Action Trust's position.  The

Avoidance Action Trust does not argue that the Shreveport Real Property Assets are not

"fixtures," nor does it take the position that there are no "fixtures" at Shreveport.  Instead, what

the Avoidance Action Trust seeks is a ruling as a matter of law that no security interest may be

created in goods under Louisiana's Commercial Code after they have become fixtures.  *See* Pl.

Br. at 1-3.  The specific question presented is whether the Collateral Agreement created a

security interest in those fixtures that were already attached at the Shreveport Plant—and thus

were realty under Louisiana law—when the security interest was granted.  The determination of

whether the Shreveport Real Property Assets are subject to the Term Lenders' security interest

falls squarely within the scope of the claims asserted in this adversary proceeding.  For the

reasons set forth in the Shreveport Motion, because a security interest in the Shreveport Real

Property Assets was not granted to the Term Lenders under the Collateral Agreement, those

assets are not, and never were, part of the Term Lenders' collateral.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Identification of Surviving Collateral

The Avoidance Action Trust filed its Amended Complaint on May 20, 2015.  Adv. Pro.

Dkt. No. 91 (Amended Complaint ("**Am. Compl.**")).  Thereafter, the parties engaged in initial

discovery regarding the "scope and value of the Term Loan collateral."  Adv. Pro. Dkt. No. 1015

("**Op.**") at 27; Adv. Pro. Dkt. No. 962 ("**JPTO**") at 2.  At a March 22, 2016 Status Conference,

the Court ordered the parties to identify which assets they contended were "collateral for the

2

Term Loan in which the Term Loan Lenders had a perfected security interest as of June 1, 2009"
(the "**Surviving Collateral**").  Adv. Pro. Dkt. No. 547 (Order Amending the August 17, 2015
"Order Regarding Discovery and Scheduling" to Provide for Proceedings Concerning
Characterization and Valuation of Representative Assets) at 1.  The parties exchanged
information and took discovery with respect to which assets constitute Surviving Collateral,
including (i) which assets at the plants named in the 26 fixture filings are fixtures; (ii) whether
fixtures in nine additional facilities identified by Defendants (the "**Additional Facilities**") also
constitute Surviving Collateral; and (iii) whether fixtures subject to capital leases or
sale/leasebacks (the "**Leased Assets**") constitute Surviving Collateral (collectively, the
"**Collateral Identification Issues**").  *Id*. at 2.  On May 4, 2016, the Court entered an amended
scheduling order to provide for trial of the Collateral Identification Issues with respect to forty
representative assets (the "**Representative Assets**") selected by the parties from among assets
inspected during plant visits conducted in Michigan and Ohio.  *Id*. at 2-4.

### B.  Collateral Identification Issues Briefing

In advance of the Representative Assets Trial, the Court ordered the parties to submit
preliminary briefs analyzing the Collateral Identification Issues under Michigan and Ohio law
and addressing, if appropriate, legal distinctions in other jurisdictions.  Adv. Pro. Dkt. No. 547 at
3.  Pursuant to the Court's order, the parties submitted briefing on two discrete issues relating to
the scope of the Term Lenders' security interest under the Collateral Agreement: (1) which assets
at the plants named in the 26 fixture filings were fixtures, and (2) whether any fixtures at the nine
Additional Facilities constituted Surviving Collateral.  Adv. Pro. Dkt. No. 630 (Preliminary
Legal Brief of Defendants' Steering Committee Regarding Collateral Identification Issues); Adv.

3

Pro. Dkt. No. 631 (Motors Liquidation Company Avoidance Action Trust's Memorandum of Law on Collateral Identification Issues).

Regarding the first issue, the Term Lenders directed the Court to the definition of "Fixtures" in Section 1.01 of the Collateral Agreement, which in turn invoked Section 9-102 of the Uniform Commercial Code (the "**U.C.C.**"), defining fixtures as "goods that have become so related to particular real property that an interest in them arises under real property law." *See* Adv. Pro. Dkt. No. 630 at 2 (quoting U.C.C. § 9-102). The Term Lenders explained that the applicable "real property law" for any given asset is the real property law of the state where that asset is located. *Id.*; *see also* Adv. Pro. Dkt. No. 900 (Defendants' Amended Pre-Trial Brief) at 7. The Term Lenders noted that the legal framework in Louisiana is "somewhat unique" but did not address Louisiana law in their brief. Adv. Pro. Dkt. No. 630 at 2 n.4.

Regarding the second issue, the Term Lenders argued that the question of which facilities contained Surviving Collateral turned on "whether the Additional Facilities were included within the *scope of the security interest granted by the Collateral Agreement*." *Id.* at 21 (emphasis added). To answer this "threshold question," the Term Lenders turned to Article II(a) of the Collateral Agreement, which identifies the grant of security interests. *Id.*

### C. The Joint Pretrial Order

The Joint Pretrial Order identified three additional issues "relevant to determining the scope of the Term Loan collateral" that were to be adjudicated at the Representative Assets Trial. JPTO at 3. The Representative Assets Trial was to determine whether the Term Lenders had a perfected security interest as of June 1, 2009 in (1) Representative Asset No. 11, the Central Utilities Complex (the "**CUC**"); (2) the fixtures at the GM assembly and stamping facilities at Lansing Delta Township ("**LDT**"); and (3) the fixtures at the GM Powertrain Engineering

4

Pontiac ("**PTE Pontiac**") facility. *Id.* at 3. The parties agreed that Defendants bore the burden of proof on all issues to be tried, except that the parties did not agree on which party bore the burden of proof as to the LDT issue. *Id.* at 4.

The parties stipulated to certain facts regarding these additional issues. First, Representative Asset No. 11, the CUC, was subject to three agreements relating to the CUC's construction, financing, maintenance, and use (the "**CUC Agreements**"), and any security interest that the Term Lenders had in the CUC was subject to the lien created by the CUC Agreements. *Id.* at IV.F.67-68. The parties further agreed that a portion of the CUC consists of ordinary building materials, which are not fixtures. *Id.* at IV.J.116.

Second, the parties stipulated that Article II(a) of the Collateral Agreement granted the Term Lenders a security interest in all fixtures located at "any plant or facility of [GM] listed on Schedule 1, including all related or appurtenant land, buildings, Equipment and Fixtures." *Id.* at IV.G.69. The parties further stipulated that PTE Pontiac is not listed on Schedule 1. *Id.* at IV.G.70, 72.

Third, the parties stipulated that the fixture filing relevant to the LDT issue described the relevant collateral as "all fixtures located on the real estate described in Exhibit A," which set out the metes and bounds of a vacant parcel of land across the street from LDT. *Id.* at IV.D.61, 63.

### D. The Representative Assets Trial

The Court held an initial trial on the Representative Assets and rendered an opinion as to which of the 40 Representative Assets was a fixture and what was their value as of June 30, 2009 (the agreed upon "**Valuation Date**"). Among the Representative Assets presented to the Court were the AA Transfer Press (Representative Asset No. 32) and the B3-5 Transfer Press (Representative Asset No. 33). Op. at 31-33. The Term Lenders acknowledged that they did not

have a security interest in either of these assets (because they were leased, rather than owned), but nevertheless contended that the assets were fixtures. *Id*. at 33-34, 107-08; JPTO at IV.E.66. The Court concluded that relevant lease provisions mandated a finding that the assets were personal property, but noted that "[i]n the absence of sale/leaseback provisions . . . Representative Asset Nos. 32 and 33 would be classified as fixtures." Op. at 34, 107-08.

The Court also rendered opinions regarding the three additional issues identified in the Joint Pretrial Order as "relevant to determining the scope of the Term Loan collateral." *Id*. at 28, 87-96, 139-140. With respect to the CUC, the Court concluded that the grant of collateral included a residual interest in the CUC, explaining that "[u]nder the UCC, GM could assign its residual rights in the CUC" and that clauses (ii) and (iii) of the Collateral Agreement did not exclude GM's interest in the CUC from the grant of collateral. *Id*. at 139-40. The Court further held that PTE Pontiac did not fall within the scope of the grant of collateral under Article II of the Collateral Agreement and that any fixtures located at the PTE Pontiac facility were thus not subject to the Term Lenders' security interest. *Id*. at 87-89.

In contrast to the Court's decisions with respect to the CUC and PTE Pontiac, the Court's decision on the LDT issue did not require an interpretation of the Collateral Agreement, as there was no dispute that the fixtures at LDT were subject to the grant of security interest under the Collateral Agreement. *Id*. at 93, 95. The Court concluded that the dispute turned not on the scope of the security interest, but rather on the priority of the security interest, an issue which the

6

Court held could only be adjudicated in a new adversary proceeding. *Id*. at 20-21, 93-94.[2] The

Court found that the time for filing such a new adversary proceeding had passed and that the

Avoidance Action Trust was thus time-barred from challenging the priority of the Term Lenders'

security interest in the fixtures at LDT. *Id*. at 20-21, 92-96.

### E. The Stipulation and Order Regarding Discovery and Scheduling

The parties have agreed that obtaining expedited rulings from the Court after trial on

certain issues could materially facilitate a consensual resolution of this matter. Adv. Pro. Dkt.

No. 1080 (Stipulation and Order Amending and Superseding Certain Prior Orders Regarding

Discovery and Scheduling) at 4. Among the issues to be presented to the Court is whether four

additional representative assets are excluded from the Term Loan collateral because they are not

fixtures but real property. *Id.* at 4-5.

## ARGUMENT

### I. THE SHREVEPORT MOTION IS APPROPRIATELY RESOLVED IN THIS ADVERSARY PROCEEDING

The Shreveport Motion seeks a determination that, as a matter of Louisiana law, the

Collateral Agreement did not and could not create a security interest in fixtures already attached

to the Shreveport Plant as of the date of the agreement. The Term Lenders have filed a

competing summary judgment motion, arguing that the issues raised in the Shreveport Motion

must, under Bankruptcy Rule 7001(2), be asserted in an adversary proceeding. What the Term

Lenders' argument overlooks is that the Shreveport Motion *has* been asserted in an adversary

---

[2] The Avoidance Action Trust expressly reserves its right to challenge on appeal the Court's
LDT decision and ruling.

7

proceeding.  To the extent that an adversary proceeding is required to address the questions

raised by the Shreveport Motion, *this* is that proceeding.[3]

### A. The Purpose Of This Adversary Proceeding Is To Determine The Scope Of The Term Lenders' Security Interest

The parties have long understood that the purpose of this adversary proceeding is to

determine the extent and value of the surviving security interest granted by the Collateral

Agreement.  Indeed, the parties have been litigating this action on that basis for years.  No

separate or additional adversary proceeding is required where, as here, an issue in dispute can

be—and, indeed, should be—adjudicated in the context of an adversary proceeding that is

already pending.  *See In re Branford Partners, LLC*, Nos. CC-08-1021-PaMkK, CC-08-1044-

PaMkK, 2008 WL 8448329, at *8-11 (B.A.P. 9th Cir. Oct. 24, 2008) (separate adversary

proceeding not required to determine issue "inextricably linked" to claim for relief in pending

adversary proceeding); *Ontra, Inc. v. Wolfe*, 192 B.R. 679, 682-83 (W.D. Va. 1996) (separate

adversary proceeding not required to determine issue of value and extent of lien arising in

context of pending adversary proceeding).  Construing the Collateral Agreement to determine the

scope of the Term Lenders' Surviving Collateral is at the heart of this adversary proceeding.

Consistent with issues and disputes already resolved by the Court in the context of this

adversary proceeding, the Shreveport Motion seeks a determination of the scope of the Term

---

[3] The principal cases cited in Defendants' opening brief are thus inapposite, for in those cases, no adversary proceedings had been brought.  *See In re Coss*, No. 02-65893, 2005 WL 5419055 (Bankr. N.D.N.Y. July 14, 2005) (determination of extent of lien not proper part of confirmation proceeding); *In re Mansaray-Ruffin*, 530 F.3d 230 (3d Cir. 2008) (invalidation of lien should not occur through provision of confirmed plan); *In re Beard*, 112 B.R. 951 (Bankr. N. D. Ind. 1990) (plan confirmation lacked preclusive effect where issues concerning validity or extent of lien not litigated).  Here, an adversary proceeding is pending, and the question presented in the Shreveport Motion falls within its compass.

8

Lenders' security interest under applicable state law, specifically Louisiana state law. As discussed below, such a determination is part and parcel of the issues already presented to and ruled on by this Court in this adversary proceeding. Indeed, had a Louisiana asset been among the forty Representative Assets, this issue of law would doubtless already have been decided at trial. Resolution of the Shreveport Motion is just one more step toward the classification of the remaining assets and thus falls squarely within the purview of this adversary proceeding. No additional adversary proceeding is necessary.

**B. The Court's Prior Decisions In This Adversary Proceeding Confirm That No Additional Adversary Proceeding Is Needed To Determine The Scope Of The Term Lenders' Security Interest**

The scope of the Term Lender's surviving security interest has been one of the defining issues of this adversary proceeding from its outset. Though the issue of whether each of the Representative Assets constitutes a fixture or personalty under relevant state law has taken up the better part of the time in this litigation, it has not been the only issue resolved by the Court.

In addition to determining what is a fixture at the Representative Assets Trial, the Court was also asked to decide three discrete, additional issues "relevant to determining the scope of the Term Loan collateral." Op. at 28. Two of these issues involved the scope of the security interest granted under the Collateral Agreement and were resolved as part of the Representative Assets Trial. The third issue, by contrast, was construed not as a challenge to the scope of the Defendants' security interest but rather as a challenge to the priority of the Defendants' lien, a distinct issue which the Court held was not within the scope of this adversary proceeding. *See id.* at 89-96. The approach taken by the Court with respect to these three issues further confirms that disputes regarding what assets are within the security interest granted by the Collateral

9

Agreement—like the dispute underlying the Shreveport Motion—are appropriately addressed in this adversary proceeding.

        **1.**       **The "Additional Facilities" Decision Involved A Determination Of The Scope Of The Security Interest Granted By The Collateral Agreement.**

During the Representative Assets Trial, the Term Lenders asked the Court to determine whether the scope of the Term Loan collateral included fixtures located at the PTE Pontiac facility and other facilities that, though not themselves identified in the Collateral Agreement, were claimed by the Term Lenders to be "related or appurtenant" to facilities identified in the Collateral Agreement. *See* Op. at 87-89; Adv. Pro. Dkt. No. 993 (Defendants' Proposed Findings of Fact and Conclusions of Law) ¶¶ 869, 869 n.120. In interpreting the Collateral Agreement's grant of security interest, the Court declined to adopt the expansive definition of relatedness advocated by the Term Lenders, concluding instead that the scope of the interest granted must be confined to the facilities specifically identified on Schedule 1 of the Collateral Agreement. Op. at 88-89.[4]

The dispute over whether the fixtures that existed at the PTE Pontiac facility were collateral was a dispute over the extent of the security interest granted under the Collateral Agreement. The task of the Court was not to determine what assets at PTE Pontiac were fixtures, but whether any fixtures at PTE Pontiac fell within the scope of the Collateral Agreement's grant of security. The Term Lenders acknowledged as much themselves, noting

---

[4] As the Court explained, had the parties to the Term Loan Agreement intended for the Collateral Agreement to cover PTE Pontiac or the other Additional Facilities, those facilities would have been listed on Schedule 1. Op. at 89. Similarly, had the parties to the Term Loan Agreement intended for the Collateral Agreement to cover real property in Louisiana, Old GM would have conveyed to the Term Lenders a mortgage in the Shreveport Plant.

that the dispute turned on "whether the Additional Facilities were included within the scope of

the security interest granted by the Collateral Agreement."  Adv. Pro. Dkt. 630 (Preliminary

Legal Brief of Defendants' Steering Committee Regarding Collateral Identification Issues) at 21.

That the Amended Complaint did not make specific reference to PTE Pontiac or to the "related

or appurtenant" provision was of no moment:  No additional adversary proceeding was required

in order for the Avoidance Action Trust to challenge whether the Term Lenders' security interest

included fixtures in facilities beyond those identified in Schedule 1 to the Collateral Agreement.

This dispute as to the scope of the security interest granted under the Collateral Agreement was

properly resolved in full within this adversary proceeding.  The present dispute over the scope of

the Term Lenders' security interest with respect to the Shreveport Plant is likewise properly

resolved within this adversary proceeding.

### 2.    The CUC Decision Involved A Determination Of The Scope Of The Security Interest Granted By The Collateral Agreement

Similarly, whether Old GM's interest in the CUC was part of the grant of collateral under

the Collateral Agreement was also addressed within this adversary proceeding.  At the

Representative Assets Trial, the Avoidance Action Trust asserted that the Collateral Agreement

granted no security interest in the CUC because the CUC was not owned by Old GM.  Adv. Pro.

Dkt. No. 994 (Plaintiff's Post-Trial Brief) at 337-38, 340-42.  The Avoidance Action Trust

argued in the alternative that Article II of the Collateral Agreement excluded any interest Old

GM may have had in the CUC and that any such interest was in any event subordinate to

GMAC's first-priority interest.  *Id*. at 340-45.

In response, relying on the Collateral Agreement's grant of security interest in equipment

and fixtures "now owned or at any time hereafter acquired by [GM] or in which [GM] now has

or at any time in the future may acquire any right, title or interest," the Term Lenders maintained

11

that Old GM granted the Term Lenders a residual interest in the CUC.  Adv. Pro. Dkt. No. 993

(Defendants' Proposed Findings of Fact and Conclusions of Law) at 397-99.  The Term Lenders

asserted that determining the extent of the interest granted by the Collateral Agreement required

an interpretation of the agreement under the U.C.C., arguing that "[u]nder the U.C.C., as long as

a party has 'rights in the collateral,' it may grant a security interest in the collateral to the extent

of those rights."  *Id*. at 399 (citing N.Y. U.C.C. § 9-203 & Official Comment 6;

MICH.COMP.LAWS § 440.9203 (2013); *Litwiller Mach. & Mfg., Inc. v. NBD Alpena Bank*, 457

N.W.2d 163, 164 (Mich. Ct. App. 1990)).  The Term Lenders maintained that Old GM held

residual rights to the CUC as of the Petition Date and was thus permitted to grant the Term

Lenders a security interest in the CUC to the extent of those rights.  *Id.* at 400-01.  The Court

agreed, finding that "[u]nder the UCC, GM could assign its residual rights in the CUC" and that

such residual rights were not excluded from the grant of collateral.  Op. at 139-40.

Here again, within the context of this adversary proceeding, the Court resolved a dispute

over the extent and validity of a grant of a security interest pursuant to the Collateral Agreement

and relevant state law.  That the Amended Complaint made no specific mention of the CUC was

of no consequence, for the parties understood that the dispute was over the scope of the Term

Lenders' security interest and, as such, was properly addressed in this adversary proceeding.  No

additional adversary proceeding was required then, just as no additional adversary proceeding is

required now, to determine whether the Term Lenders' security interest encompasses the

Shreveport Real Property Assets under the Collateral Agreement and Louisiana law.

### 3.   The LDT Dispute Was Construed As A Challenge To The Priority Of The Security Interest, An Issue Not Present Here

Finally, the Term Lenders asserted that they held a security interest under the Collateral

Agreement in fixtures at assembly and stamping facilities located at LDT and that the statute of

12

limitation for challenging the priority of the LDT fixture lien had passed. Op. at 28, 90. The

Avoidance Action Trust did not dispute that the Collateral Agreement in fact provided the Term

Lenders with a security interest in fixtures at LDT, but maintained that the Term Lenders had

failed to meet their burden of showing that they had perfected their security interest in those

fixtures, given that the relevant fixture filing described a vacant lot, rather than the LDT plant

listed in Schedule 1 of the Collateral Agreement. Op. at 90-91.[5]

The Court held that the LDT dispute—in contrast to the Pontiac PTE and the CUC

disputes, and unlike the dispute at issue here—turned not on what assets were included in the

grant of security interest but rather on the *priority* of that security interest. *Id*. at 92-96. The

Court construed the Avoidance Action Trust's argument as a challenge to the "priority of the

liens on the fixtures at LDT" and, finding that the Avoidance Action Trust had not adequately

pleaded an "attack on the priority of unperfected security interests," concluded that a challenge

to the priority of the fixture liens at LDT was time-barred. *Id*. at 14-15, 92-96.

The Term Lenders place the full weight of their argument on the Court's resolution of the

LDT dispute, *see* Defs. Br. at 1, 8, overlooking the Pontiac PTE and the CUC disputes. But the

LDT issue is readily distinguishable from the Shreveport Real Property Assets issue, and from

the Court's determinations about the Term Lenders' security interests with respect to PTE

Pontiac and the CUC. Whereas the scope of the Term Lenders' security interest was in dispute

with respect to both PTE Pontiac and the CUC—as it is currently in dispute with respect to the

---

[5] The Avoidance Action Trust argued that the relevant fixture filing did not perfect any interest
in any assets at LDT because it identified a vacant lot and thus was insufficient to provide
constructive notice of a lien under Michigan's U.C.C. Adv. Pro. Dkt. No. 903 (Plaintiff's
Pretrial Brief) at 4.

13

Shreveport Real Property Assets—there was no question that the Collateral Agreement provided

the Term Lenders with a security interest in fixtures at LDT. Op. at 90-91, 95. The Term

Lenders themselves underscored this distinction, arguing that "unlike the dispute concerning

LDT, the only issue with respect to Powertrain Engineering Pontiac is whether the Collateral

Agreement in fact granted a security interest in fixtures at that facility." Adv. Pro. Dkt. No. 993

(Defendants' Proposed Findings of Fact and Conclusions of Law) ¶ 869.

In resolving the LDT dispute, the Court concluded that a challenge to the priority of a

security interest must be asserted in a separate adversary proceeding. Op. at 92-96. The

Shreveport Motion is nothing of the kind: The parties agree that the Shreveport Motion is *not* a

challenge to the priority of any security interest. *See* Defs. Br. at 8. Instead, the issue here—as

in the PTE Pontiac and the CUC disputes—is the scope of the Term Lenders' security interest

under the Collateral Agreement and relevant law, a question that falls squarely within the claims

asserted in the Amended Complaint. No additional adversary proceeding is required.

**C. The Shreveport Motion Seeks To Determine The Scope Of The Term Lenders'
   Security Interest Under The Collateral Agreement And Louisiana Law**

The issues presented by the Shreveport Motion are substantively the same as those

previously decided by this Court with respect to the scope of the Term Lenders' security interest

under the Collateral Agreement and applicable law. Even after the close of the Representative

Assets Trial, the full scope of the Term Lenders' Surviving Collateral continues to be disputed

14

and will require further resolution by the Court.[6]  The Shreveport Motion is one more step in this

ongoing process.

As discussed in Plaintiff's briefing in support of the Shreveport Motion, Louisiana law

controls the extent of the security interest Old GM could grant in fixtures located at the

Shreveport Plant.  Pl. Br. at 8.  In particular, a security interest under Louisiana's Chapter 9 "may

not be created … in goods after they become fixtures."  LA. REV. STAT. ANN. § 10:9-334(a).

While Old GM could create a security interest under Chapter 9 in goods incorporated as fixtures

into the Shreveport Plant after the date of the grant of collateral, it could not create an interest in

fixtures that were already incorporated at the Shreveport Plant as of that date.  Pl. Br. at 8-9.

Because such fixtures are real property under Louisiana law, an interest in them could only have

been conveyed through a mortgage.  *Id*. at 11-12.

As in the PTE Pontiac and the CUC disputes, to determine whether Old GM granted a

security interest in the Shreveport Real Property Assets requires only an interpretation of the

Collateral Agreement under applicable law.  Louisiana's Commercial Code provides that no

interest may be created in fixtures "except to the extent that provision is made for . . . fixtures in

R.S. 10:9-334."  LA. REV. STAT. ANN. § 10:9-109(d)(11)(B) .  The exception in section 10:9-

---

[6] Among the issues to be adjudicated in the upcoming trial is the question of whether certain
assets are fixtures or realty.  During the Representative Assets Trial, the Term Lenders conceded
that certain portions of the CUC and the Courtyard Enclosure were ordinary building materials,
and, therefore, not subject to the Term Lenders' security interest.  JPTO at IV.J.116.  The parties
are requesting, among other things, that in the upcoming trial, the Court apply governing state
real property law to determine whether four additional assets are also real property excluded
from the Collateral Agreement's grant of security interest.  Adv. Pro. Dkt. No. 1080 (Stipulation
and Order Amending and Superseding Certain Prior Orders Regarding Discovery and
Scheduling) at 4-5.  There is no dispute that these issues fall within the claims asserted in the
Amended Complaint and that no additional adversary proceeding is necessary for their
resolution.

334 does not provide for the creation of an interest in fixtures *per se*; it only permits an interest

that was created in goods before they became fixtures *to continue* after the goods have become

fixtures.  LA. REV. STAT. ANN. § 10:9-334(a) ("Except as otherwise provided in this

Subsection, a security interest in goods that become fixtures continues in the fixtures if the

security interest was perfected by a fixture filing when the goods become fixtures.").  A security

interest under Louisiana's Chapter 9 may not be created in goods after they become fixtures,

because such fixtures are regarded as real property, Pl. Br. 9-10; LA. REV. STAT. ANN. § 10:9-

102(a)(41) ("Fixtures means goods . . . that after placement on or *incorporation in an immovable*

*have become a component part of such immovable* . . . ."), and Chapter 9 does not apply to the

creation of an interest in or lien on real property.  LA. REV. STAT. ANN. § 10:9-109(d)(11).[7]

### D.  The Collateral Agreement Did Not Grant A Security Interest In Real Property

Even assuming that Section 10:9-334(a) of the Louisiana Commercial Code did not

prohibit the creation of a security interest in already-attached fixtures—which it does—fixtures

are real property under Louisiana law, and the Collateral Agreement did not convey any interests

in real property.  Op. at 7 (grant of security interest confined to "certain equipment, fixtures,

documents, general intangibles, all books and records and their proceeds").  Thus, the scope of

---

[7] Indeed, section 10:9-334(a) treats fixtures the same as other goods that have become integral to
real property—as realty.  For example, Louisiana excludes from Chapter 9's scope another
category of goods incorporated into realty, consumer goods that "*become component parts of*
*real property.*"  LA. REV. STAT. ANN. § 10:9-334(a) (emphasis added).  Likewise, in
conformance with Article 9 of the U.C.C., a security interest does not exist under Louisiana's
Chapter 9 in ordinary building materials that are "*incorporated into an improvement on land.*"
*Id.*; *see also* U.C.C. § 9-334(a).  The comment to the U.C.C. explains that real property law
controls the priority of claims to ordinary building materials.  U.C.C. § 9-334(a) cmt. 3.  Because
Louisiana law treats fixtures like ordinary building materials, interests in fixtures, like interests
in ordinary building materials, are conveyed under Louisiana real property law.

the Term Lenders' security interest cannot include already-attached fixtures in the Shreveport Plant as a matter of Louisiana law.

There has never been any dispute in this proceeding as to whether Term Lenders' Surviving Collateral includes real property.  It does not.  The Term Lenders conceded, for example, that those portions of the CUC consisting of ordinary building materials are "real estate and not fixtures."  Adv. Pro. Dkt. No. 993 (Defendants' Proposed Findings of Fact and Conclusions of Law) ¶ 668; JPTO ¶ 116; Op. at Table A n.27.  The Court agreed, noting that "[n]aturally, the physical structure that the CUC assets are housed in is not itself a fixture, but real property."  Op. at 140.  The Term Lenders likewise conceded that much of the Courtyard Enclosure consists of ordinary building materials that are not fixtures.  Adv. Pro. Dkt. No. 993 (Defendants' Proposed Findings of Fact and Conclusions of Law) ¶ 781.  There is accordingly no dispute that, because ordinary building materials incorporated into the CUC and the Courtyard Enclosure are real property, they are not covered by the Collateral Agreement.[8]

The same principle applies here, because Louisiana law treats fixtures like ordinary building materials—as realty.  *See* LA. REV. STAT. ANN. § 10:9-334(a) (excluding security interests under Chapter 9 in "goods after they become fixtures" as well as in "ordinary building materials incorporated into an improvement on land"); *see also Serv. One Cable T.V., Inc. v. Scottsdale Ins. Co.*, No. 2011 CA 1469, 2012 WL 602209, at *4-5 (La. Ct. App. Feb. 10, 2012).  Just as the Court has already decided in this adversary proceeding that the Courtyard Enclosure and portions of the CUC are real property and, thus, fall outside of the scope of the Collateral

---

[8] The Term Lenders claimed that certain components of the Courtyard Enclosure were fixtures, but the Court found that the Term Lenders had failed to meet their burden of establishing that the Courtyard Enclosure, or any of its component parts, was a fixture.  Op. at 138-39.

Agreement, so the Court can and should decide in this adversary proceeding that assets which

Louisiana law regards as realty likewise fall outside of the Collateral Agreement.  An additional

adversary proceeding is not required to determine this question.

## II.    THE SCOPE OF THE GRANT OF COLLATERAL HAS BEEN TRIED AS PART OF THIS ADVERSARY PROCEEDING

In section I of their opening brief, the Term Lenders purport to challenge the sufficiency

of the Avoidance Action Trust's pleading, arguing that the Amended Complaint did not

adequately contest the validity or extent of the Term Lenders' security interest in the assets at the

Shreveport Plant.  Defs. Br. at 10-11.  The argument is baseless, for the question of the proper

scope of the Term Lenders' security interest—whether characterized as a question of validity or

of extent—was raised in the pleadings and has been a core issue in this adversary proceeding all

along.  As the Court has explained, one of the key allegations of the Amended Complaint—and

one that has driven this adversary proceeding—is the allegation that the Surviving Collateral is

of little or no value, in part because so much of what was purported to be collateral was "not part

of the security interest" in the first place.  Op. at 95; *see also* Am. Compl. ¶ 601.  This threshold

issue regarding the scope of the Term Lenders' security interest was central to the pleadings and

has become key to the resolution of this adversary proceeding.  The Term Lenders nevertheless

urge this Court to take a narrow view, suggesting that the Amended Complaint challenged the

scope of the Term Lenders' security interest only with respect to the "question of what assets are

properly characterized as fixtures."  Defs. Br. at 11.  But this restrictive reading of the Amended

Complaint has no basis in the pleadings—which do not confine themselves to the fixture issue

and in fact make no reference to "fixtures"—and is, moreover, inconsistent with the conduct of

this adversary proceeding and with the prior findings of this Court.  As discussed above, the

issue underlying the Shreveport Motion, like other issues previously decided by the Court in the

18

Representative Assets Trial, turns on a determination of which assets are (or are not) included in the Term Lenders' security interest, an issue that was not only asserted in the pleadings but has already been the subject of repeated adjudication within this adversary proceeding.

Indeed, if the scope of the Term Lenders' security interest under the terms of the Collateral Agreement were not a proper subject of this adversary proceeding, the Term Lenders would have been free to assert interests in any fixture, far beyond those that were ever part of the grant of security. For instance, the Term Lenders could have contended (but did not) that the Avoidance Action Trust was not permitted to challenge whether PTE Pontiac was a "related or appurtenant" facility. The Term Lenders could similarly have contended (but did not) that they had an interest in all fixtures subject to leases, irrespective of the terms of the leases and the relevant provisions of the Collateral Agreement. In fact, if this adversary proceeding were confined merely to sorting fixtures from non-fixtures, the Term Lenders could have asserted an interest in *any* fixture at *any* GM plant, without possibility of challenge and without regard to which fixtures were actually part of the grant of collateral under the Collateral Agreement. Such an absurd outcome would undermine the very purpose of this adversary proceeding and would be wholly inconsistent with how the parties have been litigating this action.

Further, even if the Amended Complaint had not adequately pleaded a challenge to the scope of the security interest granted by the Collateral Agreement—which it has—the issue has been "tried by the parties' express or implied consent" and therefore must be "treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2); *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 264 F. App'x. 36, 39 (2d Cir. 2008) (summary order) (conforming pleadings to add issue that defendants did not object to trying and both parties addressed in trial briefs). Rule 15(b) is "mandatory, not merely permissive," and reflects the principle that "cases

19

should be decided on resolution of the actual dispute between the parties, rather than on the

paper pleadings filed at the inception of suit." *Ostano Commerzanstalt v. Telewide Sys., Inc.*,

880 F.2d 642, 646 (2d Cir. 1989) (quotation marks and citations omitted). "Consent to try claims

may be implied when an issue not raised in the pleadings is either addressed in an ongoing way

by all parties prior to trial, or, alternatively, is introduced at trial, without objection, by the

opposing party." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F.

Supp. 2d 489, 529 (S.D.N.Y. 2011) (conforming complaint to add claim for aiding and abetting

breach of loyalty not alleged in pleadings). At the Representative Assets Trial, the only issue to

which the Term Lenders objected as not having been raised in the pleadings was the issue of

priority in connection with the LDT issue. Adv. Pro. Dkt. No. 900 (Defendants' Amended Pre-

Trial Brief) at 64-66. There can be no dispute that the scope of the Term Lenders' security

interest under the Collateral Agreement is an issue that has been tried by consent in this

litigation. Accordingly, even if a challenge to the scope of the Term Lenders' security interest

had not been properly pleaded—which it has—such a challenge would, given the course of the

proceedings to date, necessarily be treated as if raised in the pleadings.[9]

## III.    NOT ALL FIXTURES ARE SURVIVING COLLATERAL

In Section II of their opening brief, the Term Lenders set upon another straw-man,

insisting that goods permanently attached to realty are fixtures under Louisiana law "regardless

of whether a lien has been created on them." Defs. Br. at 11-14. The proposition is neither

---

[9] In the alternative, the Court has discretion to grant the Avoidance Action Trust leave to amend *sua sponte*. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *15, 17, 56 (Bankr. D.N.J. Nov. 8, 2013) ("A court may grant leave to amend, even when a plaintiff does not seek leave to amend, unless doing so would be inequitable or futile." (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002))).

relevant nor disputed, and it has no bearing on whether the Shreveport Motion may be heard within the context of this adversary proceeding.  As set forth in Plaintiff's briefing in support of the Shreveport Motion, the question for this Court is not whether a good is called a "fixture" even after it has become part of the realty under Louisiana law, but whether the Shreveport Real Property Assets are included in the Term Lenders' security interest, a question as to which the Term Lenders bear the burden of proof and which the Term Lenders do not address in their briefing.  The Term Lenders appear to contend that notwithstanding the prohibition in Section 10:9-334(a) of the Louisiana Commercial Code, if an asset is a fixture, then it must necessarily be subject to the Term Lenders' security interest.  The Term Lenders are wrong.  The assets at issue here fall outside the scope of the Term Lenders' security interests for several reasons.

As an initial matter, the Collateral Agreement did not grant a security interest in all of the fixtures located at the 42 Old GM Plants.[10]  Among other things, the Collateral Agreement's grant of security interest is, by its express terms, limited to the extent such grant is prohibited by law.  Adv. Pro. Dkt. No. 1092 (Declaration of Eric B. Fisher in Support of Plaintiff's Motion for Partial Summary Judgment On Certain Assets Located in the Shreveport Plant ("**Fisher Decl.**")), Ex. B (Collateral Agreement) at Art. II).  The applicable law here is Louisiana law, specifically Louisiana's Commercial Code, which does not permit the creation of a security interest in goods after they have become fixtures.  LA. REV. STAT. ANN. § 10:9-334(a); *see also* Pl. Br. 8-9; Fisher Decl. Ex. B (Collateral Agreement) at Art. I, Sect, 1.01(b) (defining "UCC" as the relevant Uniform Commercial Code in effect in the jurisdiction governing the "attachment,

---

[10] The Term Lenders acknowledge, for example, that the Collateral Agreement did not grant a security interest in two transfer presses (which they contended were fixtures) that were leased, rather than owned by Old GM.  Op. at 33-34, 107-08; JPTO at IV.E.66.

21

perfection, or priority" of the security interest). Pursuant to the Collateral Agreement, Old GM could only grant security interests in fixtures to the extent permitted under Louisiana's Commercial Code—*i.e.*, in goods before they became fixtures. Fisher Decl. Ex. B (Collateral Agreement) at Art. II. Thus, any purported grant of interest beyond what was permitted under Louisiana law is excluded under the terms of the Collateral Agreement. The Term Lenders offer no support for their contention that the Collateral Agreement created a security interest in the Shreveport Real Property Assets notwithstanding this prohibition of Louisiana law.

The Shreveport Real Property Assets also fall outside the scope of the Term Lenders' security interest because they are real property under Louisiana law. As set forth in Plaintiff's briefing in support of the Shreveport Motion, a fixture is treated as real property under Louisiana law for the purposes of a grant of security. Pl. Br. at 1-2, 9-10. For this reason, an interest in fixtures cannot be created under Louisiana's Commercial Code. *Id*. at 8-10; *see also supra* Section I.C. Accordingly, to create a security interest in a fixture after it has become a fixture, a mortgage is necessary to encumber the whole of the real property. *Id*. at 11-12. Because neither the Term Loan Agreement nor the Collateral Agreement created a mortgage in the real property at the Shreveport Plant, the Term Lenders' security interest does not include any interest in the Shreveport Real Property Assets. *Id*. at 11-14.

## CONCLUSION

For the foregoing reasons, the Term Lenders' Motion for Partial Summary Judgment

Regarding Fixtures at Shreveport Assembly should be denied.

Dated:  October 12, 2018
        New York, New York

                                    Respectfully submitted,
                                    **BINDER & SCHWARTZ LLP**


                                    /s/  Eric B. Fisher
                                    Eric B. Fisher
                                    Neil S. Binder
                                    Lindsay A. Bush
                                    Lauren K. Handelsman
                                    366 Madison Avenue, 6th Floor
                                    New York, New York 10017
                                    Tel: (212) 510-7008
                                    Facsimile: (212) 510-7299

                                    *Attorneys for the Motors Liquidation*
                                    *Company Avoidance Action Trust*