**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008
Facsimile: (212) 510-7299

*Attorneys for the Motors Liquidation*
*Company Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

Debtors.

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

------------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

Plaintiff,

against

JPMORGAN CHASE BANK, N.A., *et al.*,

Defendants.

Adversary Proceeding

Case No. 09-00504 (MG)

------------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING THE**
**TERM LENDERS' CONSTRUCTIVE TRUST DEFENSE**

# TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 4

I.      THE TERM LENDERS AND OLD GM ENTER INTO THE TERM LOAN
        AGREEMENT AND COLLATERAL AGREEMENT .................................... 4

        A.      JPMorgan, As Administrative Agent, Caused the Filing of the UCC-1 Financing
                Statements, Including the Financing Statement for the Main Lien ....................... 5

        B.      The Term Loan Agreement Requires Old GM to Provide Certain Information and
                Certifications to the Term Lenders ....................................................................... 6

II.     JPMORGAN MISTAKENLY AUTHORIZES THE FILING OF THE 2008
        TERMINATION STATEMENT, WHICH TERMINATES THE MAIN LIEN ............... 7

III.    OLD GM FILES FOR BANKRUPTCY AND THE TERM LOAN IS REPAID
        SUBJECT TO THE CREDITORS' COMMITTEE'S RIGHT TO BRING THIS
        LAWSUIT ................................................................................................................. 8

IV.     THE AVOIDANCE ACTION ......................................................................... 11

        A.      The Parties Litigate Whether the 2008 Termination Statement was Effective to
                Terminate the Main Lien ...................................................................................... 11

        B.      The Second Circuit Holds that JPMorgan Authorized the Filing of the 2008
                Termination Statement That Caused the Main Lien to Become Unperfected ...... 12

        C.      The Avoidance Action Trust Files an Amended Complaint and Certain Additional
                Term Lenders Assert a Constructive Trust Defense ............................................. 12

ARGUMENT ......................................................................................................... 13

I.      THE SUMMARY JUDGMENT STANDARD ............................................... 13

II.     THE TERM LENDERS RELEASED ALL RIGHTS WITH RESPECT TO THEIR
        COLLATERAL ......................................................................................................... 13

III.    THE ELEMENTS OF CONSTRUCTIVE TRUST ARE NOT MET ............................ 14

i

A.      THE CONTRACTUAL RELATIONSHIP BETWEEN THE PARTIES
PRECLUDES THE CONSTRUCTIVE TRUST DEFENSE ............................... 15

B.      THE RELATIONSHIP BETWEEN OLD GM AND THE TERM LENDERS
WAS NOT A FIDUCIARY RELATIONSHIP ...................................................... 18

C.      THE OLD GM BANKRUPTCY ESTATE WILL NOT BE UNJUSTLY
ENRICHED ........................................................................................................ 19

1.      Recoveries in This Case Will Be Distributed to Unsecured Creditors in
Accordance with the Bankruptcy Code's Priority Rules and to the DIP Lenders 19

2.      There Was No Unjust Pre-petition Conduct by Old GM ...................................... 21

IV.    THE TERM LENDERS CANNOT IDENTIFY THE PROPERTY TO WHICH ANY
CONSTRUCTIVE TRUST WOULD ATTACH ........................................................... 23

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. American Home Mortg. Servicing, Inc.*,
 947 F.Supp.2d 222 (E.D.N.Y. 2013) ...................................................................... 16

*Ades & Berg Group Inv's v. Breeden (In re Ades & Berg Group Inv's)*,
 50 F.3d 240 (2d Cir. 2008) ...................................................................................... 20

*Akerson Advert. & Mktg, Inc. v. St. John & Partners Advert. & Pub. Relations, Inc.*,
 89 F.Supp.3d 341 (N.D.N.Y. 2015).................................................................... 16, 18

*Alter v. Bogoricin*,
 No. 97 Civ. 0662, 1997 WL 691332 (S.D.N.Y. Nov. 6, 1998) ........................ 15, 18

*Bankers Sec. Life Ins. Soc. v. Shakerdge*,
 49 N.Y.2d 939 (1980) .............................................................................................. 15

*Brown v. Eli Lilly & Co.*,
 654 F.3d 347 (2d Cir. 2011) .................................................................................... 13

*Cabrini Med. Ctr. v. Padula (In re Cabrini Med. Ctr.)*,
 No. 09 Civ.14398, 2012 WL 527711 (S.D.N.Y. Feb. 16, 2012) ............................. 23

*Cadle Co. v. Mangan (In re Flanagan)*,
 503 F.3d 171 (2d Cir. 2007) .................................................................................... 20

*Davis v. M&M Developer, LLC (In re MBM Entm't, LLC)*,
 531 B.R. 363 (Bankr. S.D.N.Y. 2015)........................................................ 13, 15, 17

*Fangio v. DivLend Equip. Leasing, LLC (In re Ajax Integrated, LLC)*,
 No. 14 Civ. 30435, 2016 WL 1178350 (Bankr. N.D.N.Y. Mar. 23, 2016) ....... 17, 19

*Geltzer v. Balgobin (In re NBN Balgobin)*,
 490 B.R. 13 (E.D.N.Y. 2013) .................................................................................. 21

*In re Braniff Int'l Airlines, Inc.*,
 164 B.R. 820 (Bankr. E.D.N.Y. 1994)..................................................................... 15

*In re Dreier LLP*,
 429 B.R. 112 (S.D.N.Y. 2010).................................................................................. 20

*In re Fetman*,
 567 B.R. 702 (Bankr. E.D.N.Y. 2017)..................................................................... 21

*Northern Shipping Funds I, LLC v. Icon Capital Corp.*,
   921 F.Supp.2d 94 (S.D.N.Y. 2013) ................................................................. 15, 19

*Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*,
   861 F.3d 644 (7th Cir. 2017) ........................................................................ 18

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
   19 N.Y. 3d 584 (2012) ................................................................................. 18

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,*
   *N.A (In re Motors Liquidation Co.)*,
   486 B.R. 596 (Bankr. S.D.N.Y. 2013) ......................................................... 17

*Official Comm. of Unsecured Creditors or Motors Liquidation Co. v. JPMorgan Chase Bank,*
   *N.A. (In re Motors Liquidation Co.)*,
   755 F.3d 78 (2d Cir. 2014) ...................................................................... 17, 22

*Sanyo Elec., Inc. v. Howard's Appliance (In re Howard's Appliance Corp.)*,
   874 F.2d 88 (1989) ...................................................................................... 23

*Seippel v. Jenkens & Gilchrist, P.C.*,
   341 F. Supp. 2d 363 (S.D.N.Y. 2004) ......................................................... 18

*Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*,
   842 F.Supp.2d 502 (S.D.N.Y. 2012) ........................................................... 16

*Staudinger+Franke GMBH v. Casey*,
   No. 13 Civ. 6124, 2015 WL 3561409 (S.D.N.Y. June 8, 2015) .................... 18

*Summit Props. Int'l., LLC v. Ladies Prof'l Golf Ass'n*,
   No. 07 Civ. 10407, 2010 WL 2382405 (S.D.N.Y. 2010) ............................. 18

*Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.)*,
   377 F.3d 209 (2d Cir. 2004) ............................................................. 15, 16, 20, 21

*Wilde v. Wilde*,
   576 F. Supp. 2d 595 (S.D.N.Y. 2008) ......................................................... 23

iv

Plaintiff Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**" or "**Plaintiff**") respectfully submits this memorandum of law in support of its motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7056 of the Federal Rules of Bankruptcy Procedure, and Rule 7056-1 of the Local Bankruptcy Rules.  As an affirmative defense to this action, the Term Lenders (the "**Term Lenders**" or "**Defendants**") assert that this Court should find that the collateral securing the Term Loan was not property of the Old GM bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code because a constructive trust should have been imposed upon the collateral for the benefit of the Term Lenders upon the filing of Old GM's bankruptcy petition.  This motion seeks dismissal of the constructive trust defense as a matter of law.[1]

## PRELIMINARY STATEMENT

JPMorgan,[2] as the only secured party of record authorized to act with respect to the collateral for the Term Loan, authorized the filing of a UCC-3 termination statement, which caused the main lien securing the Term Loan to become unperfected.  As a defense to this action, JPMorgan and numerous other Term Lenders seek the equitable remedy of constructive trust, arguing that the collateral securing the Term Loan, and presumably any proceeds of that collateral, should not have been considered property of the Old GM bankruptcy estate and instead should be deemed to have been held in trust for their benefit.  According to the Term Lenders, a constructive trust is justified because Old GM allegedly acted inequitably when it

---

[1] By its motion, Plaintiff seeks summary judgment as to any affirmative defense that in substance asserts a defense based upon constructive trust, including but not limited to the constructive trust defenses asserted in the following answers: Adv. Proc. Dkt. Nos. 222, 224, 225, 227, 229, 230-234, 238, 241, 242, 280, 284, 292, 296, 297, and 334.

[2] All capitalized terms are as defined in Plaintiff's Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment Dismissing the Term Lenders' Constructive Trust Defense ("**SUF**").

1

failed to notify JPMorgan about JPMorgan's own mistaken filing of the UCC-3 termination

statement (even though neither JPMorgan nor Old GM were aware that the UCC-3 termination

statement related to the Term Loan collateral until after Old GM petitioned for bankruptcy).  In

essence, this defense is premised on the misguided notion that equity demands that the Old GM

bankruptcy estate should bear the consequences for JPMorgan's act.  As explained below, the

constructive trust defense has no merit and should be dismissed.

First, the Term Lenders expressly released all their rights in the collateral securing the

Term Loan, as reflected in the DIP Order.  They did so after Old GM filed for bankruptcy and

after becoming aware of the filing of the UCC-3 termination statement.  Having knowingly

released all rights in the collateral, they cannot now seek imposition of a constructive trust upon

that same collateral.

Second, the equitable remedy of constructive trust does not apply when the parties'

relationship is governed by contract.  Here, the Term Loan Agreement and the Collateral

Agreement govern the relationship between Old GM, JPMorgan and the other Term Lenders,

and Old GM's alleged obligation to notify JPMorgan about the UCC-3 termination statement

arises (if at all) from obligations defined by those agreements.  The contractual relationship

between the parties precludes the remedy of constructive trust.

Third, constructive trust is generally not available in the absence of a fiduciary

relationship.  Here, the governing contract makes explicit and all the circumstances make clear

that Old GM and the Term Lenders were not in a fiduciary relationship.  They were counter-

parties to a commercial loan transaction.

Fourth, the Term Lenders cannot show that Old GM was unjustly enriched because of

inequitable conduct.  The Second Circuit has observed that the typical equities of a bankruptcy

2

case disfavor the remedy of constructive trust because the doctrine can "wreak havoc" with the priority system ordained by the Bankruptcy Code by creating trust assets for the benefit of particular creditors that exist outside the bankruptcy estate.  In any event, Old GM did not behave inequitably.  JPMorgan mistakenly authorized the filing of the UCC-3 termination Statement.  There is no evidence that any officer or employee of Old GM was aware of the consequences of that filing until after the bankruptcy petition was filed.  And all the evidence shows that Old GM acted reasonably and in good faith with respect to all notices it supplied pursuant to the Term Loan Agreement and Collateral Agreement.  But more fundamentally, it makes absolutely no sense to say that Old GM behaved inequitably by not notifying JPMorgan about an act that JPMorgan itself had authorized.

To the contrary, to the extent that the Term Loan was not fully secured, it is the Term Lenders – not the Old GM bankruptcy estate – that have been unjustly enriched because they have received payment in full, as though they were fully secured.  There is nothing inequitable about requiring the Term Lenders to be treated like all other unsecured creditors, to the extent that their claim is unsecured.

Finally, the Term Lenders' constructive trust theory also lacks merit because they cannot identify the property upon which to impose the constructive trust.  Even if the elements of constructive trust could be satisfied (which they cannot), it is simply not possible to impose a constructive trust over the collateral or its proceeds more than nine years after most of the collateral was sold to New GM and the remaining portion of the collateral was liquidated.  At this point, it is impossible to identify property that would be subject to a constructive trust, except for property in the hands of New GM, which is not a party to this action; and even if it were possible to identify property upon which to impose a constructive trust and even if the

3

constructive trust claim were legally viable, it would be inequitable to allow the Term Lenders to impose a constructive trust now.

For all of these reasons, and those set forth below, the constructive trust defense should be dismissed on summary judgment.

## STATEMENT OF FACTS

### I. THE TERM LENDERS AND OLD GM ENTER INTO THE TERM LOAN AGREEMENT AND COLLATERAL AGREEMENT

In 2006, approximately three years before it filed for bankruptcy, General Motors Corporation ("**Old GM**") entered into an approximately $1.5 billion syndicated commercial financing term loan (the "**Term Loan**") with a group of bank lenders, who ultimately assigned some or all of their interests to over 500 Term Lenders. **SUF** ¶ 1. To secure their obligations under the Term Loan, pursuant to a November 29, 2006 collateral agreement (the "**Collateral Agreement**"), Old GM (and Saturn Corporation) granted to JPMorgan Bank, N.A., as the Administrative Agent for the Term Loan ("**JPMorgan**"), a first-priority security interest in a large number of Old GM's assets, including certain equipment and fixtures at 42 Old GM facilities throughout the United States (the "**Collateral**"). *Id.* ¶ 2. This was an arm's-length commercial transaction between Old GM, on the one hand, and JPMorgan and the Term Lenders, on the other. *Id.* ¶ 3. The Collateral Agreement specifies that, "neither the Agent nor any Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Grantors, on the one hand, and the Agent and Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor." *Id.*

A.      **JPMorgan, As Administrative Agent, Caused the Filing of the UCC-1
Financing Statements, Including the Financing Statement for the Main Lien**

Pursuant to the Collateral Agreement, JPMorgan, as Administrative Agent, took a first

priority security interest in the Collateral.  SUF ¶ 4.  JPMorgan was responsible for the

Collateral, including filing UCC-1 financing statements to perfect the Term Lenders' security

interests.  *Id.* ¶ 7.

The term loan agreement, dated as of November 29, 2006, and amended as of March 4,

2009 (the "**Term Loan Agreement**") set forth the scope of JPMorgan's role and responsibilities

as Administrative Agent with respect to the Term Lenders and the Collateral.  *Id.* ¶ 5.  Pursuant

to the Term Loan Agreement:

> Each Lender hereby irrevocably designates and appoints the Agent [JPMorgan] as
> the agent of such Lender and each such Lender irrevocably authorizes the Agent,
> as the agent for such Lender, to take such action on its behalf under the provisions
> of this Agreement and the other Loan Documents and to exercise such powers and
> perform such duties as are expressly delegated to the Agent by the terms of this
> Agreement and the other Loan Documents, together with such other powers as are
> reasonably incidental thereto.

*Id.* ¶ 6.

The Collateral Agreement sets forth additional duties assumed by JPMorgan.  *Id.* ¶ 7.

The Collateral Agreement provided that JPMorgan's "sole duty with respect to the custody,

safekeeping and physical preservation of the Collateral in its possession . . . shall be to deal with

it in the same manner as the Agent deals with similar property for its own account."  *Id.* ¶ 8.  The

Collateral Agreement also spelled out the authority granted to JPMorgan with respect to the

Collateral, including that JPMorgan "shall be conclusively presumed to be acting as agent for the

Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor [Old

GM and Saturn] shall be under any obligation, or entitlement, to make any inquiry respecting

5

such authority." *Id.* ¶ 9.  Accordingly, the Term Lenders agreed that Old GM could rely on

JPMorgan's authority to act on behalf of the Term Lender Defendants.  *See id.*

JPMorgan, as Administrative Agent, thereafter caused the filing of twenty-eight UCC-1

financing statements throughout the United States to perfect the Term Lenders' security interests

in the Collateral.  *Id.* ¶ 10.  One of the twenty-eight UCC-1 financing statements covered all the

equipment and fixtures at the forty-two Old GM facilities and was filed with the Delaware

Secretary of State and designated as file number 6416808 4 (the "**Main Lien**").  *Id.* ¶ 11.

### B.     The Term Loan Agreement Requires Old GM to Provide Certain Information and Certifications to the Term Lenders

The Term Loan Agreement obligated Old GM to provide to JPMorgan, on behalf of the

Term Lenders, certain information and certifications regarding Old GM's financial statements,

performance of its contractual covenants, and the value of the Collateral on a quarterly basis.

SUF ¶ 12.  For example, Old GM was required to furnish a certificate from an Old GM Financial

Officer stating that, "to the best of such Financial Officer's knowledge," Old GM has performed

in all material respects all of its covenants and other agreements under the Term Loan

Agreements, and that no Default or Event of Default has occurred and is continuing.  *Id.* ¶ 13.  It

is an Event of Default under the Term Loan Agreement if "any of the Security Documents shall

cease, for any reason, to be in full force and effect with respect to Collateral with a book value in

excess of $25,000,000 in the aggregate," or "any Lien created by any of the Security Documents

shall cease to be enforceable and of the same effect and priority purported to be created

there . . . ."  *Id.* ¶ 14.  Section VII also sets out the relief available to the Term Lenders in an

Event of Default.  *Id.*

As part of its reporting obligations, Old GM was also required to provide collateral

certificates, which set forth the net book value of the Term Loan Collateral.  *Id.* ¶ 15.  The

6

collateral certificates were prepared by Old GM's Capital Markets Domestic Finance Group with the assistance of internal and external counsel, and were presented to Old GM's assistant treasurer for review and signature. *Id.* ¶16. Adil Mistry, who served as an assistant treasurer and signed the certificates provided to JPMorgan from May 2008 to May 2009, took steps to ensure that the certificates were accurate. *Id.* ¶ 17. During the relevant period, Mr. Mistry was unaware of any inaccuracy in any of the collateral certificates he provided; and he testified that, if he had any doubt about the accuracy of any certificate, he would not have signed it. *Id.* ¶ 18.

## II.    JPMORGAN MISTAKENLY AUTHORIZES THE FILING OF THE 2008 TERMINATION STATEMENT, WHICH TERMINATES THE MAIN LIEN

In 2001—five years before the Term Loan transaction—Old GM entered into a synthetic lease financing transaction (the "**Synthetic Lease**") with a syndicate group of lenders, secured by liens on twelve parcels of real estate. SUF ¶ 9. JPMorgan served as the administrative agent for the Synthetic Lease and was identified as the secured party of record on the UCC-1 financing statements. *Id.* ¶ 20.

In the fall of 2008, Old GM planned to pay off the Synthetic Lease and asked its counsel, Mayer Brown, to prepare the necessary documents to repay JPMorgan and the other lenders and release the interests the Synthetic Lease lenders held in Old GM's property. *Id.* ¶ 21. In drafting the UCC-3 termination statements, Mayer Brown inadvertently included a termination statement identifying the Main Lien for the unrelated Term Loan (the "**2008 Termination Statement**"). *Id.* ¶ 22.

The draft documents, including the draft 2008 Termination Statement identifying the Main Lien, were sent to JPMorgan and its counsel, Simpson Thacher & Bartlett LLP ("**Simpson Thacher**"), along with draft escrow instructions that again identified the Main Lien as one of the financing statements that would be terminated once the Synthetic Lease was repaid. *Id.* ¶ 23.

7

JPMorgan and its counsel reviewed the draft documents and assented to their filing—including the 2008 Termination Statement. *Id.* ¶ 24.

Neither the parties to the Synthetic Lease transaction nor their counsel realized that one of the UCC-3 termination statements filed as part of the Synthetic Lease transaction covered a financing statement unrelated to the Synthetic Lease, let alone one that would terminate the Main Lien. *Id.* ¶ 25. In fact, no one from Mayer Brown involved in the Synthetic Lease transaction worked on or recalled any information about the Term Loan at that time. *Id.* ¶ 26.

On March 4, 2009, while all parties were still unaware of the mistaken filing of the 2008 Termination Statement, the Term Loan Agreement was amended, and Old GM and JPMorgan executed the First Amendment to the Term Loan Agreement (the "**Term Loan Amendment**"). *Id.* ¶ 26.

## III. OLD GM FILES FOR BANKRUPTCY AND THE TERM LOAN IS REPAID SUBJECT TO THE CREDITORS' COMMITTEE'S RIGHT TO BRING THIS LAWSUIT

On June 1, 2009 (the "**Petition Date**"), Old GM and certain of its subsidiaries filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York. SUF ¶ 28. On the Petition Date, Old GM also filed a motion in this Court seeking approval to sell substantially all of its assets to a Government-sponsored entity in an expedited sale under Section 363 of the Bankruptcy Code (the "**363 Sale**"). *Id.* ¶ 29. The Government-sponsored entity purchasing Old GM's assets was to be a new company, NGMCO, Inc. ("**New GM**"). *Id.* ¶ 30. The assets that New GM did not acquire would remain with Old GM for liquidation. *Id.* ¶ 31. The 363 Sale closed on July 10, 2009. *Id.* ¶ 32. Of the 42 plants where Term Loan Collateral was located, most were sold to New GM, and the remaining plants were left behind with Old GM to be liquidated. *Id.* ¶ 33.

8

On the Petition Date, the Debtors also filed a motion seeking authority from the Bankruptcy Court to obtain in excess of $33 billion in post-petition financing (the "**DIP Financing**") from the United States Department of the Treasury and Export Development Canada (collectively referred to as the "**DIP Lenders**").  *Id.* ¶ 34.  The motion requested authority to use a portion of the DIP Financing to repay the Term Loan in full.  *Id.*  However, days before entry of the DIP Order on June 25, 2009, which provided for the final approval of the DIP Financing, the Committee learned that the Term Lenders' security interests, in fact, may not all have been perfected as of the Petition Date due to the filing of the 2008 Termination Statement months before the Petition Date.[3]  *Id.* ¶ 36.

Therefore, the DIP Order, while conditionally approving Old GM's repayment of the Term Loan, expressly preserved the right of the Committee to investigate and bring actions based upon the purported perfection of the security interests related to the Term Loan.  *Id.* ¶ 39. Specifically, the DIP Order provided a general release from the Debtors to the Term Lenders with the exception of certain "Reserved Claims," defined to include "the perfection of first priority liens" in connection with the Term Loan.[4]  *Id.* ¶ 40.  The DIP Order further provided that "[t]he Committee shall have automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Prepetition Senior Facilities Secured Parties not later than July 31, 2009."  *Id.* ¶ 41.  The DIP Order also stated that

---

[3] The DIP Order refers to the *Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties*, Bankr. Dkt. No. 2529.

[4] The DIP Order uses the term "Prepetition Senior Facilities," which is defined to include the "Prepetition Term Loan Agreement."  SUF ¶ 38.

9

the Committee's grant of "automatic standing shall be without any further order of this Court or any requirement that the Committee file a motion seeking standing or authority to file a motion seeking standing or authority before prosecuting any such challenge." *Id.* ¶ 42. Thus, while the DIP Order allowed payment in full to the Term Lenders under the provisional assumption that their security interest was perfected, it expressly carved out the authority of the Committee to bring an action to seek relief if it was discovered that the security interest was not in fact perfected. *Id.* ¶ 43. These terms of the DIP Order had been negotiated by the Term Lenders, and the DIP Order was entered with notice to the Term Lenders and without any objection from them. *Id.* ¶ 37.

Following entry of the DIP Order, Old GM repaid the Term Lenders in full, ahead of other creditors of Old GM (the "**Term Loan Payoff**"). *Id.* ¶ 44. After Old GM paid JPMorgan the full amount due under the loan, JPMorgan transferred the payment to the Term Lenders, and the Term Lenders released their liens and claims relating to the Term Loan Collateral. *Id.* ¶ 45. The DIP Order states that upon the Term Loan Payoff, the Term Lenders "shall have no further rights with respect to the Debtors, the DIP Lenders, the Property or any claims or liens relating thereto (all of which liens and claims shall be deemed automatically satisfied and released without further action), whether such claims or liens arise under the Prepetition Term Loan Agreement, [other prepetition senior facilities] or related documents, and the Debtors and their estates shall have no further obligations" to the Term Lenders in connection with the Term Loan. *Id.* ¶ 46; *see also id.* ¶ 47 (Term Lenders' "liens, claims and interests in the Property and any adequate protection claims or adequate protection liens, shall expire upon the Payment"). Following the Term Loan Payoff, the DIP Lenders had a perfected security interest in and lien on the Collateral as security for the DIP Loan. *Id.* ¶ 48.

10

IV.    **THE AVOIDANCE ACTION**

Pursuant to the authority conferred upon it in the DIP Order, the Committee filed this adversary proceeding (the "**Avoidance Action**") to recover amounts alleged to have been improperly paid by Old GM to the Term Lenders based on the erroneous assumption that the Term Lenders' security interests were perfected, and their claims fully secured.  SUF ¶ 49.

On October 7, 2009, JPMorgan filed an answer asserting, among other defenses, that the "Bankruptcy Court should find that the Debtors held the collateral under the Term Loan Agreement pursuant to a constructive trust."  *Id.* ¶ 52.

A.    **The Parties Litigate Whether the 2008 Termination Statement was Effective to Terminate the Main Lien**

The Bankruptcy Court (with the consent of JPMorgan) ordered that the litigation would occur in two phases: (i) the Committee (and later the Avoidance Action Trust, as successor plaintiff), and JPMorgan would first litigate whether the 2008 Termination Statement terminated the Main Lien ("**Phase I**") and (ii) if the 2008 Termination Statement was held to be effective as to the Main Lien, Plaintiff would then serve the summons and complaint on the remaining Term Lenders and litigate the value of the Term Lenders' remaining perfected security interest ("**Phase II**").  SUF ¶ 53.

After the conclusion of the discovery period for Phase I, Plaintiff and JPMorgan cross-moved for summary judgment on the effectiveness of the 2008 Termination Statement as to the Main Lien.  *Id.* ¶ 54.  Among the arguments asserted in JPMorgan's Memorandum of Law was a request for alternative relief in the form of the imposition of a constructive trust on the Collateral in favor of the Term Lenders.  *Id.* ¶ 55.  JPMorgan argued that the Term Lenders are entitled to a constructive trust on the Collateral as of the Petition Date because, among other reasons, "giving effect to the Unrelated Termination Statement would contravene the express agreement of the

11

parties memorialized by the terms of the Term Loan Agreement. . . ." *Id.* ¶ 57.  JPMorgan also noted that the Term Loan was repaid from the DIP Credit Facility and to the extent recovery of "amounts provided from the U.S. Treasury to repay the Term Loan lenders," will be returned to the estate, the unsecured creditors would be grossly and unjustly enriched. *Id.* ¶ 58.

On March 1, 2013, the Bankruptcy Court granted summary judgment for JPMorgan, concluding that the 2008 Termination Statement was not a legally effective filing and thus did not cause the Main Lien to become unperfected. *Id.* ¶ 59. The Bankruptcy Court did not rule on JPMorgan's alternative constructive trust argument. *Id.* ¶ 60.

The Bankruptcy Court certified its summary judgment decision for direct appeal to the Second Circuit, and on March 7, 2013, Plaintiff appealed to the Second Circuit. *Id.* ¶ 61.

**B.   The Second Circuit Holds that JPMorgan Authorized the Filing of the 2008 Termination Statement That Caused the Main Lien to Become Unperfected**

On January 21, 2015, the Second Circuit held that "although JPMorgan never intended to terminate the Main [Lien], it authorized the filing of a UCC-3 termination statement that had that effect." SUF ¶ 62.  Accordingly, the Second Circuit reversed the Bankruptcy Court's grant of summary judgment and remanded the case with instructions to enter partial summary judgment in favor of Plaintiff, which the Bankruptcy Court did on June 12, 2015. *Id.* ¶ 63.  The mandate drew to a close Phase I of the case.

**C.   The Avoidance Action Trust Files an Amended Complaint and Certain Additional Term Lenders Assert a Constructive Trust Defense**

Following the Second Circuit's decision, the parties commenced Phase II of the litigation. In May 2015, Plaintiff filed an amended complaint (the "**Amended Complaint**") and served the Non-JPMorgan Term Lenders.  SUF ¶ 64.  JPMorgan filed an amended answer in November 2015, wherein it repeated its constructive trust affirmative defense and added a defense stating

that Plaintiff is barred from avoiding transfers under 11 U.S.C. § 549 "insofar as such transfers were not property of the estate." *Id.* ¶ 65.

Other Term Lenders filed their answers also asserting a constructive trust defense. Generally, the Term Lenders' affirmative defense of constructive trust seeks a finding by the Court that Old GM held the Collateral under the Term Loan Agreement pursuant to a constructive trust, and some Term Lenders add that such collateral is therefore excluded from the bankruptcy estate. *Id.* ¶ 66.

## ARGUMENT

## I.   THE SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  Here, Defendants bear the burden of proof to establish their defense of constructive trust by clear and convincing evidence. *Davis v. M&M Developer, LLC (In re MBM Entm't, LLC)*, 531 B.R. 363, 414 (Bankr. S.D.N.Y. 2015).  Because Defendants cannot satisfy their burden, the constructive trust defense should be dismissed as a matter of law.

## II.   THE TERM LENDERS RELEASED ALL RIGHTS WITH RESPECT TO THEIR COLLATERAL

The Term Lenders' constructive trust defense cannot be reconciled with the DIP Order, because, under the DIP Order, they released any right to impose a constructive trust on the Collateral or its proceeds.

According to the DIP Order, upon receipt of payment on the Term Loan, the Term Lenders had "no further rights" with respect to their lien, and any lien was deemed "released without further action."  SUF ¶ 46.  These terms of the DIP Order had been negotiated by the

13

Term Lenders, and the DIP Order was entered with notice to the Term Lenders and without any objection from them. SUF ¶ 37. When the DIP Order was entered on June 25, 2009, all parties were fully aware of the mistakenly filed 2008 Termination Statement, and they were also aware that the Creditors' Committee could file this action pursuant to the reserved-claim carveout in paragraph 19(d) of the DIP Order. SUF ¶¶ 36, 40-43. Accordingly, with full awareness of JPMorgan's mistaken filing of the 2008 Termination Statement and of the prospect of this litigation, the Term Lenders consented to a court order that released all their rights with respect to the Collateral, including but not limited to the right to seek imposition of a constructive trust for their benefit upon the Collateral.

## III.    THE ELEMENTS OF CONSTRUCTIVE TRUST ARE NOT MET

As a matter of law, constructive trust is not an available defense to this action because the Term Lenders cannot satisfy the elements necessary to impress a constructive trust on the Collateral. According to the Term Lenders, this Court should find that the Collateral was not property of the Old GM bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code because when Old GM filed for bankruptcy, a constructive trust should have been imposed upon the Collateral for the benefit of the Term Lenders. *See* SUF ¶ 65. Specifically, the Term Lenders contend that a constructive trust is warranted because Old GM failed to notify JPMorgan, as secured party of record, that JPMorgan had mistakenly authorized the filing of the 2008 Termination Statement. As a result, JPMorgan claims that it was unaware that there was a potential problem with the perfection of the Main Lien (a problem caused by JPMorgan's own mistake) and thus failed to take any action to remedy the problem before Old GM's bankruptcy filing. This defense is without merit.

14

Constructive trust, like other issues concerning the scope of a debtor's property interest, is governed by state law. *Superintendent of Ins. v. Ochs (In re First Central Fin. Corp.)*, 377 F.3d 209, 212 (2d Cir. 2004). "A constructive trust may not be imposed unless four elements have been established:  a confidential or fiduciary relationship, a promise, a transfer made in reliance on that promise, and unjust enrichment." *Alter v. Bogoricin*, No. 97 Civ. 0662, 1997 WL 691332 at *16 (S.D.N.Y. Nov. 6, 1998) ("constructive trust is an equitable doctrine that applies only when equity demands"); *see also In re Braniff Int'l Airlines, Inc.*, 164 B.R. 820, 827 (Bankr. E.D.N.Y. 1994), *aff'd*, 101 F.3d 686 (2d Cir. 1996) ("[t]he Court is aware of no instance, however, where a constructive trust has been imposed in the absence of all of these factors."); *Bankers Sec. Life Ins. Soc. v. Shakerdge*, 49 N.Y.2d 939, 940 (1980) (elements of constructive trust not met). While the fourth element is the most important, "enrichment alone will not suffice to invoke the remedial powers of a court of equity." *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F.Supp.2d 94, 107 (S.D.N.Y. 2013).

As explained below, the Term Lenders cannot meet the elements for a constructive trust and thus their defense should be dismissed.

### A.    The Contractual Relationship Between the Parties Precludes the Constructive Trust Defense

The contractual relationship between the Term Lenders and Old GM precludes the equitable defense of constructive trust. *See e.g., Northern Shipping Funds I, LLC*, 921 F.Supp.2d at 107 (dismissing constructive trust claim arising from contractual relationship); *Bogoricin*, 1997 WL 691332 at *16 (same). "Under New York law, a constructive trust is not an appropriate remedy where the rights of the parties are governed by a written agreement," *In re MBM Entm't, LLC*, 531 B.R. at 413, and it is "well established that the existence of a contract precludes a claim for a constructive trust." *Abraham v. American Home Mortg. Servicing, Inc.*,

15

947 F.Supp.2d 222, 235 (E.D.N.Y. 2013) (plaintiff's constructive claim precluded because

parties' relationship governed by contract); *see also Soroof Trading Dev. Co., Ltd. v. GE Fuel*

*Cell Sys., LLC*, 842 F.Supp.2d 502, 514, 515-16 (S.D.N.Y. 2012) ("the existence of a written

agreement *precludes* a finding of unjust enrichment . . . [and] constructive trust") (quoting *In re*

*First Central Fin. Corp.*, 377 F.3d at 213) (emphasis in *Soroof*).   Accordingly, to establish a

claim for constructive trust, the party seeking such remedy "must make an allegation that is not

merely 'duplicative of the breach of contract claim;' but instead must 'allege …distinct harm or

actions giving rise to a[] separate claim [for a] constructive trust.'"   *Akerson Advert. & Mktg, Inc.*

*v. St. John & Partners Advert. & Pub. Relations, Inc.*, 89 F.Supp.3d 341, 356 (N.D.N.Y. 2015).

Here, the Term Lenders do not and cannot point to any promise separate and apart from

promises contained in the parties' written agreements.   In identifying the promise that induced

the Term Lenders to provide Old GM with the Term Loan, JPMorgan stated in its 2010 motion

for summary judgment that, "[a]bsent [Old GM's] pledge of the Term Loan Collateral, the Term

Loan lenders would not have lent [Old GM] approximately $1.5 billion under the Term Loan."

SUF ¶ 56.  The pledge of Collateral is governed by the Term Loan Agreement and Collateral

Agreement.  *See generally* SUF ¶¶ 2, 4-11.

Nor can the Term Lenders identify any harm that is distinct from Old GM's purported

failure to perform the promises set forth in the Term Loan Agreement.  The crux of the Term

Lenders' alleged harm is that Old GM failed to notify JPMorgan that JPMorgan had authorized

the filing of the 2008 Termination Statement and that the Main Lien was no longer perfected.

Even assuming Old GM had knowledge of the mistaken UCC filing (it did not), to the extent that

Old GM had any duty to notify the Term Lenders of JPMorgan's error, it arose from the Term

Loan Agreement.

16

Finally, the Term Loan Agreement provided the Term Lenders with a contractual remedy for the alleged conduct of which they complain. Section VII sets out the relief available to the Term Lenders in an Event of Default. SUF ¶ 14. The Term Lenders never availed themselves of that contractual remedy, opting instead to release all such remedies against Old GM. SUF ¶ 46. Having relinquished their legal remedies against Old GM under the Term Loan Agreement in exchange for receipt of the Term Loan Payoff (subject to the reserved-claim carve-out), the Term Lenders are precluded from now seeking affirmative relief couched as a constructive trust "defense." *Fangio v. DivLend Equip. Leasing, LLC (In re Ajax Integrated, LLC)*, No. 14 Civ. 30435, 2016 WL 1178350 at *7 (Bankr. N.D.N.Y. Mar. 23, 2016) ("An equitable claim cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law.") (citation omitted); *see also In re MBM Entm't, LLC*, 531 B.R. at 413 (adequate legal remedy exists where parties' relationship is governed by valid and enforceable agreement).

In sum, because the Term Lenders cannot point to any alleged inequitable conduct by Old GM separate and apart from any claims that may have arisen under their contractual relationship, there is no merit to any claim for constructive trust.[5]

---

[5] Even if the claims about Old GM's conduct were all true and the Term Lenders had not released their claims, the conduct would not have supported a breach of contract claim against Old GM. After all, the supposed breach of contract by Old GM resulted from an act authorized by JPMorgan. *See Official Comm. of Unsecured Creditors or Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 101 (2d Cir. 2014). Moreover, JPMorgan itself believed that it continued to have a perfected security interest in the Main Lien, notwithstanding the filing of the 2008 Termination Statement and the Bankruptcy Court agreed. *See Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A (In re Motors Liquidation Co.)*, 486 B.R. 596, 623-27 (Bankr. S.D.N.Y. 2013). It was only years later that the Second Circuit ruled that the 2008 Termination Statement was effective and had resulted in the Main Lien becoming unperfected. 755 F.3d at 101. In any event, because all of the conduct at issue is governed by contract, there is no scenario in which that conduct could support the equitable defense of constructive trust.

17

**B.    The Relationship Between Old GM and the Term Lenders Was Not a Fiduciary Relationship**

The Term Lenders cannot establish that a fiduciary relationship with Old GM existed, much less a breach of any fiduciary duty, to justify imposition of a constructive trust.  *See e.g., Staudinger+Franke GMBH v. Casey*, No. 13 Civ. 6124, 2015 WL 3561409 at *13 (S.D.N.Y. June 8, 2015) ("courts regularly dismiss claims for constructive trust when addressing conventional business relationships where nothing approaching a confidential or fiduciary relationship exists."); *Bogoricin*, 1997 WL 691332 at *16 ("a constructive trust is generally not available in the absence of a breach of fiduciary duty") (citing *Smallwood Estates, Inc. v. Nikola*, 163 A.D.2d 763, 764 (3d Dep't 1990) and 106 N.Y. Jur.2d §163, at 207); *see also Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y. 3d 584, 593 (2012).

Purely commercial transactions, such as the one between Old GM and the Term Lenders, do not give rise to a fiduciary relationship.  *See Akerson Advertising & Marketing, Inc.*, 89 F.Supp.3d at 356.  Moreover, the Collateral Agreement itself expressly disclaims any fiduciary relationship between Old GM, on the one hand, and JPMorgan and the other Term Lenders, on the other, explaining that the relationship "is solely that of debtor and creditor."  SUF ¶ 3; *see also Summit Props. Int'l., LLC v. Ladies Prof'l Golf Ass'n*, No. 07 Civ. 10407, 2010 WL 2382405, at *7 (S.D.N.Y. 2010) ("Given that the Agreement contains a clear and unambiguous disclaimer of a fiduciary relationship, we find there was no fiduciary duty between the parties."); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004) ("Because contractual disclaimers of fiduciary duty are effective in New York, no fiduciary duty can arise from the relationship between [the parties.]").  And as the Seventh Circuit has held, Mayer Brown, Old GM's counsel, did not owe JPMorgan an attorney's duty of care.  *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644 (7th Cir. 2017) (dismissing class

18

action claim brought by Non-JPMorgan Term Lenders against Mayer Brown).  Because the

Term Lenders cannot establish any fiduciary relationship, they have no viable constructive trust

defense.

### C.      The Old GM Bankruptcy Estate Will Not Be Unjustly Enriched

The defense of constructive trust also requires unjust enrichment, which can only be

found where one party is unjustly enriched at the expense of another due to a wrongful act.

*Northern Shipping Funds I, LLC*, 921 F.Supp.2d at 107.  Unjust enrichment under New York law

requires proof of three basic elements: "(1) defendant was enriched, (2) at plaintiff's expense,

and (3) equity and good conscience militate against permitting defendant to retain what plaintiff

is seeking to recover."  *In re Ajax Integrated, LLC*, 2016 WL 1178350 at *7.  Here, there is no

support for a finding of unjust enrichment.

### 1.     Recoveries in This Case Will Be Distributed to Unsecured Creditors in Accordance with the Bankruptcy Code's Priority Rules and to the DIP Lenders

Defendants cannot establish that the Old GM bankruptcy estate will be unjustly enriched

at Defendants' expense if the Avoidance Action Trust recovers the portion of the Term Loan

Payoff that exceeds the value of the Term Lenders' surviving collateral.  The Term Lenders are

not entitled to the Term Loan Payoff to the extent that the value of their perfected collateral was

less than the payment they received.  The DIP Order and the Bankruptcy Code permit recovery

of that amount.

The Term Lenders were paid ahead of other unsecured creditors and in full regardless of

the fact that the Main Lien had become unperfected.  SUF ¶¶ 36-44.  The Term Lenders'

retention of any overpayment conflicts with the Bankruptcy Code's priority rules.  The

constructive trust defense would exempt the Term Loan Payoff from avoidance and thwart the

19

creditor-payment priorities mandated by the Bankruptcy Code. Requiring the Term Lenders to pay back any portion of the Term Loan Payoff that was not fully secured would not result in the estate being unjustly enriched; quite to the contrary, *Defendants* will be unjustly enriched at the expense of the bankruptcy estate if the Term Loan Payoff is insulated from recovery through a constructive trust. For precisely this reason, constructive trust is a disfavored remedy in bankruptcy and does not apply in this case.

As the Second Circuit has explained: "By creating a separate allocation mechanism outside the scope of the bankruptcy system, the constructive trust doctrine can wreak ... havoc with the priority system ordained by the Bankruptcy Code," the "chief purposes [of which]. . . are to secure a prompt and effectual administration and settlement of the estate of all bankrupts . . . for equal distribution among the creditors, and to protect the creditors from one another." *In re First Central Fin. Corp.*, 377 F.3d at 217. Because it is not the debtor who bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors, "bankruptcy courts have been reluctant, absent a compelling reason, to impose a constructive trust" on estate property. *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 182 (2d Cir. 2007); *In re Dreier LLP*, 429 B.R. 112, 136-37 (S.D.N.Y. 2010).

"The New York Court of Appeals has recognized that 'there is no inequity in treating [one creditor] in the same manner as any other depositor/creditor who was unfortunate enough to have placed its money'" with a now-bankrupt entity. *Ades & Berg Group Inv's v. Breeden (In re Ades & Berg Group Inv's)*, 50 F.3d 240, 245 (2d Cir. 2008) (quoting *In re N.Y. Agency of Bank of Commerce & Credit Int'l S.A.*, 90 N.Y.2d 410, 424 (1997)). By the same token, to the extent that the Term Lenders did not have perfected security interest, there is nothing inequitable about treating them the same as other unsecured creditors of Old GM.

20

Furthermore, not all recoveries in this action are for distribution to unsecured creditors. Thirty percent of distributable proceeds are for the benefit of the DIP Lenders.  SUF ¶ 50.  There is no conceivable argument that the DIP Lenders would be unjustly enriched by a recovery for their benefit in this action.  Because the Avoidance Action also is being conducted for the benefit of the DIP Lenders, this is an independent reason why Defendants cannot meet the unjust enrichment element to establish that they are entitled to a constructive trust.

## 2.    There Was No Unjust Pre-petition Conduct by Old GM

The Term Lenders cannot prove any wrongful conduct by Old GM that would justify a constructive trust.  "[T]he few cases in this Circuit in which a constructive trust has been imposed against a bankruptcy estate have found some pre-petition unjust conduct by the debtor relating to the subject property upon which the constructive trust was sought to be imposed." *Geltzer v. Balgobin (In re NBN Balgobin)*, 490 B.R. 13, 23 (E.D.N.Y. 2013).  In New York, "[c]ourts have uniformly held that a constructive trust is a 'fraud-rectifying' remedy, rather than an 'intent-enforcing' one."  *First Cent.*, 377 F.3d at 216.  "That is, a constructive trust should not be imposed merely to give effect to a prior agreement, but instead should be reserved for situations in which a party's misconduct gives rise to its unjust enrichment."  *In re Fetman*, 567 B.R. 702, 706-07 (Bankr. E.D.N.Y. 2017) (citing *Plotnikoff v. Finkelstein*, 482 N.Y.S.2d 730, 73233 (1st Dep't 1984)).  In this case, the Term Lenders seek imposition of a constructive trust, at best, to enforce expectations under the Term Loan Agreement and Collateral Agreement relating to the perfection of collateral.  *See* SUF ¶ 57.  That is precisely the situation where courts have uniformly held that the equitable remedy of constructive trust is unavailable.

Even if the parties' conduct were not governed by contract, Old GM did not engage in conduct that can plausibly be considered inequitable or unjust.  Only JPMorgan could authorize

21

the filing of the 2008 Termination Statement.  As determined by the Second Circuit, JPMorgan, in fact, did authorize the filing of the 2008 Termination Statement by manifesting its assent to the filing to Mayer Brown, counsel for Old GM in a different transaction.  *In re Motors Liquidation Co.*, 755 F.3d at 101.  Moreover, as JPMorgan itself contends, no one at JPMorgan or at Old GM became aware of the filing of the erroneous 2008 Termination Statement until after Old GM filed for bankruptcy.  SUF ¶ 27.  Thus, any claim that Old GM's conduct here was unjust or inequitable is frivolous.

In effect, Defendants' absurd claim is that Old GM behaved unjustly by not notifying JPMorgan that JPMorgan itself had authorized the filing of the 2008 Termination Statement.  Specifically, the Term Lenders contend that Old GM acted inequitably by failing to notify JPMorgan in the quarterly collateral certificates it provided to JPMorgan that the 2008 Termination Statement had been filed.  The testimony of Adil Mistry, a former assistant treasurer at Old GM, who signed the contractually required collateral certificates, establishes the contrary.  Mr. Mistry acted in good faith and exercised reasonable care in signing the certificates.  SUF ¶ 17.  He did not become aware of the filing of the 2008 Termination Statement until years after Old GM filed for bankruptcy when he was subpoenaed in this litigation.  *See* SUF ¶ 27.  There is no basis at all to contend that Old GM engaged in any wrongful conduct.  The filing of the 2008

22

Termination Statement was a mistaken act committed by JPMorgan and cannot possibly serve as the basis for a claim of unjust conduct by Old GM.[6]

## IV.    THE TERM LENDERS CANNOT IDENTIFY THE PROPERTY TO WHICH ANY CONSTRUCTIVE TRUST WOULD ATTACH

In addition to establishing the requirements for a constructive trust under New York law, Defendants must "establish proof of a *res* to which the constructive trust could attach and . . . [must] trace the property." *Cabrini Med. Ctr. v. Padula (In re Cabrini Med. Ctr.)*, No. 09 Civ.14398, 2012 WL 527711, at*5 (S.D.N.Y. Feb. 16, 2012) (quoting *LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 625 (Bankr. S.D.N.Y. 2002)) (constructive trust claim denied due to failure to identify traceable proceeds to which trust should apply).  The party seeking a constructive trust must "trace one's equitable interest to identifiable property in the hands of the purported constructive trustee . . . ." *Wilde v. Wilde*, 576 F. Supp. 2d 595, 605 (S.D.N.Y. 2008).

---

[6] In their pre-motion letter, JPMorgan places significant weight on *Sanyo Elec., Inc. v. Howard's Appliance (In re Howard's Appliance Corp.)*, 874 F.2d 88 (1989), because in that case a constructive trust was imposed to preserve a lien in collateral.  *See* August 7, 2018 JPMorgan letter to Judge Glenn, Adv. Proc. Dkt. No. 1067.  That case was decided under New Jersey constructive trust law, which differs materially from the New York law that applies here.  Even so, rather than support Defendants' position, that case only further demonstrates why the constructive trust remedy is not appropriate here.  In *Howard's Appliance*, the debtor had intentionally moved collateral outside the state shortly before the bankruptcy filing to defeat the creditor's lien and frustrate the secured creditor's interest in the debtor's inventory.  Here, the act that defeated the Term Lenders' lien was authorized by the secured creditor itself.  Moreover, unlike *Howard's Appliance*, there is no evidence that Mr. Mistry or any other officer or employee of Old GM was aware that the 2008 Termination Statement had been filed until well after the bankruptcy petition.

Here, Defendants seek a constructive trust over the Collateral or, alternatively, over the proceeds of the Collateral.[7] SUF ¶¶ 52, 65-66. Even if the elements of constructive trust could be satisfied (which they cannot), it is not possible to impose a constructive trust over the Collateral or its proceeds more than nine years after most of the Collateral was sold in the 363 Sale and the remaining portion of the Collateral was liquidated. SUF ¶ 33. The time for the Term Lenders to have raised the defense was *before* the 363 Sale when it was still possible to identify in the hands of Old GM the *res* upon which they seek to impose a constructive trust. At this point, it is impossible to identify property that would be subject to any such constructive trust, except for property in the hands of New GM, which is not a party to this action; and even if it were possible to identify property upon which to impose a constructive trust, it would be inequitable to allow the Term Lenders to do so now.

---

[7] To the extent that Defendants seek a constructive trust over the Term Loan Payoff, any such contention would be inconsistent with the defense as pled in their answers and should be denied. In any event, the Term Loan Payoff could not be subject to constructive trust because it is a payment from post-petition financing, not a payment from proceeds from the sale of the Collateral. Finally, any recovery against Defendants would necessarily come from the proceeds of the DIP Loan paid to them, and the right to this potential recovery has already been transferred to Plaintiff by bankruptcy court order. SUF ¶ 51. Accordingly, these same proceeds could not possibly be subject to a constructive trust for the benefit of Defendants. They already have been transferred to an actual trust: the Avoidance Action Trust.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its motion

for summary judgment dismissing the Term Lenders' constructive trust defense.

Dated: November 6, 2018

New York, New York

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008
Facsimile: (212) 510-7299

*Attorneys for the Motors Liquidation*
*Company Avoidance Action Trust*