WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000

*Additional Counsel Listed on Signature Pages*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case |
| MOTORS LIQUIDATION COMPANY, *et al.*, | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |
| MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST, by and through the Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee, | Adversary Proceeding |
| | Case No. 09-00504 (MG) |
| Plaintiff, | |
| vs. | |
| JPMORGAN CHASE BANK, N.A., individually and as Administrative Agent for Various Lenders Party to the Term Loan Agreement described herein, *et al.*, | |
| Defendants. | |

**TERM LENDERS' OPPOSITION TO AVOIDANCE TRUST'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**REGARDING EARMARKING DEFENSE**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

RELEVANT BACKGROUND .........................................................................................4

    A.    The DIP Lenders Extended an Incremental $1.5 Billion of Credit to
Ensure Repayment of the Term Loan .....................................................4

    B.    The DIP Credit Agreement and the Interim and Final DIP Orders
Required GM to Repay the Term Loan as a Condition of the DIP
Financing ..................................................................................................5

    C.    Repayment of the Term Loan Did Not Diminish GM's Estate, it
Augmented the Estate ...............................................................................6

ARGUMENT .......................................................................................................................7

I.    THE EVIDENCE SUPPORTS APPLICATION OF THE EARMARKING
DOCTRINE AS A DEFENSE TO THE AVOIDANCE TRUST'S
CLAIMS ................................................................................................................7

    A.    The Earmarking Doctrine Is Equally Applicable to Actions Seeking
to Avoid Prepetition Transfers and Postpetition Transfers.......................9

    B.    The $1.5 Billion Directed to the Term Loan Was Subject to a Clear
Obligation and Was Never Within Old GM's Dispositive Control...........13

        1.    Old GM Was Required to Use a Portion of the DIP Proceeds to
Repay the Term Loan ...................................................................13

        2.    The Deposit of the DIP Proceeds in Old GM's Bank Account
Does Not Defeat Earmarking.........................................................19

    C.    Repayment of the Term Loan with DIP Financing Did Not Diminish
GM's Estate, it Augmented the Estate.....................................................20

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

## Cases

*Ametex Fabrics, Inc.* v. *Just In Materials, Inc.*,
    140 F.3d 101 (2d Cir. 1998)..................................................................... 13

*Begier* v. *I.R.S.*,
    496 U.S. 53 (1990)................................................................................... 12

*Beyer* v. *Cty. of Nassau*,
    524 F.3d 160 (2d Cir. 2008).......................................................................7

*Cooper* v. *Centaur Invs. Ltd. (In re TriGem Am. Corp.)*,
    431 B.R. 855 (Bankr. C.D. Cal. 2010)........................................ 9, 10, 11 n.6

*Glinka* v. *Bank of Vt. (In re Kelton Motors, Inc.)*,
    153 B.R. 417 (Bankr. D. Vt. 1993) .............................................................7

*In re 1031 Tax Grp., LLC*,
    439 B.R. 47 (Bankr. S.D.N.Y. 2010), *supplemented*, 439 B.R. 78.................. 19 n.8

*In re Barefoot Cottages Dev. Co.*,
    2009 WL 2842735 (Bankr. N.D. Fla. July 28, 2009) .......................................... 10

*In re Bos*,
    561 B.R. 868 (Bankr. N.D. Fla. 2016) .................................................................. 10

*In re FBI Wind Down, Inc.*,
    581 B.R. 116 (Bankr. D. Del. 2018) ..........................................9, 10, 11 n.6

*In re Flanagan*,
    503 F.3d 171 (2d Cir. 2007).............................................................. *passim*

*In re Garringer*,
    2006 WL 3519342 (Bankr. W.D. Mo. Dec. 5, 2006) ........................................... 11

*In re Macco Props., Inc.*,
    2016 WL 3031050 (Bankr. W.D. Okla. May 23, 2016) ................................. 11 n.6

*In re Motors Liquidation Co.*,
    460 B.R. 603 (Bankr. S.D.N.Y. 2011) ........................................................ 23 n.11

*In re Network 90 Degrees, Inc.*,
    98 B.R. 821 (Bankr. N.D. Ill. 1989) ..................................................................... 11

*In re Price Chopper Supermarkets, Inc.*,
    40 B.R. 816 (Bankr. S.D. Cal. 1984) ................................................................... 11

*In re Superior Stamp & Coin Co.*,
  223 F.3d 1004 (9th Cir. 2000) ............................................................................ 19

*In re Westchester Tank Fabricators, Ltd.*,
  207 B.R. 391 (Bankr. E.D.N.Y. 1997)......................................................... 10 & n.5

*McCord* v. *Ally Fin., Inc. (In re USA United Fleet, Inc.)*,
  559 B.R. 41 (Bankr. E.D.N.Y. 2016)...................................................................... 7

## Rules and Statutes

11 U.S.C. § 541(a)(1)............................................................................................ 12

11 U.S.C. § 541(a)(7)............................................................................................ 12

11 U.S.C. § 547(b) .......................................................................................... 11, 12

11 U.S.C. § 548(a) .......................................................................................... 11, 12

11 U.S.C. § 549(a) .......................................................................................... 11, 12

Fed. R. Civ. P. 56(a) .............................................................................................. 7

JPMorgan Chase Bank N.A. ("JPMorgan") and the other signatory defendants respectfully submit this memorandum of law in support of their opposition to the Motors Liquidation Company Avoidance Action Trust's (the "Avoidance Trust") motion for partial summary judgment on the Term Lenders' earmarking defense.  Submitted herewith is the Declaration of Joseph C. Celentino (the "Celentino Decl.").

## PRELIMINARY STATEMENT

The earmarking doctrine exists to prevent windfalls.  When a debtor receives funds subject to a clear obligation to pay off a preexisting debt, and the funds are used for that purpose as part of a transaction that does not diminish the estate, the trustee cannot recover those funds for the benefit of unsecured creditors.  The reason for this is simple and compelling:  the unsecured creditors were not harmed by the transaction, and have no legitimate expectation of recovering the funds used to pay the preexisting debt.

The requirements for earmarking are readily satisfied here.  As the evidence shows, Old GM received approximately $1.5 billion from the U.S. Treasury Department ("Treasury") and Export Development Canada (together with Treasury, the "DIP Lenders") subject to a court order — and a clear commercial agreement — requiring those funds to be used to repay the Term Loan.  That the proceeds of the DIP Loan passed through Old GM is of no moment, inasmuch as the portion of those funds necessary to repay the secured debt was earmarked, including by the express terms of the DIP Order, and thus was never available to the unsecured creditors.  The Old GM estate, moreover, was *not* diminished by the Term Loan repayment:  to the contrary, the $1.5 billion was only made available to Old GM because of the need to repay the Term Loan.

In seeking summary judgment, the Avoidance Trust argues for a narrow application of the earmarking doctrine that has no basis in the law, the facts or the equities. Contrary to plaintiff's assertion, earmarking *does* apply to postpetition transactions, and earmarking does *not* require that the funds at issue be placed in escrow or the like rather than a general operating account. *See* Point I.A–B, *infra*. In addition, contrary to plaintiff's assertion, the reservation of rights in the Final DIP Order in no way precludes an earmarking defense.[1] The Final DIP Order merely carved out a potential challenge to perfection from the release of claims granted to the secured creditors elsewhere in the Order. That limited reservation of rights did not affect or impair any other defenses available to the Term Lenders, including reliance on the earmarking doctrine. *See* Point I.C, *infra*.

But there is a bigger picture, overlooked by the Avoidance Trust. The simple reality is that the Avoidance Trust is seeking an extraordinary windfall. The record shows that, if not for the need to repay the Term Loan, the $1.5 billion at issue would not have been extended to Old GM and unsecured creditors would not have received a dollar more. Instead, they would have received the *same* 10% of New GM common stock, along with warrants for an additional 15% of that stock (the "New GM Equity") — valued at between $7.4 and $9.8 billion — that they received anyway (via the GUC Trust). So the repayment of the Term Loan with the DIP Proceeds did not prejudice them.

Indeed, the unsecured creditors received a *greater* recovery than if the Term Lenders had been treated as unsecured creditors in 2009. In the unique circumstances of this case, the DIP Lenders wanted to facilitate New GM's expedited purchase of the Term Lenders'

---

[1]      References to the "DIP Order" or the "Final DIP Order" are to Bankr. Dkt. 2529. References to the "Interim DIP Order" are to Bankr. Dkt. 292.

collateral free and clear of liens, and agreed that they would not recover on the DIP Loan from

the New GM Equity channeled to the unsecured creditors.  Thus, the Term Lenders were repaid

from DIP Loan funds made available at no cost to the unsecured creditors.  Had the Term

Lenders not been repaid from the DIP Loan and instead been treated as unsecured creditors from

the outset, they would have been entitled to a *pro rata* share of the New GM Equity, thus diluting

the recovery of the other unsecured creditors.

And the potential for a windfall is even greater here.  The relief sought by the

Avoidance Trust would in effect amount to a double recovery.  The typical avoidance action

based on defective lien perfection seeks to recapture the value of the secured creditor's collateral,

free and clear of liens, for the benefit of unsecured creditors.  Here, however, that value was

captured some nine years ago, when much of the Term Lenders' collateral, free and clear of the

Term Lenders' liens, was included in the assets sold as a going concern to New GM.  The New

GM Equity paid in exchange for the Term Lenders' collateral and the other assets sold to New

GM was allocated to the unsecured creditors, so they have *already* received the value of the

Term Lenders' collateral (and much more), free and clear of the liens that the Avoidance Trust is

seeking to avoid.

Through this action, the Avoidance Trust is trying to extract a second recovery

from the Term Lenders' collateral.  It is seeking (1) to capture the almost $1.5 billion paid from

the DIP Loan to the Term Lenders in exchange for the release of their lien on the collateral,

while (2) retaining the New GM Equity already paid to the unsecured creditors, a portion of

which is the value paid by New GM for that same collateral.  Avoidance of an unperfected lien is

intended to permit unsecured creditors to benefit from the value of collateral free of the avoided

lien.  Here, plaintiff is seeking to get that value twice:  the price paid for the collateral (the

portion of the New GM Equity attributable to the collateral) plus the amount paid for the release

of the lien on the same collateral (approximately $1.5 billion of DIP Loan proceeds).

Allowing the Avoidance Trust to recover any portion of the $1.5 billion in DIP

Loan proceeds — when the evidence shows that this amount would never have been available to

unsecured creditors, but instead was provided and earmarked solely to free up the collateral to

accomplish the 363 Sale, for the benefit of Old GM's unsecured creditors — would provide

those unsecured creditors with an unprecedented and unjustified windfall. The earmarking

doctrine provides the legal tools necessary to prevent that windfall.

## RELEVANT BACKGROUND

**A.    The DIP Lenders Extended an Incremental $1.5 Billion of Credit to
Ensure Repayment of the Term Loan**

---

[2]       References to "TL SOF" are to the *Term Lenders' Counterstatement of Facts Regarding
Plaintiff's Motion for Partial Summary Judgment Dismissing Defendants' Earmarking Defense*,
filed herewith.

███████████████████████████████████████████████████

███████████

   The DIP Lenders had the final say on how much DIP Financing would be lent,

and were very focused on the DIP sizing analyses because ███████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

**B.  The DIP Credit Agreement and the Interim and Final DIP Orders
Required GM to Repay the Term Loan as a Condition of the DIP Financing**

   Section 5.5 of the DIP Credit Agreement provides that Old GM "shall use the

Loan proceeds only for the purposes set forth in Section 3.20 and *in a manner generally

consistent with the Applicable Budget*." Final DIP Or., Ex. 1 (DIP Credit Agreement) § 5.5

(emphasis added). That budget contemplated that GM would make a $1.463 billion Term Loan

repayment as part of the disbursements scheduled for July 13–19, 2009. TL SOF ¶¶ 59–61.

   If Old GM failed to repay the Term Loan, its use of funds would not have been

"generally consistent" with the Initial Budget and would therefore have required prior consent.

*See* Final DIP Or., Ex. 1 (DIP Credit Agreement) §§ 5.5 & 6.18. Section 6.18 of the DIP Credit

Agreement required Old GM to obtain the DIP Lenders' approval for any modifications to the

Applicable Budget, and the DIP Lenders would not have consented to GM's failure to repay the

Term Loan because, among other things, that would have jeopardized the 363 Sale. TL SOF

¶¶ 62–64.

The DIP Motion[3] requested authority to use a portion of the DIP Financing to repay the Term Loan, and the Interim and Final DIP Orders *required* Old GM to "apply the proceeds of the DIP Credit Facility to repay amounts outstanding under the Prepetition Senior Facilities . . . ."  Final DIP Or. ¶ 19(a); TL SOF ¶¶ 67–68. ███████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████

Three business days after entry of the Final DIP Order, Old GM made the required repayment of the Term Loan.  *Id.* ¶ 73.

### C.  Repayment of the Term Loan Did Not Diminish GM's Estate, it Augmented the Estate

Old GM's unsecured creditors received substantial consideration from the 363 Sale in the form of the New GM Equity.  *Id.* ¶ 76.  The 363 Sale could not have occurred unless the Term Lenders' collateral was available to be transferred free and clear of liens, as the assets sold to New GM included a substantial portion of the Term Lenders' most valuable collateral. *Id.* ¶¶ 81–82. ███████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
█████████████████████████████████████████ And the DIP Lenders agreed to make the DIP

---

[3]      References to the "DIP Motion" are to Bankr. Dkt. 64.

Loan nonrecourse to the New GM Equity; the unsecured creditors' recovery was thus unaffected by the borrowing of the funds that repaid the Term Loan. *See* DIP Or. ¶ 6; TL SOF ¶¶ 79–80.

Had the Term Loan been treated as unsecured, the Term Lenders would have received a share of the New GM Equity, reducing every other unsecured creditor's recovery *pro rata*. The unsecured creditors therefore benefitted from the Term Loan being treated as fully secured and paid from the DIP Loan. TL SOF ¶ 88.

## ARGUMENT

To grant the Avoidance Trust's motion for summary judgment striking the earmarking defense, the Court must find that "there is no genuine dispute as to any material fact and the movant [the Avoidance Trust] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see McCord* v. *Ally Fin., Inc. (In re USA United Fleet, Inc.)*, 559 B.R. 41, 68–71 (Bankr. E.D.N.Y. 2016) (denying cross motions for summary judgment on avoidance claim and earmarking defense where material disputes remained as to whether debtor exercised control over transferred funds); *Glinka* v. *Bank of Vt. (In re Kelton Motors, Inc.)*, 153 B.R. 417, 429 (Bankr. D. Vt. 1993) (denying summary judgment on earmarking where there were "facts in dispute concerning Debtor's control of the [loan] proceeds"). In making this determination, the Court must "construe the facts in the light most favorable to the [Term Lenders] and must resolve all ambiguities and draw all reasonable inferences against the [Avoidance Trust]." *Beyer* v. *Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

## I.    THE EVIDENCE SUPPORTS APPLICATION OF THE EARMARKING DOCTRINE AS A DEFENSE TO THE AVOIDANCE TRUST'S CLAIMS

The crux of the earmarking doctrine, as the Second Circuit "ha[s] long recognized," is "that where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds

do not become part of the estate and the transfer cannot be avoided in bankruptcy." *In re Flanagan*, 503 F.3d 171, 185 (2d Cir. 2007). That is precisely what happened here.

At the time of Old GM's bankruptcy filing, the U.S. and Canadian governments were prepared to provide Old GM with DIP Financing to facilitate its continued operation until the proposed 363 Sale to New GM could occur. To close the 363 Sale, the Term Loan collateral had to be available for transfer to New GM, free and clear of liens, which necessitated that the Term Loan be repaid in full. The DIP Order therefore *required* Old GM to repay the Term Loan from the DIP Loan proceeds: "the Debtors . . . shall apply the proceeds of the DIP Credit Facility to repay amounts outstanding under the Prepetition Senior Facilities." Final DIP Or. ¶ 19(a).

The Avoidance Trust makes three principal arguments in seeking summary dismissal, prior to trial, of the Term Lenders' earmarking defense. As shown in greater detail below, none is persuasive.

*First*, the Avoidance Trust asserts the existence of a *per se* rule against applying the earmarking doctrine to a postpetition transfer. AAT Br. § II.A.[4] But no such rule exists, and such a rule would be inconsistent with the equitable purpose of the earmarking doctrine.

*Second*, the Avoidance Trust argues that because the DIP Lenders disbursed the loan into Old GM's account and did not escrow the amount required to repay the Term Loan, Old GM had dominion and control over those funds and was free to choose not to repay the Term Loan. AAT Br. § II.B.1. That conclusion is patently untrue, as it ignores the express language of the DIP Order that *required* Old GM to pay the prepetition secured debt in full, as

---

[4]    References to "AAT Br." are to *Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgment Dismissing Defendants' Earmarking Defense*, filed in redacted form at Adv. Pro. Dkt. 1129-2.

well as the provisions in the DIP Credit Agreement requiring repayment of the Term Loan.  *See*

Point I.B.1 *infra*.  It also ignores the parties' clear commercial agreement regarding the DIP

Proceeds, as well as the calamitous results that would have ensued had it not been paid.

    *Third*, the Avoidance Trust argues that the Old GM estate was diminished and the

unsecured creditors harmed by the repayment of the Term Loan because, had the DIP Loan

proceeds not been used to repay the Term Loan, those proceeds would have been distributed to

unsecured creditors.  AAT Br. § II.B.2.  But there is no factual basis for this assertion.

    Indeed, all of the evidence is to the contrary:  If not for the need to repay the Term

Loan and release the lien, the DIP Lenders would not have loaned the ~$1.5 billion designated

for the Term Lenders without recourse to the New GM Equity, the Term Loan would have been

an unsecured claim entitled to share proportionately in the New GM Equity, and unsecured

creditors would thus have received a smaller *pro rata* share of the same New GM Equity from

which they have already been paid.  Any award of the proceeds of the DIP Loan used to repay

the Term Loan is therefore a windfall for unsecured creditors.

  **A.**  **The Earmarking Doctrine Is Equally Applicable to Actions Seeking to Avoid
Prepetition Transfers and Postpetition Transfers**

    The earmarking doctrine is based on a simple equitable rule:  "funds subject to a

clear obligation to use that money to pay off a preexisting debt . . . in fact used for that purpose"

simply never "become part of the estate."  *In re Flanagan*, 503 F.3d at 185.  "Reduced to its

essence, the earmarking defense merely holds for the unsurprising conclusion that *where

creditors would not otherwise have any reason or expectation to look to the assets transferred*,"

because the assets were only provided on account of the preexisting debt, "there is no diminution

of the net recovery on account of the earmarked funds and there can therefore be no avoidance."

*In re FBI Wind Down, Inc.*, 581 B.R. 116, 134 n.110 (Bankr. D. Del. 2018) (quoting *Cooper* v.

*Centaur Invs. Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 864 (Bankr. C.D. Cal. 2010) (emphasis added)).  Because "a debtor with earmarked funds is only a conduit to the transfer," *id.* at 134, a payment made in accordance with an earmarking obligation therefore "is held not to constitute a voidable" transfer, *In re Flanagan*, 503 F.3d at 184.

 Despite its facial applicability to the situation at hand, the Avoidance Trust argues that the earmarking doctrine is inapplicable to avoidance of postpetition transfers pursuant to Section 549 of the Bankruptcy Code.  AAT Br. § II.A.  This is wrong, for several reasons.

 *First*, the weight of the case law, including in this Circuit, is to the contrary.  The Eastern District of New York, for example, has held that "the rationale of the earmarking doctrine is equally applicable to actions under both § 547(b) and § 549(a)." *In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391, 398 (Bankr. E.D.N.Y. 1997).[5]

 Far from being "a single case" holding that earmarking applies to postpetition transfers, AAT Br. 13 n.3, *In re Westchester* is consistent with the majority of decisions that have considered the issue.  *See In re Bos*, 561 B.R. 868, 894–95 (Bankr. N.D. Fla. 2016) (considering whether "certain post-petition payments were 'earmarked'"); *In re TriGem Am. Corp.*, 431 B.R. at 863 (Ninth Circuit had established that the "underlying precept" of the earmarking doctrine that "diminishment of property of the estate [is] a prerequisite to all avoidance cases," indicating the doctrine's applicability both pre- and postpetition); *In re Barefoot Cottages Dev. Co.*, No. 09-50089, 2009 WL 2842735, at *4 (Bankr. N.D. Fla. July 28, 2009) ("the critical question of whether there was a transfer of property which could have been a part of the bankruptcy estate

---

[5] The Avoidance Trust contends, without explanation, that *In re Westchester* nevertheless "makes clear that earmarking could not apply to the transfer of proceeds from a post-petition DIP loan." AAT Br. 13 n.3 (citing 207 B.R. at 401).  The case does nothing of the sort.  Rather, the court simply noted that defendant "does not dispute that the DIP Checks constituted property of the estate." 207 B.R. at 401.

available for distribution to all creditors" is equally applicable to post-petition transfers); *In re Network 90 Degrees, Inc.*, 98 B.R. 821, 837 (Bankr. N.D. Ill. 1989) ("While precedent does not clearly show that the earmarking rationale applies to postpetition transfers as well as prepetition transfers, the doctrine logically applies."), *aff'd*, 126 B.R. 990, 992 (N.D. Ill. 1991); *In re Price Chopper Supermarkets, Inc.*, 40 B.R. 816, 820 (Bankr. S.D. Cal. 1984) (rejecting trustee's distinguishing of earmarking cases as involving preferences and not postpetition transfers; "the critical question is whether there was a transfer of property which could have been a part of the estate available for distribution to all creditors.").[6]

  The only case cited by the Avoidance Trust for the proposition that earmarking should not apply in the postpetition context merely contains a one-line statement without analysis. *See In re Garringer*, No. 05-31397, 2006 WL 3519342, at *3 (Bankr. W.D. Mo. Dec. 5, 2006) ("The Court is not aware of any cases that have applied the earmarking doctrine to validate or shield postpetition transfers of estate property, and the Court sees no legal or practical basis to extend its application here."). As explained above, however, that one-line statement is not in accord with other cases that have considered the issue.

  *Second*, nothing about earmarking's underlying principle — that funds subject to an obligation that they be used to pay off a preexisting debt never become part of the estate — is confined to the prepetition context. As the cases cited above recognize, the central question under both Section 547(b) and Section 549(a) is whether there was an impermissible transfer of

---

[6]   *See also In re Macco Props., Inc.*, Nos. 10-16682, 10-16503, 2016 WL 3031050, at *5 (Bankr. W.D. Okla. May 23, 2016) ("assum[ing], without deciding, that an otherwise unauthorized postpetition transfer might be justified by establishing that the transferred funds were effectively earmarked, and that earmarked funds are not estate property"); *see also In re FBI Wind Down*, 581 B.R. at 134 n.109 ("[N]et diminution of expected recovery, . . . is and must be the touchstone of every avoidance action whether under §§ 547, 548 or 549." (quoting *In re TriGem Am. Corp.*, 431 B.R. at 864–65)).

estate property that would have otherwise been available for distribution to all creditors. Section 547(b), like Section 548(a), only allows the trustee to avoid a transfer of "an interest of the debtor in property." 11 U.S.C. §§ 547(b), 548(a). Section 549(a) likewise only allows the trustee to avoid a transfer of "property of the estate." 11 U.S.C. § 549(a).

The Bankruptcy Code elsewhere treats these two limiting phrases as identical, defining "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7). And the Supreme Court has stated that Congress intended Section 547(b)'s reference to "an interest of the debtor in property" to be "coextensive" with its prior reference to "property of the debtor." *Begier* v. *I.R.S.*, 496 U.S. 53, 59 n.3 (1990).

Finally, the Avoidance Trust's assertion that courts have "cautioned against extending the doctrine beyond the co-debtor context" is outdated and unpersuasive. AAT Br. 13. While some opinions dating back to the doctrine's early development limited its applicability to guarantors, this is not — and has never been — the law in the Second Circuit.

In *Flanagan*, the Second Circuit applied the earmarking doctrine beyond the guarantor context, explaining that while "[e]arly applications of the earmarking doctrine concerned situations in which the debtor's obligation was secured by a guarantor . . . [t]oday, the earmarking doctrine has been extended beyond the guarantor context and several courts have held that it applies whenever a third party provides funds to the debtor for the express purpose of enabling the debtor to pay a specified creditor, that is substituting a new creditor for an old creditor." 503 F.3d at 184 (collecting cases).

And this makes sense:  Limiting the earmarking doctrine to the guarantor context does not comport with its underlying rationale — that "where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy."  *Id.* at 185.

**B.    The $1.5 Billion Directed to the Term Loan Was Subject to a Clear Obligation and Was Never Within Old GM's Dispositive Control**

Although the Avoidance Trust does not dispute "that Treasury understood Old GM intended to use a portion of the DIP Financing to pay off the Term Loan," it nevertheless asserts that Old GM "was not required to use the funds for repayment of the Term Loan."  AAT Br. 14.  This assertion is inexplicable.  As noted above and explained below, the record shows that Old GM was required to do just that.  In these circumstances, "draw[ing] all reasonable inferences and resolv[ing] all ambiguities in favor of the non-moving party," *Ametex Fabrics, Inc.* v. *Just In Materials, Inc.*, 140 F.3d 101, 107 (2d Cir. 1998) (citation omitted), a reasonable fact-finder would determine that Old GM had a clear obligation to use the DIP funds to pay a preexisting debt.  At the very least, a trial is required on that issue.

**1.    Old GM Was Required to Use a Portion of the DIP Proceeds to Repay the Term Loan**

The case for earmarking is stronger here than in the typical case.  In the typical case, the debtor's lack of control over funds is often shown by the parties' use of segregated accounts or direct payment to the earmarked creditor.  But resort to this sort of circumstantial evidence is unnecessary here because Old GM was directly required to pay the earmarked funds by orders of the court presiding over its chapter 11 case.

As noted, both the DIP Motion and the Interim and Final DIP Orders reflected the DIP Lenders' requirement that Old GM repay the Term Loan to allow the 363 Sale to go

forward.  First and most importantly, the Final DIP Order provided that "[u]pon entry of this

Final Order, the Debtors . . . *shall* apply the proceeds of the DIP Credit Facility to repay amounts

outstanding under the Prepetition Senior Facilities . . . within three business days of entry of this

Final Order."  Final DIP Or. ¶ 19(a) (emphasis added).  The Interim DIP Order and DIP Motion

reflect the same requirement.  *See* Interim DIP Or. ¶ 18(a) ("On the date of entry of the Final

Order, the Debtors shall be authorized to apply and *shall* . . . apply the proceeds of the DIP

Credit Facility to repay amounts outstanding under the Prepetition Term and Revolving Facilities

as of the repayment date . . . ." (emphasis added)); DIP Mot. ¶¶ 75–78 (requesting authority to

repay the Term Loan in light of the DIP Lenders' "*agree[ment]* to provide sufficient postpetition

financing to repay . . . the Term Loan in full" (emphasis added)).

Contemporaneous hearing testimony ██████████████ also reflect this agreement. *See, e.g.*, Bankr. Dkt. 374 at 40:17–22 (June 1, 2009 Hr'g Tr.) ("[T]here is outstanding today secured debt of almost 6 billion dollars . . . .  As part of this transaction, the U.S. Treasury will, in effect, refinance that debt and take over that debt.  And that will be part of the 33.3 billion dollars of debtor-in-possession financing."); Celentino Decl. Ex. P (UST-AAT-030224) ███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

Despite the clear and overwhelming evidence that the DIP Lenders earmarked a portion of their loan for a mandatory repayment of the Term Loan, the Avoidance Trust argues that the DIP Lenders "did not restrict use of the funds," citing to Section 3.20 in the Representations and Warranties section of the DIP Credit Agreement and out-of-context deposition testimony from Mr. Feldman.  AAT Br. 16.  These citations do not undermine the overwhelming evidence that repayment of the Term Loan was required.  And the Avoidance Trust has no answer to the plain terms of the Final DIP Order, which on its face imposed a specific obligation on Old GM to use the funds advanced to it to repay the Term Loan. Moreover, to the extent, if any, that the Credit Agreement is inconsistent with the DIP Order, the DIP Order Controls.  Final DIP Or. ¶ 22.

In addition, even aside from the Final DIP Order and the multiple court submissions cited above, the evidence will show that from the beginning, Treasury's consistent requirement and understanding was that the Term Loan needed to be repaid in full and removed from the bankruptcy via the DIP Financing. █████████████████████████████

████████████████████████████████████



██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

The DIP Lenders' requirement that Old GM use the funds in accordance with the agreed-to budget is reflected in Section 5.5 of the DIP Credit Agreement. That section contains Old GM's "[a]ffirmative [c]ovenant[]" that "the Loan Parties [*i.e.*, Old GM] shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner *generally consistent with the Applicable Budget*." *See* Final DIP Or., Ex. 1 (DIP Credit Agreement) § 5.5 (emphasis added). Similarly, Section 6.18 of the DIP Credit Agreement required Old GM to obtain the DIP Lenders' approval for any modifications to the "Applicable Budget." *Id.*, Ex. 1 § 6.18. The "Applicable Budget" is the "Initial Budget" found in Annex 1 of the DIP Credit Agreement. *See id.*, Ex. 1 § 1.1. That Initial Budget set forth $5.224 billion of payments that GM was to make during the week of July 13 through July 19, 2009. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████

The Avoidance Trust's position that "[t]he DIP Credit Agreement did not condition the provision of proceeds on payment of the Term Loan," AAT Br. 17, is premised on reading Section 3.20 of the DIP Credit Agreement (the representations and warranties section) in isolation from the rest of the DIP Credit Agreement — most notably the affirmative covenants of Section 5.5 and its express requirement that any expenditure of funds be generally consistent with the Applicable Budget.  Final DIP Or., Ex. 1 (DIP Credit Agreement) § 5.5.  Plainly, Old GM would not have been acting in a manner "generally consistent with the Applicable Budget" if it had failed to disburse ███████████████████████████ in the manner specified by that budget.  The evidence thus shows that Old GM did not simply elect to pay off the Term Loan in its discretion; it was required to do so.

The Avoidance Trust likewise mischaracterizes Mr. Feldman's testimony ███

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

In short, the DIP Orders, the DIP Credit Agreement, and all the evidence discussed above regarding the DIP Lenders' requirements and the parties' commercial understanding, is sufficient to establish the "clear obligation to use that money to pay off a

preexisting debt" required under the earmarking doctrine.  *In re Flanagan*, 503 F.3d at 185.  At

the very least, this evidence would allow a reasonable fact-finder to find such an obligation.

> **2.    The Deposit of the DIP Proceeds in Old GM's Bank Account
> Does Not Defeat Earmarking**

In the face of all this, the Avoidance Trust asserts that the fact that the DIP

Lenders allowed the funds to be deposited into Old GM's bank account means there was no

earmarking of the funds required for the repayment of the Term Lenders.  AAT Br. 17.

But that is simply not the law in the Second Circuit.  "The proper application of

the earmarking doctrine depends not on whether the debtor temporarily obtains possession of

new loan funds, but instead on whether the debtor is obligated to use those funds to pay an

antecedent debt."  *In re Flanagan*, 503 F.3d at 185.  In *Flanagan*, although the debtor "obtained

possession of the funds temporarily," he "never obtained control of the funds in the sense of

being able to control how they were ultimately distributed," and that resolved the control

analysis.[8]  *Id.*; *see also In re Superior Stamp & Coin Co.*, 223 F.3d 1004, 1009 (9th Cir. 2000)

("[T]he proper [earmarking] inquiry is not whether the funds entered the debtor's account, but

whether the debtor had the right to disburse the funds to whomever it wished, or whether [the]

disbursement was limited to a particular old creditor or creditors under the agreement with the

new creditor.").

Nothing in the factual record suggests that Old GM had either the legal authority

or the practical ability to decline to repay the Term Loan after receiving the DIP Proceeds.  To

---

[8]    The only post-*Flanagan* in-Circuit case cited by the Avoidance Trust merely held that
"money in a bank account in the name of a debtor is presumed to be property of the bankruptcy
estate," and distinguished the facts before it from a Fifth Circuit case where "the funds in
question were held by the debtor subject to an 'earmarking' transaction and held for another
party."  *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 70–71 (Bankr. S.D.N.Y. 2010) (citations
omitted), *supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010).

the contrary:  Had Old GM failed to repay the Term Loan with the DIP Proceeds, it would have

placed itself in contempt of the DIP Orders.  Failure to repay the Term Loan also would have

caused the Term Lenders to object to the 363 Sale Motion, thereby depriving Old GM and the

DIP Lenders of the urgently needed, immediate approval of the 363 Sale.  Had Old GM so much

as delayed in repaying the Term Loan, the DIP Lenders would undoubtedly have sought to

enforce the repayment requirement in the Final DIP Order.  ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

**C.    Repayment of the Term Loan with DIP Financing
Did Not Diminish GM's Estate, it Augmented the Estate**

The DIP Lenders' loan of $1.5 billion to pay off the Term Loan did not reduce the

recoveries of Old GM's other creditors.  It enhanced them.  The transfer therefore certainly "did

not diminish the debtor's estate," as the Avoidance Trust claims.  *Flanagan*, 503 F.3d at 185.

---

[9]    Despite the Avoidance Trust's suggestions, there is nothing special about the fact that the
proceeds of the DIP Financing were deposited into what the Avoidance Trust calls Old GM's
"general concentration bank account."  AAT Br. 15.  ████████████████████
████████████████████████████████████████████

As shown, the DIP Lenders advanced the $1.5 billion and required the Term Loan
to be repaid to ensure that the liens on Old GM's assets would be released, permitting the DIP
Lenders in the first instance to obtain a first lien thereon, and then for the most valuable portion
of the collateral to be sold to New GM, free and clear of liens, in the 363 Sale.  *See* TL SOF
¶¶ 81–82.  In other words, there would have been no 363 Sale absent the repayment of the Term
Loan, and the benefits that flowed to the unsecured creditors from that favorable sale — the New
GM Equity — would have been lost.  Whatever might have eventuated thereafter if the 363 Sale
had not closed, the gift to the unsecured creditors from the DIP Lenders of New GM Equity
would almost certainly have been lost, and the unsecured creditors would have recovered less.
*See* Bankr. Dkt. 435, at 7 (May 31, 2009 Declaration of A. Koch attaching AlixPartners
liquidation analysis).

Notwithstanding this, the Avoidance Trust claims that the estate was diminished
because "[the] payment to [the] Term Lenders in full, ahead of other unsecured creditors,
diminished the estate by the amount which they were overpaid due to the Term Loan being
undersecured."  *See* AAT Br. 18.  But the fact that the Term Lenders benefitted from the payoff
of the Term Loan does not equate to diminution of the estate.  If it did, there would be no
earmarking defense, since every defendant that successfully invokes the defense has benefitted
from a transfer that might otherwise be subject to avoidance.  Obviously, it is not the benefit to
the defendant that determines whether a transfer caused a diminution, it is the detriment to the
unsecured creditors caused by a reduction in the assets available for distribution.  Where, as here,
the funds used to pay the defendant were made available to the debtor at no cost to the unsecured
creditors, solely for the purpose of making a payment to the secured creditors, the unsecured
creditors have been deprived of nothing.

Although all the evidence is to the contrary, the Avoidance Trust also premises diminution of the estate on its claim that "to the extent that the DIP loan proceeds had not been used to repay the Term Lenders, they would have been distributed ratably to unsecured creditors and a portion returned to the DIP Lenders." AAT Br. 3. But nothing in the record supports this assertion. Quite to the contrary, all of the evidence shows that ██████████████████████ ██████████████████████████████████████ Based on that evidence, a reasonable fact-finder will readily conclude that, absent the need to repay the Term Loan, the DIP Loan to Old GM would have been $1.5 billion smaller. *See* TL SOF ¶ 85. And had the Term Lenders been treated as unsecured, they would have shared proportionately in the New GM Equity, and thus reduced every other unsecured creditors' recovery *pro rata*. The unsecured creditors therefore benefitted from the Term Loan being treated as fully secured and paid from the DIP Loan.

The evidence also shows that the unsecured creditors' receipt of any distribution at all was the result of ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████ ██ ████ ████████████████████████████



███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

In sum, rather than supporting any argument that unsecured creditors were

harmed by the repayment of the Term Loan, the evidence shows that Treasury decided to

allocate a certain amount of value to the unsecured creditors in the form of the New GM Equity,

and agreed that their claims for repayment of the DIP Loan would not have recourse to the New

GM Equity.[11]  Ultimately, as a result of that effective subordination, approximately $11.2 billion

of the funds lent by Treasury to Old GM through TARP and the DIP Loan (far more than the

$1.5 billion that repaid the Term Loan) went unpaid.  Old GM's borrowing of that amount,

which was not repaid, could not have diminished the estate or the recoveries of unsecured

creditors.  *See* TL SOF ¶¶ 79–88.

Lacking any substantive basis for a claim of diminution, the Avoidance Trust

attempts to equate the reservation of rights in the DIP Order that allowed for a challenge to the

perfection of the Term Loan collateral with "an implicit recognition that the transfer would

---

[11]      In addition to subordinating their claims to the unsecured creditors' receipt of the entire
equity distribution, the DIP Lenders also did not bargain to recover the DIP Loan proceeds paid
to the Term Lenders if an avoidance action was successful.  Years later, the former DIP Lenders
negotiated to receive 30% of the net proceeds of this action in exchange for $15 million of
interest-free litigation funding and giving up their claim to the proceeds, but that is not relevant
to the deal that was actually reached in 2009, in which they clearly limited their recourse to their
"Collateral," a term which excluded proceeds of this avoidance action.  *See In re Motors
Liquidation Co.*, 460 B.R. 603 (Bankr. S.D.N.Y. 2011), *vacated as unripe*, 475 B.R. 347
(S.D.N.Y. 2012).

diminish the bankruptcy estate in the event that it turned out that the Term Loan was not fully

secured." AAT Br. 18.  But nothing about the DIP Order's reservation of rights supports this

assertion; it merely carved a potential perfection challenge out of the release granted to the

secured creditors.  *See* Final DIP Or. ¶ 19(d) (allowing actions "with respect only to the

perfection of first priority liens of the Prepetition Senior Facilities Secured Parties").  Nor did the

DIP Order purport to predetermine or waive any potential defense to such a challenge that a

party might later assert.  There is simply no evidence in the DIP Order or elsewhere that Judge

Gerber considered the applicability of an earmarking defense with respect to the payments

required by the DIP Lenders to be paid to the secured lenders.

The DIP Order, in sum, merely preserved a challenge to perfection of the Term

Lenders' lien so as to allow the 363 Sale to go forward as expeditiously as possible.  It did not

prejudice or affect any defenses to the challenge, including earmarking.[12]  Determination of

whether the structure of the Term Loan supports an earmarking defense requires, as discussed

above, a review of the factual record relating to GM's authority over the DIP Proceeds and

whether the economic realities of the transaction caused any diminution of the bankruptcy estate.

Those are precisely the kinds of questions that were appropriately delayed, when Treasury's

priority was ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

---

[12]      Similarly, when Old GM's chapter 11 plan gave the right to pursue this action to the
Avoidance Trust for the benefit of the unsecured creditors, it necessarily gave that right subject
to any defenses that might be asserted, including those based on the merits of the avoidance
claim, the value of the remaining collateral, and equitable defenses like earmarking.

Finally, the Avoidance Trust argues that the earmarking defense is inconsistent with its litigation funding settlement with the DIP Lenders and Old GM's chapter 11 plan, both of which treat this action and any potential proceeds therefrom as property of the estate.  This is yet another false equation.  While the cause of action and any proceeds therefrom do indeed belong to the estate, this has no bearing on the merits of (or defenses to) the cause of action, and specifically whether the funds which repaid the Term Loan were property of the estate that diminished the unsecured creditors' recovery.

## CONCLUSION

In sum, the factual record supports the conclusion — and, at the very least, a reasonable fact-finder could conclude — that $1.5 billion of the DIP Loan was made for the express purpose of taking out the Term Loan, that those proceeds of the DIP Loan would never have been available for distribution to the unsecured creditors, and that the payment of those proceeds to the Term Lenders did not diminish the estate, thus requiring application of the earmarking doctrine.  The Avoidance Trust's arguments for avoiding trial on the merits of earmarking are unfounded, and its motion should be denied.

Dated:  November 30, 2018
       New York, New York

**JONES DAY**

By:   /s/ Bruce Bennett
    Bruce Bennett
    Erin L. Burke
    555 South Flower Street, 50th Floor
    Los Angeles, California  90071
    Telephone:  (213) 489-3939
    Email:  bbennett@jonesday.com
    Email:  eburke@jonesday.com

    Gregory M. Shumaker
    Christopher J. DiPompeo
    51 Louisiana Avenue, N.W.
    Washington, D.C.  20001
    Telephone:  (202) 879-3939
    Email:  gshumaker@jonesday.com
    Email:  cdipompeo@jonesday.com

**MUNGER, TOLLES & OLSON LLP**

By:   /s/ John W. Spiegel
    John W. Spiegel
    Matthew A. Macdonald
    Bradley R. Schneider
    350 South Grand Avenue, 50th Floor
    Los Angeles, California  90071
    Telephone:  (213) 683-9100
    Email:  john.spiegel@mto.com
    Email:  matthew.macdonald@mto.com
    Email:  bradley.schneider@mto.com

    Nicholas D. Fram
    560 Mission Street, 27th Floor
    San Francisco, California  94105
    Telephone:  (415) 512-4000
    Email:  nicholas.fram@mto.com

*Attorneys for the Term Loan Lenders Listed
on Appendix A to Adv. Pro. Dkt. 241*

Respectfully submitted,

**WACHTELL, LIPTON, ROSEN & KATZ**

By:   /s/ Harold S. Novikoff
    Harold S. Novikoff
    Marc Wolinsky
    Amy R. Wolf
    Emil A. Kleinhaus
    Joseph C. Celentino (awaiting admission)
    51 West 52nd Street
    New York, New York  10019
    Telephone:  (212) 403-1000
    Email:  MWolinsky@wlrk.com

**KELLEY DRYE & WARREN LLP**

By:   /s/ John M. Callagy
    John M. Callagy
    Nicholas J. Panarella
    Martin A. Krolewski
    101 Park Avenue
    New York, New York  10178
    Telephone:  (212) 808-7800
    Email:  jcallagy@kelleydrye.com

**JONES DAY**

By:   /s/ C. Lee Wilson
    C. Lee Wilson
    250 Vesey Street
    New York, New York  10281
    Telephone:  (212) 326-3885
    Email:  clwilson@jonesday.com

*Attorneys for Defendant JPMorgan
Chase Bank, N.A.*

**DAVIS POLK & WARDWELL LLP**

By:    /s/ Elliot Moskowitz
    Elliot Moskowitz
    Marc J. Tobak
    M. Nick Sage
    450 Lexington Avenue
    New York, New York  10017
    Email:  elliot.moskowitz@davispolk.com
    Email:  marc.tobak@davispolk.com
    Email:  m.nick.sage@davispolk.com

*Attorneys for Certain Term Loan Lender
Defendants identified on Exhibit 1 to
Adv. Pro. Dkt. 788*

**KASOWITZ BENSON TORRES LLP**

By:    /s/ Andrew K. Glenn
    Andrew K. Glenn
    Joshua N. Paul
    Michelle G. Bernstein
    Frank S. DiCarlo
    1633 Broadway
    New York, New York  10019
    (212) 506-1700
    Email:  aglenn@kasowitz.com
    Email:  jpaul@kasowitz.com
    Email:  mgenet@kasowitz.com
    Email:  fdicarlo@kasowitz.com

*Attorneys for the Ad Hoc Group of Term
Lenders listed in Appendix A to Adv. Pro.
Dkt. 670*

**ELENIUS FROST & WALSH**

By:    /s/ Daniel M. Hinkle
    Daniel M. Hinkle
    333 S. Wabash Avenue, 25th Floor
    Chicago, Illinois  60604
    Telephone:  (312) 822-3307
    Email:  daniel.hinkle@cna.com

*Attorneys for Continental Casualty Co.*

**HAHN & HESSEN LLP**

By:    /s/ Mark T. Power
    Mark T. Power
    Alison M. Ladd
    488 Madison Avenue
    New York, New York  10022
    Telephone:  (212) 478-7200
    Email:  mpower@hahnhessen.com
    Email:  aladd@hahnhessen.com

*Attorneys for Certain Term Loan Investor
Defendants identified on Exhibit 1 to Adv.
Pro. Dkt. 788*