**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                                          Debtors.

------------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

                                                          Plaintiff,

                       against

JPMORGAN CHASE BANK, N.A., *et al.*,

                                                       Defendants.

------------------------------------------------------------------------x

NOT FOR PUBLICATION

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

Adversary Proceeding

Case No. 09-00504 (MG)

**MEMORANDUM OPINION AND ORDER GRANTING AAT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON CERTAIN ASSETS LOCATED IN
THE SHREVEPORT PLANT AND DENYING THE TERM LENDERS'
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE
SAME ASSETS**

*A P P E A R A N C E S:*

BINDER & SCHWARTZ LLP
*Attorneys for Plaintiff*
28 W. 44th Street, Suite 700
New York, New York 10036-4039
By:   Eric B. Fisher, Esq.
        Neil S. Binder, Esq.
        Lindsay A. Bush, Esq.
        Lauren K. Handelsman, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
51 West 52nd Street
New York, New York  10019
By:    Harold S. Novikoff, Esq.
        Marc Wolinsky, Esq.
        Amy R. Wolf, Esq.

KELLEY DRYE & WARREN LLP
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
101 Park Avenue
New York, New York  10178
By:    John M. Callagy, Esq.
        Nicholas J. Panarella, Esq.
        Martin A. Krolewski, Esq.

JONES DAY
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
250 Vesey Street
New York, New York  10281
By:    C. Lee Wilson, Esq.

       and

555 South Flower Street, 50th Floor
Los Angeles, California  90071
By:    Bruce Bennett, Esq.
        Erin L. Burke, Esq.

       and

51 Louisiana Avenue, N.W. Washington, D.C.  20001
By:    Gregory M. Shumaker, Esq.
        Christopher J. DiPompeo, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Certain Term Loan Lender Defendants identified on Exhibit 1 to Adv. Pro. Docket No. 788*
450 Lexington Avenue
New York, New York  10017
By:   Elliot Moskowitz, Esq.
       Marc J. Tobak, Esq.
       M. Nick Sage, Esq.

KASOWITZ BENSON TORRES LLP
*Attorneys for the Ad Hoc Group of Term Lenders listed in Appendix A to Adv. Pro. Docket No. 670*
1633 Broadway
New York, New York  10019
By:   Andrew K. Glenn, Esq.
       Joshua N. Paul, Esq.
       Michelle G. Bernstein, Esq.
       Frank S. DiCarlo, Esq.

MUNGER, TOLLES & OLSON LLP
*Attorneys for the Term Lenders Listed on Appendix A to Adv. Pro. Docket No. 241*
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071
By:   John W. Spiegel, Esq.
       Matthew A. Macdonald, Esq.
       Bradley R. Schneider, Esq.

       and

560 Mission Street, 27th Floor
San Francisco, California  94105
By:   Nicholas D. Fram, Esq.


HAHN & HESSEN LLP
*Attorneys for Certain Term Loan Investor Defendants identified on Exhibit 1 to Adv. Pro. Docket No. 788*
488 Madison Avenue
New York, New York  10022
By:   Mark T. Power, Esq,
       Alison M. Ladd, Esq.

ELENIUS FROST & WALSH
*Attorneys for Continental Casualty Co*
333 S. Wabash Avenue, 25th Floor
Chicago, Illinois  60604
By:     Daniel M. Hinkle, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Cross-motions for partial summary judgment were filed by defendants, the Term Lenders (the "Term Lenders") (ECF Doc. # 1081),[1] and by the plaintiff, the Motors Liquidation Company Avoidance Action Trust (the "AAT") (ECF Doc. # 1089),[2] each seeking partial summary judgment determining whether the Term Lenders were granted a security interest in fixtures that were already attached to the Old GM plant located in Caddo Parish, Louisiana (the "Shreveport Plant") before execution of the November 29, 2006 collateral agreement between JPMorgan Chase Bank, N.A., Old GM, and Saturn Corporation (the "Collateral Agreement," ECF Doc. # 1092-2).  The parties submitted additional opposition and reply briefs.  (*See* ECF Doc. ## 1101, 1103, 1104, 1105, 1110, 1115, 1119 and 1123.)  The Court has reviewed all the pleadings and heard oral argument on January 10, 2019.

For the reasons explained below, the Court concludes that the Term Lenders were *not* granted a security interest in assets that were already affixed to the Shreveport Plant before the execution of the Collateral Agreement (the "Attached Shreveport Assets").  As a result, the Term Lenders never received a valid security interest in the Attached Shreveport Assets and cannot claim the value of those assets as a defense to the AAT's avoidance claim.  Therefore,

---

[1]     The Term Lenders' Motion is supported by a Memorandum of Law (ECF Doc. # 1082), a Statement of Undisputed Facts (ECF Doc. # 1083), and a Declaration in Support (ECF Doc. # 1084).
[2]     The AAT's Motion is supported by a Memorandum of Law (ECF Doc. # 1090), a Statement of Undisputed Facts (ECF Doc. # 1091), and a Declaration in Support (ECF Doc. # 1092).

the AAT's motion for partial summary judgment is **GRANTED** and the Term Lenders' motion for partial summary judgment is **DENIED**.

## I.    BACKGROUND

This Opinion deals with further issues raised by the mistaken release of the Term Lenders' lien on collateral securing the Term Lenders' $1.5 billion loan to Old GM. While the lien on personal property was mistakenly released, liens remain on fixtures covered by 26 fixture filings to the extent that the fixture filings were made in accordance with the Collateral Agreement and applicable non-bankruptcy law. *See Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, 576 B.R. 325 (Bankr. S.D.N.Y. (2017) (hereafter, "*Motors Liquidation Fixture Opinion*"). Familiarity with that opinion is assumed.

In the *Motors Liquidation Fixture Opinion*, it was undisputed that the Collateral Agreement granted the Term Lenders a security interest in all fixtures located at the three Old GM plants at which 40 representative assets were located. The primary issues were (1) what are fixtures under applicable non-bankruptcy law and (2) how are fixtures valued.[3] The issue here is whether the Collateral Agreement granted (or created) a security interest in the Attached Shreveport Assets. The AAT argues that no security interest could have been created in the Attached Shreveport Assets through the Collateral Agreement, while the Term Lenders argue that the Collateral Agreement created an unperfected security interest in the form of an

---

[3] The one exception to this statement arose over the additional issue of whether the AAT could challenge the Term Loan Lenders' priority of their security interest in fixtures at the Lansing Delta Township Plant. It was undisputed that the collateral agreement granted the Term Loan Lenders a security interest in fixtures, but because the fixture filing misidentified the location of the fixtures, the AAT argued that it had a superior interest to the arguably unperfected security interest of the Term Loan Lenders. The Court agreed with the Term Loan Lenders that the AAT's challenge to perfection was untimely. *See Motors Liquidation Fixture Opinion*, 576 B.R. at 390–95. Here the issue is whether the Term Loan Lenders were granted a security interest in fixtures that were attached to the realty before a fixture filing was made.

unperfected mortgage in the Attached Shreveport Assets. (Transcript of January 10, 2019 Hearing, "Hearing Tr.," ECF Doc. # 1161.)[4] The issue, therefore, ultimately boils down to a matter of contract interpretation. Could the Collateral Agreement, with all material facts construed in a light most favorable to the Term Lenders, possibly create an unperfected security interest in the Attached Shreveport Assets?

Before proceeding with the analysis of that determinative issue, the Court notes that assets incorporated into the Shreveport Plant *after* execution of the Collateral Agreement are not at issue in these motions. Those assets remain subject to a determination of whether they are: (1) within the collateral grant under the Term Loan and Collateral Agreement; (2) fixtures under applicable state law; and (3) covered by a valid, first-priority fixture filing.

### A.     The Term Lenders' Security Interest in Collateral

Under the term loan agreement, dated as of November 29, 2006, and amended as of March 4, 2009 (collectively, the "Term Loan Agreement"), among Old GM and the Term Lenders, Old GM borrowed approximately $1.5 billion (the "Term Loan"). (Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment on Certain Assets Located in the Shreveport Plant, "SUF," ECF Doc. #1091 ¶ 1.) Defendants are among the over 500 Term Lenders that held interests in the Term Loan as of June 1, 2009. (*Id.* ¶ 2.) JPMorgan was the administrative agent and a lender for the Term Loan. (*Id.* ¶ 3.) The Collateral Agreement, also executed on November 29, 2006, created a security interest in much of Old GM's property as security for the Term Loan and provided that JPMorgan, as the

---

[4]     At the hearing, counsel for the AAT argued that "the date of fixture filing is irrelevant. What matters is the date of the collateral agreement. . . . The security interest is created on the date of the collateral agreement. That's what creates the lien . . . and I think everyone agrees . . . that under Louisiana law, you can't even create a security interest in fixtures if they're attached on the date that you seek to create that security interest." (Hearing Tr. at 52–54.) The Term Lender's attorney argues that "The grant in the collateral agreement is expansive. . . . Security interest is granted in fixtures. The definition of "fixture" is something—a good that's attached to the property. If you want to perfect your interest, you have to file a mortgage." (*Id.* at 66.)

6

administrative agent, would complete the additional paperwork necessary to perfect the Term Lender's security interests. (The precise language of the Collateral Agreement will be discussed more fully below; it is the contract that governs the current summary judgment dispute over the Term Lenders' interest in the Attached Shreveport Assets.)

To perfect the Term Lenders' security interests in much of Old GM's property, as contemplated under the Collateral Agreement, JPMorgan caused several UCC financing statements to be filed. (SUF ¶¶ 6–8.) The financing statement perfecting the vast majority of the value of the collateral was a UCC-1 financing statement filed in the State of Delaware (the "Main Lien"). (SUF ¶¶ 6–7.) In addition to the Delaware UCC-1, JPMorgan also caused fixture filings (which are also UCC financing statements) to be filed with respect to 26 of the 42 facilities listed in Schedule 3.12 to the Term Loan Agreement. (SUF ¶ 8.) The Caddo Parish fixture filing was one of these filings; it was filed in Louisiana on February 16, 2007. (SUF ¶ 9.)

After filing the financing statements necessary to perfect the Term Lenders' interests under the Collateral Agreement, JPMorgan and its counsel later mistakenly authorized the filing of a UCC-3 termination statement, which terminated the Main Lien securing the Term Loan. (SUF ¶ 11.) Since the mistaken termination of Main Lien, the parties continue to litigate what security interests the Term Lenders have under the Collateral Agreement. The Attached Shreveport Assets are a small subset of the disputed assets in the ongoing litigation.

### B.    The Adversary Proceeding and the Representative Assets Trial

On July 31, 2009, the Committee filed a complaint initiating this adversary proceeding (the "Original Complaint") against Defendants alleging that the 2008 Termination Statement caused the Main Lien on the Collateral to become unperfected. (ECF Doc. # 1 ¶¶ 433, 440 and

449.) The AAT, as successor to the Committee, litigated the question of whether the 2008 Termination Statement terminated the Main Lien. *In re Motors Liquidation Co.*, 777 F.3d 100 (2d Cir. 2015). On January 21, 2015, the Second Circuit held that, because of the filing of the 2008 Termination Statement, the Main Lien was not effective as of the Petition Date and remanded the case to the Bankruptcy Court to determine the extent to which Defendants were secured parties absent the Main Lien (the "Phase I Decision"). *Id*. at 105. The AAT amended the Original Complaint on May 20, 2015 (the "Amended Complaint"). (ECF Doc. # 91.)

Between April and June 2017, the Court held a trial relating to the fixture classification and valuation of 40 representative assets located at three plants in Ohio and Michigan (the "Representative Assets Trial"). After the conclusion of the trial, the Court issued the *Motors Liquidation Fixture Opinion*.

### C.    The Attached Shreveport Assets and the Caddo Parish Fixture Filing

As of June 1, 2009, 7,801 asset line items in the Shreveport Plant, identified in GM's June 2009 fixed asset ledger (the "eFAST (June 2009)"), had an in-service date before November 29, 2006, the date of the Collateral Agreement. (SUF ¶ 15; Fisher Decl. Ex. F.) The in-service date is the date the asset was capitalized by Old GM and put into production. (SUF ¶ 14; *Motors Liquidation Fixture Opinion*, 576 B.R. at 348.) These 7,801 already-incorporated assets are the Attached Shreveport Assets that are the subject of these motions. The issue to be determined is whether the Collateral Agreement granted the Term Lenders a security interest in the Attached Shreveport Assets.

The parties agree that the Caddo Parish Fixture filing did *not* perfect a security interest in the Attached Shreveport Assets. (*See, e.g.,* Hearing Tr. at 55–66.) As already mentioned, the Caddo Parish Fixture Filing was a UCC financing statement pertaining to the Shreveport

8

Plant that was filed on February 16, 2007, in the Louisiana Secretary of State's master UCC system by recording it with the Clerk of Caddo Parish, Louisiana. (SUF ¶ 9; Fisher Decl. Exs. C and D.) The Caddo Parish Fixture Filing stated that it covered "[a]ll fixtures located on the real estate described in Exhibit A." (Fisher Decl. Ex. C.) Exhibit A identified the Shreveport Plant. (*Id.*) A copy of the UCC financing statement was also recorded in the Caddo Parish real estate mortgage index. (SUF ¶ 10, Fisher Decl. Ex. E.) The parties agree that the Caddo Parish Fixture Filing could not have *perfected* an interest in the Attached Shreveport Assets; the only dispute is whether the Granting Clause in the Collateral Agreement *created or attached* an unperfected security interest, in any form, in the Attached Shreveport Assets.

### D. Term Lenders' Interest in the Attached Shreveport Assets Under the Collateral Agreement

In the granting clause of the Collateral Agreement, Old GM granted the Term Lenders "a security interest in all of the following assets and property now owned or at any time hereafter acquired by [GM] or in which [GM] now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due . . ." (hereinafter, the "Granting Clause"). (SUF ¶ 4; Collateral Agreement at Art. II.) The assets and property identified under the Granting Clause in the Collateral Agreement includes "all Equipment and all Fixtures" and associated documents, general intangibles, books and records, and proceeds and products located at the 42 Old GM Plants identified in Schedule 1 to the Collateral Agreement (the "Collateral"). (SUF ¶ 5; Collateral Agreement at Art. II, Schedule 1.)

While the Granting Clause nominally created a "security interest" in all "Equipment and Fixtures" at the 42 Old GM facilities listed in Schedule 1 to the Collateral Agreement, the Granting Clause's seemingly broad language is limited by several other provisions. First, the

9

Collateral Agreement provides that "Fixtures" must be defined according to the UCC law in effect in the state where the relevant fixtures are located. (Collateral Agreement, Art. I.) Both parties agree that "Fixtures" should be defined according to Louisiana's Chapter 9 for the Attached Shreveport Assets. (*See, e.g.*, Hearing Tr. at 60 (Counsel for Term Lenders summarizes the issue before the Court as "what you're trying to understand is the scope of the grant. The grant is to fixtures as defined under Louisiana law.").) Second, the Granting Clause contains a carve-out, which explains that the Collateral Agreement's grant of a security interest "shall not constitute a grant of a security interest in any asset or property to the extent that: (i) such grant of a security interest is prohibited by any Requirement of Law . . ." (hereinafter, the "Legal Prohibition Carve Out"). (Collateral Agreement at Art. II). Third, the definition of the term "UCC" mandates that any provision of the Collateral Agreement relating to "attachment, perfection, or priority" of a security interest must also be interpreted according to the UCC law effective in the state where the interest is located. (Collateral Agreement at Art. I.)

## II.    DISCUSSION

### A.    Legal Standard for Summary Judgment Motion and Burden of Proof

Rule 56 of the Federal Rules of Civil Procedure applies in an adversary proceeding under Rule 7056 of the Federal Rules of Bankruptcy Procedure. FED. R. BANKR. P. 7056. A motion for summary judgment shall be granted "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); FED. R. CIV. P. 56(a); *see generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the moving party has demonstrated the absence of any factual dispute, the burden shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material

facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

Defendants bear the burden of establishing that the assets which they contend are protected by their security interest were within the grant of collateral under the Term Loan and Collateral Agreement. *See Motors Liquidation Fixture Opinion*, 567 B.R. at 387. Defendants cannot meet their burden because, as explained below, under Louisiana law the Collateral Agreement did not create a security interest in any form in the Attached Shreveport Assets.

### B.    Interpretation of the Collateral Agreement's Granting Clause

The effect of the Collateral Agreement must be determined under Louisiana law. The Term Lenders' security interest exists only to the extent that the Collateral Agreement, interpreted applying Louisiana law, validly created, or attached, any security interests under the Granting Clause. The Term Lenders argue that the Granting Clause should be interpreted broadly, as creating any form of unperfected security interest necessary to allow them to have an interest in the Attached Shreveport Assets under any Louisiana law.[5] The Court concludes that the Collateral Agreement did not create any form of security interest in the Attached Shreveport Assets under any provision of Louisiana law.

The Collateral Agreement grants the Term Lenders "a security interest in" certain enumerated "assets and property," specifically "all Equipment and all Fixtures," and related documents and proceeds. (SUF ¶ 5; Collateral Agreement at Art. II (a)–(d).) The Collateral

---

[5]    Counsel for Term Lenders argued, "The grant in the Collateral Agreement is expansive. . . . What limits it? There's no limitation. Security interest is granted in fixtures. The definition of 'fixtures' is something—a good that's attached to the property. If you want to perfect your interest, you have to file a mortgage." (Hearing Tr. at 66.)

11

Agreement also provides that "Fixtures" should be defined according to Section 9-102 of the UCC as in effect of the date of the agreement. (Collateral Agreement at Art. I.) The Collateral Agreement further specifies that the term "UCC" refers to "the Uniform Commercial Code as in effect in such other jurisdiction [1] for purposes of the provisions hereof relating to such attachment, perfection or priority and [2] for purposes of definitions related to such provisions." (*Id.*) Therefore, the Collateral Agreement requires that Louisiana's Commercial Code must govern both (1) the interpretation of provisions that purport to attach a security interest fixtures and (2) the definition of fixtures. (*Id.*)

Chapter 9 of Louisiana's Commercial Code governs secured transactions. LA. REV. STAT. ANN. § 10:9. Chapter 9, Louisiana's analogue to Article 9 of the UCC, is the controlling law for interpreting the Collateral Agreement with respect to Attached Shreveport Assets. Louisiana's Chapter 9 is substantially based upon Article 9 in the Model UCC. LA. REV. STAT. ANN. § 10:9-101 cmt (c) (La. Official Revision Comments 2001). Several key differences between Chapter 9 and the Model UCC are important here. They prevent the Granting Clause from creating a Chapter 9 security interest in fixtures that were already attached to the Shreveport Facility.

### 1. *The Definition of Fixtures*

The parties agree that Louisiana's Chapter 9 defines "fixtures," as that term is used in the Granting Clause, over assets in Louisiana. Chapter 9 has changed the usual language included in the Uniform Commercial Code with respect to the creation of an interest in "fixtures (component parts)." LA. REV. STAT. ANN. § 10:9-101 cmt (c) (La. Official Revision Comments 2001). Chapter 9 defines fixtures as "goods . . . that after placement on or incorporation in an immovable have *become a component part of such immovable* as provided in Civil Code Articles 463, 465, and 466, or that have been declared to be a component part of an immovable

12

under Civil Code Article 467." LA. REV. STAT. ANN. § 10:9-102(a)(41) (emphasis added). The Model UCC, on the other hand, defines fixtures as "goods that have become *so related* to particular real property that an interest in them arises under real property law. UCC § 9-102(a)(41) (emphasis added). Thus, unlike the UCC that governs in most states, fixtures are equated with "component parts" under Louisiana law. *See, e.g.*, *Serv. One Cable T.V. v. Scottsdale Ins. Co.*, No. 2011 CA 1496, 2012 WL 602209, at *4 (La. Ct. App. Feb. 10, 2012) ("Courts applying Louisiana law have equated the term 'fixture' with the term 'component part' as used in the Louisiana Civil Code . . . ."). As a component part of real property, a fixture becomes an indivisible part of real property and does not retain its chattel or personal property character. *See, e.g.,* A.N. Yiannopoulos, *Of Immovables, Component Parts, Societal Expectations, and the Forehead of Zeus*, 60 LA. L. REV. 1380, 1381 (Summer 2000) (explaining that when a goods are merged into or become a part of real property, "the component parts of the immovable cease to be distinct things; they become parts of a composite thing."). In sum, under Louisiana law, attached fixtures are component parts, and therefore, attached fixtures are real property.

The Term Lenders urge that this is where the analysis of Louisiana law must end.[6] They argue that Louisiana's UCC defines fixtures, but they argue it should not have any relevance in determining whether a security interest in the Attached Shreveport Assets could have been legally created under Louisiana law. This is incorrect for at least two reasons. First, even if the application of Louisiana law is limited to the definition of fixtures, fixtures are defined as real property. This definition, in itself, creates barriers to the Term Lenders ability to create a security interest in the Attached Shreveport Assets under Louisiana's Chapter 9. Second,

---

[6] Term Lenders counsel argued "The Collateral Agreement points you to the UCC. . . . [It] points you to the Louisiana UCC for the definition of the term 'fixture,' period, full stop." (Hearing Tr. at 64.)

13

limiting the analysis of Louisiana law such that it is only relevant to the definition of fixtures, overlooks the Collateral Agreement's explicit requirements under the definition of the UCC and the Legal Prohibition Carve Out.

        2.     *The Creation of an Interest in Fixtures Under Louisiana's Chapter 9*

In addition to looking to Louisiana law for the definition of fixtures, Louisiana law must be used to interpret the Collateral Agreement related to the creation of a security interest in those fixtures—both under the Legal Prohibition Carve Out and under the definition of the UCC. (*See* Collateral Agreement at Art. I–II.) The Collateral Agreement's definition of the UCC provides that if

> by reason of mandatory provisions of law, any of the attachment, perfection or priority of the Agent's and the Secured Parties' security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term 'UCC' shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of provisions hereof relating to such *attachment*, perfection, or priority . . . .

(Collateral Agreement at Art. I.) Therefore, when the Granting Clause of the Collateral Agreement grants a "security interest" in all "Fixtures," the attachment of that interest in fixtures (as defined by Louisiana's Commercial Code) is a provision relating to the attachment of an interest in a UCC good. The definition of UCC therefore requires that Louisiana's Commercial Code be used to analyze the *attachment* of an interest in the fixtures *in addition* to supplying the definition of fixtures. Louisiana's rules on the creation of an interest in fixtures are another unique aspect of Chapter 9.

Chapter 9 employs "a fundamentally different approach to security interests in fixtures, consistent with long established Louisiana legal principles relating to property and chattel mortgages." *See* James A. Stuckey, *Louisiana's Non-Uniform Variations in U.C.C. Chapter*

14

*9*, 62 LA. L. REV. 795, 830 (2002).  Among other things, and in contrast to the Model UCC, Louisiana's Commercial Code *does not permit* a Chapter 9 security interest to be created in goods once they are fixtures.  *See* LA. REV. STAT. ANN. § 10:9-334(a) ("A security interest under [Chapter 9] may not be created in goods after they become fixtures.").  Thus, the Louisiana Commercial Code only permits a Chapter 9 security interest to be created in fixtures where the security interest is granted, *before the goods become fixtures*. *Id*.  Since the Attached Shreveport Assets were already attached to the Shreveport Facility at the time of the Collateral Agreement, the Collateral Agreement's Granting Clause did not create a Chapter 9 security interest in them.

The Term Lenders are correct that Louisiana does not prohibit the creation of *any form* of security interest in attached component parts.  Chapter 9 does not apply to the creation of interests in or liens on real property.  *See* LA. REV. STAT. ANN. § 10:9-109 (d)(11) and 10:9-334 (b); *Diamond Servs. Corp. v. Benoit*, 780 So. 2d 367, 379 (La. 2001) (stating that "security interests affecting real estate or immovable property . . . are excluded from coverage under Article 9 and are subject to other statutory authority.").  While Chapter 9 specifically prohibits the creation of an interest in already attached fixtures, it leaves open the possibility of creating an interest in fixtures under real-property law.  Because *already attached-fixtures* are *defined* as real property under Louisiana law, a security interest in them *must* be created, if at all, under Louisiana's Civil Code sections dealing with the creation of a mortgage rather than under Chapter 9.[7]  At the January 10 hearing, the Term Lenders argued that the Collateral

---

[7]  Both parties agree with this interpretation of Louisiana law.  At the hearing on the issues, the Court asked "if the goods become—if they're attached, they become real property, and the only way you could protect the interest in real property is through the creation of a mortgage.  Is that correct so far?" (Hearing Tr. at 63.)  To this Term Lenders' counsel agreed, stating "So far, correct.  I'm with you so far." (*Id.*)

15

Agreement granted them a security interest in the Attached Shreveport Assets in the form of an unperfected mortgage.[8] This possibility is ruled out for the reasons explained below.

### 3. The Creation of an Interest in Fixtures through Louisiana's Mortgage Law

In Louisiana, creating a security interest in fixtures already attached to real property requires a mortgage. A recorded mortgage attaches a security interest to the fixtures that were attached to real property before a fixture filing was made. *See* LA. CIV. CODE ANN. art. 469 (stating that an encumbrance on realty includes its component parts); *see also* Peter S. Title, *Louisiana Real Estate Transactions*, §13:17 (2 ed. Nov. 2017 Update). A mortgage is an indivisible right that burdens the entirety of the real property with its component parts, including fixtures. LA. CIV. CODE ANN. arts. 3280, 3286; *see also American Bank & Tr. Co. v. Shel-Boze, Inc.*, 527 So. 2d 1052, 1054–55 (La. Ct. App. 1988) (concluding that mortgage encumbered component parts of residences including light fixtures and related electrical paraphernalia connected to the structure). Accordingly, to encumber fixtures, which are indivisible component parts of the realty, a mortgage over the entire real property is necessary.

Since the Collateral Agreement could not create an interest in the Attached Shreveport Assets under Chapter 9, the Term Lenders argue that the Collateral Agreement nonetheless created a security interest in the assets in the form of an unperfected mortgage. They argue that the grant of the security interest was not, in fact, prohibited by Louisiana law because

---

[8] At the hearing, Term Lenders' counsel argued, "[Chapter 9] is not a blanket prohibition against granting of security interests. It's . . . a prohibition against granting them under Chapter 9, which is the equivalent of Article 9 in the UCC. . . . the next provision in the same statute says that . . . [to create an interest, you] have to file a mortgage. So the grant is not prohibited. The grant is permitted under Louisiana law. You can't do it with a UCC-1. You have to do it with a mortgage." (Hearing Tr. at 61). And later stated, "They did it the wrong way, no dispute. Should have been a mortgage. They filed a UCC-1." (*Id*. at 65.) Finally, when the Court asked "Show me anywhere in that Collateral Agreement that hints, suggests, or otherwise that you rely on to say that the Term Lenders were granted a mortgage," Term Lenders' counsel replied "They were granted a security interest. It does not use the M word, agreed." (*Id*. at 64.)

16

mortgages can be created in already-attached fixtures. (*Supra* note 5.) Chapter 9 "does not prevent the creation of an encumbrance upon fixtures under real property law." LA. REV. STAT. ANN. § 10:9-334(b). If the security interest was not *prohibited*, they argue the granting clause is effective to create an interest in the already attached fixtures as a mortgage. However, in much the same way that Louisiana's Chapter 9 prohibits the Collateral Agreement from creating an interest under Chapter 9, Louisiana mortgage law prevents the Collateral Agreement from creating an interest in the form of an unperfected mortgage.

First, the language contained within the four corners of the Collateral Agreement does not suggest an intent to create a mortgage. Neither the Collateral Agreement nor the Term Loan mentions the creation of a mortgage. Rather, the Collateral Agreement requires interpreting provisions relating to the creation of a security interest according to each state's UCC analogue—in the case of the Attached Shreveport Assets, Chapter 9. (Collateral Agreement at Art. I.)

Second, even assuming arguendo that the Collateral Agreement could be construed as evidencing the intent to create a mortgage interest over the Attached Shreveport Assets, Louisiana law would still prohibit the grant of an interest in the assets because the Collateral Agreement does not meet Louisiana's mortgage requirements. To create a mortgage in Louisiana, the mortgage document must, among other things, be in writing, signed by the mortgagor, and "must state precisely the nature and situation of each of the immovables [parcels of real property] over which it is granted." *See* LA. CIV. CODE ANN. art. 3288. These requirements are strictly construed under Louisiana law. *Green v. Torrance Tremayne Green (In re Green)*, 793 F.3d 463, 469 (5th Cir. 2015) (quoting *First Guar. Bank v. Alford*, 366 So. 2d 1299, 1304 (La. 1978)). To meet Louisiana's requirements for the creation of a mortgage,

17

a mortgage document must do one of several things, which may include: (1) metes and bounds descriptions of the real property, (2) description of the real property by reference to the plat of subdivision, or (3) description of the real property by reference to the USPLS system. *See generally* Peter S. Title, La. Practice Series: Real Estate Transactions, Chapter 2 (2d ed. 2017). Additionally, Louisiana case law has specifically ruled out the creation of a purported mortgage interest where the only description of real property is a municipal address. *See Ocwen Loan Servicing, LLC v. Porter*, 248 So.3d 491, 495–96, 498 (La. Ct. App. 2018) (holding purported mortgage "an absolute nullity" where the only description was the municipal address). The Collateral Agreement's most detailed description of the Shreveport Facility, located at schedule 2(c), notes that GM Assembly Shreveport is located at 7600 General Motors Blvd., Caddo Parish, Shreveport, Louisiana, 711299426. (Collateral Agreement at 27.) As the *Ocwen* court explained, the municipal address is insufficient to create a mortgage under Louisiana law; therefore, the Collateral Agreement could not have created a mortgage over the Attached Shreveport Assets.

The recording of the Caddo Parish Fixture Filing in the state's mortgage records does not create a mortgage or other real property interest. A security interest in realty is not created by simply filing a financing statement in the local real estate mortgage records. *See* LA. REV. STAT. ANN. § 10:9-505(b); *see also In re Green*, 793 F.3d at (rejecting condominium association's argument that filing a verified claim of privilege for unpaid association dues in the mortgage records transformed its statutory privilege into a consensual security interest such as a mortgage).

Accordingly, the Term Lenders' security interests created by the Collateral Agreement do not include any real property interests in the Shreveport Plant. Because the grant of a

security interest through the Collateral Agreement was prohibited from creating an interest in the Attached Shreveport Assets under *both* Chapter 9 and Louisiana's real property provisions in the Civil Code, the grant did not create *any form* of security interest in the Attached Shreveport Assets.  Thus, the Term Lenders cannot meet their burden of proving that the Attached Shreveport Assets were within the grant of a security interest in the Collateral Agreement.  As a matter of law, Louisiana law prohibited the creation of an interest in the Attached Shreveport Assets, and therefore, as a matter of law, the Collateral Agreement prohibited the creation of an interest in the Attached Shreveport Assets.

### III.    CONCLUSION

For the foregoing reasons, the Avoidance Action Trust's motion for partial summary judgment is **GRANTED**; the 7,801 assets identified in the eFAST list submitted with the motion are **NOT** part of the Term Lenders' collateral.  The Term Lenders' motion for partial summary judgment is **DENIED.**

**IT IS SO ORDERED.**

Dated:    January 29, 2019
         New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge