**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

In re:                                              **FOR PUBLICATION**

MOTORS LIQUIDATION COMPANY, f/k/a                   Chapter 11
GENERAL MOTORS CORPORATION, *et al.*,
                                                    Case No. 09-50026 (MG)
                                                    (Jointly Administered)

                                        Debtors.

-----------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,
                                                    Adversary Proceeding

                                        Plaintiff,
                                                    Case No. 09-00504 (MG)

                against

JPMORGAN CHASE BANK, N.A., *et al.*,

                                        Defendants.

-----------------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER GRANTING AAT'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING DEFENDANTS' <u>EARMARKING DEFENSE</u>

*A P P E A R A N C E S:*

BINDER & SCHWARTZ LLP
*Attorneys for Plaintiff*
28 W. 44th Street, Suite 700
New York, New York 10036-4039
By:    Eric B. Fisher, Esq.
       Neil S. Binder, Esq.
       Lindsay A. Bush, Esq.
       Lauren K. Handelsman, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
51 West 52nd Street
New York, New York  10019
By:    Harold S. Novikoff, Esq.
         Marc Wolinsky, Esq.
         Amy R. Wolf, Esq.

KELLEY DRYE & WARREN LLP
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
101 Park Avenue
New York, New York  10178
By:    John M. Callagy, Esq.
         Nicholas J. Panarella, Esq.
         Martin A. Krolewski, Esq.

JONES DAY
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
250 Vesey Street
New York, New York  10281
By:    C. Lee Wilson, Esq.

         and

555 South Flower Street, 50th Floor
Los Angeles, California  90071
By:    Bruce Bennett, Esq.
         Erin L. Burke, Esq.

         and

51 Louisiana Avenue, N.W. Washington, D.C.  20001
By:    Gregory M. Shumaker, Esq.
         Christopher J. DiPompeo, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Certain Term Loan Lender Defendants identified on Exhibit 1 to Adv. Pro. Docket No. 788*
450 Lexington Avenue
New York, New York  10017
By:    Elliot Moskowitz, Esq.
         Marc J. Tobak, Esq.
         M. Nick Sage, Esq.

KASOWITZ BENSON TORRES LLP
*Attorneys for the Ad Hoc Group of Term Loan Lenders listed in Appendix A to Adv. Pro. Docket No. 670*
1633 Broadway
New York, New York  10019
By:   Andrew K. Glenn, Esq.
      Joshua N. Paul, Esq.
      Michelle G. Bernstein, Esq.
      Frank S. DiCarlo, Esq.

MUNGER, TOLLES & OLSON LLP
*Attorneys for the Term Loan Lenders Listed on Appendix A to Adv. Pro. Docket No. 241*
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071
By:   John W. Spiegel, Esq.
      Matthew A. Macdonald, Esq.
      Bradley R. Schneider, Esq.


      and

560 Mission Street, 27th Floor
San Francisco, California  94105
By:   Nicholas D. Fram, Esq.


HAHN & HESSEN LLP
*Attorneys for Certain Term Loan Investor*
*Defendants identified on Exhibit 1 to*
*Adv. Pro. Docket No. 788*
488 Madison Avenue
New York, New York  10022
By:   Mark T. Power, Esq,
      Alison M. Ladd, Esq.

ELENIUS FROST & WALSH
*Attorneys for Continental Casualty Co*
333 S. Wabash Avenue, 25th Floor
Chicago, Illinois  60604
By:   Daniel M. Hinkle, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

At the time General Motors Corporation ("Old GM") filed for bankruptcy on June 1, 2009, it was believed that the defendants in this action, JPMorgan Chase Bank, N.A. (the agent bank and a term lender) and various other financial institutions (collectively, the "Term Lenders") held a fully secured claim. Shortly thereafter, it was discovered that a UCC-3 termination statement ("2008 Termination Statement") purporting to terminate the main lien securing the Term Lenders' loan (the "Term Loan") had been filed by mistake in 2008. While this created uncertainty with respect to the Term Lenders' position, all parties involved understood the urgency of restructuring Old GM. Faced with a serious risk that the Term Lenders could hold up completion of a section 363 sale of substantially all of Old GM's assets, the parties agreed to a Final DIP Order by which the United States and Canadian Governments provided over $33 billion in DIP financing to facilitate a section 363 sale and the ongoing chapter 11 cases. (The "Final DIP Order," Case No. 09-50026, ECF Doc. # 2529) The terms of the order authorized Old GM to repay the Term Lenders in full, but it also preserved the right of the Official Committee of Unsecured Creditors of Old GM (the "Committee") to challenge the loan repayment after the fact and to recover all or part of that repayment for the benefit of the estate. The section 363 sale was successfully completed, and Old GM was able to confirm a chapter 11 plan and emerge from bankruptcy.

On July 31, 2009, the Committee filed a complaint initiating this adversary proceeding (the "Original Complaint") against the Term Lenders, alleging that the 2008 Termination Statement caused the main lien on the collateral to become unperfected and seeking to avoid the transfer to the Term Lenders authorized by the Final DIP Order. (ECF Doc. # 1 ¶¶ 433, 440 and 449.) The Motors Liquidation Company Avoidance Action Trust (the "AAT"), as successor to the Committee, litigated the question of whether the 2008 Termination Statement terminated the main lien. *In re*

4

*Motors Liquidation Co.*, 777 F.3d 100 (2d Cir. 2015).  On January 21, 2015, the Second Circuit

held that, because of the filing of the 2008 Termination Statement, the main lien was not effective

as of the Petition Date and remanded the case to the Bankruptcy Court to determine the extent to

which the Term Lenders were secured parties absent the main lien (the "Phase I Decision").  *Id.* at

105.  The AAT amended the Original Complaint on May 20, 2015.   (ECF Doc. # 91.)

The Term Lenders argue that the so-called "earmarking doctrine" provides a complete

defense to the AAT's claim.  The AAT now moves the Court for partial summary judgment

dismissing the Term Lenders' earmarking defense.

The earmarking doctrine is a judge-made equitable doctrine that does not appear in the

Bankruptcy Code.  The doctrine protects a transfer from avoidance where a debtor receives funds

subject to a clear obligation to use the money to pay off a preexisting debt, the funds are in fact

used for that purpose, and the transfer does not diminish the debtor's estate.  If these elements are

proven, the funds do not become part of the debtor's estate and the transfer cannot be avoided in

bankruptcy.  In the usual circumstance where an earmarking defense is recognized, one debt is

substituted for another with the same priority, and, therefore, no other creditors are worse off.

For the reasons explained below, the Court concludes that the defense is not available in

this case.  The DIP financing was not subject to a clear obligation to use the money to pay the

Term Lenders.  While the DIP Order authorized the repayment to the Term Lenders, it was

expressly subject to challenge and recovery based on the extent, validity and priority of the liens

securing the Term Loan.  Furthermore, the repayment to the Term Lenders diminished Old GM's

estate.  Accordingly, partial summary judgment is awarded to the AAT and the Term Lenders'

earmarking defense is dismissed as a matter of law.

# I.   BACKGROUND

On June 1, 2009, Old GM and certain of its subsidiaries filed voluntary Chapter 11

petitions in this Court.  (The "Term Lenders' Counterstatement of Facts," ECF Doc. # 1143-3, at

4.)  On the same day, Old GM filed a motion seeking authority to obtain over $33 billion in

postpetition DIP financing from the U.S. and Canadian governments.  (*Id.*)  The motion requested

authority to use a portion of the DIP financing to repay the Term Loan in full.  (*Id.*)

On June 3, 2009, Old GM entered into the Debtor in Possession Credit Agreement (the

"DIP Credit Agreement," Case No. 09-50026, ECF Doc. # 2529-1).  (*Id.* at 5.)  The DIP Credit

Agreement provided that the proceeds of the DIP financing shall be:

> used to finance working capital needs, capital expenditures, the
> payment of warranty claims and other general corporate purposes of
> the North American Group Members, including the payment of
> expenses associated with the administration of the Cases, in each case,
> subject to Section 6.21, and in the case of the Tranche C Term Loans,
> the Wind-Down; provided that, the North American Group Members
> may not prepay Indebtedness (other than the Canadian Facility in
> accordance with this Agreement) without the prior written consent of
> the Required Lenders.

 (*Id.*)  Further, the DIP Credit Agreement provided that the borrowers "are the ultimate

beneficiaries of this Agreement and the Loans to be received hereunder."  (*Id.* at 7.)

Also, on June 3, 2009, the Office of the United States Trustee appointed the Committee

pursuant to section 1102 of the Bankruptcy Code.  (*Id.* at 5.)  Shortly thereafter, JPMorgan Chase

Bank, N.A. ("JPMorgan"), the administrative agent for the Term Loan, informed the Committee

that an erroneous UCC-3 termination statement relating to the Term Loan's main lien had been

filed in 2008.  This called into question whether the main lien remained perfected.  (*Id.* at 12.)

On June 25, 2009, the Court entered the Final DIP Order, approving the DIP financing.

(*Id.* at 13.)  On June 30, 2009, Old GM paid $1,481,656,507.70 to the Term Lenders in full

satisfaction of all claims arising under the Term Loan Agreement.  (*Id.* at 14.)  As explained

below, however, the Final DIP Order gave the Committee and now the AAT the right to seek to

claw back all or part of the Term Loan repayment if the Court determined that the Term Lenders

were undersecured.  A month after repayment of the Term Loan, the Committee filed a complaint

in this action seeking to avoid the payment to the Term Lenders pursuant to section 549.  (ECF

Doc. # 1.)  After the Committee dissolved, prosecution of this action was transferred to the AAT.

(Term Lenders' Counterstatement of Facts, at 15.)

## II.    LEGAL STANDARD

### A.    Summary Judgment

Federal Rule of Civil Procedure 56, applied in bankruptcy court under Federal Rule of

Bankruptcy Procedure 7056, sets forth the standards for granting summary judgment.  These

standards were recently explained by the district court in *Thomas v. River Greene Constr. Grp.*

*LLC*, No. 17 CIV. 6954 (PAE), 2018 WL 6528493, at *3–4 (S.D.N.Y. Dec. 11, 2018):

> To prevail on a motion for summary judgment, the movant must
> "show[ ] that there is no genuine dispute as to any material fact and
> the movant is entitled to judgment as a matter of law."  Fed. R. Civ.
> P. 56(a).  The movant bears the burden of demonstrating the absence
> of a question of material fact.  In making this determination, the Court
> must view all facts "in the light most favorable" to the non-moving
> party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see*
> *also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).
>
> If the movant meets its burden, "the nonmoving party must come
> forward with admissible evidence sufficient to raise a genuine issue
> of fact for trial in order to avoid summary judgment."  *Jaramillo v.*
> *Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may
> not rely on mere speculation or conjecture as to the true nature of the
> facts to overcome a motion for summary judgment."  *Hicks v. Baines*,
> 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and
> citation omitted).  Rather, the opposing party must establish a genuine
> issue of fact by "citing to particular parts of materials in the record."
> Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255,
> 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) ) (internal quotation marks omitted).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1).

### B.    Avoidance of Postpetition Transactions

The AAT seeks to avoid the $1.5 billion postpetition transfer to the Term Lenders pursuant to section 549 of the Bankruptcy Code. To avoid a postpetition transfer under this section, the AAT must establish that (i) a transfer occurred; (ii) after the commencement of the case; (iii) the transfer was made without Court authority; and (iv) the property transferred was property of the estate. 11 U.S.C. § 549; *see generally In re Belmonte*, 551 B.R. 723, 731-32 (Bankr. E.D.N.Y. 2016). With respect to the fourth prong, "[p]roperty of the estate" includes, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case" as well as "any interest in property the estate acquires after commencement of the case." 11 U.S.C. § 541(a)(1) & (7).

### C.    The Earmarking Defense

The Term Lenders argue that the earmarking doctrine provides a complete defense to AAT's claim. The earmarking doctrine is traditionally raised in response to claims brought under section 547. Under that section, a transfer can only be avoided if it is of "an interest of the debtor in property." 11 U.S.C. § 547(b). The earmarking doctrine recognizes that this element of a preference action is not satisfied where a third party lends money to a debtor for the specific purpose of paying a particular creditor. *Cadle Co., D.A.N. Joint Venture, L.P. v. Mangan (In re*

8

*Flanagan)*, 503 F.3d 171, 184 (2d Cir. 2007) ("The earmarking doctrine applies where a third

party lends money to the debtor for the specific purpose of paying a selected creditor.").  This is

because the loan funds that were "earmarked" to pay a particular creditor effectively never became

part of the debtor's assets.  5 COLLIER ON BANKRUPTCY ¶ 547.03[2][a] (16th ed. 2011) ("A widely

accepted exception to section 547 holds that when a third person makes a loan to a debtor

specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never

become part of the debtor's assets, and therefore no preference is created.").

   The Second Circuit has held that "where a debtor receives funds subject to a clear

obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that

purpose, those funds do not become part of the estate and the transfer cannot be avoided in

bankruptcy."  *Flanagan,* 503 F.3d at 185 (citing *Grubb v. Gen. Contract Purchase Corp.*, 94 F.2d

70, 72–73 (2d Cir.1938)).  However, the Second Circuit has also stated:

> a new creditor provides funds to the debtor with no specific
> requirement as to their use, the funds do become part of the estate and
> any transfer of the funds out of the estate is potentially subject to
> trustee's avoidance powers.  *See Smyth*, 114 F.2d at 42 (finding that
> transfer could be avoided where "nothing indicat[ed] that [the new
> creditor] loaned this $500 on condition that it should be applied to this
> particular creditor.").  This result does not change even where the new
> creditor knows, but does not require, that the new loan funds will be
> used to pay off a preexisting debt.  *See id.*

*Id.*  Finally, the doctrine may only be applied when the transfer in question did not diminish the

debtor's estate.  *Id.* (citing *Glinka v. Bank of Vt. (In re Kelton Motors, Inc.)*, 97 F.3d 22, 28 (2d

Cir.1996).

   The AAT argues that there is no precedent for applying the earmarking doctrine to a

postpetition transfer of DIP loan proceeds, ("AAT's Reply," ECF Doc. # 1146, at 12.), and that no

court in this district has ever applied the earmarking doctrine to a section 549 claim.  ("AAT's

Motion," ECF Doc. # 1129-2, at 19.)  While it appears that the earmarking doctrine has not been

used where DIP loan proceeds were the source of funds for payment, the lack of precedent does

not, in itself, doom the Term Lenders' argument. *Peoples Bank & Tr. Co. v. Burns*, 95 F. App'x

801, 805 (6th Cir. 2004) ("Although the earmarking doctrine has not been applied to post-petition

transfers in the Sixth Circuit, other courts have so expanded its application. . . .  Whether expanded

application of the doctrine is warranted under the facts of this case remains to be determined, but

we are unwilling, at this stage, to answer the question unequivocally in the negative.").  With that

said, the earmarking defense is a judicially created exception that should be narrowly construed.  5

COLLIER ON BANKRUPTCY ¶ 547.03[2][a] (16th ed. 2011) ("Because the earmarking defense is a

judicially created exception to the preference section, it is to be narrowly construed.").  Existing

case law, developed in cases with very different factual circumstances than those presented here,

does not necessarily prescribe all of the limits for application of the doctrine.  As explained below,

the Court concludes that the earmarking doctrine cannot be applied here.

### III.    <u>DISCUSSION</u>

The Term Lenders argue that the earmarking doctrine provides a complete defense to the

AAT's section 549 claim.  The AAT's motion for partial summary judgment seeks to dismiss this

defense as a matter of law.  The AAT's partial summary judgment motion is granted because (A)

the transfer in question was not subject to a clear obligation to pay the Term Lenders, (B) the

transfer diminished the estate, and (C) the Court is not persuaded by the Term Lenders' argument

that the Final DIP Order did not waive or estop the Term Lenders' right to assert an earmarking

defense.

The filing of the erroneous UCC-3 Termination Statement was known by the Term

Lenders and the Committee before the Final DIP Order was negotiated and entered.  The Term

Lenders were able to flex their leverage to threaten the Debtors' ability to complete a prompt

section 363 sale of substantially all of the Debtors' assets unless the Term Lenders were repaid in

full. Repayment, however, was expressly subject to the Committee's right to seek to claw back the amount repaid. The repayment enabled the Term Lenders to recover more than they would have recovered as undersecured creditors, and substantially more than unsecured creditors were likely to recover many years later. The repayment to the Term Lenders violated a fundamental principle of bankruptcy—equality of distribution. Only the clearest statement in the Final DIP Order preserving the equitable earmarking defense would justify such a result.

###    A.    There Was No Clear Obligation to Pay the Term Lenders

The earmarking doctrine only applies where the "debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt." *Flanagan,* 503 F.3d at 185. The Term Lenders argue that the Final DIP Order and the DIP Credit agreement obligated Old GM to use the DIP proceeds to pay the Term Lenders. The AAT claims that the very same documents are evidence that no such obligation existed. While the Term Lenders cite to provisions that may appear to create an obligation to pay the Term Lenders, when these provisions are read in context, it becomes clear that they did not create an obligation sufficient to support an earmarking defense.

The AAT argues that the DIP Credit Agreement conclusively shows that the DIP proceeds were subject to the general use of Old GM, not conditioned upon the payoff of the Term Lenders. (AAT's Mot., at 16-18.) The agreement's "Use of Proceeds" section states that the DIP proceeds "shall be used to finance working capital needs, capital expenditures, the payment of warranty claims and other general corporate purposes of the [Loan Parties] . . . ." (DIP Credit Agreement § 3.20.) The DIP Credit Agreement also states that the Loan Parties to the Credit Agreement, *not the Term Lenders*, "are the ultimate beneficiaries of this agreement and the Loans to be received hereunder." (DIP Credit Agreement §3.20(c).)

11

In response, the Term Lenders argue that the Final DIP Order controls over the DIP Credit Agreement.[1]  The Final DIP Order states, "[u]pon entry of this Final Order, the Debtors shall be authorized to apply and shall apply the proceeds of the DIP Credit Facility to repay amounts outstanding under the Prepetition Senior Facilities . . . within three business days of entry of this Final Order."  (Final DIP Order ¶ 19(a).)  While this statement appears to create a clear obligation to use the DIP proceeds to pay the Term Lenders, when read in context, however, this language cannot give rise to an earmarking defense.

Shortly after Old GM filed for Bankruptcy, JPMorgan informed the Committee that an erroneous UCC-3 termination statement relating to the Term Loan's main lien had been filed in 2008.  (The Term Lenders' Counterstatement of Facts, at 12.)  At that point the Committee began investigating whether the termination statement effectively terminated the Term Loan's main lien. This created a timing issue.  Because Old GM was essentially out of funds to continue operating, Old GM, the U.S. Government, and the Canadian Government agreed that a prompt section 363 sale was required if the business of Old GM was going to be preserved as a going concern.  To accomplish the prompt sale, the Term Lenders' claim had to be accommodated to ensure that the Term Lenders would have no basis to block the section 363 sale until the issue of the effectiveness of the Termination Statement could be resolved.  The Committee, on the other hand, had a clear right to challenge the validity, scope, and value of the Term Lenders' collateral.  Litigation to resolve the effectiveness issue (as demonstrated by the last nine plus years of litigation) would have significantly delayed the section 363 sale.  To resolve these competing interests, the parties agreed that the Term Lenders would be paid in full ahead of all other creditors, and the Committee's right to challenge that payment would be preserved.

---

[1]    The AAT does not dispute this contention.  (AAT's Reply, at 9.)

This agreement is reflected in the terms of the Final DIP Order. Paragraphs 19(a) and (d)

state:

(a) Upon entry of this Final Order, *the Debtors shall be authorized to apply and shall apply the proceeds of the DIP Credit Facility to repay amounts outstanding under the Prepetition Senior Facilities* and all second lien Hedging Obligations (as defined in the Prepetition Revolving Credit Agreement), including principal, accrued and unpaid interest, fees, letter of credit reimbursement obligations (including obligations to cash collateralize undrawn letters of credit) and any other amounts due or owed by the Debtors thereunder within three business days of entry of this Final Order.

. . .

(d) Effective upon entry of this Final Order, the Debtors (on behalf of their estates) and any successor thereto release the Prepetition Senior Facilities Secured Parties and each of their directors, officers, appointees, counsel, advisors and employees serving in any capacity or function, including as a fiduciary, agents, advisors, shareholders, subsidiaries, affiliates, heirs, executors, administrators, attorneys, advisors, successors and assigns from, against and with respect to any and all actual or potential demands, claims, actions, causes of action (including derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity, whether asserted or unasserted, known or unknown, foreseen or unforeseen, arising under the Bankruptcy Code, state law or otherwise now existing or hereafter arising, directly or indirectly related to the Prepetition Senior Facilities and any and all dealings between the Prepetition Senior Facilities Secured Parties in connection with the Prepetition Senior Facilities, *provided, however, that such release shall not apply to the Committee with respect only to the perfection of first priority liens of the Prepetition Senior Facilities Secured Parties* (it being agreed that if the Prepetition Senior Facilities Secured Parties, after Payment, assert or seek to enforce any right or interest in respect of any junior liens, the Committee shall have the right to contest such right or interest in such junior lien on any grounds, including (without limitation) validity, enforceability, priority, perfection or value) (the "Reserved Claims"). The Committee shall have automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Prepetition Senior Facilities Secured Parties not later than July 31, 2009 (the "Challenge Period"), provided, that upon the filing of any adversary proceeding prosecuting any Reserved Claim, the Challenge Period shall be

13

extended with respect to such adversary proceeding through and until a court of competent jurisdiction dismisses such adversary proceeding. The grant of automatic standing shall be without any further order of this Court or any requirement that the Committee file a motion seeking standing or authority to file a motion seeking standing or authority before prosecuting any such challenge.  Any Prepetition Senior Facilities Secured Party accepting Payment shall submit to the jurisdiction of the Bankruptcy Court, it being understood that the respective administrative and collateral agents for the Prepetition Senior Facilities shall have no responsibility or liability for amounts paid to any Prepetition Senior Facilities Secured Parties and such agents shall be exculpated for any and all such liabilities, excluding only such funds as are retained by each such agent solely in its respective role as a lender.

(Final DIP Order ¶ 19 (emphasis added).)

Paragraph 19 of the Final DIP Order provides that Old GM shall use the DIP proceeds to repay the Term Lenders, subject to the AAT's right to challenge that transfer after the fact.  It is nonsensical to read paragraph 19 as creating a clear obligation upon which an earmarking defense can be based.  The earmarking doctrine prevents a transfer from being successfully challenged.  If paragraph 19(a) gave rise to an earmarking defense, then the reservation of rights in paragraph 19(d) would serve no purpose.  It would be a perversion of the equitable earmarking doctrine to apply it in the circumstances of this case absent a clear statement in the Final DIP Order preserving the earmarking defense when DIP Loan proceeds were used to repay the Term Lenders subject to an express challenge provision.  Accordingly, the Court finds that an earmarking defense is not available here.

The Term Lenders also argue that an earmarking defense may be based on section 5.5 of the DIP Credit Agreement.  That section states, "the Loan Parties and their Subsidiaries shall use the Loan proceeds only for the purposes set forth in Section 3.20 and in a manner generally consistent with the Applicable Budget . . . ."  (DIP Credit Agreement § 5.5.)  The budget, along with the accompanying schedules, indicates that Old GM would pay the Term Lenders $1.463

14

billion as repayment for the Term Loan. (The "Term Lenders' Opposition," ECF Doc. # 1143-2, at 21.)

This argument fails for the same reason that the Term Lenders' argument based on paragraph 19(a) fails. To the extent that the DIP Credit Agreement and the Final DIP order are inconsistent, the Final DIP Order controls. The language of the DIP Credit Agreement cannot be read independently of the reservation of rights in paragraph 19(d) of the Final DIP Order. Furthermore, it is typical for a DIP credit agreement to be accompanied by a budget detailing how the debtor plans to use funds. If the Term Lenders' argument with respect to the DIP Credit Agreement were accepted, it would lead to the absurd result that an earmarking defense would be available in almost every case involving a DIP loan. The Court declines to permit such a significant expansion of the earmarking doctrine.

### B.    The Transfer Diminished the Estate

The Term Lenders contend that repayment of the Term Loan not only did not diminish the Old GM estate, it enhanced the estate. (Term Lenders' Opposition, at 20.) The Term Lenders argue that absent the repayment of the Term Loan, there would have been no section 363 sale, which brought the unsecured creditors the benefits of New GM's equity. (*Id.* at 21.) Further, the Term Lenders assert that the unsecured creditors have been deprived of nothing because the funds used to pay the Term Loan incurred no cost to the unsecured creditors. (*Id.*) It is unproductive to speculate what would have happened had the Term Lenders not been paid. At the summary judgment stage, this hypothetical question is beside the point. To survive a summary judgment motion, the Term Lenders must establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1).

The AAT contends that the payment to the Term Lenders in full, ahead of other unsecured creditors, diminished the Old GM estate by the amount which the Term Lenders were overpaid if

the Term Loan was determined to be undersecured.  (AAT's Mot. at 18.)  The AAT further argues

that the Bankruptcy Court—in entering the Final DIP Order and authorizing this action—

implicitly recognized that the transfer would diminish the bankruptcy estate if the Term Loan was

not fully secured.  (*Id.*)  Lastly, the AAT argues that if a portion of the post-petition transfer is

recovered in this action, the recovered funds will "augment" the estate for the benefit of the

unsecured creditors and DIP Lenders.  Accordingly, the AAT argues, the estate has been

diminished to the extent that the claw-back will augment the estate.  (AAT's Reply, at 11.)  While

any recovered funds have the effect of augmenting the estate, this does not mean that the estate

was diminished in the first place.  To determine whether the estate is diminished, the Court needs

to view the transactions in the entirety rather than equate augmentation with diminution.

 The earmarking doctrine will only protect a transfer from avoidance to the extent it did not

diminish the debtor's estate.  *Flanagan*, 503 F.3d at 185.  "[T]o the extent that the debtor offered

its own property as collateral for the [loan], the debtor transferred an interest in its property and

therefore the earmarking defense is not available."  *Glinka,* 97 F.3d at 28; *see also Mandross v.*

*Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1071 (6th Cir. 1987); *Virginia Nat'l Bank v.*

*Woodson (In re Decker)*, 329 F.2d 836, 840 (4th Cir. 1964).

 Case law has established that the refinancing of one obligation with another, when

accompanied by a transfer of the debtor's interest in property as collateral, diminishes the estate.

In *Flanagan*, the debtor paid off an *unsecured* obligation with the proceeds of a family loan on a

*secured* basis.  *In re Flanagan,* 293 B.R. 102, 113 (Bankr. D. Conn. 2003) (emphasis added).  The

Second Circuit agreed with the bankruptcy court's determination that the estate was diminished to

the extent that the family loan encumbered previously unencumbered property of the debtor to

enable the payment.  *Flanagan*, 503 F.3d at 186.  Similarly, in *Decker*, after the debtor had

overdrawn his bank account, his sister lent him $8,000 in exchange for a promissory note, secured

16

by shares of stock. The sister then transferred the money directly to the bank. *Decker*, 329 F.2d at 838. The trustee, who challenged the transfer as a voidable preference, argued that the transfer depleted the estate by $8,000, the entire amount of the loan. *Id.* at 839. The Fourth Circuit disagreed, holding that the estate was diminished to the extent of the value of the collateral given up by the estate to secure the loan. *Id.* at 839–40; *see also DeRosa v. Buildtex Inc. (In re F & S Central Mfg. Corp.),* 53 B.R. 842, 847 (Bankr. E.D.N.Y. 1985) (similar holding in a case brought under section 547(b)).

In determining whether Old GM's estate was diminished, the Court focuses on the following events:

(i)    In 2006, Old GM obtained a $1.5 billion seven-year term loan (the "Term Loan"). Pursuant to a November 29, 2006, Collateral Agreement, the Term Lenders were granted a first priority security interest in certain equipment, fixtures, documents, general intangibles, all books and records and their proceeds. (ECF Doc. # 962, Joint Pretrial Order, ¶ 44.)

(ii)   In 2008, upon the filing of a UCC-3 termination statement in Delaware, the Term Lenders' security interest in personal property at GM facilities was no longer perfected. The termination statement did not affect Term Lenders' security interest in fixtures covered by the twenty-six fixture filings. *In re Motors Liquidation Company*, 576 B.R. 325 (Bankr. S.D.N.Y. 2017).

(iii)  On June 1, 2009 ("Petition Date"), Old GM and certain of its subsidiaries filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York. (The Term Lenders' Counterstatement of Facts, at 4.)

(iv)   Old GM filed a motion seeking authority to obtain over $33 billion in postpetition DIP financing from the U.S. and Canadian governments. (*Id.*) The motion requested authority to use a portion of the DIP financing to repay the Term Loan in full. (*Id.*)

(v)    On June 25, 2009, the Court entered the Final DIP Order.

(vi)   Pursuant to the Final DIP Order, the Term Lenders were granted all property and assets of each of the Debtors, of every kind or type whatsoever, including tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located, all property of the estates of each of the Debtors within the meaning of section 541 of the Bankruptcy Code. (Final DIP Order, at 3.)

17

(vii)    On June 30, 2009, Old GM paid $1,481,656,507.70 of proceeds drawn under the DIP Credit Agreement to the Term Lenders in full satisfaction of all claims arising under the Term Loan Agreement.    (The Term Lenders' Counterstatement of Facts, at 14.)

The release of the security interest following the filing of the Termination Statement renders the Term Lenders undersecured relative to their original position.  Section 544 of the Bankruptcy Code, known as the "strong arm clause," provides that:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simply contract could have obtained such a judicial lien, whether or not such a creditor exists.

11 U.S.C. § 544(a)(1).

As explained by the Second Circuit, section 544 employs a legal fiction:

> The trustee hypothetically extends credit to the debtor at the time of the [bankruptcy] filing and, at that moment, obtains a judicial lien on all property in which the debtor has any interest that could be reached by a creditor. The advantage of this status derives not from the Bankruptcy Code, but from the relevant state law defining creditor rights.

*Musso v. Ostashko,* 468 F.3d 99, 104 (2d Cir.2006) (citing *In re Kors, Inc.*, 819 F.2d 19, 22–23 (2d Cir.1987)).

A chapter 11 debtor in possession has these strong-arm powers.  11 U.S.C. § 1107(a).  Here, section 544(a)(1) gives Old GM[2] the powers and rights of such a judgment lien creditor.  The relevant state law decides the priority of conflicting security interests.  And the applicable Delaware law gives Old GM priority over Term Lenders' unperfected security interest.

---

[2]      Under the Final DIP Order, the Committee has automatic standing and authority to both investigate the Reserved Claims and bring actions based upon the Reserved Claims against the Term Lenders.  (Final DIP Order, at 25.)  After the Committee was dissolved, the prosecution of this action was transferred to the AAT.

18

*See* DEL. UNIFORM COMM. CODE § 9–317(a)(2)(A).  Because of this priority status, Old GM may

use § 544(a)(1) to avoid Term Lenders' unperfected security interest.  *See LMS Holding Co. v.*

*Core–Mark Mid–Continent,* 50 F.3d 1520, 1523 (10th Cir. 1995) ("Thus, in a bankruptcy

proceeding, if the creditor's security interest is not perfected, the creditor 'stands as [a] general

unsecured creditor who must defer to the trustee.'"); *Sommers v. Int'l Bus. Machines,* 640 F.2d

686, 692 (5th Cir. 1981) ("[S]ince West's security interest in the collateral is unperfected, the

trustee was entitled to avoid the obligation under § 544(a)(1)."); *see also* 5 COLLIER ON

BANKRUPTCY ¶ 544.03 ("[T]he bankruptcy trustee may use the strong arm clause to avoid

unperfected security interests in personal property subject to Article 9 of the U.C.C.").  The Term

Lenders' unperfected security interest may be avoided by Old GM.  Thus, the Term Lenders are

undersecured relative to their original position before the filing of UCC-3 termination statement.

　　　The Term Lenders may have been successful in using their threat to thwart the section 363

sale of substantially all of Old GM's assets to get the Term Lenders repaid in full when other

unsecured or undersecured creditors faced an uncertain future and likelihood, which has in fact

resulted, of substantially diminished recoveries in the bankruptcy case.  But the price for being

repaid in full was the certainty of the Committee challenge to the extent, validity and perfection of

the Term Lenders' security interest and the prospect of being required to repay all or part of what

they received, now more than nine years (and still counting) after the Term Loan was repaid.  The

substitution of a secured super-priority DIP Loan for the undersecured prepetition Term Loan

caused a diminution to Old GM's estate to the extent that the DIP Loan encumbered previously

unencumbered property, namely, the property that no longer served as the Term Lenders' security

interest after the release effectuated by the UCC-3 Termination Statement.

　　　The Court refuses to apply a judge-made equitable doctrine to undermine equality of

distribution, one of the most fundamental tenets of bankruptcy law.  *See Begier v. I.R.S.*, 496 U.S.

53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive *pro rata* shares of the debtor's property."); *Bentley v. Boyajian* (*In re Bentley*), 266 B.R. 229, 240 (1st Cir. BAP 2001) ("The principle of equality of distribution has been carried forward as one of the guiding principles of the Bankruptcy Code."). To the extent that the Term Lenders are unsecured, equality of distribution dictates that they receive the same treatment as the unsecured creditors represented by the AAT. Applying the earmarking doctrine to the subject transfers would inevitably prejudice the AAT and lead to inequality of distribution.

What is important in the events that the Court outlined above is that Old GM borrowed from DIP Lenders on a secured super-priority basis and used a portion of the DIP Loan to satisfy an undersecured obligation to the Term Lenders. The undersecured status of the Term Loan was the direct result of the error of the Term Lenders' agent in authorizing the filing of the UCC-3 Termination Statement. That mistake should not be rewarded now by applying a judge-made equitable doctrine that has never been applied in circumstances such as those presented here. The Court concludes that the equitable earmarking doctrine does not apply in the circumstances presented here.

C.    **The Court is Not Persuaded by the Term Lenders' Argument that the Final DIP Order Did Not Waive or Estop the Term Lenders from Asserting an Earmarking Defense**

The Term Lenders argue that the Final DIP Order does not bar or estop the Term Lenders from arguing the earmarking doctrine as a defense to the AAT's avoidance claims. They base their argument on a single bankruptcy court decision in *Musso v. Brooklyn Navy Yard Development Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391 (Bankr. E.D.N.Y. 1997). The court in *Musso* rejected the chapter 7 trustee's argument that the doctrines of waiver and judicial estoppel barred the landlord defendant from asserting an earmarking defense to a

20

section 549 avoidance claim.  The debtor obtained a $100,00 loan from a company owned by family members of the principal of the debtor.  The debtor paid the $100,000 to the landlord to stave off eviction.  The $100,000 loan was unsecured as was the rental obligation that was partially satisfied by the payment.  The court found that the earmarking defense applied, concluding that the defense "provides that the transfer of funds by a third party for the specific purpose of paying the debtor's obligation to an existing creditor is likewise not preferential where the third party is merely substituted as a creditor, and the debtor's assets and net obligations otherwise remain the same."  *Id.* at 397.  While those circumstances were true in *Musso*, they are not true here: one unsecured obligation has not been substituted for another.

The *Musso* trustee argued that the landlord should be precluded from asserting earmarking as a defense by accepting the funds "without questioning the source of the funds," *id.* at 399, attempting to invoke the doctrines of waiver and judicial estoppel in support of the argument.  The court rejected the arguments, concluding that the trustee had a "difficult burden" to sustain the arguments and a waiver "should not be lightly presumed."  *Id.* at 400.  The court also explained that the trustee did not raise the defenses of waiver and judicial estoppel at trial, raising them for the first time in post-trial submissions.  *Id.*

The Term Lenders reliance on *Musso* is misplaced.  First, the secured super-priority DIP Loan did not substitute one unsecured claim for another.  Second, *Musso* did not involve anything comparable to the Final DIP Order, negotiated and entered after the mistaken UCC-3 filing was disclosed and repayment of the Term Loan was expressly conditioned on the right of the Committee to prosecute the claw back action.  In the present circumstances, if the Term Lenders wanted to preserve an earmarking defense, they should have expressly provided for it in the negotiated Final DIP Order

It is also clear that the DIP Lenders did not think they were substituting one postpetition secured super-priority debt for a prepetition undersecured debt. This is dramatically shown by the DIP Lenders argument earlier in this case that DIP Lenders were entitled to recovery from the proceeds of this avoidance action if it was successful. (Case No. 11-09406, ECF Doc. #15.) The parties later resolved this dispute. On July 14, 2016, the DIP Lenders and the Avoidance Trust entered into a Stipulation and Agreed Order, which provided that the DIP Lenders would provide up to $15 million in interest-free financing to the AAT, that the DIP Lenders will be entitled to receive 30% of any net proceeds resulting from the Avoidance Action, and that the unsecured creditors will be entitled to receive 70% of those net proceeds. (ECF Doc. # 13688.) On August 30, 2016, this Court approved the settlement. (ECF Doc. # 13748.)

## IV.    **CONCLUSION**

For the foregoing reasons, the AAT's motion for partial summary judgment is **GRANTED.** The Term Lenders' earmarking defense is dismissed.

**IT IS SO ORDERED.**

Dated:    January 29, 2019
          New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge